1                    UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF OHIO

2                      EASTERN DIVISION

3   -----------------------------X

   ELIZABETH GOODWIN, *As*     :  Case No. 1:15-cv-00210

4   *Administrator of the Estate*  :  Cleveland, Ohio

   *of* BRIAN GARBER,          :

5                         :  Tuesday, February 19, 2019

         Plaintiff,      :  1:06 p.m.

6                         :

       v.                :  **VOLUME 1 - JURY TRIAL**

7                        :  *(Pages 92 - 257)*

   RICHLAND COUNTY, OHIO, et  :

8   al.,                  :

                        :

9         Defendants.     :

   -----------------------------X

10

11         TRANSCRIPT OF JURY TRIAL PROCEEDINGS

12     BEFORE THE HONORABLE WILLIAM H. BAUGHMAN, JR.

13         UNITED STATES MAGISTRATE JUDGE

14

15

16

   Court Reporter:         Donnalee Cotone, RMR, CRR, CRC

17                      Realtime Systems Administrator

                      United States District Court

18                      801 West Superior Avenue

                      Court Reporters 7-189

19                      Cleveland, Ohio 44113

                      216-357-7078

20                      donnalee_cotone@ohnd.uscourts.gov

21

22

23

24   Proceedings recorded by mechanical stenography, transcript

25   produced by computer-aided transcription.

```
1        APPEARANCES:

2

3                On behalf of Plaintiff Elizabeth Goodwin, As
                 Administrator of the Estate of BRIAN GARBER:
4
                         TERRY H. GILBERT, ESQ.
5                        JACQUELINE C. GREENE, ESQ.
                         Friedman & Gilbert
6                        55 Public Square,  Suite 1055
                         Cleveland, Ohio 44113
7                        216-241-1430
                         tgilbert@f-glaw.com
8                        greene@f-glaw.com

9

10               On behalf of Plaintiff Elizabeth Goodwin, As
                 Administrator of the Estate of Brian Garber:
11
                         CHANCE G. DOUGLAS, ESQ.
12                       24100 Chagrin Boulevard
                         Suite 280
13                       Cleveland, Ohio 44122
                         216-292-5200
14                       cdouglas@hoffmanlegalgroup.com

15

                 On behalf of Defendants Richland County, Ohio, et
16               al.:

17                       DANIEL T. DOWNEY, ESQ.
                         MELANIE J. WILLIAMSON, ESQ.
18                       7775 Walton Parkway, Suite 200
                         New Albany, Ohio 43054
19                       614-221-1216
                         ddowney@fisheldowney.com
20                       mwilliamson@fisheldowney.com

21

22       ALSO PRESENT:              Deputy Raymond Jeffrey Frazier
                                    Deputy Andrew Knee
23                                  Deputy James Nicholson

24

25
```

1                          **I N D E X**

2                                                    **PAGE**

3      A JURY OF 8 WAS DULY IMPANELED AND SWORN, FILED ...
       SEPARATELY
4

5      APPEARANCES.......................................  93

6      PRE-JURY COLLOQUY .................................  95

7      PRE-JURY COLLOQUY................................. 189

8      OPENING STATEMENT BY MS. GREENE................... 120

9      OPENING STATEMENT BY MR. DOWNY................... 133

10     DIRECT EXAMINATION OF ELIZABETH GOODWIN........... 143
       BY MR. DOUGLAS
11

12     CROSS-EXAMINATION OF RAYMOND JEFFREY FRAZIER....... 146
       BY MR. GILBERT
13     CROSS-EXAMINATION OF ANDREW KNEE.................. 221
       BY MS. GREENE
14

15     AFTERNOON SESSION.................................  95

16     REPORTER CERTIFICATE............................. 256

17

18

19

20

21

22

23

24

25

|  | 1 | AFTERNOON SESSION, TUESDAY, FEBRUARY 19, 2019 |
|---|---|---|
|  | 2 | AFTERNOON SESSION |
|  | 3 | DEPUTY CLERK:  All rise. |
|  | 4 | - - - |
| 13:06:39 | 5 | (Proceedings reconvened at 1:08 p.m.) |
|  | 6 | (In Open Court - Jury Not Present) |
|  | 7 | (Defendant Present) |
|  | 8 | - - - |
|  | 9 | THE COURT:  All right.  Before we bring in the |
| 13:08:17 | 10 | jury, there is a matter of a demonstrative exhibit. |
|  | 11 | Where do we stand on that? |
|  | 12 | MR. DOWNEY:  Your Honor, I think counsel spoke |
|  | 13 | after the Court left, and what was represented to myself and |
|  | 14 | Ms. Williamson is acceptable.  As long as they cut off where |
| 13:08:36 | 15 | they suggested that they would, we're agreeable for using |
|  | 16 | it. |
|  | 17 | THE COURT:  All right. |
|  | 18 | Ms. Greene, is everybody on the same page? |
|  | 19 | MS. GREENE:  Yes, Judge.  We plan to use only |
| 13:08:47 | 20 | limited parts for the opening, and we discussed all those |
|  | 21 | parts. |
|  | 22 | THE COURT:  Very good.  All right. |
|  | 23 | MR. DOWNEY:  If I may, Your Honor, just |
|  | 24 | briefly. |
| 13:08:52 | 25 | THE COURT:  Yes, you may. |

1        MR. DOWNEY:  And I hate to trouble the Court

2   with preliminary matters, but I know we're going to probably

3   get into witnesses this afternoon.

4        THE COURT:  Yes.

13:08:57  5        MR. DOWNEY:  One of them will, I think, be

6   Deputy Frazier, based on representations by counsel.

7        And I wanted to address one issue regarding the

8   preliminary rulings by the Court, and how they might impact

9   cross-examination.

13:09:08  10        Ms. Williamson and I reviewed the Court's orders, and

11   we read the Court's orders to really limit the relevance of

12   any officer that came and investigated the scene after the

13   fact.

14        And we've read the Court's order to mean that the BCI

13:09:22  15   report does not come into evidence, and we read the Court's

16   decision to mean that that would really negate the relevance

17   of Cory Momchilov testifying in this case as the lead agent

18   for BCI.

19        When we consider Deputy Frazier, who is going to be on

13:09:38  20   the stand today, he has given a number of statements, Your

21   Honor, during the course of the investigation after the

22   fact.

23        So we know that those statements are proper for use as

24   impeachment, if it were to arise that way.  And from the

13:09:49  25   defense perspective, we think the appropriate way to handle

1    that would be to indicate that he had given a statement, but

2    not specifically the statement that was a part of

3    investigation or it was to a BCI agent or something of that

4    nature.

13:09:59  5       And we had planned to proceed like that with, for

6    instance, Matt Garber, who also gave a statement to BCI

7    through the course of their investigation.

8         But after speaking to Mr. Gilbert, we just had some

9    concerns from the defense side, and wanted a brief

13:10:10  10   clarification from the Court as to whether or not

11   Cory Momchilov is even, you know, able to bring relevant

12   testimony in light of the ruling that he can't bring in

13   anything about his conclusions.

14        And we wanted to understand if he's actually available

13:10:25  15   to testify about other things that he did in carrying out

16   the investigation, because, I think, Mr. Gilbert intends to

17   call him for such matters; and we think that would be

18   prejudicial under 106, to the defense, to suggest that he

19   conducted an investigation, but to not relay the results of

13:10:41  20   it.

21             THE COURT:  Mr. Gilbert.

22             MR. GILBERT:  Well, he is relevant because he

23   is the lead agent in the Bureau of Criminal Investigation.

24   He is going to explain how BCI was called in to do the

13:10:58  25   investigation, how they collected evidence, how they dealt

1    with the crime scene, who was there.

2         He's going to talk about his report.  He's not going

3    to ask -- I'm not going to ask him about anything regarding

4    any opinions as to the ultimate issue of fact, that he did

13:11:24  5    the investigation.  There were things that he did.  There

6    were forensic things that were done.

7         All of it's in the report.  None of it is

8    controversial.  To give the jury an understanding of how

9    this investigation led, you know, to where we're at.

13:11:42 10         So I don't -- I mean, my understanding of your order

11   was that the findings of the BCI report would not be

12   admitted.

13                   THE COURT:  Well, certainly, they will not be

14   admitted.

13:11:57 15         Now, this idea that there was an investigation, and

16   then to leave it at that, is that going to cause some

17   confusion, speculation on the part of the jury?

18         They investigated it.  To what end?

19         And why don't we have some information as to what the

13:12:13 20   conclusions were?

21                   MR. GILBERT:  I'm sorry.  I don't understand.

22                   THE COURT:  All right.  Well, perhaps I wasn't

23   clear.

24         You have all this testimony about an investigation.

13:12:23 25   You have no testimony, or the conclusions themselves are not

1    put into evidence.

2         Doesn't that leave the jury hanging as to why was this

3    done?

4         There's an investigation, and so what?

13:12:43  5              MR. GILBERT:  Well, there's an investigation

6    where evidence was collected, evidence was tested.  The

7    period of time in which the crime scene was under control,

8    the deputies that were there -- or some of the deputies that

9    were there, we have questions about the remote that they

13:13:11  10   took from the crime scene that no other people from the

11   sheriff's department saw.

12        There is a report on DNA evidence.  There's some

13   fingerprint stuff that's not in controversy.  And

14   they -- they conducted interviews, which will be used --

13:13:31  15   some of which might be used in impeachment.

16              THE COURT:  For impeachment?

17        Well, certainly, they'd be relevant for impeachment.

18        Is there some way you can talk about what he did at

19   the crime scene without indicating that there ended up being

13:13:47  20   a formal report and a finding?

21              MR. GILBERT:  I mean --

22              THE COURT:  Let's let him finish.

23              MR. GILBERT:  We're not asking for any

24   conclusions.  Okay?

13:13:58  25        We want to know -- we want the jury to understand that

there's an investigation here.  That there were certain

protocols that were followed.  That -- what they did in this

investigation.  So -- because then they understand how this

evidence gets into trial.

13:14:15  I'm not willing to stipulate to any of that.  I think

he was on the scene.  He made some certain investigative

decisions as to who to talk to, where -- what evidence to

collect, and ordered certain testing to be done of certain

evidence.

13:14:40  I mean, I don't know what else we can do.

Every case that I've had as a criminal case, a

detective has taken the stand and gone over the

investigation.

We also believe that there was some contamination of

13:14:56  the crime scene.

So these are all relevant for the jury to determine

the facts in this case, and whether it was a -- it was --

what the investigation revealed.

Ms. Greene wants to --

13:15:09  MS. GREENE:  And, Judge, I'd just add that

when we filed our motions in limine, specifically what we

were seeking to exclude was conclusions of any

investigations.  BCI doesn't make findings on justifiable

shootings.

13:15:21  But in addition to that, what we moved to exclude was

1    that the reports themselves would not come in, but not

2    necessarily that factual issues processed through the

3    investigation could not be discussed.

4              THE COURT:  Mr. Downey.

13:15:36  5              MR. DOWNEY:  If I may, Your Honor.

6         And, again, the Court's point about how to use the

7    interviews for impeachment is a good one, and that's why in

8    the past, when this has arisen, I think that you can use it

9    as a statement from the witness that was given in the past

13:15:51 10   without necessarily disclosing who it was given to or when.

11        You know, from the defense perspective, grand jury, as

12   an example, you know, we can't -- we can't tell the jury the

13   grand jury no billed these officers, but then saying, Hey,

14   here's your grand jury statement, using it for impeachment,

13:16:08 15   I don't think would be proper, unless you told them that

16   there was no bill.

17             THE COURT:  Right.  I would agree that there

18   should be no reference to the fact that there was a grand

19   jury inquiry, and that it can be handled.  You gave a

13:16:20 20   statement at a certain time, and not indicate that it was

21   during a grand jury.

22             MR. DOWNEY:  So I would extrapolate,

23   Your Honor, if I may, and continue with respect to the BCI

24   agent.

13:16:32 25        The Court has quite properly, I think, addressed this

1    case as what occurred in the room --

2                    THE COURT:  Right.

3                    MR. DOWNEY:  -- in the 45 seconds to a minute.

4    The three officers are all available to testify.  They will

13:16:42 5    testify.  The evidence has been gathered with respect to

6    what happened.  There are multiple statements from each of

7    the officers that could be cross-examined.

8          Mr. Momchilov came after the fact.  Conducted an

9    investigation, the results of which are not being provided

13:16:56 10    to the jury.  That would necessarily be prejudicial to these

11    three officers, and, frankly, would not drive the case

12    forward in any way.

13          So, in a way, it would be bringing in, you know,

14    opinions as to what the officer chose to do in the

13:17:08 15    investigation.  That doesn't affect what Deputy Frazier did

16    at the time of shooting.

17          And from our perspective, when we read the order from

18    the Court, we thought it was clear that none of this would

19    come in.  And, frankly, we agree with the Court's ruling on

13:17:23 20    that issue.  We think that either none of it should come in,

21    or all of it should come in.

22                    THE COURT:  Well, the fact that the remote was

23    tested, there were no fingerprints, there was no DNA, I

24    think that's certainly probative here.

13:17:38 25                    MR. DOWNEY:  And certainly, they could bring

1    that up.  You know, we could do that through a stipulation.

2    But also what I'd say to the Court is that Matt Garber

3    observed Brian Garber with something underneath his shirt in

4    the room where the shooting occurred shortly before that,

13:17:51  5    which establishes that he had some object underneath his

6    shirt that looked like a gun.  Whether it was a remote or

7    something else, there was some object underneath his shirt.

8        So the idea that because there was no DNA or

9    fingerprints on the remote, that's not really probative of a

13:18:04 10    major issue of the case.  All the testimony is that this

11    gentleman, Brian Garber, had something under his shirt.

12        So I think it's confusing to the jury to suggest that

13    somehow suggests he didn't have anything under his shirt,

14    when his own father testified that he did that very night.

13:18:18 15            THE COURT:  Well, again, these are contested

16    issues of fact.  I think the fact that there was -- no DNA

17    was found on it, that there were no fingerprints found on

18    it, that's probative, and that can be brought up.

19        And if this witness is the one who says that, I was

13:18:36 20    called to the scene; I did certain things; I collected this;

21    certain tests were run; here's what we found, that seems to

22    be fine.  But there's a very fine line here.

23            MR. GILBERT:  Yeah.  Well --

24            THE COURT:  Very fine line getting into this

13:18:52 25    idea that there was some formal investigation.  Using those

1      terms, "formal investigation," if someone comes on the scene

2      and is asked to gather some evidence, then -- and they do

3      that and they test the evidence and there are certain

4      findings with respect to that evidence -- fact findings with

13:19:11  5      respect to that evidence, that seems -- I don't know what

6      your ultimate theory is going to be with respect to that

7      remote.

8          But it appears that you're going to argue that because

9      there was no DNA, and because there's no fingerprints,

13:19:22  10      there's some questions there.

11            MR. GILBERT:  And also, they were very

12      concerned about the so-called pop sound that justified the

13      shooting for all three of them.  And they did some testing

14      on the cell phone to see if it had an app that made a loud

13:19:46  15      sound.

16            THE COURT:  Well, there was --

17            MR. GILBERT:  And they could not find

18      anything -- they could not finding anything that even came

19      close to a gunshot sound that could have produced this

13:19:58  20      so-called pop.

21            THE COURT:  Is this the --

22            MR. GILBERT:  This is the essential theme of

23      our case.

24            THE COURT:  Is this the same witness?

13:20:04  25            MR. GILBERT:  Yes.

1          THE COURT:  All right.  This is the first I'm

2    hearing about the cell phone.

3          MR. DOWNEY:  Your Honor, from the defense

4    standpoint, it would be prejudicial to have Cory Momchilov

13:20:15   5    come in and testify whether he could recreate a pop sound

6    when the officers all testified that they heard one.  It

7    could be literally anything that causes the sound.

8        I direct the Court to the oral argument in the Sixth

9    Circuit, where Judge Steger noted that in the argument

13:20:25  10    section.  It could be anything.

11        So the idea that, Hey, Cory Momchilov wasn't able to

12    determine whether there was a pop sound in the room, that's

13    irrelevant.  All the officers heard it.  And, frankly, it

14    could of been any sort of sound like that.

13:20:40  15          MR. GILBERT:  Well, it's obvious --

16          THE COURT:  Whoa.  Whoa.  Whoa.  One at a

17    time.

18        All right.

19          MR. GILBERT:  That's his argument in the case.

13:20:44  20    His argument in the case has no bearing.  We got to get the

21    facts out to the jury.

22          THE COURT:  All right.

23          MR. GILBERT:  This was an investigator that

24    saw the issue of a "pop" a critical part of this case.

13:20:57  25          THE COURT:  All right.  Mr. Gilbert, here's

1    what I'm going to come down, and here's a fine line here.

2        This witness came in, gathered certain evidence, made

3    certain tests.  There's findings from those tests.  Those

4    can come in.

13:21:12  5        I don't want any references to any formal

6    investigation to suggest in any way that there's a report

7    out there that this jury isn't going to see.  But if there

8    are other tests that were run and observations made at the

9    scene when he came in, then he can testify on that.

13:21:27 10        But this is very, very, limited.  So don't get into

11    the gray areas here.

12                MR. GILBERT:  We'll confine it to that --

13    those areas.

14                THE COURT:  All right.

13:21:36 15                MR. GILBERT:  Thank you.

16                THE COURT:  And as far as you -- yes.  He

17    could stipulate to that, but it's up to him how he tries his

18    case.

19                MR. DOWNEY:  I agree with that, Your Honor,

13:21:47 20    ultimately.  Although, I think a stipulation would benefit

21    the jury and the Court because it would reduce the

22    opportunity for prejudices to the defense.

23                THE COURT:  Well, that -- you're right about

24    that.  And we'll see how close Mr. Gilbert or Ms. Greene

13:22:03 25    comes to that line.

1              I don't want to -- I don't want to see that line

2       transgressed.  And if we're getting to the point where

3       there's any suggestion that there's a formal investigation

4       or a report, then that will not be admitted, and we'll

13:22:18  5       back -- and we'll back off from that.

6              Understood?

7                      MR. DOWNEY:  And if I may, Your Honor, just

8       briefly.

9              From the defense perspective, if we feel a door has

13:22:28 10       been opened to that, you know, I think it would be,

11       obviously, our client's interest to pursue that line of

12       inquiry further regarding findings --

13                      THE COURT:  Well, if it's merely --

14                      MR. DOWNEY:  -- if they open the door.

13:22:37 15                      THE COURT:  You can -- you can -- yes.  You

16       can talk about the findings, but not get into the fact that

17       there was a formal investigation or that there was a report.

18       Certainly, if you open the door to findings, then you can

19       question the findings and their accuracy, and whether or not

13:22:54 20       the inferences that Mr. Gilbert is saying can be drawn from

21       those findings are reasonable inferences or not.

22              But we're going to stay away from formal

23       investigation, and we're going to stay away from any

24       reference to a report.

13:23:09 25                      MR. DOWNEY:  Thank you, Your Honor.

1          THE COURT:  That's my ruling.

2          All right.  Are we ready to have the jury brought

3    back?  Any other matters?

4          MR. GILBERT:  Are you sure?

13:23:21  5          MR. DOWNEY:  No other matters, Your Honor.

6          Thank you.

7          THE COURT:  All right.  You're playing nicely.

8          MR. GILBERT:  We also play nicely.

9          THE COURT:  Please continue to do so.  All

13:23:33  10    right.

11          Mr. DeVan, bring in the jury.  And I will give them

12    some preliminary instructions, and then you'll each

13    have . . .

14          DEPUTY CLERK:  All rise.

13:25:06  15          MR. GILBERT:  One more.

16          Remember, when we talked about the cause of death, was

17    the result of the three deputies --

18          THE COURT:  Right.  Well, I think --

19          MR. GILBERT:  -- firing.

13:25:19  20          THE COURT:  I think for purposes of where

21    we're at now, there's still no issue as to proximate cause.

22          MR. GILBERT:  Are we still at the same place?

23          MR. DOWNEY:  Yes.

24          THE COURT:  Yes.

13:25:27  25          MR. GILBERT:  Since we dismissed the other

1    two.

2                    THE COURT:  Right.

3                    MR. DOWNEY:  Right.

4                    THE COURT:  We're all good.

13:25:33  5                    DEPUTY CLERK:  All rise for the jury.

6                    (The jury entered the courtroom.)

7                    DEPUTY CLERK:  Please be seated.

8                    THE COURT:  Members of the jury, you have now

9    been sworn, and I will give you some preliminary

13:26:16 10    instructions to guide your participation in the trial.

11         It will be your duty to find the facts from the

12    evidence.  You and you alone are the judges of the facts.

13    You will then have to apply those facts to the law as I will

14    give it to you.  You must follow that law, whether you agree

13:26:37 15    with it or not.

16         Nothing the Court may say or do during the course of

17    the trial is intended to indicate what your verdict should

18    be.

19         The evidence from which you will find the facts will

13:26:50 20    consist of the testimony of witnesses, documents received as

21    exhibits, any facts that the lawyers agree or stipulate to,

22    and any facts that the Court may instruct you to find.

23         Certain things are not evidence and must not be

24    considered as such by you.

13:27:08 25         These are:  One, the statements, arguments, and

1    questions by the lawyers are not evidence.

2        Two, objections to questions are not evidence.

3    Lawyers have an obligation to their client to make an

4    objection when they believe evidence is being offered that's

13:27:28  5    improper under the rules of evidence.  The objections serve

6    as a help to the Court.

7        As jurors, you should not hold objections against

8    either the plaintiff or the defendant, or feel that either

9    side is trying to keep something from you.  And you should

13:27:44  10    not be influenced by the objection or by the Court's ruling

11    on it.

12        If the objection is sustained, ignore the question.

13    If it's overruled, treat the answer like any other.  If you

14    are instructed that some item of evidence is received for a

13:27:59  15    limited purpose only, you must then follow that instruction.

16        Testimony that the Court has excluded or told you to

17    disregard is not evidence and must not be considered.

18        Anything that you have seen or heard outside the

19    courtroom is not evidence and must be disregarded.

13:28:20  20        You are to decide the case solely on the evidence

21    presented here in the courtroom.

22        There are two kinds of evidence, direct and

23    circumstantial.  Direct evidence is direct proof of the

24    facts, such as the testimony of an eyewitness.

13:28:35  25        Circumstantial evidence is proof of facts from which

1    you may infer or conclude that other facts exist.

2         For an example, if a witness testified that he looked

3    out on a window overlooking Public Square and saw people

4    walking on the square with open umbrellas, you may infer

13:28:56  5    from that testimony that it was raining at the time.

6         I will give you further instructions on these, as well

7    as other matters, at the end of the case, but keep in mind

8    that you may consider both kinds of evidence.

9         It will be up to you to decide which witnesses to

13:29:10  10    believe, which witnesses not to believe, and how much any

11    witness's testimony to accept or reject.  I will give you

12    some guidelines for determining credibility of witnesses at

13    the end of the case.

14         Now, this is a civil case.  The plaintiff has the

13:29:26  15    burden of proving his case by what we called a preponderance

16    of the evidence.  That means, the plaintiff has to produce

17    evidence which, considered in light of all the facts, leads

18    you to believe that what the plaintiff claims is more likely

19    true than not.

13:29:42  20         To put it differently, if you were to put plaintiff's

21    and defendants' evidence on opposite sides of the scale, the

22    plaintiff would have to make the scale tip somewhat to his

23    side.  If the plaintiff fails to meet this burden, the

24    verdict must be for the defendant.

13:30:02  25         Those of you have sat on criminal cases, or you may

1      have seen in television programs about the burden of proof

2      being beyond a reasonable doubt, that requirement doesn't

3      apply in a civil case.  You should, therefore, just put it

4      out of your mind.

13:30:16  5          Now, a few words about your conduct as jurors.

6          First, during the trial, you're not to discuss the

7      case with anyone or permit anyone to even attempt to discuss

8      it with you or in your presence.

9          As to anyone whom you may recognize as having some

13:30:35  10   connection with the case, such as attorneys, parties, or

11     witnesses, you should have no conversation whatever with

12     them while you are serving on the jury.

13         If you see these people in the hall, in the elevator,

14     on the street, just ignore them.  They will understand that

13:30:50  15   you're not being impolite; you are merely obeying the

16     Court's instructions.

17         They have also been instructed not to speak to you.

18     So they are not being rude if they ignore you.  They are

19     also under court order.  So have no conversation whatsoever

13:31:09  20   with anyone connected with the case, and do not discuss this

21     case with anyone.

22         If anyone should talk to you about the case, bring it

23     to the Court's attention promptly.

24         Second, you must also avoid reading any newspaper

13:31:22  25   articles about this case, and you must also avoid listening

1    to or watching any radio or television coverage concerning

2    this case.

3         Third, do not try to do any research or make any

4    investigation about this case on your own.  You are to

13:31:37  5    decide this case solely on the testimony and evidence

6    presented during trial without consideration of other

7    matters whatsoever.

8         There are two slight exceptions to what I've just

9    said.

13:31:49  10   First, you may, of course, tell your family and your

11    employer that you have been selected as a juror.

12         And second, you may tell them what the schedule will

13    be for the trial.

14         However, do not tell them anything more.  Do not tell

13:32:03  15   them the name of the case, who the lawyers or witnesses are,

16    the nature of the claim, or anything about the case until

17    it's completely over.

18         If you are having any problem with your employer or

19    expect a problem, please advise the Court in writing.  The

13:32:20  20   courtroom deputy can provide a paper and a pen for that

21    purpose.

22         I or someone from my staff will advise your employer

23    that you must appear as part of your civic duty, and it must

24    not be held against you in any way.  A letter can also be

13:32:34  25   sent explaining this to the employer, if appropriate.

1      Also, if during the course of the trial you need a

2   recess for personal reasons, such as a bathroom break, just

3   raise your hand.  Sometimes I get carried away, and I forget

4   to take breaks when they're scheduled.

13:32:51  5      During your service as jurors in this case, my staff,

6   Mr. DeVan, Mr. Kurdziel, and Ms. Kassel, will be your

7   guardian angels.  They will do everything they can on behalf

8   of the Court to make your time here as comfortable and

9   pleasant as probable.  Please feel free to go to them if you

13:33:13 10  have questions, special needs, or problems.

11      I expect that we will have a lunch break each day of

12   approximately 1 hour and 15 minutes.  I will try to release

13   you for lunch between 12:00 and 12:30 each day.  We will

14   take about a 15-minute recess during the middle of each

13:33:29 15  morning and the afternoon.

16      I expect, and we'll try, to start no later than

17   9:00 a.m., and finish the end of the day by no later than

18   5:00 p.m.  And we anticipate that this trial may take the

19   rest of this week, and depending on circumstances, might

13:33:48 20  extend into Monday of next week.

21      If it becomes necessary to change the schedule as I've

22   just described for any reason, I will certainly let you know

23   as soon as possible.  If changing the schedule might create

24   any sort of problem for you, please let a member of my staff

13:34:05 25  know about your situation, and we will do everything we can

1    to accommodate your needs as much as possible.

2         Finally, don't form any opinion until all the evidence

3    is in.  Keep an open mind until you start your deliberations

4    at the end of the case.

13:34:20  5    If you would like to take notes during the trial, you

6    may do so.  You will be given an envelope which contains a

7    notepad and pen after opening statements of counsel.  Please

8    write your name on the front of the envelope, along with

9    your juror number.  Notes must be taken only on the notepad

13:34:39 10   provided to you.

11        Each time I call a recess, you may place your pad and

12   pen in your envelope, and leave it in your chair in the jury

13   box.  You must not take this envelope into the jury room

14   before you begin your deliberations at the close of the

13:34:53 15   evidence in this case.

16        Also, you must not take the envelope with notepad when

17   you when you leave at the end of the day.

18        If you decide to take notes, be careful not to get so

19   involved in writing things down that you miss seeing or

13:35:08 20   hearing the witness.

21        Any notes that you have taken, which would be -- which

22   you will be allowed to take with you to the jury room for

23   review during your deliberations, are only to be used as an

24   aid to your memory.

13:35:23 25        If your memory should later be different from your

1    notes, you should rely on your memory, not your notes.  If

2    you decide not to take any notes, rely on your independent

3    memory of the testimony, which counts just as much as any

4    other juror's recollection or notes.

13:35:40  5         Even though the court reporter is making stenographic

6    notes of everything that's said in this trial, a typewritten

7    copy of the testimony of the witnesses will not be available

8    to you during your deliberations.  Therefore, pay close

9    attention to the testimony presented to you.

13:35:54 10         On the other hand, any exhibit admitted into evidence

11   during the trial will be available to you for detailed

12   study, if you wish, during the deliberations.

13        So if an exhibit is received into evidence but is not

14   fully read or shown to you at the time, don't be concerned,

13:36:11 15   because you will get to see and study it later, during your

16   deliberations.

17        You should not hold delays during the course of the

18   trial against any party.  I'll take the responsibility for

19   it.  You can hold it against me.

13:36:26 20         When a case on trial does not proceed according to the

21   schedule, the delay may be caused by the Court's

22   administrative duties or an unanticipated emergency matter.

23        Also, when the trial is interrupted or delayed for any

24   of these reasons, you should not feel that your time is

13:36:43 25   being wasted.

1       During the trial, there will be times when I need to

2   confer with the lawyers out of your hearing.  These

3   conferences, which are sometimes referred to as bench or

4   sidebar conferences, are a necessary part of any trial.  I

13:36:59  5   will do my best to keep them to a minimum and as short as

6   possible.

7       I have spoken to you during jury selection about

8   restrictions on use of electronic devices, and I want to

9   amplify that as part of these instructions.

13:37:17 10      First, you must try -- you must not try to get

11  information from any source other than what you hear and see

12  in the courtroom.

13      This means that you may not speak to anyone, including

14  your family and friends, you must not use any printed or

13:37:32 15  electronic sources to get information about this case or the

16  issues involved.  This includes the Internet, reference

17  books or dictionaries, newspapers, magazines, television,

18  radio, computers, iPhones, Smartphones, iPads, or any other

19  electronic device.

13:37:49 20      You may not do any personal investigation, including

21  visiting any place involved in this case, using Internet

22  maps or Google Earth, talking to any possible witnesses, or

23  creating your own demonstrations or reenactments of the

24  events that are the subject of this case.

13:38:08 25      Second, you must not communicate with anyone about the

1    case or your jury service, and you must not allow anyone to

2    communicate with you.  In particular, you may not

3    communicate about the above case through e-mail, text

4    messages, tweets, blogs, chat rooms, comments or other

13:38:29  5    postings, Facebook, LinkedIn, or other websites.

6         This applies to communicating with your fellow jurors

7    until I give you the case for deliberation, and it applies

8    to communicating with everyone else, including your family

9    members, your employer, the people involved in the trial;

13:38:44 10   although, you may notify your family and your employer that

11   you have been seated as a juror in this case, as I

12   previously explained.

13        But if you are asked or approached in any way about

14   your jury service or anything about this case, you must

13:38:59 15   respond that you've been ordered not to discuss the matter,

16   and to report the contact to the Court.

17        You must not engage in any activity or be exposed to

18   any information that might unfairly affect the outcome of

19   this case.

13:39:17 20        Any juror who violates the restrictions as I've just

21   explained them to you jeopardizes the fairness of these

22   proceedings, and a mistrial could result that would require

23   the entire trial process to start over again.  So you can

24   imagine a mistrial is a tremendous expense and inconvenience

13:39:37 25   to the parties, the Court, and the taxpayers.

1              Any jurors exposed to outside information, or if

2       there's any difficulty whatsoever in following these

3       instructions, please notify the Court immediately.

4              These restrictions must remain in effect throughout

13:39:51  5       the trial.  Once the trial is over, you may resume your

6       normal activities.  At that point, you will be free to read

7       and research anything you wish.  You will be able to speak

8       or choose not to speak about the trial with anyone you wish.

9              You may write, post, or tweet about the case, if you

13:40:09 10       choose to do so.  The only limitation is that you wait until

11       after the verdict, when you have been discharged from your

12       jury service.

13              The trial will now begin.

14              First, each side will make an opening statement.

13:40:29 15              An opening statement is neither evidence nor argument.

16       It's an outline of what the party intends to prove offered

17       to help you in following the evidence.  It's a roadmap.

18              Next, the plaintiff will present its witnesses, and

19       the defendant may cross-examine them.

13:40:46 20              Then the defendant will present his witnesses, and the

21       plaintiff may cross-examine them.

22              After that, the attorneys will make their closing

23       arguments to summarize and interpret the evidence for you,

24       and the Court will give you the instructions as a matter of

13:41:02 25       law.

120

1          You will then retire to deliberate your verdict.

2          Mr. Gilbert, Ms. Greene, opening statement limited to

3     20 minutes.

4          Do you wish to have a five-minute notice?

13:41:19  5               MS. GREENE:  Sure, Judge.  Thank you.

6               Can you all hear me?

7                    (No response.)

8               MS. GREENE:  Good afternoon.

9          Defendant Raymond Jeffrey Frazier was formerly a

13:42:45 10    deputy sheriff for the Richland County Sheriff's Office.

11    He's sitting over here at this table.

12          On March 14th, 2016, he set in motion an aggressively

13    reckless cascade of events which ended in the unjustified

14    and illegal shooting death of an unarmed man named

13:43:01 15    Brian Garber, and afterward, Defendant Frazier and his

16    fellow officers on the scene tried to cover it up.

17          The evidence in this case will show that on that date,

18    Brian Garber was in the midst of a mental health crisis.

19    His family asked law enforcement for help, but instead of

13:43:17 20    getting the help that he needed, Brian ended up dead in his

21    childhood bedroom.

22          The evidence in this case will show that the shooting

23    violated one of the most basic rules a police officer is

24    supposed to follow:  Shooting an unarmed person, and taking

13:43:31 25    that person's life without just cause and good reason.

Opening Statement - Greene

1       If we all believe that a police officer's most sacred

2     duty is to protect life, then this officer betrayed that

3     duty by taking away a life unnecessarily.

4       This is why we are here today, ladies and gentleman.

13:43:47  5       My name is Jacqueline Greene.  And together with my

6     cocounsel, Terry Gilbert and Chance Douglas, we represent

7     the Estate of Brian Garber.  And this is Brian Garber

8     (indicating).

9       The evidence in this case will show that the shooting

13:44:06 10     violated Brian's most fundamental rights under the U.S.

11     Constitution, the right not to be killed through the use of

12     unjustified, deadly force.

13       In this trial, we ask you to hold Defendant Frazier

14     responsible for his wrongful acts.  And in our wonderful

13:44:21 15     system in America, we do hold public officials accountable

16     for their wrongdoing.  Killing someone is the most powerful

17     action a public official can undertake.  And because of

18     that, it has to be taken very seriously, and only permitted

19     when the law allows.

13:44:36 20       We're here in this courtroom to seek justice and

21     accountability.  This is the only opportunity for a jury of

22     citizens, like yourselves, to review this case and make a

23     judgment using common sense and reason to do what is right.

24       This jury, serving in the role of one of the most

13:44:54 25     fundamental institutions set up by our Constitution, has the

1       power and responsibility to make these findings.

2              So speaking of our Constitution, this case has been

3       brought under the part of the Constitution known as the Bill

4       of Rights, and in particular, the right to be free from

13:45:08  5       unreasonable searches and seizures.  That includes the

6       right --

7                          MR. DOWNEY:  Objection, Your Honor.

8                          THE COURT:  Your objection?

9                          MR. DOWNEY:  Objection, Your Honor.  This is

13:45:19 10       an instruction of law, which is the process of the Court,

11       not for opening statement.

12                          THE COURT:  All right.

13              Ms. Greene, just limit yourself to the nature of your

14       claim without getting into the law itself.

13:45:34 15                          MS. GREENE:  I'll move on.

16              This remedy is very different -- when you come in and

17       file a civil rights lawsuit like this, it's very different

18       than suing a trucking company or an insurance company or a

19       private citizen.  This applies only to seeking vindication

13:45:47 20       for civil rights violations committed by Government actors.

21              The wrongful taking of a life by someone with

22       Government power, and especially a police officer, is one of

23       the most severe wrongs that can be committed by a person who

24       is vested with a badge, with a gun, with arrest authority,

13:46:02 25       and who was sworn to uphold the law.

1    Judge Baughman will later instruct you on the law and

2    principles you must apply when you deliberate in this case.

3    But I do want to say that we all know that suing the

4    police is hard.  They're held in high regard in our culture.

13:46:17  5    We believe them.  We seek their help.  We trust them.  We

6    believe we need them in our communities, and we believe that

7    they serve and protect us.  But just like --

8    MR. DOWNEY:  Objection, Your Honor.

9    THE COURT:  Overruled.

13:46:28  10    MS. GREENE:  Just like any other profession,

11    though, some police do actually do bad things.  And these

12    very few officers are outside -- who are acting outside of

13    the rules, actually do put people in danger and cause harm.

14    We can't ignore police who don't follow the rules.

13:46:45  15   And when police are out of control and act recklessly, we

16    are all at risk.  Police must follow the law.  Police must

17    protect life.  Police must back off when appropriate.

18    Police must use other available means before using deadly

19    force.  And police cannot justify shooting someone who

13:47:04  20   doesn't actually pose and immediate threat of death or

21    serious physical harm.

22    This is not too much to ask of those who have such

23    power.  It's good for everyone because it makes us all safe.

24    Unfortunately, these simple rules did not work for

13:47:18  25   Brian Garber.

Opening Statement - Greene

124

1          Now, let me tell you the story, as we see it, and what

2     we believe the evidence in this trial will show.  Of course,

3     there are two sides to every story, as in any case.  But

4     even the officer's story in this case showed that

13:47:31  5     Defendant Frazier violated Brian Garber's constitutional

6     rights.

7          And so this is where the story begins:

8          On March 14th, 2016, Brian was not acting like

9     himself.  He's acting out.  You'll hear that Brian arrives

13:47:47 10     home from work at the house he shares with his wife,

11     Sara Knowlton.

12          At that house, he gets into a confrontation with Sara

13     and with his mother, Connie Garber, and it does get

14     physical.

13:47:56 15          And you should see on your screen now, an aerial view

16     of the house where this all started, which is the one down

17     in the right-hand corner, 3425 Mill Run Road.  This is the

18     house where the story begins.

19          You will hear during this trial, that Brian's family

13:48:13 20     knows at this time that he is in a mental health crisis, and

21     they're scared and concerned.  His mother and wife do call

22     911, and you will hear that they call because they want to

23     get help for him.  They want him to be taken to a hospital.

24     They want him to be cared for as he experiences this mental

13:48:29 25     health breakdown.

1      Now, just across the street from 3425 Mill Run Road,

2   if we go back to the aerial view for just a moment, you will

3   see 3400 Mill Run Road.  This is where Brian's parents live,

4   just across the street.

13:48:47  5      You will hear that from Brian's parents -- you'll hear

6   from Brian's parents that after this confrontation that he

7   has earlier in the evening, he goes to this home, his

8   parents' home, and to his childhood bedroom in that house.

9      And, if you could, show us the house.

13:49:02 10      Thank you.

11      So this is the house where the story takes place.

12      Now, if we could look at the upstairs floor of this

13   house.

14      Deputy movement.

13:49:09 15          MR. DOUGLAS:  Yep.

16          MS. GREENE:  So you will see here, that you

17   have an overlay of the upstairs.  You can see the stairs

18   coming up.  You can see a hallway and you see a bedroom and

19   a -- or a couple of bedrooms.  The bedroom on the right-hand

13:49:27 20   side toward the bottom of your screen, this is Brian's

21   childhood bedroom.

22      So you'll hear that when Brian is in this bedroom, he

23   continues his bizarre behavior.  His parents see him there,

24   where he has his hand under his shirt, and he implies that

13:49:44 25   he has a gun.  You will hear that his mother assures that

1    this is odd behavior, and he doesn't actually have a gun.

2         In the meantime, he sends some unsettling text

3    messages to his wife, including one that does says that he

4    has a gun.  She calls 911 to report his text messages.  The

13:50:03  5    Richland County Sheriff's Office sends officers to the

6    scene.

7         You will also hear that Defendant Frazier, along with

8    Sergeant James Nicholson and Deputy Andrew Knee, respond to

9    the Garber home at 3400 Mill Run Road.  You will hear that

13:50:15 10    the deputies go into the house, up the stairs, and down the

11    hallway.

12         And if you look on the screen, you will see that this

13    is the order they traveled in:  First, Sergeant Nicholson,

14    then Deputy Knee, followed by Defendant Frazier.  Nicholson

13:50:34 15    and Knee stay at the doorway, and Deputy Frazier entered the

16    bedroom.

17         And this moment in time, folks, this is the moment in

18    the story where you have to start listening very carefully.

19         You will hear testimony from these officers during the

13:50:50 20    trial, and throughout the trial, you must keep your eyes and

21    ears open for the things that do not add up in their

22    stories.

23         Pay close attention, please, to everything

24    Defendant Frazier says, along with the testimony of other

13:51:04 25    witnesses from the Richland County Sheriff's Office.

1       Please, also pay close attention to the physical

2   evidence, and take note when it contradicts the testimony of

3   the officers.

4       As the trial goes on, you will hear from these

13:51:19  5   officers that when they get to Brian's room, they say that

6   Brian says, I have a gun.  They will also all say they

7   thought he had a gun under his shirt at that time.

8       Now, you'll also hear that none of them fire their

9   weapons at Brian in this moment.  We believe the evidence

13:51:41 10   will show you that this is because there was no imminent

11   threat at the time.

12       Instead, you'll also hear their varying descriptions

13   about what they supposedly saw under his shirt, and you will

14   hear that Sergeant Nicholson begins having a conversation

13:51:57 15   with Brian to deescalate the situation.  You'll hear that

16   this conversation goes on for approximately 45 seconds to a

17   minute.

18             (Pause in proceedings.)

19             MS. GREENE:  Stop the clock.

13:53:12 20       This is the moment, after that 45 seconds to 1 minute,

21   when the story turns tragic.  You'll also hear that this is

22   the moment when the story turns implausible.

23       You will hear from these officers that they hear a

24   loud "bang," which they are all sure was a gunshot, but

13:53:31 25   there was no bang coming from Brian Garber, because he was

1      unarmed.  He did not have a gun.

2          The bang came from an officer's gun.  The evidence

3      will show that this was a show directed at Brian, at the

4      unarmed man who was sitting on the bed in his childhood

13:53:46  5      bedroom.

6          You will hear that this shot came from the man sitting

7      over here, Deputy Raymond Frazier.  This defendant shot and

8      fired his weapon at Brian Garber without justification, and

9      provoked the other two deputies in the room,

13:54:02  10      Sergeant Nicholson and Andrew Knee, in a contagious

11      reaction, to fire their own weapons as well.  There were

12      16 shots fired; 14 of them hit Brian Garber.

13          And then a 10-month effort to come up with an

14      illogical explanation to escape accountability.

13:54:20  15          You will hear that they all fired on Brian Garber in

16      response to that "bang," Defendant Frazier's shot.

17          You will also hear that these officers admit they were

18      not justified in shooting before the bang.  You will hear

19      that Defendant Frazier fired first, and you will hear that

13:54:38  20      his conduct led to the tragic cascade of events that

21      resulted in Brian's death.

22          All three of these officers will tell their story in

23      the courtroom, and you will hear each one of them tell you

24      what they saw in the room before, during, and after the

13:54:53  25      shooting.  You'll also hear that Defendant Frazier has

1    offered more than one version of the story about what

2    happened here.

3         But who is speaking for Brian?

4         In this case, the crime scene tells his story.

13:55:05  5         Most critically, you will hear that Brian Garber was

6    unarmed when he was shot, and you will hear, therefore, that

7    he could not have fired a shot at the officers.

8         You'll also hear from the medical examiner, who will

9    tell you where Brian was shot, and tell you about his

13:55:21 10   injuries.

11        You'll see photographs of the room from right after

12   Brian was shot, and you'll see evidence that a remote

13   control, the kind any of your kids or siblings might have

14   had in the '90s for a toy car, this remote control is laying

13:55:33 15   on the bed.

16        You'll hear that none of the deputies saw this remote

17   during or before or after the shooting, but the evidence

18   will show that it somehow appeared in these photos of the

19   scene right after the shots.

13:55:45 20        You'll hear that this remote was assumed to have been

21   the object under Brian's shirt, since, after all, he

22   actually was not armed.

23        You'll hear from other law enforcement witnesses who

24   were present on the scene.

13:55:57 25        And when you take all of these circumstances, the

Opening Statement - Greene

130

1    totality of the circumstances facing these officers, you

2    will see that their stories, and in particular,

3    Defendant Frazier's story, does not add up.

4         During this trial, you'll also hear from

13:56:14  5    Brian Garber's family and the administrator of his estate,

6    who will tell you all about Brian.

7         You'll hear that when he died, he was just 28 years

8    old.  You'll hear that he had a 4-year-old and an

9    18-month-old at the time.  You'll hear that he was a loving

13:56:28 10    father who lit up when he was with his children.  You'll

11    hear that this was all taken from him, and taken from his

12    children for the rest of their lives, when he was shot by

13    these officers.

14         And you'll hear that he needed help, and that he never

13:56:41 15    got it.

16         The evidence in this case will show that Defendant

17    Jeff Frazier shot Brian unjustifiably and without cause, in

18    violation of the law.  And the evidence will show that the

19    other two deputies, Knee and Nicholson, followed suit.  And

13:56:58 20    the evidence will show that these events caused

21    Brian Garber's death.

22         Now, the anticipated defense will try to disparage the

23    character of Brian Garber, who cannot be here to defend

24    himself, of course, because he is deceased.

13:57:08 25         The defense will also try to challenge the character

Opening Statement - Greene

131

1    of the family.  They'll argue that this was a tough

2    situation and that police have a tough -- police have a

3    tough job.  And we agree, it is a tough job.

4         But police must be required to follow the rules, and

13:57:23  5    to follow the law that protects all of us.  These rules and

6    the law protect all of us, including those of us with mental

7    health issues.

8         We're going to ask you at the end of the case, to

9    assess the credibility of the witness and the evidence.

13:57:38 10    Under the law, every witness deserves the same

11    consideration.  This is what the Judge will instruct you.

12         And in this case, you will hear that Deputy Frazier

13    has changed his story multiple times.

14         We all want to believe officers when they tell us that

13:57:53 15    what they did was right.  We're not asking you to condemn

16    all police officers or policing, and most officers

17    absolutely do the best that they can.

18         But in this case, we're asking you to keep an open

19    mind, and we're asking you to treat all officers just like

13:58:08 20    you would any other witness.

21              THE COURT:  Five minutes remaining.

22              MS. GREENE:  Thank you.

23         And to make a determination later about whether you

24    determine these officers' accounts are credible.

13:58:19 25         We believe that the evidence in this case will show

1    you that this was an unreasonable shooting against an

2    unarmed father who was the midst of this mental health

3    crisis in his childhood bed, and that there was absolutely

4    no need to shoot Brian Garber on that day.  We will do our

13:58:34  5    best to prove all of this to you throughout the trial.

6         I should note before we move further into the trial,

7    the concept of "beyond a reasonable doubt," like in a

8    criminal case, does not apply here, as the Judge instructed.

9         If at the end of the trial you believe that it is more

13:58:48  10   likely than not that our side is right about the case, just

11   tipping the scale 51 percent in our favor, that's enough to

12   find for the plaintiff, the estate of Brian Garber.  That's

13   all you need to find.

14        Think about the scales.  If you put a feather on one

13:59:03  15   side, that's enough for you to find for the plaintiff.

16        This concept of more likely than not is referred to in

17   the legal setting as a "preponderance of the evidence."  So

18   if we refer to that, that's what we're talking about.

19        As you hear, you know that Brian Garber was an

13:59:20  20   imperfect man.  He needed help.  But you'll also hear he was

21   a loving father, and he did not deserve to die.

22        As I leave you with these thoughts, and as the trial

23   begins, I just want to thank you for your time and energy

24   serving as jurors on this case.

13:59:33  25        It's really important to Brian and his family.  This

1    is the one chance they have to tell their story.

2        But beyond that, your work is important to everybody

3    in the room.  You are fulfilling a public duty to make our

4    Constitution matter.  This is the document that sets our

13:59:46 5    nation apart.  The Constitution means nothing unless the

6    people of this country can enforce the rights that it gives

7    to us all.

8        Members of the jury, after you've heard all of the

9    evidence, we are confident that you will find

14:00:00 10   Defendant Frazier liable for the unreasonable and unlawful

11   shooting of Brian Garber.

12        Thank you.

13             THE COURT:  Opening, the counsel for the

14   defendant.  20 minutes.

14:00:26 15            MR. DOWNEY:  Thank you, Your Honor.

16        May it please the Court.

17        My name is Dan Downey, and I'm here on behalf of now

18   retired Deputy Frazier.

19        This case is about choices, ladies and gentlemen of

14:00:46 20   the jury.  Brian Garber made a number of choices, and it was

21   on March 16th of 2014.

22        He made choices that set into a course of events that

23   ultimately led to his death.  It's tragic.  The choices that

24   he made affected his family, and they also affected

14:01:04 25   Deputy Frazier and the other deputies that you will hear

1    from through the course of this case.  It's truly

2    unfortunate.

3        A call went out, a 911 call.  In Richland County, they

4    take 911 calls very seriously.  Call came in at 7:10 on

14:01:17 5    March 16th.  It was Connie Garber calling.  And Connie was

6    staying across the street with her daughter-in-law,

7    Sara Knowlton, her son, Brian Garber.  And their two

8    children were also present in the house at this time, at the

9    time of the events, 1 and 4 years of age.

14:01:31 10        Connie Garber called to say that Brian Garber was

11    beating her.  He had hit her.  She said he was going nuts.

12    And he had also strangled Sara Knowlton.  That's what led to

13    officers coming out to the house.

14        The first two on the scene, you'll hear from them,

14:01:48 15    Lieutenant Zehner and Deputy Knee.  They came to the home,

16    and they do what they're trained to do.

17            We all know that officers have a dangerous,

18    difficult job.  Part of what they do is, they take evidence.

19    They interview people.  They observe a scene, and they make

14:02:03 20    decisions.

21        When they arrived at the scene, they interviewed

22    Connie Garber.  They interviewed Sara Knowlton.

23    Lieutenant Zehner spent time with the kids while Deputy Knee

24    interviewed them.

14:02:14 25        Now, during the course of this, Brian Garber fled the

1   home.  He fled at some point in time after the call started

2   to 911.  So you can logically believe he knew that the

3   police were called to the home.  He left.

4        Deputy Knee interviewed, and he learned, you know,

14:02:28  5   that Brian had been physically violent.  He observed a mark,

6   which you'll see on Connie Garber, that shows an injury to

7   her.

8        And the officers had made the decision, Brian Garber

9   was going to be charged and arrested for domestic violence.

14:02:42  10  They don't need somebody to sign a form when they observe

11  physical injuries.  So that decision had been made.

12       They also made the decision to locate him.  They

13  thought it was a very serious situation.  So it's not a big

14  force down there, but three officers also came to the scene

14:02:59  15  to search for him.

16       You'll hear from them, Deputy Berry,

17  Sergeant Nicholson, and Deputy Frazier.  Deputy Frazier was

18  dispatched to looking for Brian Garber at bridges and other

19  locations nearby.

14:03:09  20       You saw the photograph of the scene.  It's wooded.

21  The houses are apart of each other.  You don't see a lot of

22  houses in the overhead photograph.  It's kind of a rural

23  area.  They looked for him.  They couldn't find him.

24       The officers on the scene, they closed off the scene

14:03:25  25  after about 45 minutes, and they subjected Brian Garber to

1    an ATL.  What this means is, there's an attempt to locate.

2    He's going to be arrested if anybody sees him.

3          And that's what happened.  The officers left.  They

4    returned to their duties, as they're required to do.  And

14:03:39  5    then about, ah, 10, 15 minutes later, another call comes in

6    from 911.

7          And what happened in the interim?  Connie Garber took

8    the two kids across the street, up the hill to the 3400 Mill

9    Run address, and she took them up there for safety.  And

14:03:57 10    when she got there, her husband, Matt Garber, was there.  He

11    told her, Brian is upstairs in his bedroom.

12          So the two of them went up to the bedroom, and

13    Matt Garber and Connie interacted with Brian.

14          Now, the evidence is that Brian had an object

14:04:12 15    underneath his shirt that looked like a gun.  Matt Garber

16    believed it was a gun.  And Connie Garber said to him, Are

17    you telling me you have a gun?

18          They left the room.

19          Matt Garber told Connie Garber, Call the police.

14:04:25 20          Connie Garber went across the street to Sara Knowlton,

21    said, Call the police.

22          Sara Knowlton did that.  Second call to police.

23          In the interim, Sara Knowlton began receiving text

24    messages, like, I don't care if I go to jail.  I'll get out,

14:04:41 25    and I'll kill you.

1

2              That's what he said to his wife that he had

3    just strangled.  That's the situation that these deputies

4    ultimately encountered.

14:04:48    5         So the deputies come out, and they go to the original

6    location because that's where the first call was.  They

7    found out, no, he's actually across the street, up the hill.

8         Again, Lieutenant Zehner and Deputy Knee were first on

9    the scene.  They go up the hill.

14:05:01   10         Sergeant Nicholson has his own cruiser.  He goes up

11   the hill.

12         Deputy Frazier has his own cruiser.  He goes up the

13   hill.  Deputy Frazier is the third one out of his vehicle.

14   Zehner, a lieutenant at the time, tells Sergeant Nicholson,

14:05:13   15   You're the shift supervisor.  You're in charge.

16         Tells Knee, Follow him in.

17         Sergeant Nicholson goes up to the house.  He knocks on

18   the door.

19         Now, the testimony will be that none of these officers

14:05:23   20   were familiar with this house.  You folks have seen the

21   floor plan.  They didn't.  They didn't have a floor plan or

22   anything like that.

23         Sergeant Nicholson briefly talked to Matt Garber about

24   where Brian was located.  Deputy Frazier didn't hear it.  He

14:05:36   25   was sort of coming in after them, and following them into

Opening Statement - Downey

1    the scene.

2         At this time, Lieutenant Zehner was directing

3    Deputy Berry to go around the back of the house to create a

4    perimeter.

14:05:44  5         Again, these are well-trained law enforcement

6    officers.  They're attempting to maintain a perimeter, and

7    also going to interact.  They do dangerous things every day.

8    It's part of their job.  This was a dangerous situation.

9         Deputy Knee and Sergeant Nicholson, they led the way

14:05:57 10  up the staircase, Nicholson in the lead.  They found out

11   that he was upstairs at the end of the hallway.  They

12   wouldn't have known that but for the information that

13   Matt Garber shared.

14        When they went up the staircase, Deputy Frazier did

14:06:10 15  not have his gun out.  The two officers in front of him did

16   when they get to the stop of the staircase.  They turned.

17   They went down to the end of the hallway.  While they're

18   doing this, officers from other jurisdictions also came to

19   the call.

14:06:20 20        And so we have two officers from the Lexington Police

21   Department who enter the house, and on the staircase as

22   well.

23        We have Deputy Zehner at the top of the staircase at

24   the time the officers are interacting.  He's actually

14:06:30 25  protecting against anything coming up the staircase while

Opening Statement - Downey

139

```
          1    the officers interact with Brian Garber.

          2         Now, at this time, what these deputies know about

          3    Brian Garber is, he says he's got a gun.  Okay.  He's been

          4    violent earlier that night.  He fled from police.

14:06:46  5         They know these things.  He threatened his wife, to

          6    kill her.  That's what these officers know.

          7         So they go up to the room where Brian Garber is

          8    located.  And part of what you saw is accurate, part of it

          9    is not.  The evidence will show what really happened when

14:07:02 10    you hear from the officers.

         11         Deputy Knee was to the left of the door case.

         12    Sergeant Nicholson was to the right of the door.  Okay?  And

         13    Deputy Frazier was behind the two of them.

         14         Now, Deputy Frazier is an experienced law enforcement

14:07:13 15    officer.  He's been on SWAT team for many, many years.  He

         16    is well trained.

         17         Sergeant Nicholson has done two tours in Iraq, he was

         18    a military police officer, achieved the rank of sergeant in

         19    the military, and had also been a SWAT team officer.

14:07:28 20         Both Nicholson and Frazier were trained in how to

         21    deescalate the situation.  Both of them had the training.

         22         When Frazier saw Knee standing partially in the

         23    doorway, he went by him, brushed by him, and entered

         24    approximately 3 feet into the room, which is basically the

14:07:44 25    width of the door.
```

Opening Statement - Downey

140

1        He did that because he had not worked with Deputy Knee

2    in the past, and he was concerned about whether Deputy Knee

3    had the experience to interact in the way that it was

4    required.  He was concerned for him.  He saw him in the

14:07:57  5    doorway.  So Frazier entered.

6        At the time that Frazier entered the room -- and he's

7    the only officer that entered the room at this point in

8    time.  At the time he did that, Brian Garber's words, I have

9    a gun.

14:08:06 10        Now, you folks just saw a minute transpire.  Think

11    about the minute that transpired for these officers.

12    They're standing there, and Frazier pulled his gun out as

13    soon as Garber says that.  They're standing there with their

14    gun trained on Brian Garber.

14:08:21 15        And Brian Garber has an object under his shirt that he

16    has presented to these officers, back and forth to each of

17    them, looking them each in the eye -- eyes as big as saucers

18    is what Sergeant Nicholson will tell you -- for a minute.

19        I submit to you that these officers and Deputy Frazier

14:08:38 20    showed remarkable restraint in not shooting Brian Garber at

21    that point in time, when he entered the room.  It's because

22    they're trained, and they're good officer.

23        Now, you're also going to hear that Deputy Frazier

24    gave commands to Brian Garber.  Show me your hands.  Drop

14:08:51 25    the gun.  Things that Brian Garber disregarded.  Choices

1    that he made.  He made the choice not to comply with these

2    officers.  He made those choices.

3          Sergeant Nicholson also gave commands.

4          So Deputy Frazier stopped talking to Brian Garber.  He

14:09:04  5    stopped, but Sergeant Nicholson handled the deescalation.

6          And you're going to hear what Nicholson said from him,

7    from me, from Frazier.  You're going to hear it from the

8    Lexington officers at the bottom of the stairs.  He said

9    words to the affect of, We all have families.  It doesn't

14:09:18 10    have to happen like this.  We can get you help.

11          Brian Garber, No.  You're going to have to shoot me.

12          The entire time, looking right at them in the eye,

13    moving that object under his shirt back and forth,

14    presenting as a gun and an armed threat, a threat to these

14:09:34 15    officers.  To their lives.  To their well-being.  To each

16    other.

17          That, after a minute, is when the officers -- and they

18    will all tell you they heard a pop.  There were various

19    things in that room.  There's a beer can between

14:09:44 20    Brian Garber's leg.  They heard a "pop," a "bang," words to

21    the effect.

22          When they heard that, these officers are trained to

23    end a threat, and they did.  They fired for 1 to 2 seconds.

24    That's how long it took.  Brian Garber was killed instantly.

14:09:58 25          And I submit to you he was killed because he made a

```
            1   choice, not because of anything that these officers did.  In

            2   fact, these officers showed remarkable restraint.  They

            3   complied with the Constitution.  They complied with the laws

            4   of the State of Ohio.

14:10:10    5       They had a dangerous job.  They did that job.  And

            6   it's a tragedy what happened to Brian Garber, but it was

            7   justified, and it was proper under the laws of the State of

            8   Ohio and the United States of America.

            9       And each of these officers deserve and appreciate the

14:10:23   10   time you're going to put into this case listening to the

           11   evidence.

           12       We encourage you to listen to these officers.  They

           13   had a difficult job and did very good work.  We encourage

           14   you to listen to them.

14:10:34   15       And we submit to you in the close of this case, you're

           16   going to find in their favor.

           17       Thank you very much.

           18           THE COURT:  Mr. Gilbert, Ms. Greene, is your

           19   first witness ready?

14:10:53   20           MS. GREENE:  Yes, Judge.

           21           THE COURT:  All right.

           22       I am going to ask the jury, because the witness is

           23   going to be testifying from this side, to move --

           24           DEPUTY CLERK:  The witness will be --

14:11:04   25           THE COURT:  Oh, right here.
```

|     |     |
| --- | --- |
| 1 | DEPUTY CLERK:  The witness is on this side |
| 2 | over here. |
| 3 | THE COURT:  Okay.  All right.  I'm sorry.  I'm |
| 4 | backwards. |
| 14:11:09  5 | All right.  You're fine. |
| 6 | And could you close the inside door back there? |
| 7 | DEPUTY CLERK:  Yes. |
| 8 | THE COURT:  Plaintiffs, you may call your |
| 9 | first witness. |
| 14:12:33 10 | MR. DOUGLAS:  Plaintiffs call |
| 11 | Elizabeth Goodwin. |
| 12 | THE COURT:  Ms. Goodwin, please come forward |
| 13 | and be sworn. |
| 14 | MR. DOUGLAS:  Okay.  We're going to get her. |
| 15 | DEPUTY CLERK:  They got to get her. |
| 16 | THE COURT:  All right. |
| 17 | DEPUTY CLERK:  Stay standing, and raise your |
| 18 | right hand, please. |
| 19 | Do you solemnly swear or affirm that your testimony in |
| 20 | this case will be the truth, the whole truth, and nothing |
| 21 | but the truth, so help you God? |
| 22 | THE WITNESS:  I do. |
| 23 | DIRECT EXAMINATION OF ELIZABETH GOODWIN |
| 24 | BY MR. DOUGLAS: |
| 14:14:43 25 | Q.   Will you please state your name. |

```
           1    A.    Elizabeth Goodwin.

           2    Q.    And what is your occupation, Ms. Goodwin?

           3    A.    I'm an attorney.

           4    Q.    How long have you been an attorney?

14:14:52   5    A.    24 years.

           6    Q.    And can you explain what your involvement is in this

           7    case?

           8    A.    Currently, I'm the fiduciary of the estate of

           9    Brian Garber.

14:15:00  10    Q.    And is acting as a fiduciary part of your legal

          11    practice?

          12    A.    Yes.

          13    Q.    And how many times throughout your career have you

          14    acted in this capacity?

14:15:09  15    A.    Hundreds.

          16    Q.    Okay.  Prior to this case, have you been involved as

          17    the administrator or fiduciary of an estate involving police

          18    shootings?

          19    A.    Yes.

14:15:19  20    Q.    How many times?

          21    A.    Three, not including this one.

          22    Q.    And please explain your role as administrator of the

          23    estate of Brian Garber.

          24    A.    I will be -- if there's recovery, I would be

14:15:31  25    responsible for presenting the recovery amount to the
```

1    probate court judge in Richland County, Judge Mayer, and

2    asking him to determine the distribution of the proceeds.

3    Q.    Okay.  Can you explain quickly who are the beneficiary

4    of the estate of Brian Garber.

14:15:51  5    A.    Well, his two children in the back, we have Holly and

6    Nicholas, and his wife.  And he has a mother and father.

7    Q.    Okay.

8                MR. DOUGLAS:  I don't think I have anything

9    further.

14:16:07 10                MR. DOWNEY:  No questions, Your Honor.

11                THE COURT:  No questions.

12          Well, thank you.  You may step down.

13                THE WITNESS:  Thanks, Judge.

14                THE COURT:  Plaintiff, call your next witness.

14:16:20 15                MR. GILBERT:  We call Jeffrey Frazier.

16                THE COURT:  Jeffrey Frazier?

17                MR. GILBERT:  Yes.

18                THE COURT:  All right.

19                MR. GILBERT:  The defendant.

20                DEPUTY CLERK:  Do you solemnly swear or affirm

21    that your testimony in this case will be the truth, the

22    whole truth, and nothing but the truth, so help you God?

23                THE WITNESS:  Yes, I do.

24                DEPUTY CLERK:  Thank you.

14:16:30 25                THE WITNESS:  Thank you.

```
1              CROSS-EXAMINATION OF RAYMOND JEFFREY FRAZIER

2   BY MR. GILBERT:

3   Q.    Good afternoon, Mr. Frazier.

4   A.    Good afternoon.

5                   THE COURT:  Mr. Gilbert, we seem to be getting

6   some feedback off of that microphone.  You may want to push

7   it out a little bit.  All right.

8   BY MR. GILBERT:

9   Q.    Would you please state your name for the record.

10  A.    Retired Deputy Raymond Jeffrey Frazier.

11  Q.    And when did you retire?

12  A.    September 30th of last year.

13  Q.    But you're no longer serving in the capacity of a

14  deputy sheriff?

15  A.    No, sir, I'm not.

16  Q.    How long were you a deputy officer with the

17  Richland County Police Department?

18  A.    17 years.

19  Q.    How old are you?

20  A.    I just turned 49 years old.

21  Q.    Are you employed now?

22  A.    I am not.

23  Q.    Okay.  When you were a sworn law enforcement officer,

24  do you believe that honesty is an extremely important part

25  of carrying out your duties as a police officer?
```

1    A.    Yes, I do.

2    Q.    Do you agree with me that telling any kind of false or

3    misleading statements can affect the integrity of the

4    investigation of any kind of police action?

14:18:16  5    A.    Yes, I do.

6    Q.    And if the honesty is not there, it could affect the

7    competence in an investigation of a serious matter, like a

8    shooting in the line of duty?

9    A.    Yes.  I agree with that, yes.

14:18:38  10    Q.    And it also affects the respect of the rule of law

11    within the community that you serve; is that right?

12    A.    That's right.

13    Q.    And do you believe that justice can be undermined if

14    police do not tell the truth?

14:18:59  15    A.    Yes.

16    Q.    And do you believe it is important to tell the truth

17    when you are under oath, not just as a police officer, but

18    as a citizen as well?

19    A.    Yes, I do.

14:19:11  20    Q.    Now, you were involved in the shooting death of

21    Brian Garber, were you not?

22    A.    I was, yes.

23    Q.    On March 16th, 2014, correct?

24    A.    Yes, that's correct, I was.

14:19:26  25    Q.    And after that shooting, there was at least two

```
            1    investigations of that matter?

            2    A.    At least --

            3              MS. WILLIAMSON:  Objection, Your Honor.

            4              THE COURT:  Overruled, just to the fact that

14:19:45    5    there were --

            6              MR. GILBERT:  Yeah.

            7    BY MR. GILBERT:

            8    Q.    And one was by your own department, correct?

            9    A.    Correct.

14:19:53   10    Q.    And the other was through the Ohio Bureau of Criminal

           11    Investigation; is that right?

           12    A.    Correct.

           13    Q.    And you have given a number of statements in

           14    connection with the events of March 16th, 2014; is that

14:20:14   15    right?

           16    A.    Yes, sir.

           17    Q.    Do you know how many times you made statements to

           18    officials that were investigating this matter?

           19    A.    I don't know the exact number.  Numerous.

14:20:31   20    Q.    And some of these were on video?

           21    A.    Yes.

           22    Q.    Some of these were on audio?

           23    A.    Yes.

           24    Q.    Some of these were in proceedings where you were put

14:20:42   25    under oath, and there was a court reporter there, correct?
```

```
            1    A.    That's correct, yes.

            2    Q.    And I think you also gave a typewritten statement that

            3    was submitted to the authorities; is that right?

            4    A.    That's correct, also.

14:20:57    5    Q.    A statement that you prepared with the advice of an

            6    attorney, correct?

            7    A.    Correct.

            8    Q.    So would you say that around four or five statements

            9    were given?

14:21:10   10    A.    I would agree with that, yes.

           11    Q.    Do you agree that taking a life of a person in the

           12    line of duty is probably the most serious action that you

           13    could take as a law enforcement officer?

           14          Is that right?

14:21:28   15    A.    It absolutely is the most serious thing you can do,

           16    yes.

           17    Q.    And I'm sure you would agree with me that one of the

           18    most sacred duties of a police officer is to protect life?

           19    A.    Correct.

14:21:49   20    Q.    And when there is a situation with a police shooting,

           21    you would expect that your statements would be subject to

           22    scrutiny?

           23    A.    Certainly.  Yes.

           24    Q.    And your account of what happened, along with the

14:22:13   25    input of your fellow officers, would be examined thoroughly
```

1    for accuracy, consistency, and truthfulness, right?

2    A.    Of course.  Yes.

3    Q.    And as you sit here in front of this Court -- in this

4    courtroom, in front of this jury, can you say that you have

14:22:36 5    been fairly consistent regarding your account of the

6    shooting?

7    A.    Yes.

8    Q.    That you've been truthful about what happened?

9    A.    Yes.

14:22:43 10    Q.    And that there's been no contradictions or

11    inconsistencies?

12    A.    I'm sure there's a couple of inconsistencies.

13    Q.    Just a couple?

14    A.    Mm-hmm.  Yes.

14:22:53 15    Q.    Okay.  Well, we'll get into that in a minute.

16    A.    Okay.

17    Q.    All right.  So let's talk about the shooting in this

18    case.

19    A.    Okay.

14:23:02 20    Q.    Or the events that led up to it.

21          You were on duty the -- on the day of March 14th --

22    March 16th, 2014?

23    A.    Correct.

24    Q.    And what time did you get on duty?

14:23:19 25    A.    My shift started at 2:00 p.m.  I worked the 2:00 p.m.

Frazier (Cross by Gilbert)

151

1    to 10:00 p.m. shift.

2    Q.    All right.  And did you have your own

3    department-issued cruiser, or vehicle?

4    A.    Yes, sir.  We had take-home cruisers.  We have our own

14:23:38  5    cars.

6    Q.    And was there a report relating to a physical

7    altercation, domestic violence incident, at 3425 Mill Run

8    Road?

9    A.    Yes, there was.

14:24:01 10    Q.    And how did you hear about that incident?

11    A.    I heard a radio dispatch, and they dispatched two

12    officers to that scene.

13    Q.    And what was your response to that information?

14    A.    Initially, nothing.

14:24:21 15    Q.    Did you -- were you dispatched to any particular area?

16    A.    Not initially, no.  I was at home eating when I heard

17    the call come out.

18    Q.    All right.  Did you engage in any efforts to locate

19    Brian Garber?

14:24:36 20    A.    Yes.  Later on, while they were at the call, they

21    advised that he had fled on foot.  And at that time, then I

22    volunteered to go to the scene and assist in finding him.

23    Q.    All right.

24          Can you maybe put the microphone --

14:24:49 25    A.    I'm sorry.

1    Q.    -- a little closer to you.

2    A.    Yes, sir.

3    Q.    Thank you.

4    A.    How about if I just sit up?  Would that work better?

14:24:59 5    Q.    That's better.

6    A.    All right.

7    Q.    And you were aware that other deputies, and maybe even

8    other law enforcement officers, were also looking for

9    Brian Garber, correct?

14:25:08 10    A.    The only persons looking for Brian Garber at that time

11    were myself, Sergeant Nicholson, and Deputy Berry.

12    Q.    Were you aware that Nicholson and Knee

13    were -- responded to the location where the incident

14    occurred, at 3425 Mill Run Road?

14:25:30 15    A.    It was Lieutenant Zehner and Deputy Knee that

16    responded to 3425.  It's now Lieutenant Nicholson who was in

17    the area looking for Brian Garber.

18    Q.    Now, everything that you knew before you responded to

19    the parents' home at 3400 Mill Run Road was from a radio

14:26:03 20    dispatch; is that right?

21    A.    The radio dispatcher, and what I was relayed in person

22    by Sergeant Nicholson.

23    Q.    When you got to the scene?

24    A.    When I got to the scene, yes.

14:26:12 25    Q.    All right.  But while you were on the way there, what

|  |  |
|---|---|
| 1 | you learned about the situation came from a dispatcher, |
| 2 | right? |
| 3 | A.    It was straight from dispatch, yes. |
| 4 | Q.    All right.  You did not know Brian Garber before this |
| 14:26:24  5 | incident, did you? |
| 6 | A.    Never.  To the best of my knowledge, I'd never met |
| 7 | him. |
| 8 | Q.    Did you understand that there was some erratic or |
| 9 | abnormal behavior in connection with Brian Garber's conduct |
| 14:26:39 10 | at the home? |
| 11 | A.    At 3425 Mill Run Road? |
| 12 | Q.    Yes. |
| 13 | A.    The initial call?  It just came in as a domestic |
| 14 | violence call, and that he'd kicked open the door and |
| 14:26:51 15 | assaulted his wife and his mother.  I didn't receive any |
| 16 | other information after that, except when he fled from the |
| 17 | house. |
| 18 | Q.    Okay.  Okay.  So then you -- you went to the residence |
| 19 | of his parents' house; is that correct? |
| 14:27:10 20 | A.    Not while I was there the first time.  I had left and |
| 21 | got dispatched back. |
| 22 | Q.    All right.  What did you do there the first time? |
| 23 | A.    I never went to either one of the residence the first |
| 24 | time I was there.  I searched the wooded area, under a |
| 14:27:23 25 | couple of bridges on Mill Run Road.  Myself and |

**Frazier (Cross by Gilbert)**

154

| | |
|---|---|
| 1 | Sergeant Nicholson searched a couple of farmhouses, I think |
| 2 | a barn.  And we talked to a neighbor who advised us that |
| 3 | Brian Garber lived in the area all his life, and if he |
| 4 | didn't want to be found, he wasn't going to be found. |
| 14:27:40  5 | Q.    All right.  Well, my question to you was, did you |
| 6 | arrive at -- did you go to the house? |
| 7 | A.    No, I did not.  I did not go -- I did go to the house. |
| 8 | Q.    That's all I was asking you.  Did you -- |
| 9 | A.    But not -- |
| 14:27:50  10 | Q.    Did you go to the house? |
| 11 | A.    You asked me if I went to the house on the initial |
| 12 | call.  I did not. |
| 13 | Q.    All right.  Well, let's get on track here. |
| 14 | A.    Okay. |
| 14:27:57  15 | Q.    At some point, you went to the house on 3400 Mill Run |
| 16 | Road; is that correct? |
| 17 | A.    After we could not find Brian Garber on the initial |
| 18 | call. |
| 19 | Q.    I didn't -- |
| 14:28:07  20 | MR. GILBERT:  Judge, would you have him answer |
| 21 | my questions, and not go through a narrative.  Some of these |
| 22 | are yes or no questions. |
| 23 | THE WITNESS:  Yes. |
| 24 | THE COURT:  Repeat your question. |
| 14:28:18  25 | MR. GILBERT:  Okay. |

```
 1    BY MR. GILBERT:

 2    Q.   Did you go to 30 -- at some point, go to 3400 Mill Run

 3    Road?

 4    A.   Yes, I did.

 5    Q.   Okay.  And if you don't understand my question, feel

 6    free to ask me.  I'll clarify.

 7    A.   I was under the understanding that you were lumping

 8    them both together, and that wasn't the case.

 9               MR. GILBERT:  Judge --

10               THE COURT:  Well, just proceed.  Just be

11    clear.

12               MR. GILBERT:  I mean --

13               THE WITNESS:  I apologize.

14               THE COURT:  One fact at a time per sentence.

15               MR. GILBERT:  This is just a really basic

16    fact.

17               THE COURT:  I know.  So let's move through it.

18               MR. GILBERT:  Okay.

19    BY MR. GILBERT:

20    Q.   And I would appreciate, if you have a question, ask me

21    to clarify --

22    A.   My apologies.

23    Q.   -- if you don't understand the question.  Okay?

24    A.   Will do.

25    Q.   Where did you know -- did you know where Brian Garber
```

1    was in that home at 3400 Mill Run Road?

2            Did you know where inside the house he was?

3    A.    Not until we got into the house after

4    Sergeant Nicholson talked to his father.

14:29:16  5    Q.    All right.  So before you arrived, you didn't know

6    where he was in the house?

7    A.    No, sir.

8    Q.    Did you know who was in the house?

9    A.    No, sir.

14:29:25 10    Q.    Did you have a search warrant?

11    A.    No, sir.

12    Q.    Did you have an arrest warrant?

13    A.    We had domestic violence charges.

14    Q.    Okay.  Did you have an arrest warrant?

14:29:35 15    A.    A domestic violence warrant, a signed package, yes.

16    Q.    Is that what you were told?

17    A.    That's what I was told, yes.

18    Q.    Okay.

19            MR. GILBERT:  Can you put up Picture

14:29:52 20    Exhibit 29-5.

21    BY MR. GILBERT:

22    Q.    Showing that exhibit, is this the house where you

23    arrived where you believed Brian Garber to be?

24    A.    Yes.

14:30:09 25    Q.    All right.  And when -- and where that vehicle is, is

1    that the driveway facing the garage?

2    A.    Yes.

3    Q.    And when you arrived there, were there other police

4    vehicles there?

14:30:22 5    A.    Yes.

6    Q.    How many?

7    A.    I believe two.

8    Q.    There was a report that he might have a gun; is that

9    right?

14:30:37 10   A.    That's correct.

11   Q.    And this -- did anybody indicate to you anything more

12   about what the gun was or what it looked like or anything

13   like that?

14   A.    No.

14:30:57 15   Q.    So this is a -- a call that is -- has some high

16   capacity for danger, right?

17   A.    Yes, that's correct.

18   Q.    And it's important that you respond to a situation

19   like that safely and cautiously to protect yourself and any

14:31:18 20   other people that might be in that house?

21   A.    Correct.

22   Q.    When you arrived, did you meet anybody that lived in

23   the house?

24   A.    The only person that we encountered when I went into

14:31:36 25   the house was Brian Garber's father.

1    Q.    All right.  You were the last one to arrive; is that

2    right?

3    A.    That's correct, yes.

4    Q.    Did any -- did the radio dispatch tell you to go

14:31:48 5    there, or you just went on your own?

6    A.    I was told to go there by Lieutenant Zehner.

7    Q.    Excuse me?

8          I'm sorry.  What was your -- your last answer?

9    A.    I was advised where he was at by Lieutenant Zehner.

14:32:17 10    Q.    All right.  And that meant to you to go to that scene?

11    A.    They said on the hill.  I asked what "on the hill"

12    meant, and they meant -- they said 3400 Mill Run Road.

13    Q.    When you arrived there, did you actually meet the

14    other deputies in the driveway area?

14:32:37 15    A.    They were already walking into the garage.

16    Q.    All right.  So did you announce yourself, that you

17    were there?

18    A.    They seen me coming.

19    Q.    And you were the last in line; is that correct?

14:32:49 20    A.    That's correct.

21    Q.    And when you went into the house, did you talk to

22    Mr. Garber, Matt Garber, the father?

23    A.    No, I didn't.

24    Q.    Did you ask him or anybody ask him any questions, Are

14:33:09 25    there anybody -- is there anybody else in this house?

1    A.    I don't know what the conversation was between him and

2    Sergeant Nicholson.  I didn't --

3    Q.    Well, would it be important to know if there were

4    other people in the house with a man that's potentially

14:33:22  5    armed?

6    A.    Yes.

7    Q.    And did you hear anybody ask Mr. Garber, What's going

8    on upstairs?  Are there any people upstairs?  What can you

9    tell me about your son?  Any information that might be

14:33:35  10    helpful?

11    A.    I heard no conversation between Mr. Garber and anyone,

12    no.

13    Q.    Isn't it important to get all the facts before you

14    walk into a dangerous situation and know exactly what you

14:33:52  15    might be facing?

16    A.    Sure.  Yes.

17    Q.    The fact is, you didn't get any information from the

18    owner or occupant of the house that you met, correct?

19    A.    I did not, no.

14:34:03  20    Q.    Okay.  But you didn't hear any information coming from

21    Mr. Garber either, did you?

22    A.    No, sir, I didn't.

23    Q.    And you didn't hear any questions being asked of him,

24    did you?

14:34:13  25    A.    No, sir, I didn't.

1    Q.    Okay.  And did you -- did you see him motion

2    Mr. Garber upstairs?

3    A.    I -- the -- Sergeant Nicholson said he was upstairs in

4    the last bedroom on the left.

14:34:27  5    Q.    All right.

6    A.    And that's where he was leading us to.

7                  MR. GILBERT:  Can you show Picture 29,

8    Exhibit 29-4.

9    BY MR. GILBERT:

14:34:47 10    Q.    Can you, from your recollection, tell me if this looks

11    familiar to you?

12    A.    Yes, it does.

13    Q.    Okay.  This looks like a picture of the hallway; is

14    that correct?

14:34:59 15    A.    Correct.

16    Q.    And at the -- in the picture is two stairs, correct?

17    A.    Yes.

18    Q.    And is that where Mr. Garber was pointing the

19    direction of where his son was?

14:35:14 20    A.    He wasn't pointing at all.

21    Q.    He was saying, He's upstairs, right?

22    A.    I heard Sergeant Nicholson say he was upstairs.

23    Q.    Okay.

24    A.    But I'm guessing per the conversation he had with

14:35:30 25    Matt Garber.

Frazier (Cross by Gilbert)

161

```
          1    Q.    All right.  So then you followed -- who was in front

          2    of you?

          3    A.    Deputy Knee.

          4    Q.    And who was in front of Deputy Knee?

14:35:38  5    A.    Sergeant Nicholson.

          6    Q.    So you were understanding that the room was up the

          7    stairs, and then there was a landing --

          8    A.    Mm-hmm.

          9    Q.    -- and then you would go right down a hallway; is that

14:35:53 10    correct?

         11    A.    Yes.

         12    Q.    And at the end of the hallway, to the left, was the

         13    bedroom where Brian Garber was; is that correct?

         14    A.    That's correct, yes.

14:36:29 15              MR. GILBERT:  Can you bring up 27-9.

         16    BY MR. GILBERT:

         17    Q.    So this is the end of the hallway, correct?

         18    A.    Yes, sir.

         19    Q.    And that opened doorway there, to the left of that

14:36:57 20    piece of furniture and some wall hangings, correct?

         21    A.    That's correct.

         22          Excuse me.

         23    Q.    And approximately how much distance from the top of

         24    the stairway down to the hallway would that be?

14:37:15 25    A.    I -- I have no idea how far --
```

```
         1   Q.   It doesn't take much time to get up there, correct?
         2   A.   No.  There's a couple of rooms between the stairs and
         3   then that bedroom.
         4              MR. GILBERT:  You can take that down.
14:37:41 5   BY MR. GILBERT:
         6   Q.   And would you agree that the door was open?
         7        It wasn't locked and closed?
         8   A.   It was open, yes.
         9   Q.   Did you -- when you were going down the hallway, did
14:37:54 10  you hear any kind of talking by Sergeant Nicholson?
        11   A.   No.  He wasn't that far ahead of me to be -- have made
        12   contact with Mr. Garber and engaged in any conversation yet.
        13   Q.   As you were walking down the hallway, did you hear
        14   Brian Garber say anything?
14:38:16 15  A.   No, I didn't.
        16   Q.   But when you walked down that hallway, you had your
        17   weapon, right?
        18   A.   No.
        19   Q.   You didn't have a weapon with you?
14:38:26 20  A.   Well, I had it with me.  I didn't have it out.
        21   Q.   All right.  You didn't have it out, right?
        22   A.   No.
        23   Q.   But the other two had their weapons out, correct?
        24   A.   That's correct.
14:38:36 25  Q.   Did that indicate to you that there was a heightened
```

Frazier (Cross by Gilbert)

163

1    sense of danger?

2    A.    Sure.

3    Q.    Okay.  But you didn't -- you didn't take your weapon

4    out.

14:38:47  5        Is that because you didn't think that there was any

6    kind of imminent danger?

7    A.    Well, I thought because of the close proximity in the

8    hallway, I didn't want to muzzle the two guys in front of me

9    that may encounter somebody.

14:39:05  10   Q.    Now, when you arrived at the end of the house, before

11   you went upstairs, did the three of you have any discussion,

12   based on what you knew up to that point about the situation

13   with Brian Garber, of any tactical plan to figure out how

14   you were going to approach the situation?

14:39:25  15   A.    No.

16   Q.    Was there any discussion of who would deploy in

17   certain locations?

18   A.    No.

19   Q.    Whether somebody should go into the room or stay

14:39:43  20   outside, where there's some protection and safety because of

21   walls?

22        Did anybody talk about that?

23   A.    No.

24   Q.    You were on the SWAT team at one point, were you not?

14:39:56  25   A.    Seven years.  Yes, sir.

```
          1    Q.    And when you went to a house where they were serving a

          2    warrant or a search warrant or arresting somebody who might

          3    be a potential danger, you come up with a tactical plan,

          4    don't you?

14:40:12  5    A.    You have a raid plan, yes.

          6    Q.    And you basically get together, and you discuss the

          7    order of who is going out, you're going in, what safety

          8    measures you're going to take, how you're going to approach

          9    the suspect, how to keep -- maintain control and all those

14:40:28  10   things, right?

          11   A.    That's correct, yes.

          12   Q.    Okay.  But you didn't do that here, correct?

          13   A.    No, sir.

          14   Q.    All right.  Even though you had heard that he might

14:40:38  15   have a gun?

          16   A.    Yes.

          17   Q.    Okay.  Who was in charge among -- okay.

          18         So you have Knee, Nicholson, and yourself going

          19   upstairs.

14:40:51  20   A.    Correct.

          21   Q.    There's a Lieutenant Zehner, right?

          22   A.    Yes.

          23   Q.    And where was he?

          24   A.    He was on the stairwell as we were going upstairs.

14:41:04  25   Q.    All right.  So he was not out in the hallway; is that
```

1    right?

2    A.    I can't tell you if he made it to the hallway or not.

3    But I know he was in the stairway at one time.

4    Q.    But as to the events that took place at the doorway,

14:41:18  5    who was in charge?

6    A.    Sergeant Nicholson.

7    Q.    Okay.  You decided, of your own choice, to go into

8    that room, correct?

9    A.    Yes, I did.

14:41:44  10    Q.    Sergeant Nicholson -- you did not tell

11    Sergeant Nicholson, I'm going into the room with a man who

12    might have a gun?

13    A.    No, I didn't.

14    Q.    He did not direct you to go into the room, did he?

14:42:11  15    A.    No, he didn't.

16    Q.    Do you believe it might have been a bad idea to go

17    into this room knowing that -- or believing that this man

18    may have a gun, without cover, exposing yourself and the

19    other two fellow officers to a deadly danger, if Brian

14:42:32  20    actually had a gun, right?

21                    MS. WILLIAMSON:  Objection.  Form.

22                    THE COURT:  What's your objection?

23                    MS. WILLIAMSON:  Form, Your Honor.  It was a

24    long question with lots of subparts to that.

14:42:46  25                    THE COURT:  All right.  Break it down.

            1                    MR. GILBERT:  Okay.

            2    BY MR. GILBERT:

            3    Q.    You decided to go, on your own, into the interior of

            4    that room, expose yourself to somebody that you believe

14:43:00    5    might be armed, right?

            6    A.    Yes, sir.

            7    Q.    Did you think that that might be a bad idea?

            8    A.    No, sir.

            9                    MR. GILBERT:  Would you pull up Exhibit 1,

14:43:21   10    page 31, line 4 and 5.

           11                    MS. WILLIAMSON:  Objection, Your Honor.

           12                    MR. GILBERT:  This is impeachment, Your Honor.

           13                    MS. WILLIAMSON:  It's being published to the

           14    jury right now, the transcript?  Is it off?

14:43:39   15                    DEPUTY CLERK:  It's off.

           16                    MS. WILLIAMSON:  It's off my screen.

           17                    THE COURT:  Objection is overruled.

           18                    MR. GILBERT:  Thank you.

           19         All right.  I want to make sure.  Okay.

14:43:48   20                    THE COURT:  And what's the lines on this one?

           21                    MR. GILBERT:  Page 31.

           22                    THE COURT:  Lines . . .

           23                    MR. GILBERT:  -- line 4 and 5.

           24         Is it up?

14:44:06   25                    THE COURT:  Are you asking to publish it?

```
 1              MR. GILBERT:  Okay.

 2         No.

 3    BY MR. GILBERT:

 4    Q.    I'm going to ask you this:

14:44:12  5         Did you say under oath in a previous proceeding, that

 6    it was not -- it was not the smartest thing to do in the

 7    world -- Was it the smartest thing to do in the world?

 8    Probably not.

 9    A.    I remember saying that, yes.

14:44:27 10   Q.    Okay.  So it probably wasn't the most smartest thing

11    to do, right?

12    A.    Probably not, no.

13              THE COURT:  Just to clarify the record, this

14    is Plaintiff's Exhibit 1?

14:44:44 15        Is that what you're referring to?

16              MR. GILBERT:  Yes.  Yeah.  It's not an

17    exhibit.  I mean, it's not going to be admitted.

18              THE COURT:  All right.  Just so we can

19    identify it for the record.

14:44:51 20              MR. GILBERT:  Right.

21    BY MR. GILBERT:

22    Q.    And it's not a smart thing because you're being put in

23    a potential sitting duck position, correct?

24    A.    Correct.

14:45:02 25   Q.    And that could provoke a situation that no one wants,
```

                    1    correct?

                    2    A.    I can't say that it wouldn't.

                    3    Q.    Okay.  But it increases the risk of a volatile

                    4    provocation situation when you go in the room, and you stand

14:45:17    5    in front of somebody on a bed who might have a gun?

                    6    A.    It could, certainly.  Yes.

                    7    Q.    Policing involves safety and safe practices, does it

                    8    not?

                    9    A.    Yes.

14:45:39   10    Q.    Because you want to protect yourself and others; is

                   11    that right?

                   12    A.    Yes, sir.

                   13    Q.    Now, I believe you had said throughout this case, and

                   14    correct me if I'm wrong, that from the time you got to the

14:46:00   15    room until the time the shooting began, there was about

                   16    45 seconds to a minute; is that correct?

                   17    A.    Close to that, yeah.

                   18    Q.    And that Sergeant Nicholson and you were trying to get

                   19    Brian to show his hands, and, I guess -- I suppose, convince

14:46:22   20    him to drop the weapon, right?

                   21    A.    Yes, sir.

                   22    Q.    Okay.  And were you -- were you shouting and talking

                   23    over each other?

                   24    A.    No.  Initially, I started with commands of, Drop your

14:46:36   25    weapon.  Drop your weapon.  And then --

```
          1    Q.    Who was the first one to speak to Brian?

          2    A.    I was.

          3    Q.    Are you sure about that?

          4    A.    I believe so, yes.  If anybody else was speaking, I

14:46:52  5    couldn't hear them over top of me.

          6    Q.    Well, isn't it important to hear what -- to have a

          7    person who is potentially a danger, that that person is

          8    given clear and audible commands that could be understood?

          9    A.    That is correct, yes.

14:47:11 10    Q.    And if you're talking over each other, yelling and

         11    shouting, that could cause confusion, could it not?

         12    A.    It could, yes.

         13    Q.    And when you went into the room, is it at that point

         14    when you pulled out your weapon and pointed it at Brian?

14:47:35 15    A.    When he says he has a gun, yes.

         16    Q.    Okay.  And that's -- and you pointed the gun at him,

         17    correct?

         18    A.    Directly at him, yes.

         19    Q.    All right.  And you had no escape route at that point;

14:47:49 20    is that right?

         21    A.    None.

         22    Q.    Well, was there anything preventing you physically --

         23    physically -- for saying, He's got -- He says he's got a

         24    gun, let's get out of here and back off?

14:48:01 25    A.    No.
```

Frazier (Cross by Gilbert)

170

1    Q.    There was nothing physically to prevent you from

2    telling Knee and Nicholson, He's got a gun.  You got to get

3    out of here?

4    A.    Not safely, no.

14:48:13   5    Q.    Okay.  Well, was there any -- you could still have the

6    gun on him as you're backing out, right?

7    A.    Then that would draw fire towards the other two

8    officers in the doorway, and we would all be bunched up

9    there if he opened fire on us.

14:48:28  10    Q.    And that's all because you went into the room without

11    getting permission; that you put deployment of the three of

12    you in a different position than would have been safe?

13    A.    I disagree with that.

14    Q.    Okay.

14:48:58  15                MR. GILBERT:  I'm going to be referring to

16    Exhibit 2, page 51.

17    BY MR. GILBERT:

18    Q.    Did you -- did you in a previous proceeding --

19                So you had time --

14:49:31  20                "Question:  So you had time to back out to assess the

21    situation, did you not?"

22                That was a question posed to you.

23                I think I asked you had that.

24    A.    I don't understand that question.

14:49:43  25    Q.    Okay.  The question was -- tell me if you recall this

Frazier (Cross by Gilbert)

171

1   question and answer.

2        "So you had time to back out to assess the situation,

3   did you not?"

4   A.    I don't recall that question.

14:49:54  5   Q.    Okay.  And then the answer was, "Correct."

6   A.    I don't recall that, no.

7   Q.    Okay.

8             MR. GILBERT:  Could you pull up the -- can you

9   pull up --

14:50:08  10       Can I pull up the --

11            THE COURT:  Show it to the witness.

12            MR. GILBERT:  Do you want me to carry it over

13  there to show him?

14            THE COURT:  That would be fine.  Old-school --

14:50:15  15            MR. GILBERT:  Or can we put it on the screen?

16            THE COURT:  Can you put it on the screen for

17  the witness.

18            DEPUTY CLERK:  I can put it on the screen for

19  the witness.

14:50:23  20            THE COURT:  Yeah.  For the witness, we can put

21  it on the screen.

22            MR. GILBERT:  Okay.

23       So that would be from page 51 to 52.  Lines 24, 25 on

24  51, to 17 on 52.

14:50:37  25            THE COURT:  Give me those lines, again.

```
  1              MR. GILBERT:  Page 51, bottom, 24, 25 line;

  2     and 52, from 1 to 17.

  3              THE COURT:  Okay.  Got it.

  4              MR. GILBERT:  I mean, I could also just show

  5     it to him.

  6              DEPUTY CLERK:  He should have it.

  7         Do you have it on your computer?

  8              THE WITNESS:  I have nothing.

  9              THE COURT:  Why don't you approach the

 10     witness.

 11              MR. GILBERT:  Thank you.

 12              THE COURT:  Is it in the book?

 13              MS. GREENE:  It's in the book.

 14              THE COURT:  All right.  Why don't we give him

 15     the book, and have him view the transcript there.

 16     BY MR. GILBERT:

 17     Q.   So I want you to read from this line, 24 on this page,

 18     to line 17 on the next page.

 19     A.   "Question:  Okay.  So you had time to back out to

 20     assess the situation, did you not?"

 21     Q.   And there were objections.

 22     A.   There were some objections by my attorney.

 23     Q.   And then the answer.

 24     A.   Where would you like me to start --

 25     Q.   And I said --
```

**Frazier (Cross by Gilbert)**

173

```
 1    A.    -- 17?

 2    Q.    16.

 3    A.    16?

 4          "Can you answer that question."

 5          And my answer was, "Correct."

 6    Q.    Okay.  So does that refresh your recollection that in

 7    a previous --

 8              MS. WILLIAMSON:  Objection, Your Honor.  He

 9    skipped his answer to the question.  It was -- I mean,

10    line 3 is his answer.

11              THE COURT:  Sustained.  He's admitted that

12    that was his testimony.

13    BY MR. GILBERT:

14    Q.    So you did have time to get out and assess the

15    situation?

16    A.    Time and safety are two different things.

17    Q.    Okay.  I asked you, you had time to get out of that

18    room?

19    A.    I had time, yes.

20    Q.    Okay.  That's all.

21          To assess the situation.

22          Okay.  Now, when you pointed your gun at Brian, you

23    thought he had a gun underneath his shirt, right?

24    A.    Yes, sir.

25    Q.    But you did not actually see a gun, correct?
```

        1    A.    I had never seen a gun, no.

        2    Q.    Now, while you were pointing the gun at him, there was

        3    a lot of talking going on.  Drop the gun.  We have families.

        4    Don't do it.

14:54:10 5          Did he ever --

        6    A.    I'm sorry.

        7    Q.    Did Brian ever actually threaten to shoot you or

        8    anybody else?

        9    A.    No.

14:54:27 10   Q.    And for 45 seconds to a minute, which is the time

       11    frame that you were in the room before shots were fired,

       12    during that period of time, there was no -- there was

       13    nothing physical to prevent you from leaving that room?

       14    A.    Other than having what appeared to be a gun pointed at

14:54:55 15   me from underneath his shirt.

       16    Q.    But you didn't -- you didn't shoot him for 45 seconds

       17    to a minute, correct?

       18    A.    That's right, I did not.

       19    Q.    Even though -- even though he was pointing a gun at

14:55:07 20   you?

       21    A.    That's correct, yes.

       22    Q.    Or what you believed to be a gun?

       23    A.    Correct.

       24    Q.    Well, I would -- I would think that any officer who

14:55:16 25   has a gun pointed at him would want to neutralize that

**Frazier (Cross by Gilbert)**

175

1    threat, correct?

2    A.    That's not true at all.

3    Q.    You wait -- you wait until he shoots you?

4    A.    He's in crisis situation.  I'm not just going to walk

14:55:30  5    in and shoot somebody.

6    Q.    All right.  If he had got a shot off -- if he had a

7    gun, he could have gotten a shot at -- out at you before you

8    had any time to react, right?

9    A.    Sometimes that's part of our job.

14:55:40  10    Q.    Or he could have shot any of the other two, if he had

11    a gun?

12    A.    That's correct.

13    Q.    But he didn't have a gun?

14    A.    We know --

14:55:47  15    Q.    And you stood --

16    A.    -- now that he didn't have a gun.

17    Q.    And you stood there for 45 seconds to a minute with --

18    claiming and telling this jury that there was a gun pointed

19    at you, and you didn't -- you didn't shoot him?

14:56:01  20    A.    I'm not the habit of just walking in and shooting

21    people.

22    Q.    Isn't it a fact that you didn't shoot him because you

23    didn't feel the need to shoot him?

24    A.    That's not true at all.

14:56:22  25    Q.    And you had testified, had you not, before, that you

**Frazier (Cross by Gilbert)**

176

1     did not shoot until you heard a pop?

2     A.     That's correct.

3     Q.     A loud bang?

4     A.     That's correct.

14:56:32  5     Q.     Or a pop?

6     A.     Yes.

7              MR. GILBERT:  Page 56, lines 21 to 25.

8          So we're not using this?

9              MR. DOUGLAS:  I can do it now.

14:57:04  10         Can I do it?

11             DEPUTY CLERK:  The TVs are not on in the jury

12    box, correct?

13         Do you want them on for the witness?

14             THE COURT:  Yes.  The witness can view.

14:57:10  15            THE CLERK:  Okay.

16             THE COURT:  All right.

17    BY MR. GILBERT:

18    Q.     You just told the jury that you never said you didn't

19    feel the need to shoot Brian Garber during the 45 seconds to

14:57:24  20    a minute, right?

21    A.     Correct.

22    Q.     Okay.

23             MR. GILBERT:  Now, what did I do with my copy?

24         Sorry.

14:58:12  25    BY MR. GILBERT:

```
         1   Q.    All right.  Do you see it says there, page 21 -- on

         2   line 21, "And despite all the commands and references to a

         3   gun during that period of time -- we don't have to go over

         4   all the details -- prior to hearing the pop, you did not see

14:58:27 5   the need -- the need to use deadly force, correct?"

         6   A.    Correct.

         7   Q.    And you agreed with me then?

         8   A.    Correct.

         9   Q.    Okay.  So when I asked you whether you felt -- whether

14:58:45 10  you felt you needed to -- whether you didn't need to use

        11   deadly force during that period of time, I think you said, I

        12   didn't need to -- I didn't need to, right?

        13         So is it -- so now you're saying -- now you said you

        14   needed -- you could have used deadly force, but before you

14:59:03 15  said you didn't need to use it, right?

        16              MS. WILLIAMSON:  Objection, Your Honor.

        17              THE COURT:  Rephrase.

        18              MR. GILBERT:  Okay.

        19   BY MR. GILBERT:

14:59:14 20  Q.    Anyway, this speaks for itself.

        21         Do you agree with that statement you made, that you

        22   did not see the need to use deadly force?

        23   A.    I agree with that.

        24   Q.    Okay.  And the only reason that you used deadly force

14:59:29 25  was because you heard a pop?
```

         1    A.    That's not the only reason.

         2    Q.    But you didn't shoot him beforehand, right?

         3    A.    Like I said, he was in crisis mode.  We were trying to

         4    help him.

14:59:41 5    Q.    But what caused you to pull the trigger was the pop,

         6    right?

         7    A.    Was the pop, yes.

         8    Q.    Okay.  When you say you heard a pop, it was really a

         9    loud bang, was it not?

15:00:01 10   A.    I described it as a pop, if I'm not mistaken.

        11    Q.    It sounded like a gunshot, right?

        12    A.    It was a muffled pop, what I -- it sounded like a

        13    gunshot to me, yes.

        14    Q.    Well, did you -- were you not sure?

15:00:20 15   A.    I am sure.

        16    Q.    Okay.  A gun produces a distinct sound, does it not?

        17    A.    It does, depending on where you're at, yes.

        18    Q.    Especially in a small room?

        19    A.    It does sound different in a room as opposed to

15:00:35 20   outside.

        21    Q.    It would be louder in a room than it would be outside,

        22    would it not?

        23    A.    No.

        24    Q.    No?

15:00:48 25         Would you say that the need to use deadly force, that

            1   your understanding is that it should not be used unless

            2   there is an imminent danger of serious physical harm?

            3   A.    Correct.

            4             MR. GILBERT:  Would you pull up Joint

15:01:16    5   Exhibit 5.

            6        Well, the top part here.

            7   BY MR. GILBERT:

            8   Q.    Do you see that?

            9             MS. WILLIAMSON:  Objection, Your Honor.

15:01:32   10             THE COURT:  Excuse me?

           11             MS. WILLIAMSON:  I'm objecting to the use of

           12   this exhibit.  I thought the policies are not part . . .

           13             THE COURT:  I don't understand -- I don't

           14   understand your objection.

15:01:43   15        It's a joint exhibit, isn't it?

           16             MS. WILLIAMSON:  It is a joint exhibit.  We

           17   left it in just for purposes of -- I guess impeachment

           18   purposes.  But pursuant to the rulings, I believe that the

           19   policies were out.

15:02:00   20             MR. GILBERT:  I just want him to acknowledge

           21   what his standards are of this policy.

           22             THE COURT:  You may inquire.

           23             MR. GILBERT:  Okay.

           24             DEPUTY CLERK:  Should I publish it?

15:02:12   25   BY MR. GILBERT:

**Frazier (Cross by Gilbert)**
180

```
         1    Q.    You've seen these policies before, right?

         2    A.    Yes, sir, I have.  Yes.

         3    Q.    And there's a number of circumstances where deadly

         4    force is justified, right?

15:02:23 5    A.    That's correct, yes.

         6    Q.    The first one is, "To defend himself or herself from

         7    what is reasonably believed to be an imminent threat of

         8    serious physical harm and death," right?

         9    A.    That's correct, yes.

15:02:39 10   Q.    Is that the standard that you used that day?

        11    A.    Yes.

        12    Q.    All right.

        13              MR. GILBERT:  Can you go down a bit.

        14          Okay.  Keep going.

15:02:51 15         All right.

        16    BY MR. GILBERT:

        17    Q.    Where it says, "B:  Use of deadly force."

        18          "Prior to discharging a firearm to protect human life

        19    or prevent the escape of a fleeing felon, employees shall

15:03:06 20   identify themselves as sheriff's office employee, and give

        21    warning of their intent to shoot, when feasible."

        22    A.    I believe pointing a gun at somebody is --

        23    Q.    I didn't ask you -- I only asked you, is this in your

        24    policy, right?

15:03:22 25   A.    Yes, it is.
```

1    Q.    Okay.  And it says here, "Give warning of their intent

2    to shoot, when feasible."

3          Do you see that?

4    A.    I do, yes.

15:03:38  5    Q.    Okay.  And you were in that room for 50 seconds.

6          Did you ever tell Brian Garber if he doesn't drop the

7    gun, You're going to be shot and killed?

8    A.    No.

9               MR. GILBERT:  You can take that down.

15:04:02  10   BY MR. GILBERT:

11   Q.    At the time that you heard the pop, or the loud bang,

12   whatever it was, you were looking at Brian Garber, straight

13   ahead, right?

14   A.    Straight at his chest.

15:04:15  15   Q.    All right.  And did you see a muzzle flash?

16   A.    I did not.

17   Q.    And if there was a muzzle flash, you would have seen

18   it, correct?

19   A.    I never seen a gun fired from underneath a shirt

15:04:39  20   before, so I don't know.  I can't answer that.

21   Q.    And are you telling this jury that you did not create

22   that loud noise, that pop?

23   A.    I am absolutely sure.

24   Q.    And if that was a gunshot, a real gunshot, there was

15:05:08  25   nobody else in that room with a gun, correct --

```
 1   A.    Correct.

 2   Q.    -- besides you, Knee, and Nicholson?

 3   A.    That's correct, yes.

 4   Q.    Okay.  You claim it wasn't from you, right?

 5   A.    That's right, yeah.

 6   Q.    Okay.  And you have testified before that it could not

 7   have come from Knee or Nicholson, correct?

 8   A.    I don't believe it did, no.

 9   Q.    There was no ghost in that room, was there?

10   A.    No, sir.

11   Q.    And you are maintaining that the popping -- or the

12   popping sound came directly from Garber?

13   A.    Yes, I am.

14   Q.    Did you see anything there that could have been in --

15   near Garber that could be something that would create the

16   sound of a gunshot?

17   A.    No.

18   Q.    And until this day, as you sit here right now in this

19   trial, almost five years later, have you found anything that

20   could have created a sound like that, other than a firearm?

21   A.    I haven't looked.

22   Q.    Well, other people have looked, have they not?

23   A.    I don't know.

24   Q.    But you were in the -- inside of the room, the one

25   deputy out of the three that was in the most dangerous
```

1    position, correct?

2    A.    Yes, sir.

3    Q.    If anybody had the so-called logic to fire, based on

4    what you've been telling us, it would have been you, right?

15:07:08   5    Because you were the one facing the danger.

6    A.    Not necessarily.

7    Q.    And you've never come up with even a theory of how

8    that gunshot sound could have come from any other source

9    other than a gun?

15:07:34  10    A.    No, sir.

11   Q.    And is it your position that the reason that you

12   start -- pulled the trigger and fired at Brian Garber was

13   the sound of the shot, right?

14   A.    Yes.

15:07:57  15   Q.    How many times did you shoot?

16   A.    Eight to ten.

17   Q.    And did you fire those in rapid succession?

18   A.    Less than 2 seconds.

19   Q.    What's that?

15:08:09  20   A.    Less than 2 seconds, probably.

21   Q.    There was no pause by any of the shots?

22   A.    Not to my knowledge.

23   Q.    Okay.  And where were you shooting at?

24   A.    Center mass, his chest.

15:08:33  25   Q.    And did you hear other shots besides the shots that

```
             1    you fired?

             2    A.    I heard the two officers firing beside me, yes.

             3    Q.    And they were all simultaneous?

             4    A.    All simultaneous.

15:08:48     5    Q.    Okay.  And so the total -- you would say the total

             6    barrage of shots was about what?  2 seconds?

             7    A.    About 2 seconds or so, yeah.

             8    Q.    And when you were firing, did you watch what

             9    Brian Garber was doing?

15:09:02    10    A.    I'll say yes.

            11    Q.    Okay.  Did you see him slump over?

            12    A.    Yes.

            13    Q.    Okay.  To which way -- which direction?

            14    A.    To his right side, between the bed and the wall.

15:09:15    15    Q.    Okay.  So if you're looking at him, he would be going

            16    to -- from looking at him from your angle, to the left, but

            17    from him, to the right?

            18    A.    Yes.

            19    Q.    Okay.  And weren't you concerned as to whether --

15:09:34    20    after the shots were fired, whether he still had a gun?

            21    A.    He appeared to be -- the threat appeared to be --

            22    Q.    I'm just asking yes or no.  That's all right now.

            23    A.    Repeat the question, please.

            24    Q.    Okay.

15:09:48    25          You had just shot and maybe killed somebody.
```

|   |   |
|---|---|
| 1 | Were you interested in knowing if there was a gun |
| 2 | there, finding the gun, and putting it in a safe position? |
| 3 | A. That's more than one question. |
| 4 | Q. Okay. Well, did you look for the gun? |
| 15:10:06 5 | A. No. |
| 6 | Q. Did you see -- did you see a gun? |
| 7 | A. No. |
| 8 | Q. Did you see an object in his hands? |
| 9 | A. No. |
| 15:10:15 10 | Q. Did you see an object anywhere near him? |
| 11 | A. No. |
| 12 | Q. Did you tell anyone while you were in that room, after |
| 13 | the shooting, that you thought you were shot? |
| 14 | A. I thought I was hit by an object, yes. |
| 15:10:34 15 | Q. Okay. Well, did you think you were shot? |
| 16 | A. I didn't know if I was or not, but I wasn't taking any |
| 17 | chances. |
| 18 | Q. All right. Well, it turned out that you weren't shot, |
| 19 | right? |
| 15:10:46 20 | A. No, that's correct. I don't know what hit my uniform. |
| 21 | Q. And you were not hit with anything, right? |
| 22 | A. I still don't know that. |
| 23 | Q. Well, you were wearing a vest, were you not? |
| 24 | A. Correct. |
| 15:10:58 25 | Q. And where was the feeling that you had been hit with |

1    something?

2    A.    Just above my left breast pocket.

3    Q.    So it was underneath the vest?

4    A.    No.

15:11:16  5    Q.    It was where?

6    A.    I felt it on the outside.

7    Q.    On the outside?

8    A.    Yes.

9    Q.    You could feel your body from the outside when there's

15:11:22 10    a bulletproof vest on you?

11    A.    Well, if something hits you, yes, you would know that.

12    Q.    Did you ever find out what that was?

13    A.    No, I haven't.

14    Q.    Okay.  And did you think that the gun, which isn't a

15:11:42 15    gun, or the object, which we don't know what it is,

16    would -- might have fallen between the bed and the window?

17    A.    That was our initial thought, yes.

18    Q.    Okay.

19              MR. GILBERT:  I'm going to show Exhibit 28-11.

15:12:10 20    And just to let the jury know, this is the one crime

21    scene photo that we agreed on.

22              THE COURT:  That I'm permitting.

23              MS. WILLIAMSON:  Your Honor?

24              THE COURT:  Yes.

15:12:24 25              MS. WILLIAMSON:  We have an objection.

1    Perhaps we should address this sidebar.

2              THE COURT:  All right.  We can come to

3    sidebar, but I --

4         I'll hear you.

15:12:33  5              MS. WILLIAMSON:  Thank you, Your Honor.

6         (Discussion held at sidebar, as follows:)

7              MS. WILLIAMSON:  Thank you, Your Honor.

8         We received the exhibit.  I think it was your ruling

9    that just came to me that said that this --

15:13:00  10              THE REPORTER:  I can't hear you.

11              MS. WILLIAMSON:  Okay.  Let me stand over

12    here.

13              THE REPORTER:  That's better.

14              MS. WILLIAMSON:  The ruling that we had that

15:13:01  15    the crime scene photo that is allowed in could be in black

16    and white, we received that copy from plaintiff's counsel.

17    However, it appears to not just be a black and white copy,

18    but it's also zoomed in closer than the original version of

19    this photograph.

15:13:17  20         This is the original version of the photograph.  Just

21    like looking at what the exhibit is, you can tell it's

22    pulled closer.  He appears larger.

23              THE COURT:  Do you have it as you're going to

24    post?

15:13:28  25              MR. GILBERT:  It's not what she said, your

1     Honor.

2                          (Sidebar continued off the record.)

3                          THE COURT:  The objection to the exhibit

4     overruled.

15:14:14  5                       (End of sidebar discussion.)

6                       (Proceedings resumed in open court.)

7                          THE COURT:  We are at 3:15, counsel.  We

8     haven't taken an afternoon break.

9          Is this an appropriate time to take 15 minutes?

15:14:30 10                       MR. GILBERT:  That's okay.  That's fine.

11                       THE COURT:  All right.

12          We are going take a 15-minute recess, and Mr. DeVan

13     will take you back to the jury room.  And we will resume at

14     3:30.

15:14:44 15          Again, all the admonitions I've given you about

16     communicating, talking with each other.

17          Please place your notebooks back in the envelopes, and

18     leave them on your seats.

19                       DEPUTY CLERK:  All rise.

15:15:37 20                       THE COURT:  Court is in recess until 3:30.

21                              - - -- - -

22                       (The jury exited the courtroom.)

23                     (Proceedings in recess at 3:15 p.m. )

24                              - - -

15:31:51 25                       DEPUTY CLERK:  All rise.  Please be seated.

```
 1                             - - -

 2               (Proceedings commenced at 3:30 p.m.)

 3               (In Open Court - Jurors Not Present)

 4                      (Defendant Present)

15:32:03  5                    - - -

 6               THE COURT:  Before I bring the jury back in,

 7     there's been an inquiry about the stipulations of fact.

 8          My recollection is at the final pretrial, we agreed

 9     that it was not necessary to give that stipulation as part

15:32:15 10    of the instructions to the jury, initially, but we hadn't

11     made a final decision on when it would be read.  The

12     alternatives being after opening statement, or as part of

13     the evidence before we have closing argument.

14          I don't intend to do it now.

15:32:39 15         However, what is counsel's thought on doing it between

16     Officer Frazier's testimony and the next witness?

17               MR. GILBERT:  I really don't have any

18     preference.

19               THE COURT:  Preference, one way or the other?

15:33:03 20              MR. DOWNEY:  I would defer to the Court.

21               THE COURT:  Okay.  All right.  We'll decide

22     that after Officer Frazier is done testifying.

23          Do you expect to finish your --

24               MR. GILBERT:  Yes.

15:33:17 25              THE COURT:  -- your cross-examination today?
```

| | 1 | MR. GILBERT:  Yes. |

                    MR. GILBERT:  Yes.

                    THE COURT:  And probably, you would not finish

your examination of him today, would you?

                    MR. GILBERT:  He's --

15:33:27            THE COURT:  Or do you intend to bring him

back?

                    MR. DOWNEY:  We will call him back in our

case, Your Honor.

                    THE COURT:  You'll call him back as a part of

15:33:36    your case.

          So there will be no examination at this time?

                    MR. GILBERT:  Correct.

                    THE COURT:  All right.  So when we're finished

with Officer Frazier, then we'll adjourn, or recess, until

15:33:47    tomorrow.

                    MR. GILBERT:  Okay.

                    THE COURT:  Okay?

                    MR. GILBERT:  We wanted to go to 5:30.  We

could call somebody else.

15:33:53            THE COURT:  Well -- and, quite frankly, if we

can get him out about 5:00, so much the better for the

jurors, so . . .

                    MR. GILBERT:  Okay.

                    THE COURT:  We'll go to 5:30 when necessary,

15:34:05    but we'll try to always do better than that.

```
                           All right.  So, Mr. DeVan, bring back the jury.
```

 1                        All right.  So, Mr. DeVan, bring back the jury.

 2                             DEPUTY CLERK:  All rise for the jury.

 3                             (The jury entered the courtroom.)

 4                             DEPUTY CLERK:  Please be seated.

15:35:47  5                             THE COURT:  Officer Frazier, will you please

 6        retake the stand.

 7             I'll remind you that you're still under oath.

 8             And, Mr. Gilbert, you may proceed with your

 9        examination.

15:36:07 10                             MR. GILBERT:  Thank you.

 11           CONTINUED CROSS-EXAMINATION OF RAYMOND JEFFREY FRAZIER

 12       BY MR. GILBERT:

 13       Q.    Mr. Frazier, I wanted to ask you a question about at

 14       the time of the shots fired.

15:36:17 15            When you fired -- when you heard the pop, that was

 16       what -- you said that was what caused you to pull the

 17       trigger?

 18       A.    Yes.

 19       Q.    Did you see any movement from Brian Garber when you

15:36:34 20       fired the shot?

 21       A.    Yes.

 22       Q.    What kind of movement did you see?

 23       A.    He leaned forward, and lifted his shirt slightly with

 24       his left hand.

15:36:43 25       Q.    Was that after the pop?

```
 1    A.    I believe it was right before the pop.

 2    Q.    Are you sure?

 3    A.    I'm not 100 percent positive.

 4    Q.    Okay.  But you had already decided to shoot before you

 5    saw that, right?

 6    A.    Yes.

 7    Q.    Okay.  I want to show you Exhibit 28-11.

 8                MR. GILBERT:  And this is not shown to the

 9    jury at this point, right?

10                THE COURT:  Right.

11                MR. GILBERT:  Right.

12                THE COURT:  Not at this point.

13                MR. GILBERT:  All right.

14    BY MR. GILBERT:

15    Q.    Showing you what's been marked as 28-11, Plaintiff's

16    Exhibit, this photograph.

17          Does that depict accurately the position of

18    Brian Garber's body after the shots were fired?

19    A.    Yes.

20    Q.    Okay.

21                MR. GILBERT:  Can we publish this, Judge?

22                THE COURT:  Any objection?

23                MS. WILLIAMSON:  No, Your Honor.

24                THE COURT:  It may be published.

25                MR. GILBERT:  Thank you.
```

15:36:57  (line 5)
15:37:22  (line 10)
15:37:25  (line 15)
15:37:44  (line 20)
15:37:58  (line 25)

1    BY MR. GILBERT:

2    Q.    Now, in this -- do you see anything protruding from

3    his shirt in that picture?

4    A.    No, I do not.

15:38:11 5    Q.    Do you see anything in -- anything in his hands?

6    A.    I can only see one of his hands.

7    Q.    Did you ever see the other hand?

8    A.    I'm not sure when you're talking about.

9    Q.    When you -- did you ever go -- go up to the bed to

15:38:27 10    look?

11    A.    I did, yes.

12    Q.    And did you see anything in the other hand?

13    A.    I didn't get that close to him.

14    Q.    All right.

15:38:34 15    A.    I went to the end of the bed.

16    Q.    All right.  And do you know how his hands got up to

17    that point, to the right, by his head, after the shots?

18    A.    No, I don't.

19    Q.    Did you see his hands -- when you were firing, did you

15:38:48 20    see his arms go up to the right?

21    A.    No, I don't believe so.

22    Q.    You were trained -- your eyes were trained on him all

23    the time, right?

24    A.    That's right.

15:39:00 25    Q.    All right.  And so you didn't see movement -- movement

Frazier (Cross by Gilbert)

194

```
           1    from underneath his shirt to where his arms were located

           2    after the shot, correct?

           3    A.    I seen his whole body moving backwards.  That's all I

           4    seen.

15:39:17   5    Q.    Okay.  And do you see the object to the left of his

           6    left leg?

           7    A.    Yes, I do.

           8    Q.    All right.  Did you see that object after the

           9    shooting?

15:39:29  10    A.    I can't say that I did, no.

          11    Q.    Well, either you -- you don't remember whether you saw

          12    it?

          13    A.    I don't remember if I saw it or not.

          14    Q.    All right.  It's pretty visible right there, is it

15:39:45  15    not?

          16    A.    Yes, it is.

          17    Q.    And you have no idea how it got there, correct?

          18    A.    No, I don't.

          19    Q.    And you would have thought that the gun, if it was a

15:39:54  20    gun, or the object in his hand, would have fallen onto the

          21    floor between the bed and the wall, where the window is,

          22    right?

          23    A.    That was the belief, since we didn't see a gun, yes.

          24    Q.    Okay.  But the way the body is positioned, that's kind

15:40:10  25    of where you thought it went, right?
```

1      A.    That's correct, yes.

2      Q.    All right.

3                  MR. GILBERT:  You could remove the exhibit.

4      BY MR. GILBERT:

15:40:22  5      Q.    Did you see at any time, Brian lift up his shirt with

6      his left hand, and pull out what appeared to be a gun from

7      under his shirt?

8      A.    He lifted his -- lifted his shirt --

9      Q.    Just wait a second.

15:40:40  10     A.    All right.  Go ahead.

11     Q.    Did you -- did you see Brian pull out what appeared to

12     be a gun from under his shirt and then fire?

13     A.    Pull out?  No.

14     Q.    Pull out.

15:40:52  15           All right.  Do you recall your written statement,

16     which is Exhibit 6, that you provided to the authorities?

17     A.    I don't have a photographic memory.

18     Q.    Okay.  I'll get it for you.

19           I guess the better question would be:  Did you see

15:41:38  20     Brian lift up his shirt with his left hand, and with his

21     right hand, pull out what appeared to be a gun before you

22     heard the shot -- the pop?

23     A.    I don't recall.

24                 MR. GILBERT:  Can I approach?

15:41:58  25                 THE COURT:  You may.

```
 1              MR. GILBERT:  It's the bottom of page 6.

 2         Can we show the witness the bottom of page 6 of

 3    that --

 4              THE COURT:  Yes, you may.

 5              MR. GILBERT:  -- Exhibit 6?

 6         Keep going down.  Okay.

 7    BY MR. GILBERT:

 8    Q.   Okay.  It says there, "He lifted his shirt up slightly

 9    with his fingers of his left hand, and with his right hand,

10    he pulled out what appeared to be a firearm from under his

11    shirt.  As he started to extend his right hand out toward

12    me, I heard a loud popping sound."

13    A.   Yes, I see that.

14    Q.   You see that.

15         Did you see him pull out what appeared to be a firearm

16    from under his shirt?

17    A.   If I put it here in my statement, I did, yes.

18    Q.   Well, it reads to me, like, he -- when you pull

19    something out and extend it, it means -- that's what it

20    means, not anything else, right?

21         So was this not phrased properly?

22    A.   I really don't know how to explain that.

23    Q.   All right.

24              MR. GILBERT:  Take it down.

25    BY MR. GILBERT:
```

15:42:11 (line 5)
15:42:46 (line 10)
15:43:02 (line 15)
15:43:18 (line 20)
15:43:41 (line 25)

```
                1    Q.    Did you see Brian before hearing the pop, move his

                2    shirt up -- move his shirt up, and raise his hand?

                3    A.    I never seen him raise his hand.

                4    Q.    Okay.

15:43:53        5    A.    I seen him move his shirt up.

                6    Q.    All right.

                7    A.    I'm not sure what you mean by the second part.

                8          MR. GILBERT:  Would you -- would you put in

                9    Exhibit 1, page 23, lines 18 to 20.

15:44:22       10          23.  That's right.

               11    BY MR. GILBERT:

               12    Q.    Do you see here where you say under oath in a prior

               13    proceeding, "And then just all at once, moves his shirt up,

               14    and he raises his hand, and there's a pop?

15:44:41       15    A.    Yes, I do see that.

               16    Q.    Okay.  So do you -- does this refresh your

               17    recollection that you had said before that he raised his

               18    hand?

               19    A.    Yes, it does.  Yes.

15:44:49       20    Q.    Okay.  That is not accurate, is it?

               21          That is not what you said before, in front of the jury

               22    today.

               23          Do you understand?

               24    A.    I don't -- I don't understand.

15:45:05       25    Q.    It's not the same that you said, that there was some
```

1    slight movement underneath the shirt.

2    A.    I don't remember you asking me that.

3    Q.    Okay.  Well, the jury will remember.

4          Did you ever say before the pop sound, that he was

15:45:26  5    bringing his hand out of his shirt?

6    A.    I wasn't asked that today.

7    Q.    I'm sorry?

8    A.    You didn't ask me that.

9    Q.    No.  I'm asking you now.

15:45:36  10    Did you ever say that he was bringing his hand out of

11    the shirt?

12    A.    I don't recall.

13              MR. GILBERT:  Would you go to page 24, lines 2

14    to 10.  I think that's not . . .

15:46:02  15    BY MR. GILBERT:

16    Q.    Do you see where it says on line 9, "He was bringing

17    his hand out of his shirt, and moving it forward"?

18    A.    Yes, I do.

19    Q.    Okay.  Is that correct?

15:46:13  20    A.    Yes.

21    Q.    Do you remember saying in an interview that Brian

22    brandished what looked like a gun from underneath his shirt?

23    A.    I said what appeared to be a gun.

24    Q.    Do you know what "brandish" means?

15:46:32  25    A.    Show.

1    Q.   Okay.  But you never saw him show any object, correct?

2    A.   No, that's not true.

3    Q.   You didn't -- you said you didn't see anything outside

4    of the shirt.

15:46:45  5    A.   I testified that I seen what appeared to be a firearm,

6    yes.

7    Q.   Okay.  "Brandish" means show or display.

8         Did you see a gun brandished and displayed?

9    A.   No.  I never stated that I seen a gun.

15:47:05 10    Q.   I'm asking, did you see a gun brandished and

11   displayed?

12   A.   No.

13   Q.   And, once again, it -- you maintain today that the

14   reason you pulled the trigger was the sound of the pop,

15:47:23 15   right?

16   A.   Yes, that is correct.  Yes.

17   Q.   Okay.  And is it your testimony that he did -- he

18   never pulled out -- pulled out a firearm from under his

19   shirt?

15:47:37 20   A.   That's correct.

21   Q.   Okay.  So would you show -- let me show you Exhibit 6,

22   again.

23                MR. GILBERT:  Bottom of page 6.

24   BY MR. GILBERT:

15:48:05 25   Q.   Where it says, once again, "He pulled out what

1    appeared to be a firearm."

2    A.    Your question was, did he pull out a firearm?

3          My statement is, he pulled out what appeared to be a

4    firearm.

15:48:22  5    Q.    Okay.  Well, what was -- what did you see in his hand?

6    A.    A black object.

7    Q.    Okay.  Now, you're saying you saw a black -- a black

8    object?

9    A.    Yes.

15:48:30 10    Q.    When did you see the black object?

11    A.    When he lifted his shirt.  That's what appeared to be

12    a firearm.  That was my descriptor of a firearm.

13    Q.    You said you never saw anything come out from under

14    the shirt.  You told us that.

15:48:48 15    A.    My testimony, and I believe in my original statement,

16    it says that I seen what appeared to be a firearm.

17    Q.    You actually saw an object in his hand?

18    A.    I saw something black.  What the description of it --

19    Q.    What did it look like?

15:49:11 20    A.    A piece of something black.  I can't describe it to

21    you.

22    Q.    And any -- there's a million things that could be

23    black.  Not every one -- every one of them look like a

24    firearm.

15:49:23 25    A.    Sure.  You're right.

1    Q.    Okay.  You didn't tell this jury before that you never

2    saw what was underneath his shirt?

3    A.    I don't recall.

4    Q.    Okay.  Did you ever see his hand come out of his

15:50:15  5    shirt?

6    A.    Which hand?

7    Q.    His right hand.

8    A.    I never seen it come all the way out.  I seen a black

9    object that appeared to be a firearm when he lifted his

15:50:28  10   shirt with his left hand.  That's what I've always testified

11   to.

12   Q.    Was that after you shot, when you saw a black object

13   come out of his hand?

14   A.    It's about the time that I heard the pop.

15:50:44  15   Q.    What's that?

16   A.    It was about the time I heard the pop, and that's when

17   I returned fire.

18   Q.    I'm asking, did you ever say that you saw a dark

19   object in his right hand come out of the shirt after the

15:50:59  20   shooting?

21   A.    After the shooting?

22   Q.    Mm-hmm.

23   A.    I believe I said that.

24   Q.    Are you sure about that?

15:51:06  25   A.    Well --

1    Q.    Did you ever say that you saw the dark object come out

2    of his hand -- out of his -- out of his -- from his -- on

3    his right hand, out of his shirt after the shooting, and you

4    were surprised because he was still alive?

15:51:21   5    A.    I don't recall that.

6    Q.    Okay.

7                    MR. GILBERT:  BCI Video Exhibit 7.

8          Okay.  So it's 50:35 to 52:04.

9          Just before you play this, though . . .

15:52:52  10    BY MR. GILBERT:

11    Q.    Do you see this image here?

12    A.    Yes.

13    Q.    Okay.  Is that you in this image?

14    A.    Yes, it is.

15:53:00  15    Q.    Okay.  And this was an interview that you gave to some

16    officials, right?

17    A.    Yes.

18    Q.    Okay.

19                    MR. GILBERT:  You can play it.

15:54:05  20          You need sound.

21          Why don't we forget that one for now.  Okay?  That's

22    all right.

23          We're having technical difficulties.  We'll just pass

24    over this, Your Honor.

15:55:11  25                    THE COURT:  All right.

1          MR. GILBERT:  All right.  I want to bring you

2    to the deposition for page 55 -- page 54, lines 20 to 25,

3    and 55, line 1.

4              THE COURT:  This is Exhibit . . .

15:55:49  5          MR. GILBERT:  Exhibit 2.

6        Line 20 to 25.

7    BY MR. GILBERT:

8    Q.   Okay.  So I want to read this to you.

9         "Prior to" --

15:56:28 10        You said you saw a black object coming out of the

11   shirt with his right hand, correct?

12        Is that what you just told the jury?

13   A.   When he lifted his shirt with his left hand, yes.

14   Prior to that, I didn't.

15:56:46 15   Q.   That's what you said to the jury, right?

16   A.   Yes.

17   Q.   That you saw a black object come out of his -- out

18   under the shirt?

19   A.   Yes.

15:56:53 20   Q.   Okay.  I'm going to read this to you.

21        "Prior to" --

22        This is a question that I asked you at your

23   deposition.  This is the transcript.  You were under oath.

24        "Prior to hearing the pop, what did you see as far as

15:57:07 25   that area of the shirt?

```
 1              "Answer:  It looked as if what he had under his shirt

 2      he was moving back and forth, to either myself or

 3      Sergeant Nicholson, or myself and the doorway.

 4              "Question:  But it was still under the shirt,

15:57:30  5      correct?"

 6                        MR. GILBERT:  Next page.

 7      BY MR. GILBERT:

 8      Q.    "Answer:  That's correct.

 9              "And then what happened?

15:57:40 10             "I heard the pop, and I thought I was being fired

11      upon" -- et cetera.

12              Which is true, what you told the jury before, or what

13      we see in this transcript?

14      A.    It seems all the same, to me.

15:57:54 15      Q.    Okay.  You think it's the same, right?

16      A.    Yes.

17      Q.    In here, you don't say anything about any object

18      coming out of the shirt, correct?

19      A.    In where?  Here?

15:58:06 20      Q.    In this transcript.

21      A.    Initially, I didn't see anything under the shirt.

22      Q.    Okay.

23                        MR. GILBERT:  Let's go to 55.

24      BY MR. GILBERT:

15:58:31 25      Q.    Okay.  You said "initially."
```

 1         But did you ever see Brian's hand come out of his

 2   shirt at any time?

 3   A.    I don't understand that question.

 4   Q.    Did you ever see his right hand come out of his shirt

15:58:43  5   at any time throughout this whole episode?

 6   A.    I don't recall if I seen his whole hand or not.

 7   Q.    I didn't say "whole hand."  You said "whole hand."

 8         Did you see anything coming -- did you ever see his

 9   hand come out of his shirt at any time?

15:59:01 10   A.    I don't recall.

11   Q.    Okay.

12             MR. GILBERT:  Page 55, line 14 and 15.

13   BY MR. GILBERT:

14   Q.    "Did you ever see his hand come out of that shirt?"

15:59:21 15         Line 14.

16         "Answer:  No.

17         "Did you ever see him point a gun at you?

18         "Just what I perceived to be a gun underneath his

19   shirt."

15:59:36 20         Did you read -- did you read that?

21   A.    Yes.

22   Q.    Okay.  Thank you.

23         Mr. Frazier, you understand that police work can be

24   stressful, right?

16:00:00 25   A.    Absolutely.

16:00:25

16:00:39

16:00:50

16:01:08

16:01:25

1    Q.    And that stress can affect your performance in the

2    line of duty?

3    A.    It certainly can, yes.

4    Q.    Okay.  And you have experienced stress in your life,

5    have you not?

6    A.    Plenty of it, yes.

7    Q.    And isn't it a fact that you have suffered from

8    depression in your life?

9    A.    No.  I wouldn't say I was ever diagnosed with

10   depression.

11   Q.    Have you ever been on medications for any kind of

12   mental issues?

13   A.    Not mental issues, no.

14   Q.    Have you been under medications for anxiety?

15   A.    No.  I've been on medication, but not for those

16   things.

17   Q.    What kind of medications have you been on?

18   A.    The only thing that I took was -- I can't think of the

19   name of it -- Pristiq, I believe, was the name of it.

20   Q.    Have you ever taken Lexapro?

21   A.    A long time ago.

22   Q.    Have you ever taken Viibryd?

23   A.    I don't know what that is.

24   Q.    40 milligrams from Dr. Adkins?

25   A.    What is Viibryd?

```
        1    Q.    I'm just asking you.  It's in a Fitness for Duty

        2    Evaluation.

        3    A.    I don't know what that is.

        4    Q.    Were you ever ordered to get a fitness -- to a

16:01:41 5   psychologist for a Fitness of Duty Evaluation?

        6    A.    Yes, I was.

        7    Q.    Are you on medications right now?

        8    A.    I'm on a ton of medication right now.

        9    Q.    Anything for -- anything for -- that's been prescribed

16:02:00 10  for any kind of nonphysical issues?

       11    A.    No.

       12    Q.    How many times have you seen a psychologist that you

       13    were requested to go see in the line of duty?

       14    A.    From the sheriff's office?

16:02:20 15  Q.    Yes.

       16    A.    I'm not sure what you mean by "requested."

       17          Per policy or procedure or otherwise?

       18    Q.    Well, how many times have you seen a psychologist?

       19    A.    All total in my sheriff's office?

16:02:31 20  Q.    Yes.

       21    A.    Six times.

       22    Q.    All right.  And one was the result of using deadly

       23    force, was it not?

       24    A.    Two.

16:02:38 25  Q.    Well, one was previous to this case, correct?
```

```
          1    A.    Yes.  Yes.

          2    Q.    You've had internal complaints filed against you for

          3    allegations of aggressive and assaultive behavior; is that

          4    correct?

16:02:59  5    A.    That is correct, yes.

          6    Q.    Okay.  Do you remember the complaint from a guy named

          7    Randy Walters from 2012?

          8    A.    The name doesn't ring a bell.

          9    Q.    It involved a call where a citizen was having an

16:03:15 10    argument with some cable people, and you showed up at his

         11    house.

         12          Do you remember that?

         13    A.    No, I can't say that I do.

         14    Q.    Do you remember -- well, you don't remember a claim

16:03:40 15    that you went up the driveway, you drew your weapon, you

         16    walked up to his window, stuck it in the screen window, and

         17    you said, Open the fucking door, Walters, or I'll fucking

         18    kill you?

         19    A.    I don't recall any of that.

16:04:01 20    Q.    He also claims you kicked in the door.  He had his

         21    hands up, you grabbed him by the wrist, and you put your gun

         22    to his temple, handcuffed him, and slammed his face into the

         23    floor.

         24          Do you recall that allegation?

16:04:16 25    A.    I don't recall that allegation at all.
```

**Frazier (Cross by Gilbert)**

1     Q.    Do you remember the Zachary Ball complaint?

2     A.    I do remember that, yes.

3     Q.    That was August 13, 2013.

4     A.    Yes.

16:04:32  5     Q.    He said that you came to his house because of some

6     argument, and you threw him to the floor, and you handcuffed

7     him to a chair.

8     A.    He said a lot more than that.

9     Q.    Well -- and you never even made a report of this,

16:04:51  10    right?

11    A.    There was nothing to report.

12    Q.    Did you handcuff him?

13    A.    Yes, I did.

14    Q.    And that's a police function, right?

16:04:59  15    A.    Yes, it is.

16    Q.    And police are supposed to make reports when they

17    arrest somebody, right?

18    A.    He wasn't under arrest.

19    Q.    He was restrained of his liberty, was he not?

16:05:10  20    A.    He was being detained for his aggressive behavior.

21    Q.    And you made a -- you made a call -- you went to his

22    house, right?

23    A.    That's correct, yeah.

24    Q.    It was a police function, was it not?

16:05:21  25    A.    Yes.

1    Q.    And you never put it in a log or any kind of statement

2    or report of an incident?

3    A.    The call was for a civil standby.  We don't do reports

4    for those.

16:05:35    5    Q.    When you handcuff somebody, is that not an incident?

6    A.    It's not an incident that we do a report for.  He was

7    not placed under arrest.

8    Q.    And you were -- and you were investigated for that,

9    right?

16:05:46   10    A.    That's correct.

11    Q.    And were you -- were you disciplined for that?

12    A.    Yes.

13    Q.    So your department did not like what you did, did

14    they?

16:05:57   15    A.    They didn't discipline me for the allegations.

16    Q.    Because you didn't report it, right?

17    A.    No.  Because it was investigated, and they found out

18    that I didn't do it.

19    Q.    Okay.  Do you have a habit of going and taking police

16:06:12   20    action and not making a record of it?

21    A.    Not at all.

22    Q.    But you did in this case?

23    A.    That's not true.

24    Q.    You didn't report it.

16:06:19   25    A.    There was nothing to report.

1    Q.    Handcuffing somebody is nothing to report?

2    A.    It happens every day.

3    Q.    Hold on a second.

4          Okay.  So I want to ask you about what your -- about

16:06:38  5    the situation at a meeting on May 14th, at the sheriff's

6    department's office.

7          You made a complaint that -- you had a K9 dog,

8    correct?

9    A.    Three of them, yes.

16:06:55 10    Q.    And they decided to take away your K9 dog because it

11    needed more training, correct?

12    A.    Per my request, yes.

13    Q.    And there was a meeting about that because you were

14    upset about it, right?

16:07:07 15    A.    Very, yes.

16    Q.    And there was a meeting with Captain Bosko,

17    Lieutenant Zehner, Sergeant Sweat, Sergeant Gunder, and

18    yourself, right?

19    A.    That is correct, yes.

16:07:21 20    Q.    And they came up with an action plan going forward,

21    after which the dog would be returned, right?

22    A.    Yes.

23    Q.    And you didn't -- you didn't agree with that, correct?

24    A.    No, I didn't, not at all.

16:07:33 25    Q.    And you said in front of all of these superior

| | |
|---|---|
| 1 | officers, "Fuck this and you guys, and if I can't be in the |
| 2 | K9, I'm going to find a new job." |
| 3 | A.    I don't know if that's verbatim, but it was close to |
| 4 | that. |
| 16:07:48  5 | Q.    Close to it, right? |
| 6 | A.    It was close to that. |
| 7 | Q.    And you complained that the administration took away |
| 8 | your SWAT privileges. |
| 9 | Now, they were taking away your dog, right? |
| 16:08:04  10 | A.    Correct. |
| 11 | Q.    And you weren't happy with that. |
| 12 | And you said that you no longer trusted or respected |
| 13 | the administration. |
| 14 | A.    True. |
| 16:08:12  15 | Q.    Do you remember that? |
| 16 | A.    Certain ones, yes. |
| 17 | Q.    And then they told you that you had to change your |
| 18 | vehicles, right? |
| 19 | A.    Yes. |
| 16:08:20  20 | Q.    And you said you didn't want to drive that piece of |
| 21 | shit, right? |
| 22 | A.    I don't recall that, but if that's there, I said it, |
| 23 | yes. |
| 24 | Q.    Okay.  And then you started crying.  And they had to |
| 16:08:34  25 | try to calm you down and try to make you -- and try to get |

1    you to be patient.

2    A.    That's not true.

3    Q.    You didn't cry?

4    A.    I did cry, but nobody had to calm me down.  It doesn't

16:08:45  5    say that.

6    Q.    And you said, "What kind of cold-hearted individuals

7    would do this to a person?  I'm already having personal

8    problems, and now they go do this to me.  I tell you right

9    now, Zehner is the fucking problem, and the rest of them

16:09:02 10    should have stayed at the Mansfield Police Department.  I

11    should never have come to work here."

12    A.    Those are my --

13    Q.    Do you remember that?

14    A.    Those are my exact words.

16:09:07 15    Q.    Okay.  In quotes.

16         Is that the kind of behavior an officer should display

17    in front of his supervisors?

18    A.    Not necessarily.

19    Q.    Not necessarily.

16:09:18 20         And then you said they were going to come to your

21    house and pick up stuff that -- from you that they needed,

22    right?

23    A.    Yeah.  Anytime they take your dog, they need all of

24    his equipment.

16:09:30 25    Q.    And you said, "I don't want any of these assholes at

1    my house"?

2    A.    Absolutely.

3    Q.    Okay.  And then you were placed on administrative

4    leave for your behavior; is that correct?

16:09:43 5    A.    That's correct, I was.

6    Q.    And this is only -- this is in the summer of 2013,

7    correct?

8    A.    I don't recall when it was, but if that's what you say

9    it is, yeah.

16:09:54 10    Q.    Did you ever see the Fitness for Duty Evaluation by

11    Aaron Becker?

12    A.    Yes.

13    Q.    Okay.

14              MR. GILBERT:  Can you . . .

16:10:14 15    BY MR. GILBERT:

16    Q.    And you went there to see him on July -- on

17    June 7th, 2003?

18    A.    I don't recall the date.

19    Q.    That's around the date, right?

16:10:23 20    A.    Sure.  Yes.

21    Q.    Did you tell -- is it Dr. Becker?

22    A.    Dr. Aaron Becker, yes.

23    Q.    Did you tell Dr. Becker that you denied making any

24    statements in anger in any way derogatory toward any other

16:10:51 25    officer or administration during these events?

1    A.    Are you asking me if I denied that?

2    Q.    Yes.

3    A.    I don't recall denying it.

4    Q.    Well, he says that in his statement.

16:11:01  5          Do you have any dispute about that?

6    A.    Yeah, I do.  Because he would investigate that through

7    my administration, and that would be brought out anyway.  So

8    there wouldn't be any reason for me to say that.

9                MR. GILBERT:  Your Honor, can I approach

16:11:14  10   the . . .

11               THE COURT:  You may.

12   BY MR. GILBERT:

13   Q.    Right here.

14   A.    I don't know why he would type that, because he would

16:11:26  15   have to talk to my administration the next day about it.

16   Q.    All right.  Well, he put it in the report.

17         Also, it also says here that "Mr. Frazier has been

18   diagnosed with mild depression and anxiety by his primary

19   care physician, Dr. Adkins.

16:11:55  20   A.    I never gave him any of that information.  I told him

21   about being on the medicine.

22   Q.    So is he lying about that?

23   A.    I'm not going to call the man a liar.

24   Q.    And this is the -- did you challenge this report when

16:12:10  25   it went to the high-ranking sheriff officials?

1    A.    I'm not allowed to see those.  I've never read that

2    report.

3    Q.    Okay.  Did you admit to Dr. Becker that you sometimes

4    come off as cocky?

16:12:37  5    A.    Sure.  Yeah.

6    Q.    At least that, you agree with me, right?

7    A.    I'll agree with that, yeah.

8    Q.    Okay.  He also puts in there that you admitted that

9    "His intensity of expression is likely higher than need,

16:13:00  10    being when his emotions are high."

11    A.    I don't know what that means.

12    Q.    Okay.  You also -- he also said that, "He recognizes

13    that he has little patience and low frustration tolerance."

14    A.    Sometimes, yes.

16:13:16  15    Q.    Okay.  Well, that meeting kind of showed that, right?

16    A.    Certain situations, certainly.

17    Q.    That's not good for policing, is it?  That kind of

18    attitude, is it?

19    A.    I don't demonstrate it towards the public.

16:13:29  20    Q.    All right.  And then he says here that you recognize

21    the need to develop more patience, and "He understands that

22    his emotions become intense and excited, both good and bad."

23    A.    I've needed to practice patience all my life.

24    Q.    Okay.  "Sometimes this leads him" -- I'm quoting.

16:13:57  25          "Sometimes this leads him to coming off as an

1     asshole."

2          And then he goes on to say, "He has learned to back

3     off certain situations, call for another officer to deal

4     with the suspect."

16:14:14  5     A.    That's correct, yes.

6     Q.    Okay.  That would have been good advice when you

7     went -- when you didn't back off, and ran into the room

8     where Brian Garber was on the bed, right?

9     A.    I don't --

16:14:29 10     Q.    You could have left it to the other two to deal with,

11     right?

12     A.    I don't know how to answer that.

13     Q.    Okay.  And Captain Bosko, who is Captain Bosko?

14     A.    He's a retired captain that we had back then.

16:14:53 15     Q.    Back in 2013, he was there?

16     A.    Yeah.

17     Q.    Okay.  And he -- in the report, Dr. Becker says that

18     he talked to Bosko, he interviewed Bosko, and "Bosko

19     described Mr. Frazier as a hothead who responded negatively

16:15:25 20     to removal of his K9 from his position to be reassessed."

21          And it goes on and talks about that you are "sometimes

22     viewed as unbelievable, and is thought to exaggerate,

23     manipulate, and has been caught in false statements."

24     A.    You'd have to understand my relationship with

16:15:50 25     Captain Bosko.

1    Q.    Okay.  So you have a problem with Zehner.  You have a

2    problem with Bosko.

3          Who else do you have a problem with over there?

4    A.    No one.

16:15:59 5    Q.    Those are the only two?

6    A.    Yeah.

7    Q.    Okay.

8    A.    The other one left and went --

9    Q.    Okay.  So you disagree with your superior officer when

16:16:09 10   he said that you are sometimes viewed as unbelievable,

11   exaggerate, manipulate, and has been caught in false

12   statements?

13   A.    I strongly disagree with that.

14   Q.    And do you recall that what the -- what the

16:16:33 15   recommendations were by Dr. Becker?

16   A.    No.  I've never had an opportunity to see that report,

17   so I don't know.

18   Q.    Okay.  And he had said, "Therefore, it is strongly

19   recommended that he seek mental health intervention to learn

16:16:52 20   some more appropriate coping, interpersonal, self-control,

21   and patience skills."

22   A.    If he said that, it was never bought to my attention.

23   Q.    So they never brought that to your attention?

24   A.    No, sir.

16:17:08 25   Q.    Okay.  So this situation in May of 2013, was about

1    nine or ten months before you shot and killed Brian Garber.

2    A.    Which situation?

3    Q.    This situation where you blew up in the situation, and

4    had to get fitness for duty clearance.

16:17:41  5    A.    What's your question?

6    Q.    Okay.  This happened -- this incident where you blew

7    up over the K9 had happened about nine or ten months before

8    the Garber incident, right?

9    A.    Yes.

16:18:00 10    Q.    Okay.

11              MR. GILBERT:  No further questions.

12              THE WITNESS:  Okay.

13              MR. GILBERT:  One moment.  Let me just talk

14    to -- okay?

16:18:05 15        No further questions.

16              THE COURT:  And you are reserving further

17    examination until your case in chief?

18              MS. WILLIAMSON:  That's correct, Your Honor.

19              MR. GILBERT:  Thank you, Your Honor.

16:18:16 20              THE COURT:  Do you have another witness?

21              MS. GREENE:  Yes, Judge.

22        The plaintiff would call Andrew Knee, if the Court

23    deems it a good time.

24              THE COURT:  This is -- we're not going to be

16:18:30 25    able to finish this today, I take it.

 1                    MS. GREENE:  I think that we could -- yeah, I

 2      think that we could get . . .

 3                    THE COURT:  We could get --

 4                    MS. GREENE:  I'm sorry, Judge.  Just one

16:19:05  5      moment, please.

 6                    THE COURT:  All right.

 7                    MS. GREENE:  Judge, I believe that we could

 8      get through his testimony probably right around 5:00, or

 9      shortly thereafter.

16:19:19 10                    THE COURT:  All right.  Then let's try to do

11      that.

12          Call your next witness.

13                    MS. GREENE:  Thank you.

14          The plaintiffs would call Deputy Andrew Knee.

16:20:25 15                    THE COURT:  When I said previously, if there's

16      anything we can do to make you comfortable, please let us

17      know -- it's very difficult, I know, to have the sun shining

18      in your eyes.

19                    A JUROR:  Turn on the heat.

16:21:38 20                    THE COURT:  They're bringing him in --

21                    MS. GREENE:  I believe he's returning from the

22      restroom.

23                    THE COURT:  Oh, okay.

24                    MS. GREENE:  He should be here shortly.

16:21:44 25                    THE COURT:  All right.  Fine.

1          Mr. Kurdziel, are you all right?

2          Do you want some more shade?

3                  MR. KURDZIEL:  Let the sun shine in, Judge.

4                  THE COURT:  All right.

5                  DEPUTY CLERK:  Do you solemnly swear or affirm

6     that your testimony in this case will be the truth, the

7     whole truth, and nothing but the truth, so help you God?

8                  THE WITNESS:  Yes, I do.

9                  CROSS-EXAMINATION OF ANDREW KNEE

16:24:48 10    BY MS. GREENE:

11    Q.     Good afternoon, Deputy Knee.

12           My name is Jacqueline Greene, and I'm one of the

13    attorneys representing the estate of Brian Garber.

14           Will you please state your name for the record.

16:24:56 15    A.     Yes.  It's Deputy Andrew Knee.

16    Q.     And you joined the Richland County Sheriff's Office in

17    February of 2014, correct?

18    A.     Yes, that's correct.

19    Q.     And that's approximately one month prior to the

16:25:07 20    shooting of Brian Garber, right?

21    A.     That's correct.

22    Q.     And how many years of prior law enforcement experience

23    did you have before joining the RCSO?

24    A.     I was a full-time officer with the Galion Police

16:25:19 25    Department for four years prior to that, and I was an

| | |
|---|---|
| 1 | auxiliary officer with the Lexington Police Department for |
| 2 | two years prior to that. |
| 3 | Q.    I'd like to go over some of the important details of |
| 4 | the shooting that killed Brian Garber on March 16, 2014. |
| 16:25:30  5 | On that date, you and Lieutenant Donald Zehner were on |
| 6 | duty together, correct? |
| 7 | A.    That's correct. |
| 8 | Q.    And earlier in the evening, you and Lieutenant Zehner |
| 9 | had responded to a call concerning someone who entered into |
| 16:25:42  10 | a residence and was engaging in a physical altercation with |
| 11 | the people inside, correct? |
| 12 | A.    That's correct. |
| 13 | Q.    And that was at 3425 Mill Run Road, in Lexington, |
| 14 | Ohio? |
| 16:25:55  15 | A.    Yes, it was. |
| 16 | MS. GREENE:  I'd like to show the witness |
| 17 | Exhibit 29-6, please. |
| 18 | BY MS. GREENE: |
| 19 | Q.    And, Deputy Knee, this exhibit, 29-6, shows the house |
| 16:26:12  20 | at 3425 Mill Run Road, correct? |
| 21 | A.    Correct. |
| 22 | MS. GREENE:  Your Honor, permission to publish |
| 23 | to the jury? |
| 24 | THE COURT:  No objection? |
| 16:26:21  25 | MS. WILLIAMSON:  No objection. |

1          THE COURT:  You may publish.

2    BY MS. GREENE:

3    Q.    All right.  So when you arrived at this house, you

4    spoke there with Connie Garber and Sara Knowlton, right?

5    A.    Yes, that's correct.

6    Q.    And during your conversation with them,

7    Lieutenant Zehner was present at the house, but not handling

8    the call?

9    A.    Correct.

10   Q.    And you were taking the lead?

11   A.    Yes.

12   Q.    And by the time you arrived at that house,

13   Brian Garber had already left the home, correct?

14   A.    That's correct.

15   Q.    You learned while you were there that this was the

16   home that Brian Garber and Sara Knowlton shared, correct?

17   A.    Yes.

18   Q.    And that they were married?

19   A.    Correct.

20   Q.    You also learned that Connie was Brian's mother?

21   A.    Yes, I did.

22   Q.    And you were told that Connie wanted Brian to spend

23   the night at her house that night?

24   A.    I was told she wanted him to stay with her that

25   afternoon.

1    Q.    You were also told that Sara had already placed

2    Brian's clothing and medications outside the house before he

3    had arrived home from work so he could pick them up, right?

4    A.    Correct.

16:27:17  5    Q.    And you were told that Brian came upset because Sara

6    was not allowing him into the house, right?

7    A.    Correct.

8    Q.    And that he'd kicked the door in?

9    A.    Correct.

16:27:25 10    Q.    And he entered the home?

11    A.    Correct.

12    Q.    Connie and Sara reported to you that Brian had had

13    physical contact with each of them, right?

14    A.    Correct.

16:27:32 15    Q.    And Sara said that she pushed -- or he pushed her down

16    on the bed?

17    A.    She advised that she was thrown down and strangled, is

18    what I was told.

19    Q.    And she said that his hands were in the area of her

16:27:43 20    collarbone, neck area, correct?

21    A.    I don't remember the exact placement that she said,

22    just that she was thrown down and strangled.

23    Q.    And he reported to you that Connie intervened in that

24    situation?

16:27:54 25    A.    Correct.

1   Q.    And then Brian pounded her on her left arm and chest

2   area?

3   A.    Correct.

4   Q.    So when you were conducting this interview with Connie

16:28:01  5   and Sara, they were both calm at that point, though,

6   correct?

7   A.    Correct.

8   Q.    They weren't -- they were talking in a normal,

9   conversational voice?

16:28:09  10   A.    Yes.

11   Q.    And they weren't crying, were they?

12   A.    Not that I remember.

13   Q.    And they were not frantic, right?

14   A.    No.

16:28:17  15   Q.    They made you -- or they made you aware while you were

16   there that Brian was on medication, right?

17   A.    All I remember for sure is that I was told he'd had

18   medications placed outside for him.

19   Q.    Okay.  Well, you knew that Sara and Connie called 911

16:28:33  20   because they wanted Brian to get help for his state of mind,

21   right?

22   A.    They wanted to get him help, yes.

23   Q.    And while you were there, you asked Connie and Sara to

24   fill out domestic violence packets?

16:28:43  25   A.    Correct.

1    Q.    They did not ask for those packets, though, did they?

2    A.    I don't believe so.

3    Q.    And you brought out the packets and asked them to fill

4    them out?

16:28:51  5    A.    Correct.

6    Q.    And after filling out those packets, that would allow

7    you to arrest and charge Brian with domestic violence,

8    right?

9    A.    Correct.

16:28:58  10    Q.    Connie did express hesitation to you about signing the

11    packet, though, correct?

12    A.    Correct.

13    Q.    On that day, you were aware that the Richland County

14    Sheriff's Office has emergency resources available to people

16:29:10  15    with mental health crisis, right?

16    A.    Correct.

17    Q.    And one of those resources available to a police

18    officer in this kind of situation is pink slipping?

19    A.    Correct.

16:29:19  20    Q.    And "pink slipping" is a term used to describe when

21    police take a person to a hospital for evaluation or

22    treatment rather than taking them to jail, right?

23    A.    Correct.

24    Q.    And pink slipping can be done, even if a person has

16:29:34  25    committed a criminal act, right?

Knee (Cross by Greene)

227

1    A.    Correct.

2    Q.    And if a person is a danger to themselves or to other

3    people, this can be an appropriate situation to pink slip

4    them?

16:29:44  5    A.    It can be.

6    Q.    While you were at the house, you also advised Connie

7    and Sara about the existence of what's called Mental Health

8    Court, right?

9    A.    Correct.

16:29:54  10    Q.    And Mental Health Court is a special court where

11    criminal charges are met with interventions involving mental

12    health assessments and treatment plans, right?

13    A.    Correct.

14    Q.    As well as court-based monitoring of progress on those

16:30:05  15    treatment plans?

16    A.    That would be correct.

17    Q.    And the goal there is to provide community-based

18    treatment instead of jail time, where possible, right?

19    A.    I would believe so, yes.

16:30:16  20    Q.    So while you and Lieutenant Zehner were at the house,

21    other deputies were out looking for Brian Garber, right?

22    A.    That's correct.

23    Q.    And when you concluded at 3425 Mill Run Road with Sara

24    and Connie, you and Lieutenant Zehner left?

16:30:28  25    A.    Correct.

1    Q.    You were done with the situation at that point?

2    A.    Yes.

3    Q.    Okay.  So it's true, though, that as you were some

4    distance, driving away from that home, you heard over the

16:30:42  5    radio that Brian had been found?

6    A.    Yes, that's correct.

7    Q.    And you heard that he possibly had a 10-10?

8    A.    Correct.

9    Q.    And a "10-10" means firearm, right?

16:30:53  10    A.    Correct.

11    Q.    No one at the 3425 Mill Run Road house ever mentioned

12    a firearm to you at any time, did they?

13    A.    Not on an initial call, no.

14    Q.    Okay.  And radio said it was unknown if he actually

16:31:05  15    had a gun?

16    A.    I don't remember the exact radio traffic, just that he

17    had returned and possibly had a firearm.

18    Q.    So just "possibly had a firearm," right?

19          You didn't know for sure at the time?

16:31:15  20    A.    Correct.

21    Q.    Okay.  So you then turn your police cruiser around and

22    headed back to Mill Run Road?

23    A.    Correct.

24    Q.    And Sergeant James Nicholson arrived in the area

16:31:26  25    approximately the same time as you?

1    A.    Correct.

2    Q.    Along with other officers from the Lexington police?

3    A.    Correct.

4    Q.    And you then learned that Brian was actually across

16:31:34  5    the street at his parents' house at 3400 Mill Run Road,

6    right?

7    A.    That's correct.

8             MS. GREENE:  If I could, show the witness,

9    please, Exhibit 29-5.

16:31:51  10   BY MS. GREENE:

11   Q.    This photo in Exhibit 29-5 shows the house at 3400

12   Mill Run Road, right?

13   A.    Yes, it does.

14            MS. GREENE:  Your Honor, permission to publish

16:32:01  15   to the jury?

16            THE COURT:  No objection.

17            MS. WILLIAMSON:  No objection.

18            THE COURT:  You may publish.

19   BY MS. GREENE:

16:32:05  20   Q.    Okay.  So you parked your cruiser near this house, and

21   then exited the vehicle?

22   A.    That's correct.

23   Q.    And Lieutenant Zehner told you to follow right behind

24   Sergeant Nicholson?

16:32:15  25   A.    Correct.

1    Q.    And you followed Sergeant Nicholson into the garage,

2    and then into the house, right?

3    A.    Correct.

4                MS. GREENE:  If I could, show the witness,

16:32:22  5    please, Exhibit 29-2.

6    BY MS. GREENE:

7    Q.    Is this the garage you entered through?

8    A.    Yes, it is.

9    Q.    Okay.

16:32:41 10               MS. GREENE:  Permission to publish to the

11    jury, Your Honor?

12               MS. WILLIAMSON:  No objections.

13               THE COURT:  You may publish.

14    BY MS. GREENE:

16:32:49 15    Q.    Okay.  So you went through the door in this

16    garage -- let's see -- right over here, right?

17    A.    That's correct.

18    Q.    Okay.  And Defendant Frazier arrived at some point

19    after you, right?

16:33:05 20    A.    Correct.

21    Q.    And you know that he followed you into the house,

22    correct?

23    A.    Correct.

24    Q.    Did you know if he was directly behind you at the

16:33:13 25    time?

Knee (Cross by Greene)

231

```
              1    A.    I knew that him and Lieutenant Zehner were both behind

              2    me.  As to what order they were in at the time, I'm not

              3    certain because I didn't look over my shoulder.

              4    Q.    When he arrived, you didn't have any conversation with

16:33:25      5    Defendant Frazier, did you?

              6    A.    No.

              7    Q.    But you did say that Lieutenant Zehner and

              8    Defendant Frazier entered the home behind you?

              9    A.    That's correct.

16:33:33     10    Q.    And so you followed Sergeant Nicholson to the stairs?

             11    A.    That's correct.

             12    Q.    And then up to the second floor?

             13    A.    That's correct.

             14    Q.    Okay.  And at the top of the stairs, you looked -- you

16:33:48     15    looked down the hallway, correct?

             16    A.    Correct.

             17                MS. GREENE:  Can I please bring up

             18    Exhibit 27-4 for the witness.

             19    BY MS. GREENE:

16:34:07     20    Q.    Is this the hallway that you looked down?

             21    A.    Yes.

             22    Q.    Okay.  At the time that you were looking down the

             23    hallway, the lights were on, correct?

             24    A.    Yes.

16:34:16     25                MS. GREENE:  Your Honor, permission to publish
```

1    to the jury, please.

2                    THE COURT:  No objection?

3                    MS. WILLIAMSON:  No objection.

4                    THE COURT:  You may publish.

16:34:25   5    BY MS. GREENE:

6    Q.    Were the lights that we see in the photographs the

7    same lights that were on when you were in that hallway?

8    A.    I believe so.

9    Q.    Okay.  And as you moved down the hallway, you looked

16:34:34  10    into the various rooms you were passing?

11    A.    Yes, that's correct.

12    Q.    And in this photo, we see two doors on the left and

13    one door on the right, correct?

14    A.    Correct.

16:34:43  15    Q.    Did you look into each of them?

16    A.    I would have looked into the rooms on the left and the

17    right that come first.  I don't remember looking into the

18    room on the right once we got there.

19    Q.    Okay.  You continued down the hallway, looking into

16:35:03  20    those rooms.

21          Did you see anybody in them?

22    A.    No, I did not.

23    Q.    Okay.  And then finally, you reached the end of the

24    hallway?

16:35:09  25    A.    Correct.

1    Q.    And when you got there, did you look into the bedroom

2    on the left?

3    A.    Correct.

4    Q.    And did you have your firearm drawn at this time?

16:35:20  5    A.    Yes, I did.

6    Q.    When did you first draw your firearm?

7    A.    I had it out as I came in the house.

8    Q.    And what firearm were you carrying?

9    A.    My duty-issued firearm.

16:35:29  10    Q.    And when you reached that bedroom, the last door on

11    the left, you saw Brian Garber inside, correct?

12    A.    Correct.

13    Q.    He was sitting on his bed, right?

14    A.    Correct.

16:35:39  15    Q.    And his back was against the headboard?

16    A.    Correct.

17    Q.    His legs were extended in front of him?

18    A.    Correct.

19    Q.    And the bed was located in the back corner of that

16:35:49  20    bedroom, the corner opposite the doorway, correct?

21    A.    Correct.

22    Q.    And when you got there, Sergeant Nicholson positioned

23    himself on the right side of the doorway?

24    A.    Correct.

16:35:58  25    Q.    And you positioned yourself on the left side of the

1    doorway?

2    A.    Correct.

3    Q.    Your bodies, were they inside or outside the doorway

4    to that room?

16:36:08 5        Meaning, were you still in the hallway at that time?

6    A.    My body was in the hallway.  My right arm was through

7    the door.

8    Q.    Okay.

9              MS. GREENE:  I'd like to show the exhibit,

16:36:20 10   please -- or show the witness Exhibit 27-10, please.

11   BY MS. GREENE:

12   Q.    Does this photograph in Exhibit 27-10 show the doorway

13   where you and Sergeant Nicholson positioned yourself?

14   A.    Yes, it does.

16:36:37 15   Q.    And this photo shows the doorway from the inside of

16   the bedroom, right?

17   A.    Yes, it does.

18             MS. GREENE:  Your Honor, permission to publish

19   to the jury, please.

16:36:48 20            THE COURT:  No objection.

21             MS. WILLIAMSON:  No objection.

22             THE COURT:  You may publish.

23   BY MS. GREENE:

24   Q.    Okay.  So looking at this photograph, then, since

16:36:53 25   we're inside the room, Nicholson would have been on the side

1    nearest that dresser, right?

2    A.    Correct.

3    Q.    And you would have been on the side closest to, I

4    guess, the door hinges?

16:37:01  5    A.    Correct.

6    Q.    Okay.  And we also see the foot of the bed there in

7    the corner, right?

8    A.    Yes, we do.

9    Q.    So by positioning yourselves at the left side of the

16:37:12 10    doorway, were you taking cover?

11    A.    Yes.

12    Q.    You chose not to enter the room for potential safety

13    reasons, right?

14    A.    That's correct.

16:37:19 15    Q.    Sergeant Nicholson also stayed outside the room?

16    A.    That's correct.

17    Q.    When you first saw Brian, you heard him say, I've got

18    a gun; is that correct?

19    A.    Yes, that's correct.

16:37:34 20    Q.    But Brian did not say, Leave or I'll shoot, right?

21    A.    No.

22    Q.    He did not verbally threaten you?

23    A.    No.

24    Q.    And at the point that you positioned yourself at the

16:37:44 25    doorway, Defendant Frazier steps between you and

1    Sergeant Nicholson, right?

2    A.    Correct.

3    Q.    Did he make any physical contact with your body when

4    he did that?

16:37:54 5    A.    With me?

6    Q.    Yes.

7    A.    No.

8    Q.    Okay.  So he stepped between you and went into the

9    bedroom, into a position directly in front of Brian Garber,

16:38:01 10   right?

11   A.    Correct.

12   Q.    Was he fully inside of that bedroom at that time?

13   A.    Yes.

14   Q.    You were surprised that he entered the room, weren't

16:38:14 15   you?

16   A.    Yes.

17   Q.    At that point, everybody in their positions, you and

18   Nicholson at the door and Frazier in the room, you proceeded

19   to keep a line of sight on Brian Garber, correct?

16:38:27 20   A.    Correct.

21   Q.    But you did not personally speak to Brian or converse

22   with him in any way?

23   A.    No.

24   Q.    At that point, you heard Sergeant Nicholson begin to

16:38:36 25   give orders to show hands and things to that effect, right?

1    A.    Correct.

2    Q.    And then you heard Nicholson begin having conversation

3    with Brian, right?

4    A.    Correct.

16:38:46  5    Q.    And he was saying things like, It doesn't have to be

6    like that.  We all have families?

7    A.    That's correct.

8    Q.    And from where you were standing, you were able to see

9    Brian on the bed from that vantage point?

16:38:57  10   A.    Correct.

11   Q.    His left hand was down by his side at the time, right?

12   A.    Correct.

13   Q.    You could not see his right hand, though?

14   A.    No.

16:39:05  15   Q.    And you claim that you saw a shape under his shirt,

16   right?

17   A.    Yes, I did.

18   Q.    What shape was that?

19   A.    It was a distinct rectangular shape.

16:39:16  20   Q.    But you couldn't exactly make out what it was, could

21   you?

22   A.    No.

23   Q.    Can you demonstrated for us the size of the impression

24   that you saw?

16:39:26  25   A.    About yea wide, yea thick.

1    Q.    It looks like you're showing something several inches

2    long and, maybe, an inch and a half or so thick; is that

3    right?

4    A.    Yes, approximately.

16:39:38  5    Q.    Okay.  Did Brian move that object around?

6    A.    Not that I was able to notice.

7    Q.    You saw that it was just stationary?

8    A.    From my perspective, yes.

9    Q.    And you did not see anything in Brian's exposed left

16:39:54  10   hand, correct?

11   A.    No.

12   Q.    I would like to show you Plaintiff's Exhibit 42.

13              MS. GREENE:  And if we could, pull up the

14   perspective from the left side of the doorway.

16:40:33  15        We'd like to show this to the witness, please.

16   BY MS. GREENE:

17   Q.    Okay.  Deputy Knee, you're looking at an illustration

18   right now, right?

19   A.    Correct.

16:40:45  20   Q.    Does this illustration depict your approximate

21   perspective into the room where Brian was located?

22   A.    My positioning in this photo is not accurate.

23   Q.    Well, tell me what the inaccuracy is.

24   A.    My body in this -- when I was positioned here, was

16:40:59  25   completely flat against this wall that you have me leaning

1    up against, with my left hand out like this, whole arm

2    flattened against the wall.  Had my entire body pressed up

3    against the wall with just enough for my head around the

4    frame.

16:41:14  5        And I could see him and my right arm completely

6    through the doorway.

7    Q.    Okay.  Well, when you look at the inset illustration,

8    where it shows the view into the room --

9        Do you see that there?

16:41:25  10  A.    Yes.

11   Q.    -- is that view into the room approximately what you

12   saw from the doorway, as far as the positioning?

13   A.    That's approximately what I saw, yes.

14   Q.    Okay.  Thank you.

16:41:34  15       At that point in time, while Sergeant Nicholson was

16   conversing with Brian, you were not yet ready to shoot, were

17   you?

18   A.    No.

19   Q.    And your decision to hold fire was based on the deadly

16:41:50  20  force training you'd received from the academy and various

21   police departments, right?

22   A.    Correct.

23   Q.    And you're trained that the use of deadly force is

24   supposed to be the last resort, right?

16:42:03  25                THE REPORTER:  Can you slow down.

1              MS. GREENE:  Sure.  Sorry.

2         I'm a little too fast.  Sorry about that.

3    BY MS. GREENE:

4    Q.    And you're trained that the use of deadly force is

16:42:03  5    supposed to be the last resort, right?

6    A.    It would be, yes.

7    Q.    And the Richland County Sheriff's Office policies

8    require that an officer may only use deadly force to defend

9    himself or another person when they reasonably believe that

16:42:18 10    there is an imminent threat of death or serious physical

11    harm, right?

12    A.    Correct.

13    Q.    And you agree that you have a duty to comply with

14    Richland County Sheriff's Office policies as a deputy,

16:42:34 15    right?

16    A.    Yes, I do.

17    Q.    And you agree with me that police officers have a duty

18    to follow the law, right?

19    A.    Yes, I do.

16:42:39 20    Q.    And that includes a duty to comply with the

21    Constitution?

22    A.    Yes.

23    Q.    And police should not abuse their authority, right?

24    A.    No.

16:42:48 25    Q.    So turning back to the events in the room,

1    Sergeant Nicholson continued conversing with Brian, right?

2    A.    Correct.

3    Q.    And that conversation went on for about one minute?

4    A.    Approximately.

16:43:00  5    Q.    And you were watching Brian closely at the time so you

6    could react quickly if the situation changed, right?

7    A.    That's correct.

8    Q.    And at the time while Sergeant Nicholson was talking

9    to him, Brian was sitting on the bed, right?

16:43:15  10   A.    Correct.

11   Q.    And you were watching him?

12   A.    Correct.

13   Q.    And at that time, Brian was not presenting an

14   immediate threat requiring you to use deadly force, right?

16:43:25  15   A.    We could have used force at that point in time, yes.

16   We chose not to, though.

17   Q.    Well, you weren't shooting, though, right?

18   A.    That's correct.

19   Q.    And wouldn't you use deadly force when you needed to

16:43:37  20   use deadly force to protect yourself?

21   A.    You would.

22   Q.    And then after that one-minute mark or so, you claim

23   you heard a bang, right?

24   A.    That's correct.

16:43:48  25   Q.    And that bang sounded like a gunshot to you?

1    A.    Yes, it did.

2    Q.    And you thought -- you claim that you thought that

3    bang sound came from Brian Garber's area, right?

4    A.    That's correct.

16:44:01  5    Q.    Now, you're a certified firearms instructor, right?

6    A.    That's correct.

7    Q.    And in your experience as a firearms instructor, all

8    guns emit a flash when they're fired, correct?

9    A.    Correct.

16:44:14 10    Q.    What does a muzzle flash look like?

11    A.    It looks like a bright flash of light.

12    Q.    And you did not see any muzzle flash when you heard

13    that bang in the bedroom, did you?

14    A.    That's correct.

16:44:28 15    Q.    And you were looking at Brian Garber at the time that

16    you heard the bang, right?

17    A.    That's correct.

18    Q.    So there were no muzzle flash in Brian's area?

19    A.    No.

16:44:36 20    Q.    And when you heard that bang, you did not see

21    Brian Garber move, correct?

22    A.    No.

23    Q.    And your focus had been on Brian the entire time?

24    A.    That's correct.

16:44:47 25    Q.    You did not divert your attention to look anywhere

1    else during this period, right?

2    A.    No, I did not.

3    Q.    And you were looking directly at him when you heard

4    the bang?

16:44:56 5    A.    Yes.

6    Q.    And immediately after hearing this bang, you fired

7    your gun at Brian Garber, right?

8    A.    I did return fire after that.

9    Q.    You heard Raymond Frazier, Raymond Jeffrey Frazier,

16:45:11 10   begin firing shots at Brian Garber before you pulled your

11   trigger, right?

12   A.    Correct.

13   Q.    And all three of you, Jeff Frazier,

14   Sergeant Nicholson, and you, you all shot at Brian Garber,

16:45:22 15   right?

16   A.    Correct.

17   Q.    And the reason you shot at Brian Garber was because

18   you heard the bang, right?

19   A.    That's correct.

16:45:30 20   Q.    And that's the bang you thought was a gunshot?

21   A.    Yes.

22   Q.    And until that point, you were not in a situation

23   where you believed you needed to use deadly force, correct?

24   A.    I was not in a situation where I believed I wanted to

16:45:44 25   before that.  As I stated before, I could have used it

```
                1   before.

                2   Q.    All right.

                3              MS. GREENE:  Well, if we could, please show

                4   the witness Exhibit 15.

16:45:56        5   BY MS. GREENE:

                6   Q.    You were deposed in this case previously, right?

                7   A.    Yes, ma'am.

                8   Q.    And you testified under oath in that proceeding?

                9   A.    Yes.

16:46:03       10              MS. GREENE:  If we could, go, please, to

               11   page 63, lines 9 through 11.

               12   BY MS. GREENE:

               13   Q.    So you see here that in your deposition, you were

               14   asked the question at line 9.

16:46:22       15         "Right.  Up to that point, you were not in a situation

               16   where you believed you needed to use deadly force, correct?

               17         "Answer:  Not immediately."

               18         Do you see there?

               19   A.    Yes, I do.

16:46:34       20   Q.    So it was your testimony at one point, that at that

               21   time, you did not need to use deadly force, right?

               22   A.    I did not want to at that point, yes.

               23   Q.    Okay.  Do you know how many shots you fired?

               24   A.    At that particular point in time, no.

16:46:48       25   Q.    Do you know now how many shots you fired?
```

1    A.    I looked afterwards.  I believe it was three.

2    Q.    You never saw Brian Garber's hand, his right hand,

3    come out of his shirt, and point an object in your direction

4    prior to firing at him, did you?

16:47:04  5    A.    No, I did not.

6    Q.    In fact, you never saw any object in Brian Garber's

7    hand, outside of his shirt, prior to firing at him, did you?

8    A.    Not outside of his shirt.

9    Q.    And you never saw him pull up his shirt, did you?

16:47:17  10    A.    No.

11    Q.    You never saw him lean forward and extend his right

12    hand?

13    A.    No.

14    Q.    You never saw him pull out from under his shirt an

16:47:24  15    object that appeared to be a firearm?

16    A.    No.

17    Q.    You never saw a black object in his hand, did you?

18    A.    No.

19    Q.    After the shooting, you went in the bedroom, right?

16:47:36  20    A.    That's correct.

21    Q.    And you checked on Defendant Frazier?

22    A.    Yes.

23    Q.    And you kept your weapon drawn at this time, correct?

24    A.    That's correct.

16:47:44  25    Q.    And then you looked in Brian Garber's direction?

                    1    A.      Yes.

                    2    Q.      And at that time, did you see -- whatever object was

                    3    supposedly under his shirt as this incident unfolded, did

                    4    you see that object visible?

16:47:59      5    A.      No, I didn't.

                    6    Q.      Did you go over to him, and try to find this alleged

                    7    gun?

                    8    A.      No.

                    9    Q.      And did you pat him down?

16:48:05    10    A.      No.

                  11    Q.      Did Deputy Frazier try to pat him down?

                  12    A.      No.

                  13    Q.      Did Sergeant Nicholson try to pat him down?

                  14    A.      Not that I saw.

16:48:14    15    Q.      Did any of you look for a weapon?

                  16    A.      No.

                  17    Q.      You weren't thinking about looking for a weapon at

                  18    that point in time, were you?

                  19    A.      Not at that point in time.

16:48:22    20    Q.      Did you, Defendant Frazier, or Sergeant Nicholson

                  21    touch Brian at all at that point?

                  22    A.      No.

                  23    Q.      And when you were looking at Brian after the shooting,

                  24    did you see anything on the bed that looked like a gun?

16:48:37    25    A.      No.

1    Q.    Did you see a remote control on the bed at that time?

2    A.    No.

3               MS. GREENE:  If I could, please show the

4    witness Exhibit 28-11.

16:49:03 5    BY MS. GREENE:

6    Q.    Okay.  Did you ever see Brian's right hand come out

7    from underneath his shirt prior to the shooting?

8    A.    Prior to the shooting, no.

9    Q.    Did you see it come out during the shooting?

16:49:13 10   A.    Not that I noticed.

11   Q.    Okay.  So I'm showing you Plaintiff's Exhibit 28-11.

12        Does this photo accurately represent the room and

13   Brian Garber's body on the bed, as you recall it, after the

14   shooting was over?

16:49:27 15   A.    Yes.

16              MS. GREENE:  Your Honor, permission to publish

17   to the jury?

18              THE COURT:  Objection?

19              MS. WILLIAMSON:  No objection.

16:49:33 20             THE COURT:  You may publish.

21   BY MS. GREENE:

22   Q.    Do you recall seeing this remote on the bed when the

23   shooting occurred?

24        The remote that's visible in this photo?

16:49:48 25   A.    No, I do not.

1    Q.    Do you recall seeing it on the bed when the shooting

2    was over?

3    A.    No.

4    Q.    A couple minutes after the shooting ended,

16:50:02  5    Deputy -- or excuse me -- Defendant Frazier told you to

6    clear the room, right?

7    A.    That's correct.

8    Q.    And then Sergeant Nicholson asked you to go get a

9    camera from his cruiser?

16:50:11  10    A.    Yes.

11    Q.    So that the scene could be photographed?

12    A.    Yes, that's correct.

13    Q.    And when you exited the room, Defendant Frazier was

14    still inside?

16:50:18  15    A.    Yes.

16    Q.    And did Sergeant Nicholson exit the room with you?

17    A.    I don't remember.

18    Q.    Okay.  In any case, you went out and got the camera

19    from the cruiser, right?

16:50:31  20    A.    That's correct.

21    Q.    So you had to leave the house, and go out to a vehicle

22    outside?

23    A.    Yes.

24    Q.    And then you took the camera and brought it back into

16:50:38  25    the house, right?

1    A.    Yes.

2    Q.    And you gave it to Sergeant Nicholson?

3    A.    Yes.

4    Q.    Did that process -- how long did it take, of getting

16:50:45  5    the camera?

6    A.    Just a couple of minutes.

7    Q.    And after you gave Nicholson the camera, you went

8    downstairs to the kitchen, right?

9    A.    That's correct.

16:50:55  10                    MS. GREENE:  If I could, please show the

11    witness Exhibit 27-1.

12    BY MS. GREENE:

13    Q.    So you're looking at Exhibit 27-1.

14          Is this the kitchen that you went downstairs to?

16:51:17  15    A.    Yes.

16    Q.    Okay.

17                    MS. GREENE:  Permission to publish to the --

18    or sorry.

19          Permission to publish to the jury, please.

16:51:21  20                    MS. WILLIAMSON:  No objection.

21                    THE COURT:  You may publish.

22    BY MS. GREENE:

23    Q.    So while you were in the kitchen, this one we see in

24    27-1, you spoke with Defendant Frazier and

16:51:33  25    Sergeant Nicholson about what happened in Brian Garber's

1      room, right?

2      A.    We did talk, yes.

3      Q.    And during that conversation, all three of you

4      discussed that you saw an impression under the shirt, right?

16:51:44  5      A.    I don't remember all the specifics.  I can just tell

6      you that we did discuss what had just happened.

7      Q.    During that conversation, did Sergeant Nicholson

8      suggest that the impression looked like a Glock?

9      A.    That was brought up at some point in time during the

16:51:59 10      course of this investigation.  I don't remember exactly

11      when, but, yes, he did bring that up at one point.

12      Q.    And a Glock is a handgun, right?

13      A.    Yes, that's correct.

14      Q.    And all three of you discussed the shooting later in

16:52:12 15      the same 24-hour period at a so-called critical incident

16      debrief with a union representative, right?

17      A.    That's correct.

18      Q.    You agree with me, though, that it's important for

19      officers involved in a shooting to not discuss the shooting

16:52:25 20      event after it happens, correct?

21      A.    Yes.

22      Q.    And you agree that discussing the shooting gives an

23      appearance that you're trying to make your stories match,

24      right?

16:52:36 25      A.    I understand how that can look.

1    Q.    So a couple of days later, though, you learned that

2    Brian Garber was actually unarmed when Defendant Frazier and

3    you and Sergeant Nicholson shot him, right?

4    A.    That's correct.

16:52:52 5    Q.    And you also later heard that it was not a gun inside

6    underneath Brian Garber's shirt, but instead, it was a

7    remote?

8    A.    Yes.

9            MS. GREENE:  If I could, please show the

16:53:03 10   witness Exhibit 27-12.

11   BY MS. GREENE:

12   Q.    Have you ever seen this photo before?

13   A.    I believe one similar to that was shown to me during

14   my deposition.

16:53:22 15   Q.    And what is depicted in this photo?

16   A.    A remote control.

17           MS. GREENE:  Permission to publish to the

18   jury, please.

19           MS. WILLIAMSON:  No objection.

16:53:32 20           THE COURT:  You may publish.

21   BY MS. GREENE:

22   Q.    So this is the remote that was collected into evidence

23   from Brian's bed, right?

24   A.    As far as I understand, yes.

16:53:45 25   Q.    And the remote in this photo does not look like it

1    could have been the thing under Brian's shirt, does it?

2    A.    No, it does not.

3    Q.    And what you saw under the shirt was smaller than this

4    remote, right?

16:53:57 5    A.    Yes.

6    Q.    There was no gun ever found on Brian Garber, correct?

7    A.    Correct.

8    Q.    And no gun was ever found in his room?

9    A.    Correct.

16:54:05 10    Q.    He was unarmed when you shot him?

11    A.    Correct.

12    Q.    You were not hurt at all during this shooting event,

13    correct?

14    A.    No, I was not.

16:54:23 15              MS. GREENE:  No further questions.

16         Thank you.

17              THE COURT:  Any examination for the defense at

18    this time?

19              MS. WILLIAMSON:  No.  We'll reserve.

16:54:33 20              THE COURT:  Officer, thank you for your

21    testimony.  You may step down.

22              THE WITNESS:  Thank you.

23              THE COURT:  Well, Ms. Greene, your estimate

24    was accurate; we're at 4:54.

16:55:09 25         So at this time, we're going to adjourn for the day.

1          I admonish the jury, once again, not to discuss the

2     case, not to communicate with this case about anyone, not to

3     do any research on the Internet, not to the communicate with

4     anyone about this case on the Internet.  And all the other

16:55:32  5     admonitions that I gave you remain in full force and effect

6     for the end of the trial.

7          I thank you for your service, and thank you for your

8     patience and your attention today.

9          And we are adjourned -- we are in recess until

16:55:46  10     9:00 a.m. tomorrow morning.

11          And, Mr. DeVan, they'll report up here?

12               DEPUTY CLERK:  No, to the jury.

13               THE COURT:  You'll report to jury, and please

14     be down in jury at 8:30.

16:56:00  15          So the jury is excused for the day.

16               DEPUTY CLERK:  All rise.

17                         - - -

18          (Jury excused for the day at 4:56 p.m.)

19                         - - -

16:56:44  20               THE COURT:  What do we have for tomorrow?

21               MR. GILBERT:  We have Koehler, Nicholson,

22     Zehner, Compton, Couch-Page, maybe Momchilov.

23               MS. GREENE:  Depending on how things go, we

24     may continue on to Sara Knowlton and Matt Garber.

16:57:11  25               THE COURT:  All right.  So you have a full day

| | |
|---|---|
| 1 | tomorrow with your witnesses, correct? |
| 2 | MR. GILBERT:  Yes. |
| 3 | MS. GREENE:  Yes. |
| 4 | THE COURT:  All right.  Very well. |
| 16:57:18 5 | Ms. Kassel, do you want to give us the time remaining. |
| 6 | MS. KASSEL:  Plaintiffs are at 7 hours, 50 |
| 7 | minutes, and 35 seconds. |
| 8 | Defendants have used none of their time. |
| 9 | THE COURT:  And do we have any other matters |
| 16:57:31 10 | to discuss before tomorrow? |
| 11 | MR. DOWNEY:  Not from defendants. |
| 12 | MR. GILBERT:  No. |
| 13 | THE COURT:  Anything for the plaintiffs? |
| 14 | MR. GILBERT:  I'm just trying to figure out |
| 16:57:41 15 | what -- |
| 16 | You said how many hours?  Seven hours? |
| 17 | MS. KASSEL:  You have seven hours. |
| 18 | MR. GILBERT:  Does that include -- |
| 19 | THE COURT:  Used. |
| 16:57:46 20 | MR. GILBERT:  -- include opening? |
| 21 | THE COURT:  No, it does not. |
| 22 | MS. KASSEL:  No, it does not.  Out of your 10 |
| 23 | hours, you have 7 hours, 50 minutes 35 seconds. |
| 24 | MR. GILBERT:  Remaining. |
| 16:57:55 25 | MS. KASSEL:  Remaining. |

1          MR. GILBERT:  Oh, okay.

2          MR. DOWNEY:  It's only 5:00.

3          THE COURT:  All right.  Very well.

4          MR. DOWNEY:  It felt like seven hours to us,

16:58:07  5  too.

6          THE COURT:  Be in the courtroom tomorrow by

7  8:45.

8          MR. DOWNEY:  Thank you, Your Honor.

9          MS. WILLIAMSON:  Thank you.

16:58:13 10         THE COURT:  And just a reminder that

11  Judge Greenberg is available, in the event that you want to

12  talk to him.

13      And if you would prefer that I, at some point, just

14  ask him to see you without either party requesting, I'll be

16:58:30 15  very happy to do that also.

16      All right.  There being no further business before the

17  Court, we are in recess for the day.

18          MR. DOWNEY:  Thank you.

19          MS. GREENE:  Thank you.

16:58:39 20         MR. GILBERT:  Thank you.

21          THE COURT:  Thank you.

22      And you may make arrangements with Mr. DeVan, if you

23  want to leave things in the courtroom and have them locked

24  up.

16:58:48 25         MS. WILLIAMSON:  Thank you.

1          THE COURT:  I know I've said this in other

2     trials.  I want to say it again.

3          I want to thank counsel for their cooperation, and for

4     having this move along.

16:59:50  5     I've tried cases for 25 years, and I know when I go

6     home, except to look over my notes and make a few notes for

7     tomorrow, I'm essentially through until tomorrow morning,

8     but I know your work has just begun for the next day.

9          And I very much appreciate the work that you do,

17:00:05  10    especially when it manifests itself in a trial.  It's moving

11    along, from my perspective.

12          MR. GILBERT:  I've never been in a trial where

13    I've gotten this much testimony in the first day.

14          THE COURT:  All right.  Well, that's good, I

17:00:21  15    guess.

16          MR. GILBERT:  Even in Muni Court, you know.

17          THE COURT:  All right.  Well, very good.

18    Let's hope that all this continues, and that we're off to a

19    good start that we'll follow through with this trial.

17:00:51  20                    - - -

21          (Proceedings in recess for the day at 4:58 p.m. )

22

23

24

25

1                          **C E R T I F I C A T E**

2

3              I certify that the foregoing is a correct transcript

4       from the record of proceedings in the above-entitled matter.

5

6       */s/ Donnalee Cotone _____21st of April, 2019*
        DONNALEE COTONE, RMR, CRR, CRC                     DATE
7       Realtime Systems Administrator

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25