<pre>
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
 2                         EASTERN DIVISION

 3    ------------------------------X
      ELIZABETH GOODWIN, As          :   Case No. 1:15-cv-00210
 4    Administrator of the Estate    :   Cleveland, Ohio
      of BRIAN GARBER,               :
 5                                   :   Wednesday, February 20, 2019
                  Plaintiff,         :   9:18 a.m.
 6                                   :
           v.                        :   VOLUME 2 - JURY TRIAL
 7                                   :   (Pages 258 - 459)
      RICHLAND COUNTY, OHIO, et      :
 8    al.,                           :
                                     :
 9                Defendants.        :
      ------------------------------X
10

11

12              TRANSCRIPT OF JURY TRIAL PROCEEDINGS

13         BEFORE THE HONORABLE WILLIAM H. BAUGHMAN, JR.

14                UNITED STATES MAGISTRATE JUDGE

15

16

17
      Court Reporter:            Donnalee Cotone, RMR, CRR, CRC
18                               Realtime Systems Administrator
                                 United States District Court
19                               801 West Superior Avenue
                                 Court Reporters 7-189
20                               Cleveland, Ohio 44113
                                 216-357-7078
21                               donnalee_cotone@ohnd.uscourts.gov

22

23

24    Proceedings recorded by mechanical stenography, transcript

25    produced by computer-aided transcription.
</pre>

1    APPEARANCES:

2

3         On behalf of Plaintiff Elizabeth Goodwin, *As
          Administrator of the Estate of* BRIAN GARBER:

4
                    **TERRY H. GILBERT, ESQ.**
5                   **JACQUELINE C. GREENE, ESQ.**
                    Friedman & Gilbert
6                   55 Public Square,  Suite 1055
                    Cleveland, Ohio 44113
7                   216-241-1430
                    tgilbert@f-glaw.com
8                   greene@f-glaw.com

9

10        On behalf of Plaintiff Elizabeth Goodwin, *As
          Administrator of the Estate of Brian Garber*:

11
                    **CHANCE G. DOUGLAS, ESQ.**
12                  24100 Chagrin Boulevard
                    Suite 280
13                  Cleveland, Ohio 44122
                    216-292-5200
14                  cdouglas@hoffmanlegalgroup.com

15

          On behalf of Defendant Richland County, Ohio, et al.:
16
                    **DANIEL T. DOWNEY, ESQ.**
17                  **MELANIE J. WILLIAMSON, ESQ.**
                    7775 Walton Parkway, Suite 200
18                  New Albany, Ohio 43054
                    614-221-1216
19                  ddowney@fisheldowney.com
                    mwilliamson@fisheldowney.com
20

21

22   ALSO PRESENT:             Deputy Raymond Jeffrey Frazier
                               Deputy Andrew Knee
23                             Deputy James Nicholson

24

25

1                          **I N D E X**

2

                                                          **PAGE**
3

    APPEARANCES........................................ 259
4

    PRE-JURY VOIR DIRE COLLOQUY........................ 262
5

    PRE-JURY VOIR DIRE COLLOQUY........................ 412
6

    DIRECT EXAMINATION OF LISA KOHLER, M.D............. 264
7   BY MR. GILBERT

8   CROSS-EXAMINATION OF LISA KOHLER, M.D.............. 290
    BY MS. WILLIAMSON
9
    CROSS-EXAMINATION OF JAMES A. NICHOLSON............ 300
10  BY MR. GILBERT

11  CROSS-EXAMINATION OF DONALD ZEHNER................. 336
    BY MS. GREENE
12
    DIRECT EXAMINATION OF RICHARD COMPTON.............. 350
13  BY MS. GREENE

14  CROSS-EXAMINATION OF RICHARD COMPTON.............. 357
    BY MR. DOWNEY
15
    DIRECT EXAMINATION OF CORY MOMCHILOV............... 358
16  BY MR. GILBERT

17  CROSS-EXAMINATION OF CORY MOMCHILOV............... 368
    BY MR. DOWNEY
18
    DIRECT EXAMINATION OF SARA CORDRAY KNOWLTON........ 375
19  BY MS. GREENE

20  CROSS-EXAMINATION OF SARA CORDRAY KNOWLTON......... 400
    BY MR. DOWNEY
21
    REDIRECT EXAMINATION OF SARA CORDRAY KNOWLTON...... 410
22  BY MS. GREENE

23  DIRECT EXAMINATION OF BAMBI COUCH-PAGE............. 415
    BY MS. GREENE
24
    DIRECT EXAMINATION OF CONNIE S. GARBER............. 420
25  BY MR. DOUGLAS

1                    I N D E X  (Continued)

2

3    CROSS-EXAMINATION OF CONNIE S. GARBER.............. 441
     BY MS. WILLIAMSON
4
     REDIRECT EXAMINATION OF CONNIE S. GARBER........... 447
5    BY MR. DOUGLAS

6    AFTERNOON SESSION.................................. 349

7    REPORTER CERTIFICATE.............................. 459

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
              1              MORNING SESSION, WEDNESDAY, FEBRUARY 20, 2019

              2                                 -  -  -

              3                   (Proceedings reconvened at 9:18 a.m.)

              4              (In Open Court - Prospective Jurors Not Present)

              5                        (Defendant Present)

              6                                 -  -  -

              7              THE COURT:  Are there any matters for counsel

              8    to discuss with the Court before we bring in the jury?

              9              MR. GILBERT:  Oh, yeah.

09:19:40     10         During the course of today, we may offer the remote

             11    into evidence, and I wanted to make sure there were no

             12    problems with handling it.

             13         Are there gloves that we need to hold -- to put on to

             14    take it out of the package?

09:20:00     15              MR. DOWNEY:  I mean, I know I just brought the

             16    remote.  I didn't bring gloves.  I brought the remote.  It's

             17    in the sealed bag --

             18              MR. GILBERT:  Yeah.

             19              MR. DOWNEY:  -- with the Court.

09:20:10     20              THE COURT:  Right.

             21              MR. DOWNEY:  You know, if you want to handle

             22    it, I guess . . .

             23              THE COURT:  Well, as long as handling it is

             24    not going to cause any objections.

09:20:24     25              MR. GILBERT:  I mean, at this point --
```

1       MR. DOWNEY:  We may have gloves, if one of the

2   officers is out there.  So we may be able to supply those --

3           THE COURT:  All right.

4       MR. DOWNEY:  -- if he wants to handle it.

09:20:34  5       And, obviously, we would reserve the right to object

6   to how you intend to use that, because we don't know that

7   yet.

8           THE COURT:  Okay.  But just -- we want to

9   avoid any arguments that the exhibit's been tainted in any

09:20:45 10   way.

11           MR. DOWNEY:  Right.

12           THE COURT:  So whatever counsel agreed on is

13   fine with me, as long as it doesn't create an issue.

14           MR. DOWNEY:  During a break, I'll check with

09:20:56 15   one of the officers --

16           THE COURT:  All right.

17           MR. DOWNEY:  -- if they have the gloves.

18           THE COURT:  All right.  Very well.

19       Anything else?

09:21:03 20           MR. DOWNEY:  None from defense, Your Honor.

21           THE COURT:  All right.

22       Mr. DeVan, bring in the jury.

23           (The jury entered the courtroom.)

24           DEPUTY CLERK:  Please be seated.

09:23:13 25           THE COURT:  Good morning, members of the jury.

1          I know we all encountered adverse conditions this

2     morning, and I very much appreciate that you're here, and

3     that everyone is here safely.

4          Counsel for the plaintiff, please present your next

09:23:30  5     witness.

6                    MR. GILBERT:  We would call Dr. Lisa Kohler.

7                    DEPUTY CLERK:  Please raise your right hand.

8          Do you solemnly swear or affirm that your testimony in

9     this case will be the truth, the whole truth, and nothing

09:23:30 10     but the truth, so help you God?

11                    THE WITNESS:  I do.

12                DIRECT EXAMINATION OF LISA KOHLER, M.D.

13     BY MR. GILBERT:

14     Q.    Good morning.

09:24:43 15     A.    Good morning.

16     Q.    Would you please state your name for the record.

17     A.    Dr. Lisa Kohler, K-O-H-L-E-R.

18     Q.    And what is your occupation?

19     A.    I am a forensic pathologist, and I'm employed as the

09:24:58 20     chief medical examiner for the County of Summit.

21     Q.    Okay.  And what, basically, is the role of the medical

22     examiner?

23     A.    The medical examiner determines the cause and manner

24     of death of individuals dying under various circumstances

09:25:13 25     within their county.  This is accomplished by obtaining

1    information about the circumstances surrounding death and

2    performing an examination of the individual.

3    Q.    Are you also a physician?

4    A.    Yes, sir.

09:25:28 5    Q.    And when did you become a physician?

6    A.    I graduated from medical school in 1993, and that was

7    when my medical doctor degree was conferred.

8    Q.    Are you also specializing in pathology?

9    A.    Yes, sir.

09:25:51 10   Q.    And how long have you been practicing as a

11   pathologist?

12   A.    I have been with the medical examiner's office for

13   approximately 20 years.

14   Q.    And have you performed autopsies?

09:26:07 15   A.    Yes, sir.

16   Q.    Approximately how many autopsies have you performed?

17   A.    Greater than 3,000, and I've supervised more than

18   that.

19   Q.    What is an autopsy?

09:26:17 20   A.    An autopsy is an examination of a deceased person.  It

21   begins with an examination of the person, how they are

22   received, clothed, unclothed, with medical therapies, what

23   have you.

24        The person is examined in that fashion.  Then the

09:26:35 25   clothing and medical therapies are removed.  We examine the

1    body, again, unclothed.

2         And then we do an internal examination, which involves

3    obtaining fluids from the eye, from the blood vessels, the

4    stomach, and from the bladder.

09:26:52 5         And then we will examine all of the organs, where they

6    lay in the body.  We will remove those organs and describe

7    them, weigh them, and make our observations.

8         Additional testing can be done as needed.

9    Q.   And are these autopsies usually performed within some

09:27:14 10   days after the death of an individual?

11   A.   Could you restate that question.

12   Q.   Are the autopsies conducted -- well, they have to

13   be -- the body has to be received at the medical examiner's

14   office, correct?

09:27:35 15   A.   Yes, sir.

16   Q.   All right.  And they typically come in at what point?

17   A.   They come in after we have been -- after the death has

18   been reported, and the transportation has been arranged.

19   Q.   Now, Dr. Kohler, are you able to, in the course of an

09:27:56 20   autopsy analysis, identify entry and exit wounds?

21   A.   Yes, sir.

22   Q.   All right.  Are you able to determine with sufficient

23   information, the pathway of the bullet in connection with an

24   entry and exit wound?

09:28:09 25   A.   In most situations, yes.

1    Q.    Are you able to determine what tissue, bones, or

2    organs a bullet might go through?

3    A.    Yes, sir.

4    Q.    And are you able to determine what the damage might be

09:28:28  5    of those tissues, organs, and bones?

6    A.    Yes.  I can identify and describe the injuries that

7    were observed.

8    Q.    Now, did you conduct the autopsy of Brian Garber on

9    March 19th, 2014?

09:28:46 10    A.    Yes, sir.

11              MR. GILBERT:  Would you put up Exhibit 34,

12    please.

13    BY MR. GILBERT:

14    Q.    Showing you what, I believe, is the first page of your

09:29:07 15    report.

16         Is this the report that you prepared in connection

17    with the autopsy of Brian Garber?

18    A.    Yes.  This is the first page of the autopsy report.

19    Q.    Okay.

09:29:21 20              MR. GILBERT:  Would you go through the pages,

21    Chance.

22    BY MR. GILBERT:

23    Q.    How many pages is that report?

24    A.    There are ten pages --

09:29:37 25    Q.    Okay.

Kohler (Direct by Gilbert)

268

```
           1    A.    -- listed here.

           2    Q.    Okay.  Do you see on the screen all ten pages?

           3    A.    Yes.  This is the tenth page of ten.

           4    Q.    Okay.

09:30:02   5              MR. GILBERT:  Can we publish this to the jury?

           6              THE COURT:  Any objection?

           7              MS. WILLIAMSON:  No objection.

           8              THE COURT:  It may be published.

           9    BY MR. GILBERT:

09:30:25  10    Q.    Was anybody present at the autopsy when you conducted

          11    it?

          12    A.    Yes, sir.

          13    Q.    And who was that?

          14    A.    Agent Cory Momchilov of the Bureau of Criminal

09:30:45  15    Identification Investigation.

          16    Q.    Okay.  When the body arrived at the medical examiner's

          17    office, were there EKG adhesive still on his body from any

          18    medical intervention?

          19    A.    Yes, there were EKG adhesives.

09:31:19  20              MR. GILBERT:  Exhibit 34, page 3.

          21    BY MR. GILBERT:

          22    Q.    In your report, you identify gunshot wounds to the

          23    body of Brian Garber?

          24    A.    I do.

09:31:32  25    Q.    How many actual gunshot wounds did you identify?
```

Kohler (Direct by Gilbert)

269

1    A.    There are 14 entrance wounds.

2    Q.    And your report goes over entrance, wound path, exit,

3    whether there was bullet recovery, and direction; is that

4    correct?

09:31:56  5    A.    Yes, sir.

6    Q.    Okay.  Did you take x-rays that show these gunshot

7    wounds, and whether there are bullets still in his body?

8    A.    Yes, sir.

9    Q.    Did you prepare a computerized diagram as a visual aid

09:32:22  10   to show the entrance wound, exit wound, and bullet recovery

11   for the various wounds?

12   A.    Yes, sir.

13   Q.    Okay.

14                MR. GILBERT:  Would you bring up

09:32:36  15   Exhibit 35-13.

16   BY MR. GILBERT:

17   Q.    Okay.  Is this the computerized diagram that you

18   created?

19   A.    Yes, sir.

09:32:51  20   Q.    And does this diagram show entrance wound, exit wound,

21   and bullet recovery?

22   A.    Yes, sir.

23   Q.    All right.  And you prepared this in the course of

24   your work at the medical examiner's office, correct?

09:33:04  25   A.    I did.

1   Q.    All right.

2           MR. GILBERT:  Can we publish this to the jury?

3           MS. WILLIAMSON:  No objection.

4           THE COURT:  It may be published.

09:33:15  5  BY MR. GILBERT:

6   Q.    What I'm going to ask you, Dr. Kohler -- well, first

7   of all, the numbers of the various entrance and exit wounds,

8   is there any correlation between the numeric assignment that

9   you gave to the various wounds, and the order of the shots?

09:33:40  10  A.    No, sir.

11  Q.    Some of these wounds, are they not more life

12  threatening than others, depending on what area of the body

13  was impacted?

14  A.    I believe that would call for an expert opinion.  I'm

09:33:58  15  here as a fact witness.

16  Q.    Okay.  But you did indicate in your findings,

17  that -- on page 2, you entered an opinion, did you not?

18  A.    Yes, sir.

19  Q.    Okay.  Can you read that opinion.

09:34:21  20  A.    "The autopsy of Brian M. Garber (Case #1403770)

21  revealed multiple gunshot wound injuries to the torso and

22  extremities.  Chest wounds injured his heart and lungs,

23  causing significant blood loss.  The majority of the wounds

24  are directed rightward across the body.  Two wounds have a

25  slightly leftward trajectory.  One superficial wound could

1    not be adequately assessed with regards to direction.

2    Correlation with investigative information is recommended."

3    Q.    Okay.  So let's look at the diagram.  I think you can

4    point onto the screen the various -- the various locations

09:35:03  5    on this diagram.

6                    MR. GILBERT:  Is that right, Judge?

7                    DEPUTY CLERK:  Yes, she should be able to.

8                    MR. GILBERT:  If you need to, point on the

9    exhibit.

09:35:17  10                    THE WITNESS:  Then how do I erase it once

11    I . . .

12                    DEPUTY CLERK:  Just using your finger, and it

13    will work.

14    BY MR. GILBERT:

09:35:26  15    Q.    Okay.  So let's talk about each of the entrance

16    wounds, starting with Number 1, and what your findings were.

17    A.    Okay.  Entrance Number 1, which is in the upper chest,

18    it's a round circle with a Number 1.  This entrance wound

19    enters the -- it's on the upper sternum, or breast bone,

09:35:52  20    just left of center, and above the level of the nipples.

21    It's a round wound, and it is just three-eighths inches left

22    of the midline.

23          The wound path is such that it passes through the skin

24    of the chest.  It goes below the left third rib next to the

09:36:13  25    sternum.  It gets into the chest cavity going rightward.  So

Kohler (Direct by Gilbert)

272

1    it injures the right lower lobe of the lung, and results in

2    a right hemothorax, which is blood in the chest cavity.

3         It then goes through the right fifth rib, and lodges

4    in the back, near the scapula, or shoulder blade.

09:36:34 5    And at that point, we were able to cover a

6    medium-caliber jacketed bullet from near the shoulder blade.

7    The wound went upward, rightward, and backward.

8    Q.   Okay.  And Number 2, can you go to that wound.

9    A.   Okay.  Number 2 is lower on the chest, near the

09:36:53 10   midline, again.

11        This is a slightly ovoid wound, just 1 inch left of

12   the anterior midline, with a slight graze wound just

13   inferior, or below, the wound.

14        The wound path goes through the skin of the chest, the

09:37:13 15   seventh rib near the xyphoid process, which is at the bottom

16   of the chest bone there, goes through the left-lower lobe of

17   the lung, the paracardial sac areas within the heart, and

18   then goes to the skin of the back near the shoulder blade

19   overlying the sixth rib.

09:37:33 20        It does not exit.  The bullet, medium-caliber,

21   mushroom, jacketed bullet is recovered from the skin of the

22   left back, and the direction is upward, backward, and

23   slightly leftward.

24   Q.   Okay.  Number 3.

09:37:47 25   A.   Number 3 is on the lower abdomen near the midline,

Kohler (Direct by Gilbert)

1    again, just below the umbilicus, or the belly button.  This

2    is a round wound.  It enters the skin of the lower abdomen,

3    goes through the abdominal cavity, and involves loops of

4    bowel, and lodges in the skin of the right back -- or not --

09:38:11  5    excuse me.  It does not lodge.  It goes out the skin of the

6    right back.

7         The exit wound is on the right posterior flank, and

8    the direction is upward, backward, and rightward.

9    Q.    Okay.  Let's go on to Number 4.

09:38:31  10    A.    Number 4 is just above and to the left of the previous

11    wound on the abdomen.  So it's located -- it's a round

12    wound, just at the level of the belly button, umbilicus.  It

13    enters through the skin of the abdomen.  It goes through the

14    abdominal cavity and the backside of the abdominal wall.

09:38:57  15         The bullet exists through a crescent-shaped wound, and

16    the direction is upward, backward, and slightly leftward.

17    Q.    Okay.  And Number 5.

18         Is that where we're at?

19    A.    Yes, sir.

09:39:14  20         Gunshot wound Number 5 is the left anterior hip.  So

21    you can see it just above the hipbone on the diagram there.

22         It's an ovoid pull just above the -- just at the iliac

23    crest, which is the top of your hipbone.

24         The wound passes through the skin of the abdomen into

09:39:37  25    the abdominal cavity.  It grazes the backside of the liver,

1      goes through the left ninth rib, and skin of the back just

2      above the ninth rib.  There is no exit.

3          A mushroom, jacketed, medium-caliber bullet is

4      recovered from the skin of the right back near the ninth

09:39:56  5      rib.  It passes upward, backward, and rightward.

6      Q.    Okay.  Number 6.

7      A.    Number 6 is on the left flank area.  This is an ovoid

8      wound as well.  There are two parts to this wound.

9          There's an anterior, which is more frontward, and a

09:40:23 10      posterior, which would be a backward wound associated with a

11      very shallow wound track through the soft tissues.  It does

12      not go into the abdominal cavity at all.

13          No bullet was recovered.  It is unclear whether it's

14      going back to front or front to back.

09:40:38 15      Q.    Number 7, please.

16      A.    Wound Number 7 is on the left chest.  It is the middle

17      one on the left side of the body there.

18          This is entering the left side of the chest below the

19      seventh rib.  It gets into the pleural cavity, which is the

09:41:03 20      space around the lung.  It then passes through the left

21      ninth rib into the skin of the back.

22          A deformed, jacketed, medium-caliber bullet is

23      recovered from the left back behind the ninth rib.  And this

24      one went slightly upward, slightly backward, and rightward.

09:41:21 25      Q.    And are we on Number 7 or 8?

1    A.    Number 8, sir.

2    Q.    Number 8, please.  Explain that one.

3    A.    Gunshot wound 8 is the left lateral chest near the

4    axilla, or armpit.  So that, on the diagram, is the

09:41:37 5    uppermost wound on the left side of the body.

6        This one enters the left side of the chest.  Goes

7    through the chest cavity, through the eighth rib to skin of

8    the back near the eighth rib.  There is no exit.

9        A medium-caliber bullet is recovered from the skin of

09:41:53 10    the back near the eighth rib.  This passed rightward and

11    backward.

12    Q.    Nine, please.

13    A.    Gunshot Wound Number 9.  We're now going down lower on

14    the body, to the left knee.  The wound is on the outer

09:42:12 15    aspect of the left knee.

16        It goes through skin and soft tissues of the outer

17    aspect of the left knee.  It fractures or breaks the femur

18    bone, which is the thigh bone, and goes through soft tissues

19    on the front of the thigh and skin of the front of the

09:42:29 20    thigh.  It does exit the front of the thigh, so there is no

21    bullet recovered.

22        This is upward, forward, and rightward.

23    Q.    Okay.  And then going on to Number 10, which is on the

24    back view diagram.

09:42:48 25    A.    Yes.  Number 10 is left foot.  The entrance of the

Kohler (Direct by Gilbert)

276

1    wound is on the sole of his foot between the third and

2    fourth toes, and then it passes upward through the bone and

3    soft tissues of the foot, exiting the top of the foot.

4         It is upward and slightly rightward in direction.

09:43:13 5   Q.   All right.  Now, Number 11.

6    A.   Gunshot Wound Number 11 is entering below the left

7    elbow.  It's coming in from the backside, if the body is

8    held in anatomic position with the hand slightly out to the

9    side of the body with the palms facing forward.

09:43:31 10      It's coming in from the backside of the elbow.  It

11   passes through the soft tissues of the elbow, and goes out

12   the front side of the forearm, near the elbow.

13       So this is going upward and slightly forward, if the

14   arm is held in anatomic position.

09:43:50 15  Q.   Now, Dr. Kohler, I'm particularly interested on this

16   wound here.

17       Can you show on your left arm, where that entrance

18   wound would be.

19   A.   The entrance would be by the elbow, where the arm

09:44:03 20  bends.

21   Q.   In the back of the elbow, correct?

22   A.   Yes, sir.

23   Q.   And where would be the exit wound?

24   A.   The exit wound is on the inside, near the arm fold

09:44:13 25  towards the front of the body.

Kohler (Direct by Gilbert)

1    Q.    Okay.  And number -- Entrance Wound Number 12.

2    A.    Entrance Wound Number 12 is on the backside of the

3    diagram.  It's on the back, inner side of the right thigh.

4         This wound passes through the skin and soft tissues of

09:44:38  5    the thigh.

6         And there is a typo in the report.  It says "left

7    thigh."  That is right.  It's the right thigh, not left.

8         It fractures the femur, and lodges in the soft tissue

9    adjacent to the bone.

09:44:50  10        This bullet is a medium-caliber bullet recovered from

11    the femur, and it's going upward, rightward, and forward.

12    Q.    Now, have you gone through all the entrance wounds?

13    A.    No, sir.

14    Q.    Any others?

09:45:12  15    A.    Yes.  Entrance Wound Number 13 and 14.

16    Q.    Okay.  And where do they enter?

17    A.    Entrance Wound Number 13 is in the right thigh or

18    groin on the diagram, on the front of the body.  You can see

19    it right near the groin area.

09:45:30  20        The wound passes through the skin and soft tissues of

21    the upper inner aspect of the thigh.  It grazes the scrotum,

22    and lodges in the deep soft tissues near the pelvis.  It

23    doesn't exit.

24        A medium-caliber bullet is recovered from the soft

09:45:48  25    tissues of the pelvis.  This is upward, slightly backward,

Kohler (Direct by Gilbert)

278

1    and rightward.

2         And then the 14th wound is the left lateral hip area.

3    And that is on the left side, on the upper part of the thigh

4    on the diagram there.

09:46:06 5    Q.    Okay.

6    A.    So it enters the skin of the left hip.  It enters the

7    abdominal cavity with injury to the bowel, the left kidney,

8    and the left back going behind rib 11, near the spine.  It

9    does not exit.

09:46:22 10        It is recovered as a medium-caliber, minimally

11   deformed, jacketed bullet.  It goes upward, backward and

12   rightward.

13   Q.    Now, just so the record is clear, all the red circles

14   with the hole in them are the designated entrance wounds,

09:46:44 15   correct?

16   A.    Yes, sir.

17   Q.    And all the blue diamond shapes on the bodies -- on

18   the body is related to exit wounds; is that right?

19   A.    Yes, sir.

09:46:58 20   Q.    And the triangle, blue triangle, the bullet was

21   recovered?

22   A.    Correct.

23   Q.    All right.  And specifically on the diagram to the

24   right, there are one, two -- three entrance wounds on the

09:47:28 25   back of the body; is that true?

1    A.    Yes, sir.

2    Q.    Okay.  And you also were able to confirm some of these

3    locations through x-rays?

4    A.    Confirm locations of what, sir?

09:47:49  5    Q.    Of bullets.

6    A.    Yes, sir.

7    Q.    All right.

8              MR. GILBERT:  I would ask, 35-1.

9          Okay.

09:48:12  10   BY MR. GILBERT:

11   Q.    Do you see Plaintiff's Exhibit 35-1 on the screen?

12   A.    Yes, sir.

13   Q.    All right.  If you need to look at your notes, that's

14   fine.

09:48:38  15   A.    I'm ready, sir.

16   Q.    So 35-1 shows what?

17   A.    35-1 is an image showing the skull and upper chest of

18   Mr. Garber.

19             MR. GILBERT:  Can we publish that, Judge?

09:48:52  20             THE COURT:  Any objection?

21             MS. WILLIAMSON:  No objection.

22             THE COURT:  You may publish.

23   BY MR. GILBERT:

24   Q.    And what does it show, again?  I'm sorry.

09:48:58  25   A.    This is the skull and upper chest of Mr. Garber.

```
          1    Q.    Okay.

          2                MR. GILBERT:  Let's go to 35-2.

          3    BY MR. GILBERT:

          4    Q.    And what does this x-ray show?

09:49:15  5    A.    Plaintiff's Exhibit 35-2 is a chest x-ray of

          6    Mr. Garber.

          7    Q.    And how many bullets are in it -- are indicated in his

          8    body?

          9    A.    There are five bullets visible on this x-ray.

09:49:31  10   Q.    Okay.  Can you identify where they're at.

          11   A.    On --

          12               MR. GILBERT:  Wait.  Let's publish this for

          13   the jury to see.  I'm sorry.

          14               THE COURT:  No objection?

09:49:46  15               MR. GILBERT:  I keep forgetting.

          16               MS. WILLIAMSON:  No.

          17               THE COURT:  You may publish.

          18               MS. WILLIAMSON:  No objections.

          19               MR. GILBERT:  Thank you.

09:49:53  20   BY MR. GILBERT:

          21   Q.    Okay.  Can you go over all the -- there are how many

          22   bullet wounds in there -- bullets in there?

          23   A.    There are five bullets present in this image.

          24         Keep in mind that this is a reverse image, so the

09:50:05  25   right side of his body is on your left.  And you can see
```

Kohler (Direct by Gilbert)

281

1    there's a white "R" on the upper left corner to indicate

2    that's the right side of the body.

3    Q.    Okay.

4    A.    There are two bullets on the right side of the body.

09:50:18  5    There is one up near the top of the chest cavity that looks

6    kind of like a flower.  This is Bullet Number 1 from Gunshot

7    Wound Number 1.

8    Q.    And that --

9    A.    Farther down --

09:50:30  10    Q.    Excuse me, Doctor.

11        That would -- would that -- where did that bullet go

12    through?  Do you remember?

13    A.    Gunshot Wound Number 1 is the wound that was near the

14    chest bone above the level of the nipples.  It went

09:50:50  15    through the -- it went below the left third rib, through the

16    right lower rib of the lung, with a lead into the chest

17    cavity, and perforated the right fifth rib, and lodged in

18    the back.

19    Q.    And would that wound cause significant blood loss?

09:51:07  20    A.    There was blood in the right cavity, which was

21    characterized as 900 cc's, or milliliters.

22    Q.    All right.  Continue on with the other bullets.

23    A.    The -- going down, again, on the right side, there is

24    a more rectangular-shaped white object there.  That is

09:51:29  25    Bullet Number 5 from Entrance Number 5, and that originated

Kohler (Direct by Gilbert)

282

1    in the left anterior hip, left front hip.

2    Q.    Continue.

3    A.    On the opposite side of the body, there are three

4    bullets.  The upper-most one that, again, looks like a

09:51:55  5    flower, is from Entrance Wound Number 2.

6          The next one down and slightly to the outside of that

7    is from Bullet Wound Number 8.

8          And below it, to the inside of that, is Bullet

9    Number 7.

09:52:10 10    Q.    Did any of these bullets associate with wounds to

11    organs?

12    A.    Bullet Number 5 grazed the back of the liver.

13          Number 7 went through the chest cavity, and Number 8

14    went through the chest cavity.

09:52:56 15          So those may have injured lungs as well.

16    Q.    And any of them into the heart?

17    A.    No, sir.

18                    MR. GILBERT:  Number 35-3.

19                    THE WITNESS:  Okay.  Exhibit Number 35-3, for

09:53:18 20    the plaintiff's, is an abdominal x-ray which shows three

21    bullets, two of which you have already seen.

22    BY MR. GILBERT:

23    Q.    Okay.  These are repeated in the other x-ray?

24    A.    Yes.  They're the two floral, flower-shaped ones you

09:53:39 25    saw on the previous image.

1          The new one is kind of the elongated oval bullet.

2     This is from Gunshot Wound Number 14, which came in on the

3     left lateral hip area, went through the abdominal cavity

4     with injury to the bowel and left kidney.

09:54:02  5               MR. GILBERT:  Can we publish that exhibit?

6                    THE COURT:  No objection?

7                    MS. WILLIAMSON:  No objection, Your Honor.

8                    THE COURT:  You may publish.

9                    MR. GILBERT:  35-4.

09:54:11  10   BY MR. GILBERT:

11    Q.    Is this an x-ray that you -- that was taken in the

12    course of the autopsy?

13    A.    Yes, sir.

14    Q.    Okay.

09:54:27  15              MR. GILBERT:  Can we publish that?

16                   THE COURT:  No objection?

17                   MS. WILLIAMSON:  No objection, Your Honor.

18                   THE COURT:  You may publish it.

19    BY MR. GILBERT:

09:54:34  20   Q.    Can you explain the bullets in that x-ray.

21    A.    Okay.  This is an x-ray of the pelvis and the upper

22    portion of the thigh.  We have two bullets visible here.

23    The bullet that is uppermost, which is here, near the

24    pelvis, -- this is Bullet Number 13 -- was a wound in the

09:54:59  25   right thigh/groin, passed through soft tissues after grazing

Kohler (Direct by Gilbert)

284

1    the scrotum, and became lodged in the soft tissues of the

2    pelvis.

3         And then the lower bullet near the thigh bone here,

4    this is from Wound Number 12 on the back inner aspect of the

09:55:25  5    right thigh.  It fractures the femur.  And you can see --

6    just below where the bullet is, you can see the top part of

7    the broken femur.

8         This wound, Number 12, just damaged soft tissues and

9    the femur.

09:55:48  10              MR. GILBERT:  And Exhibit 35-6, please.

11   BY MR. GILBERT:

12   Q.   Is this an x-ray that was taken in the course of the

13   autopsies?

14   A.   Yes, sir.

09:56:10  15              MR. GILBERT:  Can we publish that, please.

16              MS. WILLIAMSON:  No objection.

17              THE COURT:  You may publish.

18   BY MR. GILBERT:

19   Q.   And what does this exhibit show?

09:56:18  20   A.   This is an x-ray of the left foot.  You can see that

21   there are very small, white, irregular fragments through

22   that.  Those are pieces of the bullet left behind as the

23   bullet passed through his foot.

24              MR. GILBERT:  Go to 35-7.

09:56:50  25   BY MR. GILBERT:

Kohler (Direct by Gilbert)

285

```
            1    Q.    Now, this is an x-ray that's similar to the previous

            2    x-ray we saw, but it has numbers on it; is that correct?

            3    A.    Yes, sir.

            4    Q.    Did you put the numbers on the x-ray to identify the

09:57:04    5    bullets?

            6    A.    Yes, sir.

            7    Q.    Okay.

            8              MR. GILBERT:  Can we publish this?

            9              MS. WILLIAMSON:  No objection.

09:57:10   10              MR. GILBERT:  Okay.

           11              THE COURT:  You may publish.

           12    BY MR. GILBERT:

           13    Q.    So there are five bullets in that chest area; is that

           14    right?

09:57:22   15    A.    Yes, sir.

           16    Q.    And you have in there the word "heart"?

           17    A.    Yes, sir.

           18    Q.    That's just the location of the heart; is that right?

           19    A.    Yes.  That is the heart shadow that you're seeing on

09:57:34   20    the x-ray.

           21              MR. GILBERT:  And let's go to 35-8.

           22    BY MR. GILBERT:

           23    Q.    Is that an exhibit that you had prepared through the

           24    x-ray of that particular location, which is the abdomen?

09:57:50   25    A.    Yes.  35-8 is an exhibit I prepared, with the number
```

Kohler (Direct by Gilbert)

286

```
         1    "14" next to the lowest bullet on the abdomen.

         2              MR. GILBERT:  Can we publish that, please.

         3              MS. WILLIAMSON:  No objection.

         4              THE COURT:  You may publish.

09:58:09 5              MR. GILBERT:  Let's go on to 35-9.

         6    BY MR. GILBERT:

         7    Q.    And is this an exhibit that you prepared?

         8    A.    Yes, sir.

         9    Q.    All right.

09:58:24 10             MR. GILBERT:  Can we publish?

        11             MS. WILLIAMSON:  No objection.

        12             THE COURT:  You may publish.

        13    BY MR. GILBERT:

        14    Q.    And this shows the -- this Exhibit 35-9 shows Bullet

09:58:34 15    Number 13?

        16    A.    Yes, sir.

        17    Q.    And that's located in the pelvis?

        18    A.    Yes, sir.

        19             MR. GILBERT:  35-10.

09:58:47 20    BY MR. GILBERT:

        21    Q.    Is this an exhibit you prepared from the x-rays?

        22    A.    Yes, sir.

        23             MR. GILBERT:  Publish, please.

        24             MS. WILLIAMSON:  No objection.

09:58:54 25             THE COURT:  You may publish.
```

```
            1    BY MR. GILBERT:

            2    Q.    And, once again, is this the Bullet Number 12?

            3    A.    Yes, sir.

            4    Q.    Which struck the femur?

09:59:05    5    A.    Yes, sir.

            6              MR. GILBERT:  Next, 35-11.

            7    BY MR. GILBERT:

            8    Q.    And is this an exhibit that you prepared based on the

            9    x-ray?

09:59:19   10    A.    Yes, sir.

           11              MR. GILBERT:  Publish?

           12              PROBATION OFFICER:  No objection.

           13              THE COURT:  You may publish.

           14    BY MR. GILBERT:

09:59:27   15    Q.    And this shows Bullet Number 10, which is the right or

           16    left foot?

           17    A.    Number 10 is the left foot.

           18    Q.    All right.  And does that show the entrance wound to

           19    Number 10 or the exit?

10:00:07   20    A.    It shows the damage to the foot as a result of Gunshot

           21    Wound Number 10.

           22    Q.    Okay.

           23              MR. GILBERT:  And can we go to Number 35-12.

           24    BY MR. GILBERT:

10:00:25   25    Q.    Is this an exhibit that you prepared from the autopsy?
```

1    A.    Yes, sir.

2    Q.    Okay.

3              MR. GILBERT:  Can we publish?

4              MS. WILLIAMSON:  No objection.

10:00:38  5              THE COURT:  You may publish.

6    BY MR. GILBERT:

7    Q.    And 35-12 shows what?

8    A.    35-12 is in reference to Gunshot Wound Number 9, in

9    which it fractures the femur bone, or thigh bone.  There was

10:00:49  10   no bullet recovery associated with this wound.

11   Q.    And all these findings are based on a reasonable

12   degree of medical certainty, based on your performance of

13   the autopsy?

14   A.    Yes, sir.

10:01:10  15   Q.    Okay.  And your opinion is reflected on page 2 of the

16   autopsy report?

17   A.    Yes, sir.

18   Q.    Okay.

19              MR. GILBERT:  One moment.

10:01:47  20                  (Pause in proceedings.)

21              MR. GILBERT:  Thank you, Dr. Kohler.

22        I have no further questions.

23              THE COURT:  Cross-examination?

24              MR. GILBERT:  And can we have a sidebar,

10:01:56  25   please.

Kohler (Direct by Gilbert)

289

```
        1            THE COURT:  Yes.

        2            MR. GILBERT:  Thank you.

        3       (Discussion held at sidebar, as follows:)

        4            MR. GILBERT:  Okay.  Two things I want to

10:02:10 5   raise, just to make sure I know where you're going.

        6       We would object to any reference to a toxicology

        7   report because she's not a toxicologist.  So I don't know if

        8   you're bringing that in or not.

        9            MS. WILLIAMSON:  No.

10:02:25 10           MR. DOWNEY:  No.

       11            MR. GILBERT:  Okay.  That's fine.

       12       And -- because the police officers didn't know that

       13   whatever --

       14            THE COURT:  I got you.

       15            MR. GILBERT:  -- is contained in the

       16   toxicology.

       17            THE COURT:  All right.  We're not going to

       18   bring it up.

       19            MR. GILBERT:  Okay.  That's all I wanted to

10:02:36 20  raise.

       21            THE COURT:  Okay.  All right.

       22       Thank you.

       23       Cross?

       24            MS. WILLIAMSON:  Yeah.

10:02:48 25           THE COURT:  Okay.
```

```
         1              (End of sidebar discussion.)

         2              (Proceedings resumed in open court.)

         3              CROSS-EXAMINATION OF LISA KOHLER, M.D.

         4    BY MS. WILLIAMSON:

10:03:23 5    Q.    Good morning, Dr. Kohler.

         6    A.    Good morning.

         7    Q.    You and I have met before.  It's been a while.

         8          I think it was April of 2016, where we did your

         9    deposition in this case?

10:03:34 10   A.    Yes, ma'am.

         11   Q.    I just have a few questions for you here today.

         12         You went through --

         13              MS. WILLIAMSON:  Using Exhibit 35-13.  If you

         14   could, pull that up.

10:03:58 15   BY MS. WILLIAMSON:

         16   Q.    In your testimony, you explained that these were the

         17   bullet wounds that you examined on Brian Garber's body

         18   during his autopsy, correct?

         19   A.    Yes, ma'am.

10:04:07 20   Q.    And you indicated that the numbers on there were not

         21   chronology, correct, of those wounds?

         22   A.    Correct.  They are numbered for convenience.

         23   Q.    During the course of your examination, you were able

         24   to simply examine the wounds on the body as they were?

10:04:30 25   A.    Yes.
```

Kohler (Cross by Williamson)

1    Q.   So were you able to determine the position of

2    Brian Garber's body at the time of the shooting from

3    examining those wounds?

4    A.   No, ma'am.

10:04:39 5   Q.   And why is that?

6    A.   It's not possible to know the position of the

7    individual, nor of the shooter at the time the wounds are

8    inflicted.

9    Q.   When doing your examination, your autopsy examination,

10:04:54 10  you also collect medical records, correct?

11   A.   Yes, ma'am.

12   Q.   And did you receive medical records from Brian Garber,

13   or pertaining to Brian Garber?

14              MR. GILBERT:  Objection.

10:05:07 15             THE COURT:  Overruled.

16        Let's see where she's going with this.

17              THE WITNESS:  I don't recall what all I

18   received.  I was preparing as a fact witness, and not an

19   expert witness.  So I was reviewing the findings of the

10:05:20 20  body, and not any additional findings.

21   BY MS. WILLIAMSON:

22   Q.   Do you have your file with you?

23        I know you --

24   A.   I do not have the full file with me, no, ma'am.

10:05:31 25  Q.   Okay.

Kohler  (Cross by Williamson)

1              Do you recall during our deposition, being asked

2       questions about Brian Garber's medical history?

3       A.     I don't recall the details of that deposition at this

4       time.

10:05:45  5     Q.     If I showed you your deposition transcript, would that

6       help refresh your recollection?

7       A.     I'm sure that it would, yes.

8       Q.     Okay.

9                      MS. WILLIAMSON:  Can we look at Ms. Kohler's

10:06:00 10     deposition transcript?  Plaintiff's Exhibit 45, I believe.

11             And just show this to counsel and the witness, please.

12      BY MS. WILLIAMSON:

13      Q.     Is it up?

14      A.     Yes, ma'am.

10:06:19 15     Q.     Okay.

16      A.     Page 1.

17      Q.     If you could, look at page -- can you go to page 41,

18      please.

19             At the bottom of page 41, line 24 --

10:06:56 20                     MR. GILBERT:  I'm going to object, and ask for

21      a sidebar.

22                     THE COURT:  All right.  Let's have her ask the

23      question, and then you can object.

24                     MR. GILBERT:  Well, I'm worried that something

10:07:04 25     is going to come in that shouldn't come in, so . . .

```
 1                THE COURT:  All right.  Well, let's have a

 2      sidebar.  Okay.

 3                (Discussion held at sidebar, as follows:)

 4                THE COURT:  What medical records are you going

 5      to question him about?

 6                MS. WILLIAMSON:  I'm just going to question

 7      him about the records that she received from the

 8      Richland County Coroner's Office when she examined the body,

 9      asking her, as it was in the deposition, whether or not

10      those records indicated that he had a history of suicide.

11                MR. GILBERT:  No.  She --

12                MS. GREENE:  In your ruling on the motions in

13      limine, you said that the suicide comes in as damages.  But

14      she is, obviously, not a damages witness.  These are records

15      that were not prepared by her, and they contain hearsay.

16                MR. GILBERT:  I go by what she says.

17                THE COURT:  I know.

18                MR. GILBERT:  No.  I mean, the suicide issue

19      was ruled on by the Court for damages.

20                THE COURT:  Damages.

21                MR. GILBERT:  All right.  There are other ways

22      of getting that in when the damages pieces are called.

23           At this point, her reading something that she did not

24      prepare in the course of her business as a medical examiner

25      is an improper way of bringing that in.
```

             1          THE COURT:  You intended it to be -- do you

             2    intend to present those records as an exhibit at some point?

             3          MS. WILLIAMSON:  I do not intend to bring them

             4    in.

10:08:40     5          THE COURT:  Well, aren't they the best

             6    evidence of what the records say?

             7          MR. GILBERT:  I mean, I think she'd have to

             8    call the medical records -- I mean, there's a lot of stuff

             9    in that that is irrelevant, along with, you know --

10:08:56    10          THE COURT:  Were they marked as an exhibit in

            11    the deposition?

            12          MS. WILLIAMSON:  It was.  It was part of her

            13    actual autopsy file.  It was in there.  Yes, it was.

            14          MR. GILBERT:  But she did not rely on that at

10:09:08    15    all, in terms of her autopsy.

            16          THE COURT:  It has nothing to do with her

            17    autopsy.

            18          MR. GILBERT:  That's right.

            19          MR. DOWNEY:  You can bring in --

10:09:16    20          THE REPORTER:  I can't hear Mr. Downey.

            21          MR. DOWNEY:  I'll bring in evidence on damages

            22    through any witness that you call or that we call.  We can

            23    address that.  She has her own knowledge regarding

            24    practices, and that is relevant as to the recovery in this

10:09:31    25    case.

```
              1          So the fact that this doctor observed it, she has
              2    every right to testify about it.
              3                    MR. GILBERT:  But it's not her record, though.
              4    It's not something she prepared.
10:09:42      5                    MR. DOWNEY:  It's part of her file in the
              6    normal course of business that she --
              7                    MR. GILBERT:  She did not rely on it for her
              8    expert testimony.
              9                    THE COURT:  Well, you can go into that.
10:09:51     10                    MR. DOWNEY:  She said she's a fact witness.
             11                    THE COURT:  You can go into that on redirect.
             12    I'll give a limiting instruction for the limited purposes
             13    of --
             14                    MR. DOWNEY:  Okay.
10:09:55     15                    THE COURT:  All right.
             16          But -- so you're not going to put any records as an
             17    exhibit here.  You're merely going to refer to her
             18    testimony.
             19                    MS. WILLIAMSON:  Yes.
10:10:10     20                    THE COURT:  You object --
             21                    MR. GILBERT:  Object.
             22                    THE COURT:  You object when the question is
             23    asked, and then I will give the limiting instruction.
             24                    MR. GILBERT:  Okay.
10:10:16     25                    THE COURT:  All right.
```

Kohler (Cross by Williamson)

296

| | |
|---|---|
| 1 | MS. WILLIAMSON:  Thank you. |
| 2 | (End of sidebar discussion.) |
| 3 | (Proceedings resumed in open court.) |
| 4 | THE COURT:  You may proceed. |
| 10:10:55  5 | MS. WILLIAMSON:  Thank you, Your Honor. |
| 6 | BY MS. WILLIAMSON: |
| 7 | Q.    Ms. Kohler, you received a request for autopsy from |
| 8 | Richland County regarding Brian Garber, correct? |
| 9 | A.    Yes, ma'am. |
| 10:11:05 10 | Q.    And with that request, Richland County Coroner's |
| 11 | Office also provided you with records regarding |
| 12 | Brian Garber? |
| 13 | MR. GILBERT:  Objection. |
| 14 | THE COURT:  Basis? |
| 10:11:21 15 | MR. GILBERT:  You want to hear -- |
| 16 | THE COURT:  Briefly.  Briefly.  Just briefly. |
| 17 | MR. GILBERT:  It's not her record. |
| 18 | THE COURT:  All right.  Your objection is |
| 19 | overruled. |
| 10:11:30 20 | However, I am going to instruct the jury that the |
| 21 | testimony you are about to hear regarding these medical |
| 22 | records is to be considered for the limited purposes of |
| 23 | damages that may be awarded in this case, if you return a |
| 24 | verdict for the plaintiff, and not for any other purpose in |
| 10:11:49 25 | connection with this case, and in particular, with respect |

Kohler (Cross by Williamson)

1    to the issue of liability for those damages.

2         You may ask your question.

3              MS. WILLIAMSON:  Thank you, Your Honor.

4    BY MS. WILLIAMSON:

10:12:00  5    Q.   Ms. Kohler, if you could, take a look at your

6    deposition transcript that I had pulled up -- or asked to be

7    pulled up for you prior to our sidebar.

8         Looking, again, at the bottom of this, if you could,

9    just read over silently, to yourself, starting at line 17,

10:12:28 10   and ending on line 6 on page 42.

11        And just let me know when you're finished.

12   A.   (Document review.)

13        Okay.  Page 42, please.

14              THE COURT:  Page 42.  The witness --

10:12:43 15             MS. WILLIAMSON:  Oh, I'm sorry.

16              THE COURT:  It is not being displayed for the

17   witness.

18        All right.

19              THE WITNESS:  (Document review.)

10:13:02 20        Yes, ma'am.

21   BY MS. WILLIAMSON:

22   Q.   Okay.  Does reading this refresh your recollection

23   that you were given records by the Richland County Coroner's

24   Office regarding Brian Garber?

10:13:10 25   A.   It does state that I received records, yes, ma'am.

1    Q.    And in those medical records, did it indicate that

2    Brian Garber had a history of suicide attempts?

3    A.    All that I can state is what I am reading on the

4    deposition.  I do not independently recall the medical

10:13:27  5    records or their content.

6         Would you like me to read what is written in the

7    deposition?

8    Q.    Yes.

9    A.    Starting at what point, ma'am?

10:13:44  10    Q.    Let's look at page 42.

11         On line 1, it indicates, "The records -- The records

12    here that you were provided by Med Central indicate that

13    Brian Garber had attempted suicide, correct, if you look at

14    the "Brief History?"

10:14:02  15         Your answer there is . . .

16    A.    "Yes, ma'am.  The records were provided by the

17    coroner's office, not Med Central."

18              MS. WILLIAMSON:  Can I have a moment,

19    Your Honor?

10:14:16  20              THE COURT:  You may.

21                   (Pause in proceedings.)

22              MS. WILLIAMSON:  Thank you, Ms. Kohler.  I

23    don't have any more questions for you this morning.

24              MR. GILBERT:  No questions.

10:14:38  25              THE WITNESS:  Thank you.

```
            1              THE COURT:  No redirect?

            2              MR. GILBERT:  No redirect.

            3              THE COURT:  Dr. Kohler, thank you for your

            4    testimony.  You may step down.

10:14:46    5              THE WITNESS:  Thank you, sir.

            6              MR. GILBERT:  I have to hand her --

            7              THE COURT:  All right.  Counsel, who will be

            8    your next witness?

            9              MR. GILBERT:  Nicholson.

10:15:19   10              THE COURT:  Nicholson.  All right.

           11         We are at 10:15.  And although we started a little

           12    late, so we can get off for on lunch on time, I'm going to

           13    give the jury a 15-minute break.

           14         So we are in recess until 10:30.

10:15:38   15              DEPUTY CLERK:  All rise.

           16              THE COURT:  We're in recess until 10:30.

           17                              - - -

           18              (The jury exited the courtroom.)

           19            (Proceedings in recess at 10:16 a.m. )

10:31:10   20                              - - -

           21              DEPUTY CLERK:  All rise.

           22              THE COURT:  Is counsel ready to proceed?

           23              MR. GILBERT:  Yes, we are.

           24              THE COURT:  Mr. DeVan, please bring in the

10:31:24   25    jury.
```

```
             1              DEPUTY CLERK:  All rise for the jury.

             2              (The jury entered the courtroom.)

             3              DEPUTY CLERK:  Please be seated.

             4              THE COURT:  Plaintiff, call your next witness.

10:32:53     5              MR. GILBERT:  We will call James Nicholson.

             6              DEPUTY CLERK:  Please raise your right hand.

             7          Do you solemnly swear that your testimony in this case

             8      will be the truth, the whole truth, and nothing but the

             9      truth, so help you God?

            10              THE WITNESS:  I swear.

            11              DEPUTY CLERK:  Please have a seat.

            12              THE WITNESS:  Thank you.

            13          CROSS-EXAMINATION OF JAMES A. NICHOLSON

            14      BY MR. GILBERT:

10:33:24    15      Q.   Good morning.

            16      A.   Good morning.

            17      Q.   You and I have met before?

            18      A.   Yes, we have.

            19      Q.   Would you please state your name for the record.

10:33:32    20      A.   James A. Nicholson.

            21      Q.   And what is your current occupation?

            22      A.   Deputy sheriff, Richland County Sheriff's Office.

            23      Q.   How long have you been with the Richland County

            24      Sheriff's Office?

10:33:46    25      A.   I'm going on my 25th year.
```

```
 1    Q.    And what is your rank at the current time?

 2    A.    Lieutenant.

 3    Q.    And during your career, you were a member of a

 4    multidistrict team called ASRT?

 5    A.    Correct.  Allied Special Response Team.

 6    Q.    And is that basically a SWAT unit?

 7    A.    That is a SWAT unit, yes, sir.

 8    Q.    I would like to go over some of the important details

 9    of the shooting death of Brian Garber on March 16th, 2014.

10    A.    Okay.

11    Q.    Obviously, you remember that day.

12    A.    I do.

13    Q.    You were on duty that day, correct?

14    A.    Yes, sir, I was.

15    Q.    And in the early evening of that date, you heard over

16    the radio about a call for an incident at 3425 Mill Run

17    Road --

18    A.    That's correct.

19    Q.    -- in Lexington?

20    A.    Correct.

21    Q.    All right.

22          Try to let me answer [sic] the question --

23    A.    Okay.

24    Q.    -- before you answer so the court reporter can take it

25    down.
```

1    A.    Okay.

2    Q.    I'll try not to talk over you as well.  Okay?

3    A.    Okay.

4    Q.    You did not respond to the scene of that particular

10:34:54  5    call at 3425 Mill Run Road; is that right?

6    A.    I responded, but I wasn't directly involved with that

7    particular call.

8    Q.    But you didn't go to that house in connection with the

9    incident that was being reported at that house, did you?

10:35:10  10    A.    Yes, I did.  I went to the house, but I never made it

11    in the house.

12    Q.    I see.

13          But when it came to your attention that the sheriff's

14    department was looking for Brian Garber, you took part in

10:35:25  15    that process; is that right?

16    A.    Correct.

17    Q.    You did not find him, did you?

18    A.    No, sir, I did not.

19    Q.    And at some point during that evening, after the

10:35:35  20    incident at 3425 Mill Run Road, you heard that Brian Garber

21    had been found?

22    A.    Yes, I had.

23    Q.    Okay.  And that -- and you heard over the radio that

24    there was a possibility that Brian might be in possession of

10:35:57  25    a gun?

1    A.    Correct, I did.

2    Q.    And you learned that he might be at 3400 Mill Run Road

3    when you heard that radio transmission?

4    A.    Correct.

10:36:13  5    Q.    And you did proceed to that address?

6    A.    I did proceed to that address after I called some

7    other units to help out from local agencies.

8    Q.    All right.  And 3400 Mill Road is the home of

9    Brian Garber's parents; is that correct?

10:36:38  10    A.    That is correct.

11    Q.    All right.  And that's across the street of the house

12    where the incident occurred earlier?

13    A.    Kind of diagonal, yes.

14    Q.    And it's up on a hill, right?

10:36:48  15    A.    Way up on a hill.

16    Q.    Okay.  Do you know whether there were any officers

17    outside the house, forming a perimeter around that house, at

18    the time you arrived?

19    A.    Upon my arrival, no.  We were all still down the

10:37:03  20    roadway.  We thought he had returned back to the original

21    address.

22    Q.    All right.  But when you arrived at the house, were

23    there any other personnel present from the sheriff's

24    department?

10:37:17  25    A.    When we made --

1      Q.    I mean, near the entrance of the house.

2      A.    Oh, no.  I was the first vehicle that parked in front

3      of the residence.

4      Q.    And did any other personnel show up?

10:37:27  5      A.    Yes.

6      Q.    And who were they?

7      A.    It would have been Captain Zehner, which was

8      Lieutenant Zehner at the time; Deputy Andrew Knee;

9      Deputy James Berry; I believe Patrolman Beasley; and two

10:37:45  10     other officers from between Lexington Police Department and

11     Belleville Police Department.

12     Q.    All right.  And were any of the officers that you just

13     mentioned, were they deployed around the house, the

14     perimeter?

10:38:00  15     A.    Yes.  Lieutenant Zehner sent Deputy Berry around the

16     side of the house because he had fled before, and we knew

17     that it was a possibility that might happen, again.

18           And it was getting so dark --

19     Q.    Okay.  I think you answered the question.

10:38:14  20           Thank you.

21           Try to answer the question.  I'll go on to the next

22     part after that.

23     A.    Okay.

24     Q.    So the reason was to keep him from leaving; is that

10:38:24  25     right?

1    A.    Correct.

2    Q.    And then you headed toward the house after you arrived

3    at the driveway; is that correct?

4    A.    Yes, we did.

10:38:31  5    Q.    And the purpose was to check on Brian Garber, engage

6    him?

7    A.    To arrest him.

8    Q.    To arrest him.  Okay.

9    A.    I had two domestic violence packets.

10:38:50  10   Q.    Okay.  And then you -- did you have any discussions

11   with the other officers at this point in developing a

12   tactical plan on how to proceed?

13   A.    No.  Just that we sent the officers around the

14   perimeter of the residence, and that I was going to take

10:39:03  15   lead, and Deputy Knee was going to follow up behind me.  And

16   I was going to try to make contact at an interior door.

17   Q.    But nothing other than that, correct?

18   A.    Nothing at that.

19   Q.    And so you went into the garage; is that right?

10:39:16  20   A.    Correct.  One door was open; one was closed.

21   Q.    I just asked you if you went into the garage.

22   A.    Yes, I did.

23   Q.    Okay.  And that's the location where you entered into

24   a door that went into the house; is that right?

10:39:27  25   A.    There was a man door there that I knocked to.

```
            1    Q.    Okay.  And who was with you when you entered?

            2    A.    It would have been Deputy Knee, Lieutenant Zehner.

            3    Q.    Before you went into the house, did you know that

            4    Defendant Frazier had also arrived at the scene?

10:39:46    5    A.    He was pulling up behind my vehicle and --

            6    Q.    When you were entering the house.

            7    A.    No, I did not know that he was behind me at that time.

            8    Q.    Okay.  So when you went into the house, you didn't

            9    know Frazier was behind you; is that correct?

10:39:58   10    A.    Correct.  He fell in on the end.  I'd already entered

           11    the house.

           12    Q.    Yeah.  Can I -- can you just try to answer my

           13    question?

           14    A.    No, I did not.

10:40:05   15    Q.    When you walked in the house, Frazier was not behind

           16    you, correct?

           17    A.    Correct.

           18    Q.    Did you ask Frazier to follow you into the house?

           19    A.    No, I did not.

10:40:26   20    Q.    You saw Matt Garber, Brian's father, downstairs; is

           21    that right?

           22    A.    At the door.

           23    Q.    He told you that Brian was upstairs?

           24    A.    Yes, he did.

10:40:37   25    Q.    And in the last bedroom on the left?
```

Nicholson (Cross by Gilbert)

1    A.    Second bedroom on the left.

2    Q.    Did he tell you Brian was the only person in the

3    house?

4    A.    At that time, I don't recall.

10:40:49  5    Q.    Did you ask him if anybody else was in the house?

6    A.    I just asked him if he was fine, and he said he was

7    all right.  And he just told me --

8    Q.    Okay.  Did you ask him if there was anybody else in

9    the house?

10:41:02  10    A.    Not at the time, I did not, that I recall.

11    Q.    Well, at any time, did you ask him whether anybody

12    else was in the house?

13          Yes or no?

14    A.    No, not at that time.

10:41:13  15    Q.    Okay.  Wouldn't that be a good thing to know, if there

16    were other people in the house?

17    A.    It would be.  I had already known that his wife and

18    kids had already left the residence in a vehicle.

19    Q.    Okay.  But you didn't confirm it with Matt Garber,

10:41:26  20    correct?

21    A.    Not with him directly, no.

22    Q.    Okay.  Did you ask Matthew Garber whether he saw a gun

23    in Brian's possession?

24    A.    I do not recall.

10:41:38  25    Q.    Did you ask Matthew Garber whether Brian was having a

1    mental health crisis?

2    A.    No, I did not.

3    Q.    As a police officer, is it important to get as much

4    information as possible before you get into a potentially

10:41:52  5    dangerous situation?

6    A.    Absolutely.

7    Q.    Once you were inside the house and knew where Brian

8    was, did you discuss a tactical plan before going upstairs?

9    A.    Just that I explained that I was going to take lead

10:42:06  10    going up the stairs.

11    Q.    That's it?

12    A.    That's the only room [sic] we had room for, yes.

13    Q.    Not who was going to go to the room, who was going to

14    be -- where you were going to be deployed?

10:42:16  15    A.    Just myself taking lead; meaning, I will communicate.

16    I will be the one that leads.

17    Q.    Or anything about how you would ensure that the

18    officers have cover?

19         That wasn't discussed?

10:42:28  20    A.    I can't make that decision until I get up on the

21    floor.

22    Q.    But you never discussed it with the other officers; is

23    that correct?

24    A.    Correct.

10:42:35  25    Q.    Did you discuss who would do the talking to

```
              1   Brian Garber once you reached the doorway?

              2   A.    Which . . .

              3   Q.    Did you discuss with the other deputies with you who

              4   would do the talking when you arrived at the door?

10:42:51      5   A.    No, I did not.

              6   Q.    Okay.  Did you discuss amongst yourselves what methods

              7   could be used to deescalate the situation?

              8   A.    Not amongst ourselves.  We were being pretty quiet at

              9   the time.

10:43:08     10   Q.    Okay.  You did have time to discuss a plan before you

             11   went upstairs, did you not?

             12   A.    Yes, we could have.

             13   Q.    There was no hostage situation, correct?

             14   A.    No.

10:43:19     15   Q.    In any case, you headed towards the stairs, correct?

             16   A.    Yes, we did.

             17           MR. GILBERT:  Can you put up Exhibit 29-4.

             18   BY MR. GILBERT:

             19   Q.    Showing you Exhibit 29-4, plaintiff's exhibit.

10:43:41     20         Can you identify this picture?

             21   A.    Yes.  It's a hallway.  It looks like a door that leads

             22   outside.  A set of steps that lead up.

             23   Q.    Is this an accurate depiction of what you saw that

             24   night?

10:43:52     25   A.    I believe so, yes.
```

```
                1   Q.    Okay.

                2                 MR. GILBERT:  Can we publish that to the jury?

                3                 THE COURT:  Any objection?

                4                 MR. DOWNEY:  You may.  No objection.

10:44:01        5                 THE COURT:  You may publish.

                6                 MR. GILBERT:  Thank you.

                7   BY MR. GILBERT:

                8   Q.    And by the way, the location that you were -- when

                9   Matthew Garber indicated where Brian was upstairs at, is

10:44:15       10   that in this viewpoint?

               11   A.    No.

               12   Q.    It was further down the hall?

               13   A.    No.  He met me at the door in the garage, when he

               14   opened the man door, and told me that's where he was at.

10:44:28       15   Q.    All right.  So you went up the stairs.

               16         Were you in front?

               17   A.    Yes, I was.

               18   Q.    Who was with you?

               19   A.    Behind me would have been Deputy Knee and

10:44:40       20   Lieutenant Zehner, and at that time, Deputy Frazier.

               21   Q.    All right.  And Frazier was the last person that went

               22   up the stairs?

               23   A.    No.  I believe he became third person behind me.  Then

               24   Lieutenant Zehner was the last person.

10:44:57       25   Q.    But Lieutenant Zehner did not go to the bedroom, did
```

1    he?

2    A.    Negative, he did not.

3    Q.    Okay.  You were the highest ranking officer among the

4    three; is that correct?

10:45:07  5    A.    The three deputies, yes.

6    Q.    The three deputies that went to the door.

7    A.    Correct.

8    Q.    You were a sergeant at that time, right?

9    A.    Sergeant at that time.  Correct, I was.

10:45:15  10    Q.    And so any decisions that had to be made were through

11    you?

12    A.    Correct.

13    Q.    Deputy Knee was essentially a rooky, was he not?  Just

14    started working at the sheriff's department?

10:45:30  15    A.    He had previous law enforcement experience --

16    Q.    But for the sheriff's department --

17              THE REPORTER:  I'm sorry.  One at a time.

18              THE WITNESS:  -- but new to our department.

19         I'm sorry.

10:45:44  20    BY MR. GILBERT:

21    Q.    Did you give Knee or Defendant Frazier any

22    instructions on how to safely handle the situation?

23    A.    Just for them to follow my lead.

24    Q.    Nothing else than that?

10:45:55  25    A.    Nothing else than that.

```
  1   Q.   Did you assume that they would know what to do up

  2   there?

  3   A.   Yes.

  4   Q.   Do you agree that police must comply with the law?

  5   A.   Yes.

  6   Q.   And that includes the constitution; is that right?

  7   A.   Oh, yes.

  8   Q.   Do you agree that police must be cautious in

  9   confronting a potentially dangerous situation?

 10   A.   Yes.

 11   Q.   Do you agree that the most important duty of a police

 12   officer is to protect life?

 13   A.   Yes, it is.

 14   Q.   So you, Knee, and Frazier headed down the hallway

 15   towards the last bedroom on the left; is that correct?

 16   A.   I had checked the room prior to that --

 17   Q.   Okay.

 18   A.   -- before they made that.

 19   Q.   And you had a flashlight; is that right?

 20   A.   I did, sir.

 21   Q.   And you were using the flashlight?

 22        It was on?

 23   A.   The hallway was illuminated, but the doors to my left

 24   and down the hall, they were not illuminated.

 25   Q.   But you used the flashlight to look into those rooms?
```

```
            1    A.    Correct, I did.

            2    Q.    Was it dark in the hallway?

            3    A.    No, sir.  It was lit.

            4    Q.    Now, the bedroom where you finally located where

10:47:02    5    Brian Garber was, was the door open?

            6    A.    Yes, it was.

            7                MR. GILBERT:  Can you put up Exhibit 27-9,

            8    please.

            9    BY MR. GILBERT:

10:47:15   10    Q.    Does this depict reasonably and accurately the

           11    location of the door in the hallway?

           12    A.    Yes, it does.

           13                MR. GILBERT:  Can we publish?

           14          Can we publish it?

10:47:27   15                MR. DOWNEY:  No objection, Your Honor.  I

           16    think it's already been published.

           17                THE COURT:  You may publish it.

           18    BY MR. GILBERT:

           19    Q.    Okay.  So is this the doorway to the bedroom?

10:47:38   20    A.    Yes, it is.

           21    Q.    All right.  And this is how the doorway appeared as

           22    you approached it, absent the evidence plaques there?

           23    A.    Yes.

           24    Q.    And when you reached the doorway, where did you

10:48:00   25    position yourself?
```

1    A.    I was along the left side of the wall, approaching,

2    kind of doing a threshold evaluation of the doorway with

3    just my light.

4    Q.    All right.  Where did you finally stop?

10:48:12  5    A.    My stopping point was on the right side of the wall.

6    I had crossed the doorway to the right door frame.

7    Q.    And where did Knee position himself?

8    A.    He came along my backside, left side, positioned

9    himself on the left door frame.

10:48:30 10    Q.    Okay.  What did you see when you looked into the room?

11    A.    When I looked into the room with my Maglite, I saw a

12    subject sitting on the bed.  His was back was against -- it

13    looked like a headboard or a shelf, and it was more towards

14    the right corner or -- or the left side, looking in at the

10:48:55 15    wall.

16    Q.    When you saw that, was the light on in the room?

17    A.    No, it was not.  It was dark.

18    Q.    But you did see Brian sitting on the bed?

19    A.    I did.

10:49:04 20    Q.    His back was against the headboard?

21    A.    It was.

22    Q.    Were his legs extended?

23    A.    They were.

24    Q.    Okay.  You had claimed that his right hand was under

10:49:16 25    the shirt?

1    A.    His right hand was under the shirt.

2    Q.    You saw that before you flipped the light on?

3    A.    With my Maglite, yes.

4    Q.    Okay.  And I think you previously testified that his

10:49:30 5    left hand was down at his side?

6    A.    I could barely see it.  It looked like the top of his

7    wrist.

8    Q.    Was his palm facing his thigh or --

9    A.    Facing the thigh.

10:49:43 10    Q.    Okay.

11    A.    I could barely see -- I couldn't see the hand, just

12    the wrist.

13    Q.    Okay.

14            MR. GILBERT:  Can we show Exhibit 42, please.

10:50:15 15    BY MR. GILBERT:

16    Q.    Does this illustration depict your approximate

17    perspective into the room where Brian was located?

18    A.    The bigger picture?

19    Q.    The bigger picture.

10:50:26 20    A.    Similar to that, yes.

21    Q.    Okay.

22    A.    But I was more -- my weapon was closer to the door

23    frame.

24    Q.    Okay.

10:50:34 25            MR. GILBERT:  Can we publish this?

Nicholson (Cross by Gilbert)

316

1          MR. DOWNEY:  Objection, Your Honor.

2          THE COURT:  No objection.

3          MR. DOWNEY:  Objection.

4          THE COURT:  You're objecting?

10:50:41  5          MR. DOWNEY:  We are objecting.

6          THE WITNESS:  The second photo --

7          THE COURT:  We have an objection.

8     Overruled.

9     You can publish.

10:50:52 10          MR. GILBERT:  We can publish.

11   BY MR. GILBERT:

12   Q.    So you are testifying that the larger picture here,

13   not the one to the right --

14   A.    Not the one to the right yet, no.

10:51:01 15   Q.    The one where -- the picture of the male on the bed.

16   A.    Okay.

17   Q.    That, and that gun is similar to where you were

18   pointing?

19   A.    I was further back into the hallway.

10:51:18 20   Q.    Okay.

21   A.    So picture the gun almost touching the side of the

22   threshold.

23   Q.    All right.

24   A.    And then the subject was sitting, when I saw him,

10:51:28 25   closer to the right, not centered in the bed.

```
         1    Q.    All right.  But his position and the posture of his
         2    body was the same?
         3    A.    Similar to the same.  Other than his left hand was
         4    completely under him.
10:51:42 5    Q.    All right.  You didn't see the left hand?  Is that
         6    what you're saying?
         7    A.    Yes.
         8    Q.    When you first looked in?
         9    A.    No.  God, no.
10:51:54 10   Q.    All right.
         11                MR. GILBERT:  All right.  You can take that
         12   down.
         13   BY MR. GILBERT:
         14   Q.    When you reached the room, you claim you heard Brian
10:52:01 15   say, I have a gun; is that correct?
         16   A.    Yes.  He yelled out at me, I have a gun.
         17   Q.    Did you have your weapon drawn at that point?
         18   A.    I did, sir.
         19   Q.    And is it that point when you turned on the light
10:52:15 20   switch?
         21   A.    Not until I moved from the left side of the door frame
         22   to the right side of the door frame.
         23         I was able to look in and see that there was a light
         24   switch there.
10:52:25 25   Q.    Okay.  And at that point, did you put yourself in a
```

```
        1   position in the doorway to provide yourself cover?

        2   A.    I tried, yes.

        3   Q.    That was your intent, right?

        4   A.    Yes, sir.

10:52:34 5   Q.    You didn't want to be in the middle of that room at

        6   that point, did you?

        7   A.    Correct.

        8   Q.    Okay.  Did you consider -- did you consider the wall

        9   there as your friend?

10:52:52 10  A.    Yes.  It provided something I could move to.

        11  Q.    Okay.  How long were you -- excuse me.

        12        How long were you and Knee positioned at the doorway

        13  to the room before Frazier showed up?

        14  A.    It would have been seconds, I believe.

10:53:10 15  Q.    Okay.  So you and Knee were there first?

        16  A.    I was there first.  Knee came in second.

        17  Q.    Okay.  It's not a very wide doorway, is it?

        18  A.    No.

        19  Q.    Okay.

10:53:18 20  A.    It's a standard door.

        21  Q.    Did you actually see him come down the hallway, or

        22  were you focused on what was going on in the room?

        23  A.    Did I see Brian?  Is that what you're asking?

        24  Q.    Yes.  I mean -- no.

10:53:36 25        When you were positioned at the doorway, you were
```

1   focused -- did you know where Frazier was?

2   A.    No.  I knew he was just behind me.

3   Q.    You knew because you saw him coming up the stairs,

4   right?

10:53:50 5   A.    Correct.

6   Q.    Okay.  And I believe you said that Frazier stepped in

7   between you and Knee and actually entered the room; is that

8   right?

9   A.    Correct.  One step in front of me, one step to the

10:54:05 10   left.

11   Q.    Did you tell him to go into the room?

12   A.    I did not.

13   Q.    Did you want him to go into the room?

14   A.    Not necessarily, no.

10:54:18 15   Q.    And when a police officer puts himself in a position

16   of danger, that can possibly create a risk of more danger to

17   himself and other officers in the vicinity, correct?

18                  MR. DOWNEY:  Objection.

19                  THE COURT:  Overruled.

10:54:32 20   BY MR. GILBERT:

21   Q.    What's your answer?

22   A.    Yes, it can.

23   Q.    And this is part of your training, is it not?

24   A.    Correct.

10:54:38 25   Q.    And especially in SWAT operations, you need to

```
          1    consider all the safety and precautionary moves you make,

          2    correct?

          3    A.    Yes.

          4    Q.    To have some control over the situation, and being

10:54:55  5    able to communicate and using caution makes good sense, when

          6    it's possible, right?

          7    A.    Correct.

          8    Q.    So getting back to the communication with you and

          9    Brian.

10:55:06 10          You were giving him commands to show his hands; is

         11    that right?

         12    A.    Numerous times I did.

         13    Q.    And he said no?

         14    A.    Every time, right.

10:55:15 15    Q.    And at some point, you saw what you believed to be an

         16    object protruding under his shirt, between his stomach and

         17    chest?

         18    A.    Yes, sir.

         19    Q.    Was the object that you claim you saw under the shirt

10:55:34 20    moving at all?

         21    A.    Yes, it was.

         22    Q.    I believe you said it was moving a little bit towards

         23    Frazier, and then come back in towards you?

         24    A.    Yes, sir.

10:55:46 25    Q.    Very slight movement; is that right?
```

1   A.   Yes, sir.

2   Q.   And this is while you were talking to Brian Garber?

3   A.   Yes, sir.

4   Q.   You have said that the object was rectangular or

10:56:03  5   square at the end, and you believed it was to be a gun --

6   you believed it was a gun; is that right?

7   A.   100 percent.

8   Q.   Can you demonstrate the size of the object that was

9   protruding.

10:56:17 10   A.   5 to 6 inches or so.

11   Q.   Okay.  Thank you.

12   A.   Length-wise.

13   Q.   You, I believe, said at one point it looked like a

14   teepee?

10:56:35 15   A.   Yes.  The fabric fell back because it was pushed

16   against it so tightly.

17   Q.   But you now know, even though you might have thought

18   it was a gun, there was never a gun?

19   A.   I know that now, correct.

10:56:53 20   Q.   In any case, you did not fire your weapon at Brian

21   when you saw this object under his shirt the way you just

22   described, did you?

23   A.   I did not at that time.

24   Q.   Okay.  And to your credit, you were trying to

10:57:08 25   deescalate the situation; is that right?

1    A.    I was.  I could have upon the first contact with --

2    Q.    What's that?  I'm just asking you --

3    A.    I'm sorry.

4    Q.    -- you were trying to deescalate the situation?

10:57:20  5    A.    Oh, absolutely.

6    Q.    And you were trying to converse with him; is that

7    right?

8    A.    Yes, sir, I was.

9    Q.    How long did that communication with Brian go on for?

10:57:29  10   A.    45 seconds to close to a minute-ish, I guess.

11   Q.    All right.  Now, during this period of time, Brian

12   appeared agitated and upset, did he not?

13   A.    Very.

14   Q.    I think you had said at one point, that his eyes were

10:57:54  15   as big -- were big as he looked at you?

16   A.    Very big.

17   Q.    That's something unusual to see, is it not?

18   A.    Absolutely.

19   Q.    That's something you were particularly noticing?

10:58:05  20   A.    That, and his behavior and his voice.

21   Q.    Okay.  And during this conversation, you told Brian

22   that we can get you medication and take you to a hospital?

23   A.    I advised him that we could get him help.

24   Q.    Now, during this conversation, you never saw an object

10:58:32  25   or Brian's hand, right hand, come out from underneath his

```
         1   shirt, did you?

         2   A.    No, I did not.

         3   Q.    And despite what you observed and the talking back and

         4   forth during those 45 minutes -- 45 seconds to a minute

10:58:56 5   while you were communicating, you did not feel the need to

         6   use your firearm, correct?

         7   A.    I did not at that time.

         8   Q.    You did not feel the need --

         9   A.    No.

10:59:05 10  Q.    -- to use your firearm; is that correct?

        11   A.    Correct.

        12   Q.    Thank you.

        13         And Brian did not, at any time, verbally threaten you

        14   or the other deputies, did he?

10:59:16 15  A.    Verbally, no.

        16   Q.    And after that 40 to 50 seconds past, you claim you

        17   heard a loud bang; is that right?

        18   A.    A loud pop, yes.

        19   Q.    And I believe you said in previous testimony that you

10:59:37 20  were sure that the bang sounded like a gunshot; is that

        21   correct?

        22   A.    That, it did.

        23   Q.    And that this was kind of a -- kind of a loud bang.

        24   That you would want headphones because the sound would hurt

10:59:55 25  your ears.
```

1       Have you said that before?

2   A.   It was loud.

3   Q.   But did you say it was the -- that when you were at a

4   range, you sometimes have to put earphones on, right, to

5   protect you from --

6   A.   I don't recall, but I would have used them.

7   Q.   All right.  But that was a sound that could hurt your

8   ears, right?

9   A.   Correct.

10  Q.   I think you have said that you thought that the bang

11  came from Brian's direction; is that right?

12  A.   Yes, sir.

13  Q.   Frazier was also in the vicinity -- inside the room

14  where Brian was at the time of the bang, correct?

15  A.   Correct, he was.

16  Q.   And isn't it true that the source of the sound in a

17  small room under those circumstances can be deceptive,

18  particularly in a small room?

19  A.   Yes.

20  Q.   When you heard this bang, that's the point when you

21  brought your weapon up and fired at Brian; is that correct?

22  A.   Correct, I did.

23  Q.   Is it that -- before the bang sound, your gun was down

24  at your side, was it not?

25  A.   No, it was not.

```
           1    Q.    Was it pointed at him?

           2    A.    It was pointed, but the barrel was down.  Because I'm

           3    communicating over the weapon.  I don't want to communicate

           4    through the weapon.

11:01:35   5    Q.    Got you.

           6          But it was -- it was in a position with both hands

           7    focused on center mass at the time before you raised it?

           8    A.    Slightly below that, but I had my flashlight in my

           9    hand.

11:01:52  10    Q.    I understand.

          11          And during the 45 to 50 seconds, your weapon was not

          12    pointed at Brian; is that correct?

          13    A.    Pointed in his direction, but not -- I have to be able

          14    to communicate.

11:02:10  15    Q.    I understand.

          16          Nothing happened in that 45 to a minute which caused

          17    you to raise and point your gun directly if you were going

          18    to fire?

          19    A.    Correct.

11:02:26  20                MR. GILBERT:  Sorry.  One second.

          21    BY MR. GILBERT:

          22    Q.    But you fired because of the bang, right?

          23    A.    Correct, I did.

          24    Q.    During the 45 seconds to a minute, there was nothing

11:02:43  25    to prevent you from ordering everyone out of the room, into
```

         1    the hallway, and to communicate with Brian from a position

         2    of safety, correct?

         3    A.    Correct.

         4    Q.    And obviously, during that time, 45 seconds to a

11:03:01 5    minute, you did not shoot at Brian until the bang, correct?

         6    A.    Correct.

         7    Q.    You were -- you were -- you could wait him out, right?

         8    A.    Oh, absolutely.

         9    Q.    Time was not a problem for you?

11:03:21 10   A.    No.

        11    Q.    And, in fact, you did not feel the need to use the

        12    firearm during that 45 to 50 seconds; is that right?

        13    A.    Correct.

        14    Q.    At the time of the bang, you were looking at Brian,

11:03:39 15   were you not?

        16    A.    I was.  I was totally focused on him.

        17    Q.    All right.  And you did not see Brian move his arms or

        18    throw anything at you, did you?

        19    A.    No.

11:03:51 20   Q.    Okay.  You did not see a muzzle flash come from

        21    Brian's direction, did you?

        22    A.    No.  It was under his clothing, so I didn't know if

        23    that had anything to do with it, what I would have saw.  But

        24    I was so focused on him.

11:04:07 25   Q.    Okay.  You know about muzzle flashes, don't you?

Nicholson (Cross by Gilbert)

327

1   A.   Yes, I do.

2   Q.   Okay.  I understand that when you fired your weapon,

3   or during the time you were firing your weapon, your gun

4   jammed, or your magazine disengaged?

11:04:31  5   A.   My magazine was disengaged.

6   Q.   All right.  And you only got -- got off two shots,

7   right?

8   A.   Yes, sir.

9   Q.   Isn't it a fact that Frazier and Knee were both firing

11:04:45 10   their weapons before you started to fire?

11   A.   I felt I was a little behind, yes.

12   Q.   You felt you were a little behind.

13        After the shooting ended, what happened?

14   A.   As soon as the shooting had ended, I had entered the

11:05:02 15   room.

16   Q.   Right after the shooting, you entered into -- further

17   into the room, right?

18   A.   I stepped into the room, correct.

19   Q.   Okay.  And did you check on Brian to see what was his

11:05:17 20   condition?

21   A.   Yes.  I walked over to the bed.

22   Q.   And what did you see?

23   A.   He was slumped over to the right side of the wall, and

24   I could see that there was nothing on me that could

11:05:30 25   help -- I knew he had passed.

Nicholson (Cross by Gilbert)

328

```
           1    Q.    Okay.  You did not try to find the weapon, did you?

           2    A.    No, I did not.

           3    Q.    You did not pat Brian down, did you?

           4    A.    No, I did not.

11:05:42   5    Q.    And after the shooting, how was Brian's body situated?

           6    A.    From what I remembered, slumped to the right, almost

           7    parallel with the bed.  I believe hands or arms were also to

           8    the right.

           9    Q.    Did you actually see the movement of him slumping over

11:06:04  10    to the right?

          11    A.    As I reached down to unsnap my magazine, when I looked

          12    up, he had already slumped over, and it was -- he was

          13    already -- had stopped.

          14    Q.    As you watched him slump to the right after

11:06:19  15    the -- after the shooting, did you see anything coming out

          16    of his hand?

          17    A.    I did not.

          18    Q.    You did see a beer can between his legs after the

          19    shooting; is that correct?

11:06:31  20    A.    I do believe I did.

          21    Q.    After the shooting, did you see the object that had

          22    supposedly been under his shirt during this episode?

          23    A.    No, I had not.

          24    Q.    Did you ever say in an interview that, When he slumped

11:06:57  25    over to the right, it was still under his shirt?
```

```
          1    A.    I would have -- let me think.

          2    Q.    Or were you just assuming that?

          3    A.    I'm assuming that, because I never saw it.

          4    Q.    So you did not see any object?

11:07:20  5    A.    No, sir.

          6    Q.    When you went to check on Brian, did you see a

          7    protrusion under his shirt?

          8    A.    No, I had not.

          9    Q.    You had seen a protrusion before, during the

11:07:34 10    45 seconds to a minute; but after he slumped over, you did

         11    not see even a protrusion under his shirt; is that right?

         12    A.    Correct, sir.  He was facing the wall.  I couldn't.

         13    Q.    All right.

         14               MR. GILBERT:  Can you --

11:08:03 15    BY MR. GILBERT:

         16    Q.    Are you sure about that?

         17    A.    Yes, sir.

         18    Q.    Okay.

         19               MR. GILBERT:  Let's put Exhibit 9, page 82,

11:08:14 20    lines 8 to 25.

         21         No.  That's not the -- It's Exhibit 9, page 82.

         22         Is that it?  Okay.

         23    BY MR. GILBERT:

         24    Q.    Okay.  Do you see where it says -- could you read

11:09:01 25    lines 18 to 25.
```

```
          1    A.    Yes, I can.

          2          "When you -- you went up to him -- Brian, I'm speaking

          3    of --

          4          "Mm-hmm.

11:09:14  5          "-- and you didn't see the object under his shirt.

          6    Correct?

          7          "Correct.

          8          "And you have no idea where the object went?

          9          "I have no idea."

11:09:37 10    Q.    So when you told the interviewer that the object was

         11    still under his shirt, that was not accurate?

         12          That was just what you believed?

         13    A.    I believed that the object had actually fell in

         14    between the bed and the wall.

11:09:51 15    Q.    So when you said to the investigators, It was still

         16    under his shirt, that's not accurate, correct?

         17    A.    That would not be accurate.

         18    Q.    Okay.

         19    A.    I don't recall.

11:10:08 20    Q.    Did anyone touch or move his body?

         21    A.    No, we had not.

         22                MR. GILBERT:  Exhibit 28-11.

         23    BY MR. GILBERT:

         24    Q.    This is the scene that you saw after the shooting; is

11:10:45 25    that right?
```

1    A.    Correct.

2                MR. GILBERT:  Can we publish this to the jury?

3                MR. DOWNEY:  No objection, Your Honor.

4                THE COURT:  You may publish.

11:10:57  5    BY MR. GILBERT:

6    Q.    You see the remote in the room, do you not?

7    A.    I do.

8    Q.    Okay.  It's to the left side of Brian Garber's left

9    leg; is that right?

11:11:13 10    A.    Yes, it is.

11    Q.    On the bed.

12          And you have said that you did not see the remote when

13    you looked at this scene after the shooting; is that right?

14    A.    Correct.  It did not come to mind.

11:11:40 15    Q.    Can you agree with me that this is in plain sight,

16    this remote?

17    A.    Being there, yes, it is.

18    Q.    And that would be -- if that had been there at the

19    time you saw and went up to the body, that's much more

11:12:02 20    visible than a beer can; is that right?

21    A.    Yes.

22    Q.    How long were you in the room before you or Knee or

23    Frazier left?

24    A.    Probably a couple of minutes.  Two to three.

11:12:18 25                MR. GILBERT:  You can take the picture down.

```
            1    BY MR. GILBERT:

            2    Q.    Did anybody touch anything or move anything in the

            3    room?

            4    A.    No, we had not while I was there.

11:12:31    5    Q.    Now, isn't it true that you had asked for a camera to

            6    take pictures of the scene?

            7    A.    I did.

            8    Q.    And you felt that was an important thing to do, right?

            9    A.    Very important.

11:12:44   10    Q.    And you sent Deputy Knee to get the camera?

           11    A.    I did.

           12    Q.    Where was the camera?

           13    A.    Glove box in my vehicle.

           14    Q.    Okay.  Your vehicle was right in front of the garage

11:12:56   15    there; is that right?

           16    A.    Correct.

           17    Q.    And so then after Knee left --

           18          Was Frazier in the room still?

           19    A.    Frazier was still in the room, correct.

11:13:10   20    Q.    -- you went looking for your magazine; is that right?

           21    A.    Yes.  I had looked in the room where I was standing,

           22    and I looked in the hallway.

           23    Q.    Okay.  Just for everybody's benefit, a "magazine" is

           24    not like a picture.  It's a -- it's what contains the

11:13:27   25    bullets?
```

Nicholson (Cross by Gilbert)

1     A.    Yes, sir.

2     Q.    Okay.  And where did you go look for the magazine?

3     A.    In the immediate room where I was standing, the

4     hallway portion I was standing --

11:13:40  5     Q.    All right.

6     A.    -- the length of the hallway, and the steps.

7     Q.    And where did you -- and you found it between the wall

8     and the dresser; is that correct?

9     A.    Right beneath the light switch.

11:13:51 10    Q.    And at some point, Knee brought the camera to you; is

11    that right?

12    A.    Yes, he did.

13    Q.    And when you got the camera, you unzipped the case so

14    you could start to take photos; is that right?

11:14:02 15    A.    Correct, sir.

16    Q.    And then Zehner appeared, stopped you, and he told you

17    he would take care of the photos; is that right?

18    A.    He told me he would take care of radio traffic and the

19    photos, correct.

11:14:15 20    Q.    And you gave the camera to him, right?

21    A.    I did.

22    Q.    And he went into the room; is that right?

23    A.    Correct, he did.

24    Q.    And he was the only person in the room from the

11:14:28 25    sheriff's department?

```
          1    A.    At that time, yes.

          2    Q.    And where did you go?

          3    A.    I went downstairs to the kitchen.

          4               MR. GILBERT:  Exhibit 27-1.

11:14:47  5    BY MR. GILBERT:

          6    Q.    Okay.  Does this look like the kitchen that you went

          7    down to?

          8    A.    From what I recall, yes.

          9    Q.    Okay.

11:14:55 10               MR. GILBERT:  Can we publish?

         11               MR. DOWNEY:  No objection, Your Honor.

         12               THE COURT:  You may.

         13    BY MR. GILBERT:

         14    Q.    And when you went -- when you went down to the

11:15:10 15    kitchen, were Frazier and Knee already there?

         16    A.    Yes, sir, they were.

         17    Q.    And you told Frazier and Knee that you thought the

         18    protrusion under the shirt that you claim you saw looked

         19    like the end of a Glock?

11:15:32 20    A.    I do believe so, yes.

         21    Q.    A Glock is a semiautomatic handgun, right?

         22    A.    Correct.

         23    Q.    And you three were able to get on the same page about

         24    that because you talked about it, right?

11:15:50 25    A.    Well, I mentioned it, yes.
```

Nicholson (Cross by Gilbert)

335

| | |
|---|---|
| 1 | Q. Okay. And they all agreed with you, right? |
| 2 | A. Not necessarily agreed, but they said okay. |
| 3 | Q. All right. And you're the sergeant in command of the |
| 4 | two of them, right? |
| 11:16:15  5 | A. Correct. |
| 6 | MR. GILBERT: One moment. |
| 7 | I have no further questions. |
| 8 | Thank you. |
| 9 | You can take that. |
| 11:16:28 10 | MR. DOWNEY: We will recall him in our case, |
| 11 | Your Honor. |
| 12 | THE COURT: Okay. Reserved for your case? |
| 13 | MR. DOWNEY: Yes. |
| 14 | THE COURT: Officer, thank you for your |
| 11:16:36 15 | testimony. You may step down. |
| 16 | THE WITNESS: Thank you. |
| 17 | THE COURT: Plaintiff, call your next witness. |
| 18 | MS. WILLIAMSON: The plaintiff would call |
| 19 | Captain Donald Zehner. |
| 11:16:57 20 | DEPUTY CLERK: Please raise your right hand. |
| 21 | Do you solemnly swear or affirm that your testimony in |
| 22 | this case will be the truth, the whole truth, and nothing |
| 23 | but the truth, so help you God? |
| 24 | THE WITNESS: Yes, I do. |
| 25 | |

1          CROSS-EXAMINATION OF DONALD ZEHNER

2     BY MS. GREENE:

3     Q.    Good morning, Captain Zehner.

4           Please state your name for the record.

5     A.    Capital Donald Zehner.

6     Q.    And where are you currently employed?

7     A.    Richland County Sheriff's Office.

8     Q.    What's your rank in the sheriff's department?

9     A.    Captain.

10    Q.    How long have you been with the sheriff's department.

11    A.    27 years.

12    Q.    What was your rank on March 16, 2014?

13    A.    Staff lieutenant.

14    Q.    And on that day, you were serving in the capacity of

15    training officer, correct?

16    A.    Correct.

17    Q.    And who were you training?

18    A.    Deputy Andrew Knee.

19    Q.    And you were training him on proper execution of

20    duties as a Richland County sheriff's deputy, correct?

21    A.    Correct.

22    Q.    And on that date, March 16, 2014, at around quarter

23    after 8:00 at night, you and Knee responded to 3400 Mill Run

24    Road, correct?

25    A.    I'm not sure of the correct time, but, yes, that

1    evening.

2    Q.    Okay.  And when you arrived at that house at 3400 Mill

3    Run Road, you and Deputy Knee exited your vehicle?

4    A.    Yes.

11:19:04  5    Q.    And then you told him to get on Sergeant Nicholson and

6    not leave him, correct?

7    A.    Correct.

8    Q.    And next, you directed Deputy James Berry to the rear

9    of the residence; is that right?

11:19:15  10    A.    Correct.

11    Q.    And then you went toward the front of the house to

12    help with establishing a perimeter?

13    A.    Correct.

14    Q.    And when you went toward the front of the house, do

11:19:26  15    you know where Deputies Nicholson, Frazier, and Knee were?

16    A.    Headed towards -- through the garage door.

17    Q.    Okay.  And at that point, you then left the front of

18    the house and followed toward the garage where they -- where

19    you had seen them, right?

11:19:41  20    A.    Correct.

21    Q.    And did you also enter the home?

22    A.    Yes, I did.

23    Q.    And when you did enter the home, where did you go?

24    A.    Followed behind them.

11:19:51  25    Q.    Okay.  And do you recall where you moved through the

```
          1   home?

          2   A.    We tactically cleared the first floor of the house,

          3   and, again, I was behind them, and then they went to the

          4   upstairs.

11:20:03  5   Q.    Okay.  And how far behind them were you?

          6   A.    10 feet.

          7   Q.    Okay.  Did you see them on the stairs ahead of you

          8   when you were going up the stairs, or had they already made

          9   it you mean?

11:20:20 10   A.    I don't remember.

         11   Q.    Okay.  In any case, all four of you did head to the

         12   staircase, right?

         13   A.    Correct.

         14   Q.    And did you travel the entirety of the stairway?

11:20:32 15   A.    Ask again, please.

         16   Q.    Did you go up the entire staircase?

         17   A.    Yes.

         18   Q.    Did you continue into the hallway at the top of the

         19   stairs?

11:20:41 20   A.    No.

         21   Q.    Where did you stop?

         22   A.    I stood at the top of the staircase because I could

         23   see all three officers' backs, and I could see down the

         24   staircase behind us.

11:20:58 25   Q.    Okay.
```

1          MS. GREENE:  If we could, please show the

2     witness Exhibit 42.  And if you could, select the deputy

3     movement.

4     BY MS. GREENE:

11:21:15  5     Q.    I'm going to set up a little marker on the screen.

6          Can you mark on these steps where you -- or on the

7     hallway area where you stopped.

8          You should be able to mark on the screen with your

9     finger.

11:21:32  10    A.    So where it's at now, is that kind of pointing towards

11    the staircase?

12    Q.    Oh, you know what, let me -- sorry.  I think we have a

13    cursor issue here.  There you go.

14         You should be able just to use your finger, and draw

11:21:48  15    an "X" wherever you were standing.

16         There you go.

17              MS. GREENE:  Permission to publish to the

18    jury?

19              MR. DOWNEY:  No objection, Your Honor.

11:21:55  20              THE COURT:  You may publish.

21    BY MS. GREENE:

22    Q.    Okay.  So from this position on the steps, did you see

23    Frazier, Nicholson, and Knee?

24    A.    Yes, I could.

11:22:01  25    Q.    Okay.  And while you were on the stairs, did you hear

1    orders given by those deputies?

2    A.    Communication.

3    Q.    Okay.  You heard conversation between the deputies and

4    Brian Garber; is that right?

11:22:12  5    A.    That's correct.

6    Q.    And then after some amount of time, you heard several

7    gunshots, correct?

8    A.    Correct.

9    Q.    After you heard the gunshots, what did you do?

11:22:27  10    A.    When that occurred, it got really busy really quickly.

11    I ended up getting on the radio and telling that -- our

12    dispatch center that shots had been fired.  I needed the

13    sheriff.  I needed the major.  I needed a squad.

14    Needed -- and checked on them all at the same time.

11:22:46  15    Q.    Okay.  When you say "checked on them," do you mean

16    Defendant Frazier, now Lieutenant Nicholson, and

17    Andrew Knee?

18    A.    And Brian Garber.

19    Q.    Did you check on Brian Garber before or after you

11:22:58  20    checked on the deputies?

21    A.    I checked on my deputies first.

22    Q.    And when you checked on Brian Garber, what position

23    was his body in?

24    A.    Kind of slumped over to the right.

11:23:07  25    Q.    Do you recall anything else about positioning of his

```
          1    limbs at the time?

          2    A.    No.

          3    Q.    Okay.  Did you touch his body?

          4    A.    I don't believe so.

11:23:21  5    Q.    Did you see anything on the bed near Brian's body?

          6    A.    The only thing that I could recall was a pop can or

          7    beer can in the area of his legs.

          8    Q.    And there were no problems with lighting in the room

          9    when you were looking at Brian, correct?

11:23:38 10    A.    No problems.

         11    Q.    Did you ever see at that time, a remote control on the

         12    bed near Brian's body?

         13    A.    I did not.

         14    Q.    After you looked at Brian, did you remove the three

11:23:51 15    deputies from the scene?

         16    A.    Actually, it was all at the same time, and made sure

         17    they were okay.  Removed them.  Secured the scene.  And I

         18    don't remember the exact . . .

         19    Q.    In any case, you sent them out of the room, right?

11:24:06 20    A.    Yes.

         21    Q.    At around that time, did you also come into possession

         22    of a camera?

         23    A.    I was given a camera, yes.

         24    Q.    Do you remember who gave it to you?

11:24:13 25    A.    I do not.
```

```
            1    Q.    Do you know whether it was one of the deputies who had

            2    been in the room?

            3    A.    I don't remember.

            4    Q.    Okay.  In any case, you took and used that camera,

11:24:23    5    correct?

            6    A.    Correct.

            7    Q.    And you took photos of the scene at that point in

            8    time?

            9    A.    I took several photos of the room, yes.

11:24:30   10    Q.    And did you tell Defendant Frazier,

           11    Sergeant Nicholson, and Deputy Knee to go downstairs before

           12    you started taking those photos?

           13    A.    Yes.  I removed them from the area.

           14    Q.    Okay.  And what did you photograph?

11:24:46   15    A.    The room the way it was.

           16    Q.    Did you photograph Brian's body as well?

           17    A.    It was an overall photos of the room.  He was in some

           18    of those photos.

           19    Q.    And when you took those photos, who was in the room

11:25:03   20    with you?

           21    A.    No one.

           22    Q.    So you were alone in the room when you took those

           23    photographs?

           24    A.    Yes.

11:25:09   25    Q.    No one was watching you to see what you were doing
```

```
         1    while you were in that room alone, were they?

         2    A.    Correct.

         3    Q.    And you were in that room until Fire Chief

         4    Richard Compton showed up; is that correct?

11:25:24 5    A.    That's correct.

         6    Q.    And you were alone until he got there?

         7    A.    Correct.

         8    Q.    And what did he do when he arrived in the room?

         9    A.    There was communication, radio traffic, again, that I

11:25:35 10   didn't need -- and I'll go back to that -- was I didn't need

        11    the whole fire department up there.

        12          So the chief shows up.  He brought his machine.  I

        13    believe he put four sticky things onto Brian, hooked that to

        14    the machine, and verified.

11:25:51 15   Q.    Do you recall what type of machine this was?

        16    A.    No.

        17    Q.    Do you know what the purpose of the machine was to be

        18    used for?

        19    A.    It was to show life.

11:26:00 20   Q.    Or lack of life, absence of life?

        21    A.    Or lack of life.

        22    Q.    Death?

        23    A.    Yes.

        24    Q.    And you said that he put stickies on the body; is that

11:26:09 25   right?
```

Zenner (Cross by Greene)

344

1    A.    Correct.

2    Q.    Were they electrodes for this machine?

3    A.    Don't know what they are.

4    Q.    Okay.  Well, in any case, he put something on the

11:26:16  5    body, right?

6    A.    Correct.

7    Q.    Do you recall where on Brian Garber's body he placed

8    those sticky pads?

9    A.    No.

11:26:23  10    Q.    Did you ever touch those electrodes or sticky pads

11    that Chief Compton applied to Brian's body?

12    A.    I don't believe so.

13    Q.    Did Chief Compton conclude whether Brian Garber was

14    deceased?

11:26:39  15    A.    Yes, he did.

16    Q.    So at that point in time, Brian had passed?

17    A.    Correct.

18    Q.    At some point after that, you did leave the room,

19    right?

11:26:49  20    A.    Yes.

21    Q.    Do you recall going back to the room later in the

22    night to show the scene to a prosecutor?

23    A.    Yes.

24    Q.    Do you recall whether or not you saw the remote

11:27:00  25    control on the bed at that time?

```
           1    A.    Did not.

           2    Q.    Okay.

           3                MR. GILBERT:  I'd like to bring up Plaintiff's

           4    Exhibit 28 for the witness, please.

11:27:21   5    BY MS. GREENE:

           6    Q.    We're going to start at Exhibit 28-1.

           7          Is this one of the photographs you took?

           8    A.    It appears like it.

           9    Q.    Okay.

11:27:31  10                MS. GREENE:  Permission to publish?

          11                MR. DOWNEY:  No objection, Your Honor.

          12                THE COURT:  You may publish.

          13    BY MS. GREENE:

          14    Q.    And so this is the hallway leading to the bedroom

11:27:39  15    where the shooting happened?

          16    A.    Correct.

          17    Q.    Okay.

          18                MS. GREENE:  I'd like to show the witness

          19    Exhibit 28-2, please.

11:27:48  20    BY MS. GREENE:

          21    Q.    And is this a photograph that you took?

          22    A.    Could have.

          23    Q.    You're not sure, as you sit here?

          24    A.    I don't remember the photos specifically, but they

11:28:00  25    appear -- that's the area of the photos that I took in that
```

1    area.

2    Q.    Okay.

3            MS. GREENE:  Let's actually just move on to

4    Exhibit 28-11, and show it to the witness, please.

11:28:23    5    BY MS. GREENE:

6    Q.    Is this a photograph that you took?

7    A.    Again, I can't confirm or deny that I took that photo.

8    I took photos in the room, and it appears that it could be

9    one of my photos, yes.

11:28:38    10    Q.    Okay.  And you took photographs before the sticky pads

11    were applied to the body, right?

12    A.    Yes, I did.

13    Q.    And there are no sticky pads visible on the body in

14    this photograph?

11:28:47    15    A.    That's correct.

16            MS. GREENE:  Permission to publish, please.

17            MR. DOWNEY:  No objection.

18            THE COURT:  You may publish.

19    BY MS. GREENE:

11:28:53    20    Q.    And so since there are no sticky pads on the body in

21    this picture, it's likely that you took this photograph,

22    correct?

23    A.    Correct.

24    Q.    In this photo, there is a remote on the bed, though,

11:29:02    25    isn't there?

1    A.    Yes, there is.

2    Q.    How many other officers were on the scene when you

3    took the photograph of this scene?

4          Or strike that.

11:29:09 5          How many other officers were on the property, or there

6    in the area of the residence at the time you took the

7    photographs of this scene in the room?

8    A.    I don't know.

9    Q.    There were several officers around, right?

11:29:24 10   A.    Yes.

11   Q.    And that included several officers in addition to the

12   three officers who had been involved in the shooting,

13   correct?

14   A.    Correct.

11:29:31 15   Q.    And you did not ask anyone else to be present during

16   the time you were taking the photographs?

17   A.    That's correct.

18                MS. GREENE:   Just a moment, please.

19   BY MS. GREENE:

11:30:02 20   Q.    Captain Zehner, after you left the scene, did you

21   enter the photographs into evidence in this case, or take

22   them into evidence?

23   A.    I don't believe I did.

24   Q.    Do you know what you did with the camera?

11:30:16 25   A.    I do not.

```
          1   Q.    Okay.

          2                 MS. GREENE:  Thank you.

          3         No further questions.

          4                 THE COURT:  Any examination at this time?

11:30:26  5                 MR. DOWNEY:  We reserve our questioning of

          6   Captain Zehner in our case, Your Honor.

          7                 THE COURT:  Captain, thank you for your

          8   testimony.  You may step down.

          9                 THE WITNESS:  Thank you, sir.

11:30:40 10                 THE COURT:  Who is your next witness going to

         11   be?

         12                 MR. GILBERT:  I'll check and see who is here.

         13                 THE COURT:  All right.  Well, we can take our

         14   lunch break, and give the jury a chance to get downstairs

11:30:50 15   early.

         16         All right.  We are going to have our lunch break, an

         17   hour and 15 minutes from 11:30, and we'll reconvene at

         18   12:45.

         19         We are in recess until 12:45.

11:31:08 20                 DEPUTY CLERK:  All rise.

         21                 (The jury exited the courtroom.)

         22                 THE COURT:  All right.  Recess until 12:45.

         23                 MR. DOWNEY:  Thank you, Your Honor.

         24                     (Luncheon recess had.)

11:31:52 25                             -  -  -
```

```
 1                          AFTERNOON SESSION

 2                    DEPUTY CLERK:  All rise.

 3                    THE COURT:  Plaintiff, please call your next

 4      witness.

 5                    DEPUTY CLERK:  Do you want the jury first?

 6                    THE COURT:  Oh, I'm sorry.

 7           Yes, please bring in the jury.

 8                    DEPUTY CLERK:  All rise for the jury.

 9                               - - -

10             (Proceedings reconvened at 12:54 p.m.)

11           (In Open Court - Defendant and Jury Present)

12                               - - -

13                    DEPUTY CLERK:  Please be seated.

14                    THE COURT:  And now, plaintiff, you may call

15      your next witness.

16                    MS. GREENE:  Plaintiff calls Fire Chief

17      Richard Compton.

18                    DEPUTY CLERK:  Could you raise your right

19      hand.

20          Do you solemnly swear that your testimony in this case

21      will be the truth, the whole truth, and nothing but the

22      truth, so help you God?

23                    THE WITNESS:  I do.

24                    DEPUTY CLERK:  Please be seated.

25
```

12:54:02 (line 5)
12:55:17 (line 10)
12:55:47 (line 15)
12:56:43 (line 20)

```
          1              DIRECT EXAMINATION OF RICHARD COMPTON

          2    BY MS. GREENE:

          3    Q.    Good afternoon, Chief Compton.

          4          Could you please state your name for the record.

12:56:58  5    A.    Richard Compton.

          6    Q.    And what is your current job title?

          7    A.    Fire chief of the Troy Township Fire Department.

          8    Q.    Do you hold any other positions of employment?

          9    A.    Yes, ma'am.

12:57:07  10   Q.    And what is that?

          11   A.    I'm a flight paramedic for MedFlight.

          12   Q.    And did you hold these positions in March of 2014?

          13   A.    Yes, ma'am.

          14   Q.    How long have you been the Troy Township fire chief?

12:57:17  15   A.    Since 2005.

          16   Q.    And when did you first join the fire department?

          17   A.    In 1974, as a explorer scout for the Boy Scouts.

          18   Q.    So you've been there a long time?

          19   A.    A little bit.

12:57:29  20   Q.    Can you please briefly describe your duties in the

          21   role of fire chief.

          22   A.    Oversee the daily operations of the Troy Township Fire

          23   Department, involving preservation of property and lives.

          24   Q.    Does Troy share fire services with other

12:57:41  25   municipalities?
```

Compton (Direct by Greene)

351

```
          1    A.    We contract with two other municipalities, and the

          2    Village of Lexington is within Troy Township.

          3    Q.    And you're also a paramedic, you mentioned?

          4    A.    Yes, ma'am.

12:57:55  5    Q.    Are you certified as a paramedic by the State of Ohio?

          6    A.    Yes, ma'am.

          7    Q.    In your capacity as fire chief, do you recall being

          8    paged to a scene regarding a shooting in Lexington, Ohio, on

          9    March 16, 2014?

12:58:09 10    A.    Yes, ma'am.

         11    Q.    Do you recall who paged you to that scene?

         12    A.    Richland County 911.

         13    Q.    And what was the call for?

         14    A.    Injuries related to shots fired.

12:58:19 15    Q.    Did you know at the time of the call that this was a

         16    police-involved shooting?

         17    A.    No, ma'am.

         18    Q.    Do you recall where the scene you were paged to was

         19    located?

12:58:26 20    A.    On Mill Run Road.

         21    Q.    And that was in Lexington, Ohio?

         22    A.    Yes, ma'am.

         23    Q.    Was this a residential address?

         24    A.    Yes, ma'am.

12:58:34 25    Q.    And did you respond to that scene?
```

Compton (Direct by Greene)

```
            1    A.    Yes, ma'am.

            2    Q.    How did you get there?

            3    A.    By ambulance.

            4    Q.    Was anyone with you when you responded?

12:58:42    5    A.    Yes, ma'am.

            6    Q.    Sorry?

            7    A.    Yes, ma'am.

            8    Q.    And who was that?

            9    A.    Assistant Chief Brad Ross and Ben Caroche [phonetic],

12:58:50   10    who is now lieutenant.

           11    Q.    So the three of you together responded to the scene?

           12    A.    Yes, ma'am.

           13    Q.    And when you got there, what did you do?

           14    A.    We responded to the bottom of the driveway, and met

12:59:01   15    law enforcement.

           16    Q.    And what happened at the bottom of the driveway?

           17    A.    If I recall, correctly, I believe they said that they

           18    wanted two of us to go up to the house.  And at that point

           19    in time, I explained to the officer that all three of us

12:59:15   20    needed to go, and he gave us permission to proceed.

           21    Q.    And what happened next?

           22    A.    We went up to the house and met with law enforcement

           23    at the house also.

           24    Q.    And what happened at that meeting?

12:59:33   25    A.    We were instructed to go into the house, and all three
```

Compton  (Direct by Greene)

353

```
          1    of us entered the residence.

          2    Q.   Did you bring any equipment with you into the house?

          3    A.   Yes, ma'am.

          4    Q.   What was that equipment?

12:59:47  5    A.   Our first response equipment, which would have

          6    included a cardiac monitor and a first-in bag with all of

          7    our initial lifesaving equipment, including airway devices.

          8    Q.   Okay.  Did all three of you, then, after you entered

          9    the house, go to the scene of the shooting?

13:00:02  10   A.   No, ma'am.

          11   Q.   Who went to the scene of the shooting, if anyone?

          12   A.   Myself.

          13   Q.   Just you?

          14   A.   Yes, ma'am.

13:00:09  15   Q.   And where was that scene located?

          16   A.   On the second floor of the residence, in a bedroom.

          17   Q.   Sorry.  Go ahead.

          18        Where was it?

          19   A.   Second floor of the residence, in a bedroom.

13:00:19  20   Q.   Okay.  Did you go into that bedroom?

          21   A.   Yes, ma'am.

          22   Q.   And what was your purpose in entering into the

          23   bedroom?

          24   A.   To check on the condition of a patient in that room.

13:00:30  25   Q.   And what did you see when you entered the room?
```

Compton (Direct by Greene)

354

```
         1   A.    Saw a person sitting up against a bed -- I'm sorry --

         2   sitting against -- sitting on a bed up against the wall.

         3   Q.    Did that person have any injuries?

         4   A.    Yes, ma'am.

13:00:45 5   Q.    What were the nature of those injuries?

         6   A.    It appeared to be gunshot wounds.

         7   Q.    And did you later come to know that this man on the

         8   bed was named Brian Garber?

         9   A.    Yes, ma'am.

13:00:56 10  Q.    When you saw Brian on the bed, did he show signs of

        11   life?

        12   A.    He did not.

        13   Q.    And what did you do when you got into the room?

        14   A.    I'm sorry, ma'am?

13:01:05 15  Q.    When you got into the room, what did you do?

        16   A.    Interacted with law enforcement.

        17   Q.    And what was that interaction?

        18   A.    Asked them permission to check for a pulse, and also

        19   to apply the cardiac monitor to the patient.

13:01:19 20  Q.    Did you check for a pulse?

        21   A.    Yes, ma'am.

        22   Q.    How did you do that?

        23   A.    On the carotid pulse and, I believe, also radially, on

        24   the wrist.

13:01:31 25  Q.    You also mentioned a cardiac monitored?
```

Compton (Direct by Greene)

355

A.    Yes, ma'am.

Q.    Did you use that in the room?

A.    I'm sorry, ma'am?

Q.    Did you use the cardiac monitor in the room?

13:01:39  A.    Yes, ma'am.

Q.    How did you use it?

A.    Applied the electrodes to the patient, one on each arm and one on each leg.

Q.    And what purpose do these electrodes --

13:01:46  A.    To check for cardiac activity, see if there's any --

          THE REPORTER:  I'm sorry.  One at a time.

          What purpose --

BY MS. GREENE:

Q.    -- do these electrodes serve when you apply them to

13:01:55  the body?

A.    To check for cardiac activity, electrical activity within the heart.

Q.    And did you check for electrical activity in the heart on Brian Garber?

13:02:05  A.    Yes, ma'am.

Q.    Do you recall whether there was any electrical activity in Brian's heart?

A.    I do recall.  There was not.

Q.    And do you recall where you placed the electrodes on

13:02:19  his body?

1    A.    Yes, ma'am.

2          As previously stated, one on each arm, and one on each

3    leg, around the area of the ankle.

4    Q.    What does the absence of electrical activity in the

5    heart mean?

6    A.    Asystole cardiac standstill.

7    Q.    And does that mean that the patient is deceased?

8    A.    Yes, ma'am.

9    Q.    Did you leave the electrodes on Brian Garber's --

10   A.    With permission of law enforcement --

11   Q.    -- after the test?

12   A.    -- yes, ma'am.

13   Q.    I'm sorry.  If you let me finish the question before

14   you start talking.

15   A.    I'm sorry.  Go ahead.

16   Q.    Everybody does it, but . . .

17         So did you leave the electrodes on Brian Garber's body

18   when you were done with the test?

19   A.    Yes, ma'am, with permission of law enforcement.

20   Q.    And who was the law enforcement who gave you

21   permission, if you recall?

22   A.    I believe it was Lieutenant Zehner.

23   Q.    Okay.  And did you advise Lieutenant Zehner that Brian

24   was deceased?

25   A.    Yes, ma'am.

Compton (Cross by Downey)

357

```
        1    Q.    Okay.

        2              MS. GREENE:  No further questions.

        3              MR. DOWNEY:  Briefly, Your Honor.

        4              CROSS-EXAMINATION OF RICHARD COMPTON

13:03:13  5    BY MR. DOWNEY:

        6    Q.    Was anyone else present in the room when you examined

        7    Mr. Garber, other than Officer Zehner?

        8    A.    I do not recall.

        9    Q.    Were you careful not to disturb anything else in the

13:03:34 10    room, other than to conduct your examination of Mr. Garber?

       11    A.    Yes, sir, I was.

       12    Q.    And is that because it was a crime scene?

       13    A.    Yes, sir.

       14              MR. DOWNEY:  I have no additional questions.

13:03:45 15        Thank you.

       16              MS. GREENE:  Nothing else.

       17              THE COURT:  Fire Chief, thank you for your

       18    testimony.  You may step down.

       19              THE WITNESS:  Thank you, sir.

13:04:01 20              THE COURT:  Next witness?

       21              MR. GILBERT:  We would call Cory Momchilov.

       22              THE COURT:  May I see counsel at sidebar.

       23          (Discussion held at sidebar, as follows:)

       24              THE COURT:  This is the BCI person?

13:05:00 25              MR. GILBERT:  Yes.
```

Momchilov (Direct by Gilbert)

```
             1              THE COURT:  Okay.  What I said before, and
             2    I'll repeat, again, no formal -- no reference to the formal
             3    investigation, and no reference to a final -- to a report.
             4              MR. GILBERT:  Okay.
13:05:11     5              THE COURT:  Other than that, that's --
             6              MR. GILBERT:  I basically told him this
             7    before.  So I don't want him to slip it out.
             8              THE COURT:  Just so that we don't go beyond
             9    those boundaries.
13:05:26    10              MR. GILBERT:  Okay.  All right.
            11              THE COURT:  All right.
            12         Thank you.
            13                   (End of sidebar discussion.)
            14                (Proceedings resumed in open court.)
13:05:39    15              DEPUTY CLERK:  Would you raise your right
            16    hand.
            17         Do you solemnly swear that your testimony in this case
            18    will be the truth, the whole truth, and nothing but the
            19    truth, so help you God?
13:05:41    20              THE WITNESS:  I do.
            21              DEPUTY CLERK:  Please have a seat.
            22              DIRECT EXAMINATION OF CORY MOMCHILOV
            23    BY MR. GILBERT:
            24    Q.    Good afternoon.
13:05:50    25    A.    Afternoon.
```

1    Q.    What is your name?

2    A.    Cory Momchilov.

3    Q.    And what is your occupation?

4    A.    I'm a special agent with the Ohio Bureau of Criminal

13:06:02  5    Investigation.

6    Q.    And what is your current assignment?

7    A.    I'm assigned to the special investigations unit.

8    Q.    And what does the special investigations unit do?

9    A.    Mostly, we investigate officer-involved shootings,

13:06:13 10    public official corruption, use of force involving officers,

11    financial crimes, and homicides and cold case homicides.

12    Q.    Are you aware of the police-involved shooting of

13    Brian Garber in March of 2016?

14    A.    I was.  I am.

13:06:34 15    Q.    I believe it was March 16th, 2014.  I'm sorry.

16    A.    Correct.

17    Q.    And how did you learn about the event that -- on that

18    day?

19    A.    I was notified by my supervisor via phone that the

13:06:50 20    Richland County Sheriff's Office was requesting our

21    assistance to investigate an officer-involved shooting.

22    Q.    And you were the lead agent overseeing the gathering

23    and analysis of evidence from this shooting scene?

24    A.    I wouldn't say I was overseeing.  We have a separate

13:07:06 25    unit that collects evidence and analyses evidence.  I was

Momchilov (Direct by Gilbert)

```
 1   present, but I don't oversee how they perform their

 2   functions.

 3   Q.    All right.  But you would agree that BCI took over the

 4   scene at some point; is that right?

 5   A.    That is correct.

 6   Q.    What time did BCI take control of the scene,

 7   approximately?

 8   A.    I know we have an agent that lives in that area, and

 9   he arrived on scene after he received the call.  I couldn't

10   testify to what time he arrived.

11   Q.    All right.  But it was some period of time after the

12   shooting occurred, correct?

13   A.    Once again, I can't testify to how long it took him.

14   I don't know what you mean by --

15   Q.    I mean, there was a shooting.  And then at some point

16   later BCI was called in to take over the crime scene; is

17   that right?

18   A.    Correct.

19   Q.    And once BCI took control of the crime scene, did the

20   BCI agents take items from the scene into evidence?

21   A.    Correct.

22   Q.    Is crime scene preservation critical to your work?

23   A.    It is.  But, you know, with us responding to the scene

24   later, there's sometimes where, you know, we can only

25   document what is at the scene when we arrive.
```

Momchilov (Direct by Gilbert)

361

```
          1    Q.    So you have to rely on the state of the crime scene as

          2    you find it when you arrive; is that correct?

          3    A.    That's correct.

          4    Q.    And do you know who had control over the crime scene

13:08:36  5    before you arrived?

          6    A.    I believe it was the sheriff's office.

          7    Q.    But generally speaking, is it critical to preserve and

          8    document evidence immediately after a shooting incident?

          9    A.    Yes.

13:08:51 10    Q.    And why is that?

         11    A.    So we can determine what happened.  So evidence isn't

         12    moved or accidentally -- you know, like, shell casings

         13    accidentally stepped on.  Things of that nature.

         14    Q.    Prior to BCI taking control of the scene, you know

13:09:12 15    that the sheriff's department was in control of the crime

         16    scene; is that correct?

         17    A.    Yes.

         18    Q.    And for BCI purposes, you have to rely on the crime

         19    scene as you find it; is that right?

13:09:27 20    A.    We can only document how we found it.  We can't --

         21    Q.    If something is moved without you knowing it, or added

         22    to the crime scene and you didn't know about it, that's

         23    something -- you can't assume anything about how that might

         24    have happened; is that right?

13:09:43 25                   MR. DOWNEY:  Object to the form, Your Honor.
```

```
                              THE COURT:  Leading?
```
2                              MR. DOWNEY:  It's leading, and form of the

3          question, Your Honor.  Both.

4                              THE COURT:  Overruled.

13:09:56   5    BY MR. GILBERT:

6          Q.    So basically, you can only rely on the crime scene as

7          you find it; is that right?

8          A.    Correct.

9          Q.    In your analysis of the evidence relating to the

13:10:07  10    shooting, did you learn that Brian Garber was unarmed when

11         he was shot?

12         A.    Yes.

13         Q.    Now, one of the pieces of evidence that was retrieved

14         from the crime scene was a black remote control, correct?

13:10:27  15    A.    Correct.

16                             MR. GILBERT:  27-11, please.

17         BY MR. GILBERT:

18         Q.    Do you see this photograph?

19         A.    I do.

13:10:42  20    Q.    Does that photo depict the remote control that was

21         taken by BCI at the crime scene?

22         A.    It does.

23         Q.    Okay.

24                             MR. GILBERT:  Can we publish?

13:10:59  25                   MR. DOWNEY:  No objection, Your Honor.

                                THE COURT:  You may publish.

  BY MR. GILBERT:

  Q.    Did you actually arrive at the crime scene at some

  point?

13:11:12  A.    Yes.

  Q.    Do you have any idea approximately when that was?

  A.    I couldn't say for certain.  I was doing some

  investigation interviews at the sheriff's office prior to my

  arrival at the scene.  I couldn't say for certain what time

13:11:24  I arrived.

  Q.    Now, when you did arrive at the crime scene, did you

  go into the bedroom?

  A.    I did.

  Q.    And did you see this remote after you arrived there?

13:11:34  A.    Yes.

                        MR. GILBERT:  May I approach?

                        THE COURT:  You may.

                        MR. GILBERT:  We want to mark this as

  Plaintiff's Exhibit 51.

13:11:52                 THE COURT:  All right.

  BY MR. GILBERT:

  Q.    I'm going to give you some gloves.

        I'm sure you've seen these before, have you not?

  A.    Gloves?

13:12:07  Q.    Yeah.

1    A.    Yes.

2    Q.    Can you take the object out of the bag.

3    A.    (Witness complied.)

4    Q.    And can you hold it up.  Can you look at that.

13:12:36  5    A.    Yes.

6    Q.    Is that the remote that you saw on the bed in the

7    bedroom where Brian Garber was shot and the remote that was

8    taken by BCI in evidence?

9    A.    It appears to be.

13:12:51  10    Q.    Can you just show that to the jury so they can see it.

11    Just turn it around and show it to them.

12    A.    (Witness complied.)

13    Q.    Thank you.

14          You can put it back in the bag.

13:13:06  15    A.    (Witness complied.)

16    Q.    And I guess you can dispose of the gloves.

17          Now, because BCI came in later to take over the crime

18    scene, you can't say for sure that this remote was there on

19    the bed at the time of the shooting, can you?

13:13:47  20    A.    I can't say for certain.

21    Q.    And that's because BCI was not in control of the crime

22    scene from the beginning, correct?

23    A.    I mean, it's impossible for us to be in control of the

24    scene from the beginning until one of our agents arrived.

13:14:03  25    Q.    Were you aware that there were deputies in the room

```
          1     after the shooting but before BCI took control of the scene?

          2     A.    Yeah.  The officers involved, and, I think,

          3     lieutenant -- one of the lieutenants took some photographs

          4     of the scene.

13:14:17  5     Q.    Does Lieutenant Zehner ring a bell?

          6     A.    Correct.  Correct.

          7     Q.    Are you aware that none of the officers involved in

          8     the shooting say they saw the remote?

          9     A.    Yes.

13:14:30 10     Q.    Okay.  Do you know who Bambi Couch-Page is?

         11     A.    Yes.

         12     Q.    Who is she?

         13     A.    A former prosecutor for the Richland County

         14     Prosecutor's Office.

13:14:40 15     Q.    Were you aware that she came to the scene that night?

         16     A.    I think I was informed that she was at the scene at

         17     one point, but I didn't see her in the room.

         18     Q.    Now, if everybody who was in the room prior to

         19     Bambi Couch-Page arriving said that they did not see a

13:14:59 20     remote control on the bed, would that be of interest to you?

         21     A.    Possibly.

         22     Q.    Why is that?

         23     A.    It's something we might have wanted to explore if --

         24     how it was gotten there, and why some officers didn't see

13:15:10 25     it.  Kind of an explanation of why they didn't see it there.
```

1    Q.    Okay.  Now, did BCI conduct any forensic testing on

2    this remote?

3    A.    We did.

4    Q.    Okay.  And what kind of testing was done on the

13:15:25  5    remote?

6    A.    Latent prints and touch DNA.

7    Q.    So latent prints.

8          Were there any latent prints found there were suitable

9    for comparison to Brian Garber?

13:15:36 10    A.    No.

11    Q.    Do you remember who the forensic scientist who did the

12    fingerprint analysis?

13    A.    Not off the top of my head, no.

14    Q.    And with respect to the DNA, was there a DNA swab

13:15:54 15    taken around the remote -- on the remote?

16    A.    I believe so.

17    Q.    And did the DNA swab analysis contain sufficient

18    material for Brian Garber to be included in having had his

19    biological substance on that remote?

13:16:25 20    A.    No.

21    Q.    So that remote cannot be linked to Brian Garber

22    through his DNA or his fingerprints, correct?

23    A.    Correct.

24    Q.    Now, do you know whether BCI obtained fingerprints

13:16:51 25    from the three officers who were involved in the shooting?

1    A.    I don't believe we did.

2    Q.    Do you know whether BCI took DNA samples of the three

3    officers involved in the shooting to test and compare?

4    A.    Not to my knowledge.

13:17:20  5    Q.    Do you know whether or not any DNA tests or

6    fingerprint comparisons were done with respect to

7    Lieutenant Zehner?

8    A.    No.

9    Q.    Okay.  You're not aware of any, correct?

13:17:37 10    A.    Correct.

11    Q.    Do you know whether there was blood on the remote?

12    A.    I do not.

13    Q.    Do you recall the deputy -- in the deputies' accounts,

14    that they did not shoot until after they heard a loud bang,

13:17:59 15    which they believed was a gunshot from Brian Garber?

16    A.    Yes.

17    Q.    And you know that it was impossible for a gunshot to

18    have come from Brian Garber because he had no gun, correct?

19    A.    Correct.

13:18:13 20    Q.    Did anyone -- were you aware of any effort to

21    determine whether -- to determine what could have been an

22    alternative source of such a loud bang in that bedroom?

23    A.    Yes.

24    Q.    Did BCI analyze Brian's cell phone to see if there was

13:18:36 25    some kind of .wav or audio file in there that could produce

Momchilov (Cross by Downey)

1    such a sound?

2    A.    Yes.

3    Q.    And what did you find?

4    A.    We could not locate any such device or any such app

13:18:48  5    that would create that sound.

6    Q.    And could you or any of your agents discover and find

7    any other source of a noise that it could have created the

8    sound that was described by the deputies that would be other

9    than a gun?

13:19:09  10   A.    No definitive.

11              MR. GILBERT:  Thank you.

12         No further questions.

13              THE COURT:  Cross-examination?

14              MR. DOWNEY:  Thank you, Your Honor.

13:19:21  15              CROSS-EXAMINATION OF CORY MOMCHILOV

16   BY MR. DOWNEY:

17   Q.    Thank you.

18         I'm Dan Downey.  I think we met a few years ago.

19   A.    Yes, sir.

13:19:38  20   Q.    In response to one of Mr. Gilbert's question, you said

21   "Not definitive" to a sound, correct?

22   A.    Correct.

23   Q.    What are some of the things you tried to do?

24   A.    I know when a special prosecutor was requested on

13:19:50  25   this, they went back to the house, and tried to bang the bed

```
 1    against the wall to see if it would possibly be a sound,
 2    gunshot sound.
 3    Q.    Now, as part of your duties, you also interviewed
 4    people that were in the house; is that right?
 5    A.    Correct.
 6    Q.    Did you interview Matt Garber?
 7    A.    I did.
 8    Q.    Can you tell the ladies and gentlemen of the jury what
 9    Mr. Garber shared with you regarding his interaction with
10    Brian that day.
11    A.    Yes.
12                MR. GILBERT:  Objection.
13                THE COURT:  I don't know where you're going
14    with this.
15                MR. DOWNEY:  Can we sidebar, Your Honor?
16                THE COURT:  Sure.
17          (Discussion held at sidebar, as follows:)
18                MR. DOWNEY:  So I just heard a bunch of
19    testimony that basically suggests that the remote was
20    planted.  Okay?  That is what we believe was under the shirt
21    of Brian Garber at the time of the shooting.
22          We also believe from the defense side, that
23    Matthew Garber observed an object under Brian Garber's shirt
24    earlier that day and that's why he talked about calling it a
25    gun.
```

1        I think the fact that he interviewed Mr. Garber and

2    Brian [sic] Garber said it looked like a gun under the shirt

3    negates this entire theory of the case that somehow the

4    deputies planted something.

13:21:12 5        Now, I have him in my case as well, and I can call him

6    in, if they don't want me to do it today.

7                THE COURT:  Well, I don't see that they're

8    saying that it was planted.  They're just saying that

9    they're trying to find an alternate explanation as to -- as

13:21:26 10   to where the sound came from.

11               MR. DOWNEY:  Well, from my perspective,

12   Your Honor, this is key to our case, that Matt Garber told

13   Cory Momchilov that he had a gun.  I'll bring him in my case

14   in chief, if I need to, to go through the direct

13:21:43 15   examination.  But I'd like to get the agent out of here, if

16   i can.  I don't think it's objectionable at all.

17               MR. GILBERT:  Matt Garber has to be called as

18   a witness to establish whether he did or he didn't do what

19   you're saying.  He cannot testify to hearsay.  It's a

13:21:54 20   hearsay statement clearly, no matter what Matt Garber told

21   him.

22               MR. DOWNEY:  But hearsay is --

23               MR. GILBERT:  I'm only bringing in part of the

24   inconsistent statements to the witness testifying in a prior

13:22:06 25   declaration from them.  This is just rank hearsay.

1          Plus --

2                     THE COURT:  Are you calling Matt Garber?

3                     MS. GREENE:  We haven't made that

4     determination.  But he can be called --

13:22:21  5                     THE REPORTER:  I can't hear.

6                     MS. GREENE:  Sorry.

7          But he can be called.  And if he desires to use the

8     recordings to impeach his prior statements, that is an

9     option available, too.

13:22:34 10                     THE COURT:  What recordings are where you

11    talking about?

12                     MS. GREENE:  He gave an interview to this

13    agent.  He made statements to the agent.

14                     MR. DOWNEY:  Let's face it.  We can give the

13:22:44 15    impression that this agent tested it, and there was no

16    sound, that they can't figure out a sound.  There's an

17    object that may have been planted or placed there after the

18    scene was disturbed.  And we have an agent who ruled out

19    that they had done anything wrong in this officer-involved

13:22:58 20    shooting.

21         And the impression that we have with the jury right

22    now is prejudicial to the defense in this case, in my view.

23    And we have every right to inquire of him what he did

24    through the course of his investigation.

13:23:06 25         I know that we have a motion in limine --

                        1              MR. GILBERT:  Do you want to open the whole

                        2      door?

                        3              MR. DOWNEY:  I think --

                        4              MR. GILBERT:  Do you want an investigation?

13:23:11   5          It isn't open.  I was very clear.  You told me it was

                        6      just about physical evidence.

                        7              THE COURT:  All right.  In order to -- in

                        8      order to make sure that there is -- there is foundation for

                        9      this, then Matt Garber is going to have to testify.  And

13:23:31  10      then at that point --

                       11              MR. DOWNEY:  We'll call Special

                       12      Agent Momchilov back.

                       13              THE COURT:  All right.  You want to call him

                       14      back?

13:23:36  15              MR. GILBERT:  You better see if he's going to

                       16      admit what you're asking him.

                       17              MR. DOWNEY:  Here's -- I don't think I do.

                       18      But, obviously --

                       19              MR. GILBERT:  Before you can impeach him.

13:23:43  20              MR. DOWNEY:  I'm not impeaching.  I'm asking

                       21      him what he did during the course of the investigation,

                       22      which, I think, is essential to the defense of our case.

                       23          I was hoping to get him out of here --

                       24              MR. GILBERT:  The investigation you did not

13:23:54  25      want in this case.

1          MR. DOWNEY:  And you didn't call him.  That's

2    why I have to use him.

3          THE COURT:  You want to be very careful to

4    stay away from the fact that there's a formal investigation

13:24:03  5    into any wrongdoing, and also, that there was any findings.

6    And that was -- and that was my direction as to the

7    circumstances under which this witness would be allowed to

8    testify.

9          Now, if you believe, as you apparently do, and have

13:24:19 10    evidence that Matt Garber gave certain information to him

11    that's relevant, then let's hear what Matt Garber had to say

12    to him, and then we'll go from there.

13          MR. DOWNEY:  Okay.  And I don't want to

14    reargue.  I already lost the motion in limine.

13:24:33 15          But one of the issues that we raise, Your Honor, is

16    they now know he conducted the investigation eventually,

17    because he was out at the scene.  It's called a crime scene.

18    He's interviewed witnesses.  All of that stuff is basically

19    in front of the jury now.

13:24:46 20          And from our perspective, the results of what he did

21    is prejudicial if they don't hear it, because they --

22          MR. GILBERT:  (Indiscernible.)

23          THE COURT:  Well, you know, the DNA, the

24    fingerprints --

13:24:53 25          MR. DOWNEY:  You don't like it.

                          1              THE COURT:  The DNA, the fingerprints, the

                          2     cell phone analysis is all very relevant here.

                          3              MR. DOWNEY:  Well, I think it's all relevant.

                          4              THE COURT:  It's all relevant, right.

13:25:01             5              MR. DOWNEY:  I think the whole -- the whole

                          6     investigation is relevant when we ultimately determine that

                          7     these officers were justified in shooting.

                          8              THE COURT:  Well, that's not going to come in.

                          9     That's for the jury to decide.

13:25:10           10         All right.  So in order to make sure that this is done

                         11     without any question, then Matt Garber is going to have to

                         12     testify.  And if you want to bring him back, then --

                         13              MR. DOWNEY:  We will bring him back, and we'll

                         14     just call him in our case in chief, and have everything that

13:25:20           15     we want --

                         16              THE COURT:  Fine.

                         17              MR. DOWNEY:  That's what we'll do.

                         18              THE COURT:  That's fine.

                         19              MR. DOWNEY:  Thank you, Your Honor.

13:25:25           20              THE COURT:  That's the best way to go.

                         21         Thank you.

                         22              (End of sidebar discussion.)

                         23              (Proceedings resumed in open court.)

                         24              MR. DOWNEY:  Your Honor, from the defense, we

13:25:39           25     will recall Special Agent Momchilov in our case in chief.

1              Thank you, Your Honor.

2                    THE COURT:  Thank you.

3              Mr. Momchilov, thank you --

4                    THE WITNESS:  Thank you, sir.

13:25:56  5          THE COURT:  -- for your testimony.

6                    MR. GILBERT:  I got to check to see if they're

7        here.

8                    THE COURT:  Okay.

9                    MS. GREENE:  Plaintiff calls Sara Knowlton.

13:28:00 10          DEPUTY CLERK:  Please raise your right hand.

11         Do you solemnly swear that your testimony in this case

12       will be the truth, the whole truth, and nothing but the

13       truth, so help you God?

14                   THE WITNESS:  I do.

13:28:04 15          DEPUTY CLERK:  Have a seat.

16             DIRECT EXAMINATION OF SARA CORDRAY KNOWLTON

17       BY MS. GREENE:

18       Q.    Good afternoon, Ms. Knowlton.

19             Please state your name for the record.

13:28:18 20      A.    Sara Cordray Knowlton.

21       Q.    How are you related to Brian Garber?

22       A.    He was my husband.

23       Q.    When did you two get married?

24       A.    April of 2010.

13:28:28 25      Q.    And did you two live together at the time of his

Knowlton (Direct by Greene)

376

```
             1   death?

             2   A.     Yes.

             3   Q.     Do you and Brian Garber have any children together?

             4   A.     Yes.

13:28:35     5   Q.     And who are they?

             6   A.     Holly Cordray Garber, she's 8; and

             7   Nicholas William Garber, he's 5.

             8   Q.     How old were they at the time of Brian's passing?

             9   A.     Holly was 4, and Nick was around 18 months.

13:28:52    10   Q.     You had another child with Brian as well, correct?

            11   A.     Correct.

            12   Q.     Who was that?

            13   A.     Charlotte Catherine Garber.

            14   Q.     And did Charlotte pass away?

13:29:00    15   A.     Yes.

            16   Q.     How did that happen?

            17   A.     She passed away from sudden infant death syndrome.

            18   Q.     And when did that happen?

            19   A.     February 20th of 2012.

13:29:10    20   Q.     How old was she when she passed?

            21   A.     Six months.

            22   Q.     We'll come back to your children in a bit, but for now

            23   I'd like to ask some questions about you.

            24          Where do you currently reside?

13:29:21    25   A.     In Lancaster, Ohio.
```

Knowlton (Direct by Greene)

377

```
         1    Q.    Is that in the Greater Columbus area?

         2    A.    Yes.

         3    Q.    And how long have you lived in that area?

         4    A.    I've lived there my whole life, except when I was

13:29:31 5    living in Mansfield.

         6    Q.    And what's your educational background?

         7    A.    I graduated from high school.

         8    Q.    In what year?

         9    A.    In 1998.

13:29:37 10   Q.    And where did you go?

        11    A.    Canal Winchester High School.

        12    Q.    Did you do any higher education?

        13    A.    I studied at Columbus State, briefly.

        14    Q.    And what did you study there?

13:29:49 15   A.    Hospitality management.

        16    Q.    You didn't finish that program, did you?

        17    A.    Correct.  No.

        18    Q.    Are you currently employed?

        19    A.    Yes, I am.

13:29:56 20   Q.    And where is that?

        21    A.    I work for the JCPenney call center.

        22    Q.    And what is your job there?

        23    A.    I'm a floor supervisor in our major appliance

        24    department.

13:30:06 25   Q.    Let's talk about your marriage to Brian.
```

Knowlton (Direct by Greene)

378

1        Now, you said you were married in April of 2010?

2   A.   Correct.

3   Q.   Over the course of your marriage, did Brian struggle

4   with mental health issues?

13:30:19   5   A.   Yes.

6   Q.   What did you understand his mental health issues to

7   be?

8   A.   Depression.  To my understanding, bipolar, and

9   anxiety.

13:30:29  10   Q.   And was he ever symptomatic in relation to those

11   mental health issues?

12   A.   Yes.

13   Q.   And on days when you observed him expressing symptoms

14   of mental illness, what did you observe in him?

13:30:43  15   A.   He would sleep a lot, or he would be hyper.

16   Q.   Did he have mood swings?

17   A.   Yes.

18   Q.   Any other symptoms you can think of?

19   A.   Not at the moment.

13:30:59  20   Q.   Was his behavior predictable when he was experiencing

21   mental health episodes?

22        MR. DOWNEY:  Objection, Your Honor.  Leading.

23        MS. GREENE:  Withdrawn.

24   BY MS. GREENE:

13:31:10  25   Q.   Is there anything else that you can tell us about

Knowlton (Direct by Greene)

379

```
            1    interacting with or observing Brian during periods of mental

            2    illness?

            3    A.    I mean, it would be difficult to communicate with him.

            4    He would shut down.

13:31:29    5    Q.    Was he like that all the time, being symptomatic of

            6    mental health issues?

            7    A.    No.  No.

            8    Q.    How often would you observe him expressing symptoms of

            9    mental illness?

13:31:42   10    A.    It would be a few times -- you know, a few times in a

           11    few months.  If something stressful happened, then he could

           12    sometimes, you know, display those behaviors.

           13    Q.    And the rest of the time, then -- you said those few

           14    times in those few months.  Outside of those periods, what

13:32:07   15    was he like?

           16    A.    Funny and caring and a great father.

           17    Q.    Okay.  So let's turn to March 16th, 2014, which was

           18    the date of his death.  And I want to start at the

           19    beginning.

13:32:20   20          Do you remember what day of the week that was?

           21    A.    Sunday.

           22    Q.    On that day, was Brian showing signs of mental

           23    illness?

           24    A.    Yes.

13:32:29   25    Q.    And what were those signs?
```

Knowlton (Direct by Greene)

380

```
               1   A.    He was sending very odd text messages.

               2   Q.    Do you remember what those texts were?

               3   A.    Threatening.

               4   Q.    What was the tone and tenor?

13:32:46       5   A.    Threatening and scary and just odd.

               6   Q.    So in relation to these text messages, did you have a

               7   reaction to them?

               8   A.    Yes.

               9   Q.    And what was your reaction?

13:33:01      10   A.    I replied in an equally mean way.

              11   Q.    And it sounds like you two were not getting along at

              12   that point?

              13   A.    Correct.

              14   Q.    So in relation to that disagreement, or that tension,

13:33:19      15   what did you do?

              16   A.    Can you ask that again?  I'm sorry.

              17   Q.    Sure.

              18         In relation to the texts, after you responded, was

              19   there any other interaction that you had with him about how

13:33:36      20   the texts were affecting you?

              21   A.    I brought up the death of our child to him.  I blamed

              22   him.  And I asked him -- well, told him that he needed to

              23   stay the night at his mother's house.

              24   Q.    So in relation to him staying the night at his

13:33:58      25   mother's house, did you do anything to facilitate that?
```

Knowlton (Direct by Greene)

381

```
           1    A.    I put some clothes together for him and his
           2    medications, and I put them out on the front porch for him
           3    to pick up.
           4    Q.    So he wasn't home when you put them on the porch?
13:34:11   5    A.    Correct.
           6    Q.    Where was he?
           7    A.    He was at work.
           8    Q.    And what medications did you put on the porch?
           9    A.    Lamictal and Zoloft.
13:34:20  10    Q.    And do you know whether he'd been taking those
          11    medications at that time?
          12    A.    To my knowledge, no.
          13    Q.    So he was off his medication?
          14    A.    Yes.
13:34:30  15    Q.    Do you know about how long he had been off his
          16    medication?
          17    A.    For the last week, maybe two.
          18    Q.    When he was on his Lamictal and Zoloft, how was his
          19    temperament?
13:34:48  20    A.    He was calm and, you know, we could speak with each
          21    other.  We could have arguments that didn't go to the extent
          22    of, like, straight-out fighting.  And he was just pleasant.
          23    Q.    Okay.  So you said he was at work.
          24          Did he come home from work at any point?
13:35:05  25    A.    Yes.
```

Knowlton (Direct by Greene)

382

```
            1   Q.    And what happened when he came home?

            2   A.    He came to the front door and was asking me to let him

            3   in, and I refused.  So that's when he got angry, and he came

            4   around to our back door and kicked it open.

13:35:23    5   Q.    Where were you when that happened?

            6   A.    I was in the bedroom with our children.

            7   Q.    And what happened after he kicked in the door?

            8   A.    He came running at me, and placed his hands at my neck

            9   and collarbone area.  I fell back, and then he went off into

13:35:45   10   the kitchen.

           11   Q.    When you fell back, where did you fall back?

           12   A.    Onto our bed.

           13   Q.    Was he strangling you?

           14   A.    I know I used that word before, but, no, he was not

13:35:57   15   squeezing my neck.

           16   Q.    His hands were in the area of your neck and

           17   collarbone, though?

           18   A.    Correct.

           19   Q.    Was he cutting off your air?

13:36:05   20   A.    No.

           21   Q.    So you said that then he went where after you fell

           22   onto the bed?

           23   A.    He went into our kitchen.

           24   Q.    And what happened there, if you know?

13:36:14   25   A.    He was in there with his mother, and they were
```

Knowlton (Direct by Greene)

383

1    arguing.  And she said, We need to call 911.

2    Q.    And so did you call 911?

3    A.    Yes, we did.

4    Q.    Who called?

13:36:27  5    A.    We called together.

6    Q.    And at the point that you made that phone call to 911,

7    what did you want to happen?

8    A.    He needed help.

9    Q.    So that was the purpose of calling 911?

13:36:42  10   A.    Yes.

11   Q.    Did you want him to go to jail?

12   A.    No, I did not.

13   Q.    Did you want him to be arrested?

14   A.    No, I did not.

13:36:48  15   Q.    Was Brian still home while you were on the phone with

16   911?

17   A.    Yes.

18   Q.    And what did you tell them on 911?

19   A.    About Brian being home or . . .

13:37:09  20   Q.    Yeah.  When you called 911, you said Connie said you

21   could call.

22          So what did you tell them when you called?

23   A.    We told them that he was acting like a nut, I believe

24   was the word, and that he needed help.

13:37:23  25   Q.    Was Brian in the house during the entire phone call

Knowlton (Direct by Greene)

384

| | |
|---|---|
| 1 | with 911? |
| 2 | A.    No. |
| 3 | Q.    So he left at some point? |
| 4 | A.    Yes. |
| 13:37:31  5 | Q.    After this alteration with Brian, did you feel that |
| 6 | you needed medical attention? |
| 7 | A.    No. |
| 8 | Q.    Did you have any injuries? |
| 9 | A.    No. |
| 13:37:39  10 | Q.    Did anyone respond to the house in relation to the 911 |
| 11 | call? |
| 12 | A.    Yes. |
| 13 | Q.    Who was that? |
| 14 | A.    Sheriff's deputies. |
| 13:37:51  15 | Q.    And do you remember how many came? |
| 16 | A.    No, I do not. |
| 17 | Q.    When they arrived at the house, what did they do? |
| 18 | A.    They asked us if we would sign a domestic violence |
| 19 | packet. |
| 13:38:04  20 | Q.    Did you ask for that packet? |
| 21 | A.    No, we did not -- or excuse me.  I did not. |
| 22 | Q.    And what did you say in response them asking you to |
| 23 | sign a packet? |
| 24 | A.    We told him -- we told them that we wanted him to get |
| 13:38:21  25 | help.  We didn't want him arrested. |

1    Q.    Did you eventually end up signing the packet?

2    A.    No.  No, we did not.

3    Q.    Are you sure about that?

4              MR. DOWNEY:  Objection.  Leading.

13:38:45  5              THE COURT:  Rephrase.

6    BY MS. GREENE:

7    Q.    Did you fill out any paperwork --

8              THE COURT:  Rephrase.

9              MS. GREENE:  I'm sorry.  Withdrawn.

13:38:48  10   BY MS. GREENE:

11   Q.    Did you fill out any paperwork?

12   A.    Yes, we did fill out paperwork.  Yes.

13   Q.    Do you know what the paperwork was?

14   A.    The paperwork was asking us to describe what was going

13:38:57  15   on.

16   Q.    Okay.  Did anyone else come to the house while this

17   interaction with the deputies was going on?

18   A.    Yes.

19   Q.    Who was that?

13:39:05  20   A.    Brian's father, Matthew Garber.

21   Q.    And when he got to the house, what did you do?

22   A.    He told us not to fill out the paperwork.  He said it

23   wasn't a good idea.

24   Q.    Why was that?

13:39:18  25   A.    He didn't want Brian to be arrested.

Knowlton (Direct by Greene)

386

1   Q.    Did you and Connie discuss with him the paperwork

2   or --

3                 MS. GREENE:  I see Mr. Downey is about to make

4   an objection.

13:39:35  5               MR. DOWNEY:  Objection.  Hearsay, Your Honor.

6                 MS. GREENE:  I'll move on.

7                 THE COURT:  Sustained.

8   BY MS. GREENE:

9   Q.    What did the police tell you about your interest in

13:39:43 10  Brian getting help?

11  A.    They told us that he would have to spend a night in

12  jail.  In order for him to get help, he'd have to be

13  arrested.

14  Q.    And they did not present the option of taking him to

13:39:55 15  the hospital?

16  A.    No, they did not.

17  Q.    Did they tell you anything about the process that

18  would follow you completing this paperwork?

19  A.    No, they did not.

13:40:06 20  Q.    During that time when you were talking with the

21  deputies, did you know whether law enforcement were looking

22  for Brian?

23  A.    Yes.

24  Q.    Did you want him to be located?

13:40:15 25  A.    Yes.

```
             1    Q.     Why?

             2    A.     I wanted him to get help.

             3    Q.     At some point, this interaction with the deputies came

             4    to a close, right?

13:40:26     5    A.     Mm-hmm.  Yes.

             6    Q.     What happened after that?

             7    A.     After they had left, Connie let me know that he was at

             8    their home, and she was going to take the children

             9    somewhere.  And then he started texting me.

13:40:44    10    Q.     What were the texts about?

            11    A.     That he was going to kill me and he had a gun.

            12    Q.     Why did you think he was texting you these messages?

            13    A.     He was in the middle of a mental health crisis.

            14    Q.     So what did you do in response to receiving these

13:41:03    15    texts?

            16    A.     I called 911.

            17    Q.     And what did you tell 911?

            18    A.     I told them that he was threatening to kill me and

            19    that he had a gun.

13:41:13    20    Q.     And why did you want them to know about these texts at

            21    911?

            22    A.     I was scared for Brian.

            23    Q.     Were you scared for anyone else?

            24    A.     No -- well, yes.  I was scared, yes.

13:41:25    25           I'm sorry.
```

Knowlton (Direct by Greene)

388

```
           1    Q.    Do you remember anything else you talked about on the

           2    phone with 911?

           3    A.    I spoke about barricading the back door that had been

           4    kicked in.

13:41:43   5    Q.    And why did you talk about that?

           6    A.    I was scared he was going to come back.

           7    Q.    So what happened next?

           8    A.    I stayed on the phone with 911, and then I heard,

           9    like, in the background of the 911 call, someone saying,

13:42:05  10    Shots fired.

          11    Q.    When you heard that, what did you make of hearing

          12    "Shots fired" over the phone?

          13    A.    That they shot Brian.

          14    Q.    And I know it's hard to describe, but if you can, in

13:42:18  15    that moment, how did you feel when you heard that?

          16    A.    Horrified.  Horrified.

          17    Q.    Before you heard that, were you are alone at the

          18    house?

          19    A.    Yes.  Yes.  Yes.  Because Connie had come to get the

13:42:49  20    children.

          21    Q.    Connie had come to the house, though, at some point

          22    while you were on that call?

          23    A.    Yes.

          24    Q.    And did you talk to her when she came?

13:42:58  25    A.    Yes.  And I told her that Brian said that he had a
```

```
         1   gun.

         2        She said, I -- she said she did not think that Brian

         3   would actually have a gun.

         4        And I also said, You're right.  He probably does not

13:43:13 5   have a gun.

         6   Q.   So you did hear "Shots fired" over the phone?

         7   A.   Yes.

         8   Q.   And then what happened after that?

         9   A.   It's hard to recall.  I do know that some of the

13:43:30 10  deputies came back to the home, to our home.

         11  Q.   And was anyone else with them when they came?

         12  A.   They brought my father-in-law, Matthew Garber.

         13  Q.   And what happened after that?

         14  A.   I know they brought a chaplain, and then that's when

13:43:52 15  they told us that Brian was dead.

         16  Q.   So that's how you found out that Brian was dead?

         17  A.   Yes.

         18  Q.   What about your children?  How did Holly find out

         19  about her father's passing?

13:44:06 20  A.   I had to tell her the next day that he was in heaven

         21  and would always be in her heart.

         22  Q.   How did she react to hearing that?

         23  A.   Well, she cried.  And I don't think it was completely

         24  understood -- she was four -- but she knew that he was gone.

13:44:32 25  Q.   What about Nicholas?  He was only 18 months old at the
```

Knowlton (Direct by Greene)

390

```
          1    time?

          2    A.    Yes.  He -- he didn't know of anything going on.

          3    Q.    Does he know now?

          4    A.    Yes.

13:44:42  5    Q.    And how do you know that he knows now?

          6    A.    He'll be looking at pictures.  He'll say, Is that my

          7    daddy?

          8          I'm, like, Yeah.  And he loved you.

          9    Q.    He never really knew his dad very well, did he?

13:44:59 10    A.    Correct.  No.

         11    Q.    So your kids have lost their father.

         12          But prior to his death, had Brian helped support the

         13    children with work over the years?

         14    A.    Yes.

13:45:08 15    Q.    And did he pursue at any point while you were married,

         16    higher education opportunities?

         17    A.    Yes.

         18    Q.    What studies did he undertake?

         19    A.    Computers.

13:45:22 20    Q.    Did he ever receive a degree?

         21    A.    Yes.

         22    Q.    I'd like to show you Plaintiff's Exhibit 39.

         23          Do you recognize this document?

         24    A.    Yes.

13:45:38 25    Q.    And what is it?
```

Knowlton (Direct by Greene)

391

1   A.    It's his diploma from DeVry University.  He had an

2   associate's degree in applied science, electronics, and

3   computer technology.

4               MS. GREENE:  Permission to publish to the

13:45:54  5   jury.

6               MR. DOWNEY:  No objections, Your Honor.

7               THE COURT:  You may publish.

8   BY MS. GREENE:

9   Q.    And how did he do at DeVry?

13:46:02 10   A.    He graduated with honors.

11   Q.    Why did Brian go into the computer science field?

12   A.    He loves math, and he always wanted to know how things

13   worked.

14               MR. GILBERT:  If we could, go to the second

13:46:17 15   page of this document to show the witness, please.

16   BY MS. GREENE:

17   Q.    Do you recognize this document?

18   A.    Yes.

19   Q.    And what is it?

13:46:30 20   A.    It looks like his grades.

21               MS. GREENE:  Permission to publish?

22               MS. WILLIAMSON:  No objection, Your Honor.

23               THE COURT:  You may publish.

24   BY MS. GREENE:

13:46:40 25   Q.    And looking at this transcript with grades, how did

Knowlton (Direct by Greene)

392

1  Brian do at DeVry?

2  A.    He had a 4.0, an A in each class.  Two classes.

3  Q.    So when Brian was in school, how did he spend his

4  out-of-class time?

13:47:00  5  A.    He was -- he took care of our children while I worked.

6  Q.    Did he spend a lot of time with them in that capacity?

7  A.    Yes.  Yes.

8  Q.    And how much time, for example, in a given week?

9  A.    I would drive from Mansfield to Columbus, and I worked

13:47:19  10  about 8:00 to 4:00.  So he'd be there in the morning to get

11  them up, and cook for them, and take care of them all day,

12  until I got home.

13  Q.    Prior to him obtaining his degree from DeVry, did

14  Brian work?

13:47:36  15  A.    Yes.

16  Q.    And what were some of his jobs?

17  A.    He worked at Bob Evans.  He worked at the Laptop Guy.

18  He also worked -- he loved skiing, so he worked at a skiing

19  resort in Mansfield.

13:47:55  20            MS. GREENE:  I'd like to show the witness

21  Plaintiff's Exhibit 40, please.

22  BY MS. GREENE:

23  Q.    Do you recognize this document?

24  A.    Yes.

13:48:09  25  Q.    What is it?

```
         1    A.    It is a paycheck stub.

         2    Q.    And --

         3              MS. GREENE:  I guess, actually, permission to

         4    publish to the jury, please.

13:48:21 5              THE COURT:  Any objections?

         6              MR. DOWNEY:  I'm still checking it out, Your

         7    Honor.

         8              THE COURT:  All right.

         9              MR. DOWNEY:  One second, here.

13:48:32 10         No objection, Your Honor.

        11              THE COURT:  You may publish.

        12    BY MS. GREENE:

        13    Q.    And so what we see here is a pay stub, you said?

        14    A.    Correct.

13:48:40 15    Q.    With a pay date of October 14th, 2011?

        16    A.    Yes.  Yes.

        17    Q.    And he was working here at which job?

        18    A.    Bob Evans.

        19    Q.    So was he a server?

13:48:58 20    A.    He was a server and a host.  He would seat customers.

        21    Q.    Okay.

        22              MS. GREENE:  And permission to show the

        23    witness the second page of this document.

        24                   (No response.)

13:49:14 25    BY MS. GREENE:
```

Knowlton (Direct by Greene)

394

1    Q.    And what's this?

2    A.    A check stub from Bob Evans.

3    Q.    And what's the pay date on this one?

4    A.    October 7th, 2011.

13:49:24  5    Q.    Okay.

6                MS. GREENE:  Show the witness page 3, please.

7    BY MS. GREENE:

8    Q.    And what's this?

9    A.    A paycheck stub at Bob Evans from October 21st, 2011.

13:49:37 10    Q.    Also from, you said, Bob Evans; is that right?

11    A.    Yes, Bob Evans.

12                MS. GREENE:  Can we look at page 4, please.

13    BY MS. GREENE:

14    Q.    And what's this document?

13:49:46 15    A.    This is a paycheck stub from Bob Evans.

16    Q.    From which pay date?

17    A.    Oh, the check date was September 30th, 2011.

18                MS. GREENE:  And can we look at page 5,

19    please.

13:50:05 20          And, actually, perhaps we can just look at page 5, 6,

21    7, 8, and 9.

22          Take a moment to look at each of those.  If you can,

23    show them to the witness, please.

24    BY MS. GREENE:

13:50:27 25    Q.    And so what are these documents?

```
          1    A.      Paycheck stubs.

          2    Q.      All from Bob Evans?

          3    A.      Yes.

          4    Q.      So he was definitely working while he was in school,

13:50:35  5    and taking care of the kids, right?

          6    A.      Yes.

          7                    MR. DOWNEY:  Objection.  Leading.

          8                    MS. GREENE:  Withdrawn.

          9                    THE COURT:  Sustained.

13:50:43 10    BY MS. GREENE:

         11    Q.      I'd like to show you -- or excuse me.

         12            You mentioned also that Brian worked at a place called

         13    the Laptop Guy?

         14    A.      Yes.

13:50:53 15                    MS. GREENE:  I'd like to show the witness

         16    Plaintiff's Exhibit 41.

         17    BY MS. GREENE:

         18    Q.      And what is this document?

         19    A.      It is a W-2.

13:51:05 20    Q.      For what job?

         21    A.      The Laptop Guy.

         22    Q.      From which year?

         23            If you look at the top there.

         24    A.      It's hard to read.

13:51:29 25    Q.      If you look at the very top of the document, I think
```

Knowlton (Direct by Greene)

396

```
             1    you'll see it there.

             2         I can mark it for you.

             3    A.   I can't really read it.  I'm sorry.

             4    Q.   That's all right.

13:51:41     5         Well, I think if I circle this --

             6    A.   Is it 2012?

             7    Q.   Yes.  If you see that there.

             8    A.   I'm sorry.

             9    Q.   That's all right.

13:51:49    10         And let's flip to the third page of this document,

            11    please.

            12         And what do we have here?

            13    A.   A paycheck stub.

            14    Q.   And for which job?

13:52:02    15    A.   The Laptop Guy.

            16              MS. GREENE:  Permission to publish, please.

            17              MR. DOWNEY:  No objection, Your Honor.

            18              THE COURT:  You may publish.

            19    BY MS. GREENE:

13:52:11    20    Q.   And so here, this is a paycheck stub for what pay

            21    date?

            22    A.   It is February 1st, 2012.

            23    Q.   And his net pay for that date was how much?

            24    A.   $598.20.

13:52:39    25    Q.   Okay.  And that was a job he held while he was in
```

```
           1    school?

           2    A.     Yes.

           3    Q.     Okay.

           4               MS. GREENE:  You can take that down.

13:52:50   5         Thank you.

           6    BY MS. GREENE:

           7    Q.     So following Brian's graduation from DeVry, did he

           8    start working in the field of computer technology?

           9    A.     Yes.

13:52:59  10    Q.     And where was that?

          11    A.     Oops Repair at the Richland Mall.

          12    Q.     And what was that job?

          13    A.     He would repair cell phones.

          14    Q.     Did he have this job at the time of his passing?

13:53:10  15    A.     Yes.

          16    Q.     Did he enjoy the job?

          17    A.     Yes.

          18    Q.     Besides working outside the home, you said that Brian

          19    spent a lot of time with the kids?

13:53:20  20    A.     Yes.

          21    Q.     Can you tell us about Brian as a father.

          22    A.     He was always ready to say, I love you.  To hold our

          23    children.  Get up with them in the night.  We would make up

          24    silly songs together.  And just he was really happy whenever

13:53:41  25    he was with them.
```

Knowlton (Direct by Greene)

398

1    Q.    Did he have a close relationship with the kids?

2    A.    Yes.

3    Q.    Did he love his children?

4    A.    Yes.

13:53:49 5    Q.    Did they love him?

6    A.    Yes.

7    Q.    What types of memories do you have of Brian with his

8    children when they were little babies?

9    A.    He was always holding them.  He would get up in the

13:54:05 10   night to feed -- to feed Holly.  He was -- would read books

11   to them, watch sports.

12   Q.    So for everyday kind of memories, you just mentioned

13   watching sports.

14         Tell me what kind of memories you have about Brian

13:54:32 15   with his kids in that regard.

16   A.    Brian would always want to watch the Cleveland

17   Cavaliers, and I remember he and Nick wearing sports attire

18   together to watch a game.

19   Q.    And that was when Nick was a baby?

13:54:47 20   A.    Maybe almost a year.

21   Q.    And what about Holly?

22         What memories do you have of Brian with Holly on an

23   everyday basis?

24   A.    She always wanted her daddy, and to know where her

13:55:01 25   daddy was.  And they would read together.  They would watch

Knowlton (Direct by Greene)

```
        1    Peppa Pig.  He would always rock her to sleep.  He was just
        2    always there for them.
        3    Q.    What about holidays?
        4          Do you have any memories of holidays with Brian and
13:55:20 5    the kids?
        6    A.    Every Halloween we would go to my grandmother's
        7    assisted living facility where the kids would trick or treat
        8    to each apartment.
        9          Brian would always be a zombie, and it was so funny.
13:55:37 10   But he did it so well, it started to get a little scary.
       11    Q.    And he did that, you said, on Halloween, during
       12    trick-or-treating with kids?
       13    A.    Yes.
       14    Q.    What about in the summertime?
13:55:49 15        Do you have any holiday-related memories from that
       16    period?
       17    A.    Every Fourth of July his family would have a cookout
       18    and fireworks, so we would always be there swimming, eating,
       19    getting excited to watch the fireworks.  And he always would
13:56:10 20   hold Holly, hold her up so she could see the fireworks.
       21    Q.    And what about in the wintertime, holiday memories?
       22    A.    Well, every Christmas Eve we would go to his parents'
       23    home and open gifts.  It was their tradition.  We -- we
       24    would read the Elf on the Shelf, and hide our elf that we
13:56:38 25   named Elvin.  And we would stay up all night on Christmas
```

1    Eve putting together Holly's gifts, just so we could see how

2    excited she was in the morning.

3    Q.    So turning back to this case.

4          You recently stepped down as the administrator for

13:56:56 5    Brian's estate, right?

6    A.    Yes.

7    Q.    Why was that?

8    A.    I haven't been emotionally ready, and I wanted this to

9    be done in the correct way, and, you know, seriously, with

13:57:09 10   someone who -- who knows, you know, to be the administrator

11   of the estate.

12   Q.    Someone with experience?

13   A.    Yes.

14   Q.    And what do you hope this trial accomplishes?

13:57:22 15   A.    I do not want a dime for myself.

16         I want my children to be taken care of, and I want

17   them to know that I fought for their father.

18              MS. GREENE:  No further questions.

19              THE COURT:  Cross-examination?

13:57:42 20              MR. DOWNEY:  Thank you, Your Honor.

21         CROSS-EXAMINATION OF SARA CORDRAY KNOWLTON

22   BY MR. DOWNEY:

23   Q.    Good afternoon, Ms. Knowlton.

24         I'm Dan Downey, as you know.  We've met previously.

13:58:16 25         I am sorry for your loss.

|  |  |
|---|---|
| 1 | A.    Thank you. |
| 2 | Q.    And I'd like to begin this afternoon with just some |
| 3 | questions about what happened on March 16th, 2014, in the |
| 4 | time surrounding that date. |
| 13:58:28  5 | A.    Okay. |
| 6 | Q.    When you talked to the ladies and gentlemen of the |
| 7 | jury earlier, you noted that there had been some -- maybe |
| 8 | some mean-spirited texts back and forth between you and |
| 9 | Brian that day; is that correct? |
| 13:58:41 10 | A.    Yes.  Yes. |
| 11 | Q.    Did you accuse Brian of killing Charlotte that day? |
| 12 | A.    Yes, I did. |
| 13 | Q.    Did you regret that? |
| 14 | A.    Yes. |
| 13:58:48 15 | Q.    And you know that Brian was with Charlotte when she |
| 16 | passed, correct? |
| 17 | A.    Yes. |
| 18 | Q.    They were sleeping together? |
| 19 | A.    Yes. |
| 13:58:55 20 | Q.    And didn't he attempt suicide three days after |
| 21 | Charlotte passed away? |
| 22 | A.    Yes. |
| 23 | Q.    And did it strike you that he related the loss of |
| 24 | Charlotte to committing suicide? |
| 13:59:10 25 | A.    Did you ask me if it stressed me or -- |

```
 1   Q.    No.  I'm asking about -- you observed that he actually
 2   attempted suicide shortly after Charlotte passed away,
 3   correct?
 4   A.    Yes.
 5   Q.    And then you accused him of killing Charlotte
 6   approximately 24 hours before he passed away in this
 7   shooting, correct?
 8   A.    Correct.
 9   Q.    Okay.  There were other times that Brian had attempted
10   suicide in the past, correct?
11   A.    Yes.
12   Q.    In fact, he had attempted to take pills approximately
13   a year earlier; is that right?
14   A.    Yes.
15   Q.    And that was over at Matt and Connie's house, correct?
16   A.    Yes.
17   Q.    The house was across the street?
18   A.    Yes.
19   Q.    And I know you talked a little bit about Brian's
20   employment, but his employment was kind of spotty, wasn't
21   it?
22   A.    Yes.
23   Q.    And you folks weren't paying rent to Matt and Connie
24   to live in the house down there, right?
25   A.    No, we were not.
```

1    Q.    And he was working about, I don't know, 30 hours a

2    week at Oops at the time that he passed away?

3    A.    I don't know exactly the hours that he was working.

4    Q.    If you told me that in your deposition, would you

14:00:20  5    disagree with it now?

6    A.    No.

7    Q.    About 110 bucks a week?

8    A.    If that's -- yes.

9    Q.    And it wasn't enough for you folks to make ends meet,

14:00:27  10    correct?

11    A.    Correct.

12    Q.    Now, he worked at Oops the day of the incident, on

13    March 16th, correct?

14    A.    Yes.

14:00:32  15    Q.    And just so the ladies and gentlemen of the jury fully

16    understand your testimony, were you concerned or afraid that

17    Brian Garber was going to kill you on March 16th, 2014?

18    A.    Yes.

19    Q.    Okay.  And you had that legitimate belief, didn't you?

14:00:52  20    A.    Yes.  I was scared.

21    Q.    And in the past, I know you testified that when he

22    took his medication at times that, you know, he could be a

23    good, normal person to live with; but when he wasn't taking

24    his medications, he wasn't, right?

14:01:07  25    A.    Yes.

```
            1    Q.    And you knew he hadn't been taking his medications for

            2    approximately two weeks prior to March 16th?

            3    A.    Yes.

            4    Q.    And you still engaged in some mean-spirited texting

14:01:19    5    with him, correct?

            6    A.    Yes.

            7    Q.    And after Brian had left, and after Connie had taken

            8    the children from your house that night, you received other

            9    texts from Brian Garber, correct?

14:01:29   10    A.    Yes.

           11    Q.    And he threatened to kill you in those texts?

           12    A.    Yes.

           13    Q.    And he said words to the effect of, you know, I don't

           14    care.  I'll get out of jail, and when I do, I'm going to

14:01:38   15    kill you?

           16    A.    If -- I don't recall exactly.  But, yes, if that's in

           17    my texts, then, yes.

           18    Q.    And you were scared enough that you were attempting to

           19    move a washing machine to block the back door of the house,

14:01:52   20    correct?

           21    A.    Yes.

           22    Q.    Okay.  Now, Brian's past had also included some

           23    violence against you prior to March 16th, 2014, correct?

           24                    MS. GREENE:  Objection.

14:02:06   25                    THE COURT:  Overruled.
```

1          THE WITNESS:  "Violence," as in . . .

2     BY MR. DOWNEY:

3     Q.    There have been other domestic incidents in the past

4     where you filled out a packet back in 2012, correct?

14:02:18  5     A.    Yes.

6     Q.    Okay.  And there had been times over the years where

7     you and Brian had both threatened each other with divorce?

8     A.    Yes.

9     Q.    You, yourself, at the time that Nicholas was born, you

14:02:30 10     had been engaged in relations with a gentlemen name Carlo as

11     well as with Brian Garber, correct?

12          MS. GREENE:  Objection.

13          THE COURT:  Overruled.

14          THE WITNESS:  Yes.

14:02:40 15     BY MR. DOWNEY:

16     Q.    And at the time that Brian passed, you had been

17     engaged in a sexual relationship with a gentleman named

18     Grant, correct?

19     A.    Yes.  I had an affair, yes.

14:02:48 20     Q.    And, in fact, Grant actually came to the house the

21     night that Brian passed away?

22     A.    He came to the house, yes.

23     Q.    And he comforted you?

24     A.    He was also there -- he and Brian knew each other.

14:03:01 25     You know, I worked with him.  He was devastated.

1    Q.    He came to comfort you as well?

2    A.    Yes.

3    Q.    Okay.  Now, were there ever periods of time where

4    Brian actually maintained treatment with a healthcare

14:03:21  5    practitioner?

6    A.    Yes.  He saw the same doctor.

7    Q.    Now, you and Brian had, at times in the past, done

8    street drugs together, correct?

9    A.    Yes.

14:03:31  10    Q.    You've done marijuana and cocaine together?

11    A.    Yes.

12    Q.    Brian had actually stolen some of the medication that

13    had been prescribed to you in the past, correct?

14    A.    Yes.

14:03:41  15    Q.    In fact, he took your Vicodin?

16    A.    Yes.

17    Q.    And that troubled you greatly?

18    A.    Yes.

19    Q.    Now, I think you also told me in your deposition that

14:03:50  20    you were very concerned about the dynamic between Brian and

21    his mother?

22    A.    Yes.

23    Q.    Can you tell the ladies and gentlemen of the jury why

24    that concerned you so much.

14:04:00  25    A.    I felt that she was into our marriage more than she

                1    should have been.

                2    Q.    And so that created conflict between the three of you,

                3    correct?

                4    A.    Yes.

    14:04:12    5    Q.    Now, you called 911, along with Connie Garber, because

                6    Brian was acting nuts, but also because you folks were

                7    afraid that he was going to hurt you, correct?

                8    A.    Yes.

                9    Q.    Okay.  And Brian left, for whatever reason, while you

    14:04:32   10    were on the phone with 911?

               11    A.    Yes.

               12    Q.    Okay.  And you were not present at 3400 Mill Run Road

               13    at the time that the officers interacted with Brian Garber,

               14    correct?

    14:04:44   15    A.    No, I was not.

               16    Q.    And you did tell the ladies and gentlemen of the jury

               17    that you spoke to Connie Garber at some point prior to the

               18    shooting, when she had your kids, but -- and prior to when

               19    you called 911 the second time; is that right?

    14:05:00   20    A.    Yes.

               21    Q.    Now, Connie Garber, didn't she, in fact, tell you

               22    that, Brian says he has a gun, but I don't believe it?

               23    A.    I don't know if she said, Brian says he has a gun.

               24    But she said she didn't believe he had a gun.

    14:05:15   25    Q.    Okay.  But why did the "gun" come out of her mouth at

```
         1    all?
         2    A.    Oh, I told her about the texts.
         3    Q.    Okay.  Did she tell you about anything that she and
         4    Matt observed in Brian's childhood room prior to coming to
14:05:30 5    your house?
         6              MR. GILBERT:  That's hearsay, Judge.
         7              MR. DOWNEY:  I'm not asking what she said.
         8    I'm just asking if she said anything.
         9              MR. GILBERT:  Objection.
14:05:39 10             MR. DOWNEY:  I think it's Ms. Greene's
        11    witness.
        12             THE COURT:  All right.  All right.
        13             MR. GILBERT:  Well, we're both the lawyers.
        14    Okay?
14:05:45 15            THE COURT:  Admitted that the statement was
        16    made, but not for the truth of the matter asserted.  Limited
        17    purpose.
        18             THE WITNESS:  Can you ask me, again?
        19             MR. DOWNEY:  I'm going to ask the court
14:05:53 20   reporter to read it back.
        21             THE WITNESS:  Okay.
        22             MR. DOWNEY:  Thank you.
        23             (Record read.)
        24             THE WITNESS:  I don't remember.
14:06:29 25            MR. DOWNEY:  I'm just going to take one
```

1    minute, Your Honor.

2    BY MR. DOWNEY:

3    Q.    And just to clarify for the ladies and gentlemen of

4    the jury, Ms. Knowlton, you had plans, at some point, to

14:07:00  5    move out, up to Cleveland; is that right?

6    A.    Yes.

7    Q.    And Brian still hadn't found what he was hoping would

8    be his permanent position, correct?

9    A.    Correct.

14:07:10  10    Q.    Okay.  And, in fact, would it be fair to say he had

11    never earned more than $10,000 in a year when he lived with

12    you?

13    A.    I can't answer that.

14    Q.    Do you even know?

14:07:22  15    A.    No.

16    Q.    Were you employed in 2012, at the time of the

17    incident?

18    A.    2012.

19                MR. GILBERT:  Objection.

14:07:32  20         You mean 2013.

21                MR. DOWNEY:  I'm sorry.  2014.

22         We're both wrong.

23                THE WITNESS:  Yes.

24    BY MR. DOWNEY:

14:07:36  25    Q.    Where were you employed?

```
            1    A.     I worked for iQor.

            2    Q.     Were you also -- strike that.

            3                  MR. DOWNEY:  I have no additional questions,

            4    Your Honor.

14:07:48    5                  THE COURT:  Redirect?

            6                  MS. GREENE:  Yes, Your Honor.

            7            REDIRECT EXAMINATION OF SARA CORDRAY KNOWLTON

            8    BY MS. GREENE:

            9    Q.     Ms. Knowlton, did any of the things Mr. Downey just

14:08:04   10    asked you to admit about the course of your marriage with

           11    Brian have anything to do with why the deputy sheriff shot

           12    and killed him?

           13                  MR. DOWNEY:  Objection.

           14                  THE WITNESS:  No.

14:08:15   15                  MR. DOWNEY:  Objection.

           16                  THE COURT:  Overruled.

           17    BY MS. GREENE:

           18    Q.     Was your marriage perfect?

           19    A.     No.

14:08:20   20    Q.     Are you perfect?

           21    A.     No.

           22    Q.     What did you want for Brian when you called 911 on

           23    March 16th, 2014?

           24    A.     I wanted to get him help.

14:08:27   25    Q.     And why are you here to testify today?
```

```
            1    A.     I'm here today to fight for Brian and for my children.

            2                 MS. GREENE:  Thank you.

            3           No further questions.

            4                 THE COURT:  Thank you for your testimony,

14:08:40    5    Ms. Knowlton.

            6                 THE WITNESS:  Thank you, Your Honor.

            7                 MR. GILBERT:  Our next witness is parking

            8    right now.

            9                 THE COURT:  All right.  Well, what time are we

14:09:01   10    at?

           11           We're at 2:08.

           12                 DEPUTY CLERK:  2:08.

           13                 THE COURT:  2:08?

           14           All right.  We'll give our 15-minute break, and give

14:09:09   15    your witness an opportunity to arrive.

           16           So we will be in recess until 2:30.

           17                 DEPUTY CLERK:  All rise.

           18                            - - -

           19                 (The jury exited the courtroom.)

14:09:17   20                 (Proceedings in recess at 2:09 p.m. )

           21                            - - -

           22                 THE COURT:  We are in recess until 2:30.

           23                 DEPUTY CLERK:  All rise.

           24

           25
```

                              - - -

          1

          2           (Proceedings reconvened at 2:36 p.m. )

          3             (In Open Court - Jurors Not Present)

          4                   (Defendant Present)

14:36:34  5                              - - -

          6           THE COURT:  I understand counsel have several

          7   matters to discuss before we bring the jury in.

          8           MR. GILBERT:  I don't know about several, but

          9   I --

14:36:41 10           THE COURT:  Well, who wants to go first?

         11           MR. GILBERT:  I'll go first.

         12           THE COURT:  Okay.

         13           MR. GILBERT:  All right.

         14       So during the course of the cross-examination of

14:36:49 15   Sara Knowlton, I raised some objections.

         16       My concern was that Mr. Downey was bringing up a lot

         17   of background and prior history that was not part of the

         18   motion in limine order, because we were under the impression

         19   that only information that the deputies knew at the time --

14:37:20 20           THE COURT:  Well, this goes to damages.  This

         21   goes to credibility, not to -- not to liability.

         22           MR. GILBERT:  Well, the order didn't specify

         23   that.

         24           THE COURT:  Right.  But I believe she takes

14:37:34 25   the stand, and her credibility and the damages she's seeking

1    are at issue.

2        So, therefore, the --

3            MR. GILBERT:  But she indicated that she was

4    not seeking damages.

14:37:43  5            THE COURT:  I mean, for herself.  That's

6    right.  I understand that.

7            MR. GILBERT:  So bringing in domestic violence

8    incidents, criminal incidents, extramarital affairs has

9    nothing to do with the liability in this case.

14:37:58 10        We would like a cautionary instruction.

11            THE COURT:  I will give a cautionary

12    instruction.

13            MR. DOWNEY:  If I may, Your Honor.

14            THE COURT:  Mr. Downey.

14:38:06 15            MR. DOWNEY:  You thought I might have

16    something to say, right?

17        Thank you, Your Honor.

18        Just about what Mr. Gilbert just said, from our

19    perspective, plaintiff, in their case in chief, indicated

14:38:16 20    that Brian Garber basically had a bad day on

21    March 16th, 2014, but that wasn't the way he was normally.

22        And, you know, we also think that other incidents from

23    the past would come in as a result of that, with that door

24    being opened by indicating that this was out of the ordinary

14:38:34 25    for him that day.  So past bad acts would come in through

1    that.

2         We also feel that, you know, Ms. Knowlton, you know,

3    that some of the incidents and issues that she observed with

4    him over the years is certainly fair game from a damages

14:38:47  5    perspective, and we would argue that there should not be a

6    limiting instruction with respect to that.

7         And at the very least, we would want to see what the

8    Court comes up with.

9              THE COURT:  All right.  Well, we'll see what

14:38:59  10    the Court comes up with.

11         But that's my ruling.  I will give a limiting

12    instruction and I'll work on it and I'll share it with you

13    before I give it.

14              MR. DOWNEY:  Thank you, Your Honor.

14:39:10  15              THE COURT:  All right.  I also heard some

16    possible concern about how we're going to proceed should you

17    close your case today?

18         Do you think you're going to do that?

19              MR. GILBERT:  It's possible.

14:39:23  20              THE COURT:  All right.  If we do, and there's

21    some time left over, then the next step is to go over

22    exhibits that you're going to be offering into evidence.

23              MR. GILBERT:  Right.

24              THE COURT:  And so that's what we do, and I

14:39:36  25    would not expect you to start your case today.

Couch-Page (Direct by Greene)

415

                    1       MR. DOWNEY:  Thank you, Your Honor.

                    2       THE COURT:  All right?  Does that alleviate

                    3   everybody's concerns and address their questions?

                    4             (No response.)

14:39:46    5       THE COURT:  Very well.  I'm not going to make

                    6   the same mistake twice.

                    7        Mr. DeVan, bring in the jury.

                    8       DEPUTY CLERK:  All rise for the jury.

                    9             (The jury entered the courtroom.)

14:41:20   10       DEPUTY CLERK:  Please be seated.

                   11       THE COURT:  Plaintiff, your next witness,

                   12   please.

                   13       MS. GREENE:  The plaintiff calls

                   14   Bambi Couch-Page.

14:41:50   15       DEPUTY CLERK:  Please raise your right hand.

                   16        Do you solemnly swear that your testimony in this case

                   17   will be the truth, the whole truth, and nothing but the

                   18   truth, so help you God?

                   19       THE WITNESS:  I do.

14:41:54   20        DIRECT EXAMINATION OF BAMBI COUCH-PAGE

                   21   BY MS. GREENE:

                   22   Q.   Good afternoon, Miss Couch-Page.

                   23        Can you please state your name for the record.

                   24   A.   Bambi Couch-Page.

14:42:38   25   Q.   Are you currently employed?

```
            1    A.    Yes.

            2    Q.    Where?

            3    A.    Huron County Prosecutor's Office.

            4    Q.    And what's your title there?

14:42:44    5    A.    I'm an assistant prosecutor.

            6    Q.    And before that position, what position did you hold?

            7    A.    I was the Richland County prosecutor.

            8    Q.    And on March 16th, 2014, what was your title?

            9    A.    I was the first assistant prosecutor in

14:42:59   10    Richland County.

           11    Q.    In March 2014, how long had you been the first

           12    assistant prosecutor?

           13    A.    Probably less than a year.  I don't remember exactly

           14    when I got that title.

14:43:13   15    Q.    Before you were first assistant, what was your job?

           16    A.    I was an assistant prosecutor in the prosecutor's

           17    office in Richland County.

           18    Q.    And how long did you hold that position?

           19    A.    I had held that position probably 13 or 14 years

14:43:26   20    before I became the first assistant.

           21    Q.    Can you please briefly describe for us the duties of

           22    the first assistant prosecutor.

           23    A.    You are responsible for the entire trial staff and

           24    civil division of the office.

14:43:43   25          You are the person that's directly under the
```

1    prosecutor.  So you basically manage the office.  He is also

2    managing.  Jim Mayer was the prosecutor.  He managed the

3    office as well.

4        When he wasn't there, I did -- I ran the office.  I

5    made sure that there was staffing.  I was responsible for

6    assisting in hiring and raises and all sorts of

7    administrative duties within the office as first assistant.

8    Q.    As part of your duties in that role, did you ever go

9    to crime scenes?

10   A.    Yes.

11   Q.    And in your capacity as first assistant prosecutor, do

12   you recall responding to a crime scene regarding an

13   officer-involved shooting on March 16th, 2014?

14   A.    Yes.

15   Q.    Where was that scene located?

16   A.    It was on Mill Run Road in Lexington, Ohio.

17   Q.    Was that a residential address?

18   A.    Yes.

19   Q.    Do you know who the officers were who were involved in

20   that shooting?

21   A.    As far as the officers who actually were the ones that

22   fired shots, or --

23   Q.    Yes.

24   A.    It was Deputy Knee.  I don't remember if he had

25   a -- he was a deputy or a sergeant at the time --

1    Jimmy Nicholson, and Deputy Frazier, Jeff Frazier.

2    Q.    When you arrived at that house, did you see those

3    three officers together in the kitchen area?

4    A.    Yes.

14:45:09 5    Q.    Do you recall where the shooting took place on that

6    property?

7    A.    It was in a bedroom on the second floor.

8    Q.    And did you go view that bedroom?

9    A.    Yes, I did.

14:45:19 10    Q.    Did anyone accompany you to that room?

11    A.    To my recollection, it was Lieutenant Zehner of the

12    sheriff's department.

13    Q.    And when he accompanied you there, did you look into

14    the room when you arrived?

14:45:37 15    A.    Yes.

16    Q.    And what did you see?

17    A.    I saw Brian Garber seated on the bed, leaning

18    backwards against the headboard.  He was obviously deceased.

19    He had a beer can between his legs, and there were other

14:45:54 20    items on the bed.

21    Q.    What other items?

22    A.    There was a remote control of some type on the bed.

23    Q.    Did Lieutenant Zehner facilitate your viewing of this

24    scene in any way?

14:46:08 25    A.    He flashed a flashlight around the room.

1    Q.    Did he shine that flashlight on the remote control?

2    A.    Yes, he did.

3    Q.    How long were you upstairs viewing the bedroom?

4    A.    Based upon what was indicated from the log, about four

14:46:26  5    minutes.

6                    MS. GREENE:  Just one moment, please.

7    BY MS. GREENE:

8    Q.    When you viewed Brian Garber's body, do you recall

9    whether there were electrodes on his limbs at the time?

14:46:51  10    A.    I believe there were.

11                    MS. GREENE:  No further questions.

12              Thank you.

13                    MR. DOWNEY:  No questions, Your Honor.

14                    THE COURT:  No questions.

14:46:56  15              Thank you for your testimony.  You may step down.

16                    THE WITNESS:  Thank you.

17                    MR. DOUGLAS:  Plaintiffs call Connie Garber.

18                    DEPUTY CLERK:  Please raise your right hand.

19              Do you solemnly swear that your testimony in this case

14:47:38  20    will be the truth, the whole truth, and nothing but the

21    truth, so help you God?

22                    THE WITNESS:  Yes, I do.

23                    DEPUTY CLERK:  Please be seated.

24

25

```
 1              DIRECT EXAMINATION OF CONNIE S. GARBER
 2     BY MR. DOUGLAS:
 3     Q.    Good afternoon.
 4     A.    Good afternoon.
 5     Q.    Please state your name for the record.
 6     A.    Connie Sue Garber.
 7     Q.    And, Mrs. Garber, how are you related to Brian Garber?
 8     A.    His mother.
 9     Q.    Do you have any other children?
10     A.    No.
11     Q.    Is Brian your only child?
12     A.    Yes.
13     Q.    And where do you currently reside?
14     A.    3400 Mill Run Road in Lexington.
15     Q.    How long have you lived at that residence?
16     A.    25 years.
17     Q.    Is that the home that Brian grew up in?
18     A.    Yes.  Since he was 10.
19     Q.    Okay.  And who do you currently live there with?
20     A.    My husband.
21     Q.    Okay.  And are you currently employed?
22     A.    No, I'm not.  I'm retired.
23     Q.    Okay.  When was the last time you were employed?
24     A.    I was employed about four or five years ago at
25     American Health Network.  I was a secretary.
```

Couch-Page (Direct by Greene)

421

```
            1    Q.    Okay.  And your reason for leaving?

            2    A.    I couldn't function after the death of my son.  It was

            3    just very hard for me to function.

            4    Q.    Let's talk a little bit about Brian.

14:49:33    5          Can you describe him growing up.

            6    A.    Yeah.  He was a very good kid.  He was an intelligent

            7    kid.  He was just happy-go-lucky, easy going.

            8    Q.    Can you give us any of his hobbies or interests?

            9    A.    At a younger age, he loved taking things apart.  We

14:49:54   10    gave him an old VCR once, and it was like a toy to him.  He

           11    wanted to take it apart to see how it worked.

           12          And as he went through high school, he loved to ski.

           13    Q.    Where did Brian go to high school?

           14    A.    Lexington High School.

14:50:11   15    Q.    And at Lexington High School, was he involved in any

           16    school activities, sports, academics?

           17    A.    Yes.  He ran track and he ran cross country.

           18    Q.    How many years did he do that?

           19    A.    From the freshman year to the senior.

14:50:23   20    Q.    And what type of student was Brian?

           21    A.    Pardon me?

           22    Q.    What type of student was Brian?

           23    A.    Very good.  He made very good grades.

           24    Q.    And did he eventually graduate from high school?

14:50:34   25    A.    Yes, he did.
```

Couch-Page (Direct by Greene)
422

1    Q.    What did he do after graduating from high school?

2    A.    He worked a few odd jobs, Bob Evans, Grinders.  And as

3    he was going to school, Laptop Guy, Snow Trails.

4    Q.    Okay.  Did he eventually seek higher education?

14:50:52  5    A.    Yes.  He went to college.

6    Q.    What college did he go to?

7    A.    In the beginning, he went to Columbus State and took

8    accounting.

9    Q.    Okay.  You said "In the beginning."

14:51:03 10         What does that mean?

11   A.    He changed his major.

12   Q.    To what?

13   A.    To computer science at DeVry.

14   Q.    At DeVry.

14:51:12 15         And did he ever receive a degree?

16   A.    Yes, he did.  He graduated with honors.

17   Q.    And what was his degree in?

18   A.    In computer science.

19   Q.    Okay.  And why did he switch from accounting to

14:51:24 20   computer science?

21   A.    Because his passion was computers, seeing how they

22   worked, what made them work.  Computers, phones, tablets,

23   that was his passion.

24   Q.    Now, earlier you mentioned some jobs that Brian had.

14:51:43 25   A.    Yes.

```
         1   Q.    Following graduation, did he ever enter the field for
         2   which he graduated from DeVry from?
         3   A.    Pardon me?
         4   Q.    You mentioned some jobs earlier that Brian held during
14:51:54 5   his life.
         6   A.    Yes.
         7   Q.    Following his graduation from DeVry, did he ever enter
         8   the computer science field in a job capacity?
         9   A.    Yes.  He received a job at Oops in Mansfield, which
14:52:06 10  they fix -- they repaired tablets and phones and computers.
        11   Q.    Okay.  And is that where he worked at the time he
        12   passed away?
        13   A.    Yes.
        14   Q.    Okay.  And of all the jobs you listed earlier, which
14:52:17 15  was his favorite job?
        16   A.    Oops.  He loved it.
        17   Q.    Was Brian married?
        18   A.    Yes.
        19   Q.    To whom?
14:52:23 20  A.    Sara Knowlton.
        21   Q.    And if you know, how did they meet?
        22   A.    He went to a birthday party of a coworker, a friend of
        23   his, and she was there.
        24   Q.    Okay.  And when did they eventually get married?
14:52:36 25  A.    April 2010.
```

Couch-Page (Direct by Greene)

424

```
         1    Q.    And did they have children together?

         2    A.    Yes.

         3    Q.    How many?

         4    A.    Three.

14:52:43 5    Q.    And what are their ages?

         6    A.    Holly is 8.  Nicholas is 5.  Charlotte passed away

         7    when she was an infant of SIDS.

         8    Q.    And where did you live -- at the time of the incident,

         9    where did you live in relation to Brian, Sara, Holly and

14:53:03 10   Nicholas?

         11   A.    Directly across the street.

         12   Q.    And how often did you see Brian with his children?

         13   A.    Pretty much daily.

         14   Q.    How did he appear when he was with his children?

14:53:12 15   A.    Oh, he was his happiest.  He loved his children.  He

         16   always had a smile on his face.  That was when he was his

         17   happiest.

         18   Q.    What were some of Brian's favorite things to do with

         19   his children?

14:53:26 20   A.    He loved taking Holly to the park to feed ducks, to

         21   look at flowers, to watch fireworks.  Read to her.

         22         Nicholas, he was very attentive.  Would play tummy

         23   time with him.  Puppets.  He did puppets with him.

         24   Q.    Did Brian spend a lot of time with his kids?

14:53:49 25   A.    Yes.
```

1    Q.    Can you give us an example?

2    A.    Well, he was a stay-at-home dad while he was going to

3    college, and he did spend a lot of time at home with them.

4    And I complimented him what a great father i thought he had

14:54:06  5    turned out to be.

6          And his response was, I enjoy spending every moment

7    with my children.

8    Q.    And what about Holly and Nicholas?

9          How did they appear when they were with Brian?

14:54:15 10    A.    Oh, they loved them.  Holly was a daddy's girl.  Her

11    daddy was everything.  She always wanted her daddy.

12          And Nicholas, he would always reach for him.  Always.

13    When he'd walk in a room and notice his voice, he would

14    reach for him.

14:54:33 15          They loved him.

16    Q.    How would you describe Brian as a father?

17    A.    Very good.  He was very tentative.  He did everything

18    he needed to do for them, and he was very happy with them.

19    Q.    Mrs. Garber, I'd like to take you back to March 16th

14:54:49 20    of 2014.

21          Can you describe your day for me starting at around

22    lunchtime.

23    A.    My husband and I took our granddaughter out to eat,

24    and Brian had texted me.  He was at work at Oops.  He texted

14:55:00 25    me and said, Could you bring me something to eat for lunch?

1       And I said, Yes.  What do you want?

2       Took him his lunch.  Dropped it off, and then we went

3   home.

4   Q.    Okay.  And when you took Brian lunch, how was he

5   acting?

6   A.    He acted okay.  He was very busy.  He had customers.

7   Q.    Okay.  After you came home from dropping lunch off,

8   explain to me what happened next.

9   A.    I turned around, and I had to go pick him up after

10  work.  That was probably around 6:00.

11  Q.    And when you picked him up from work, where were you

12  headed?

13  A.    To take him home.

14  Q.    And how was he acting at that time?

15  A.    He was upset.  He wasn't himself.  He just didn't seem

16  himself.

17  Q.    When you say "upset," can you elaborate.

18  A.    He just -- I could tell something was wrong.  I don't

19  know what it was.  I could just tell something was wrong.

20  Q.    Did you attempt to talk to him about why he was upset?

21  A.    Yes, I did.  He said that he was in an argument with

22  his wife.  And I felt that it would be better for him to

23  spend the night at our home until everything calmed down.

24  Q.    Okay.  And describe what happened when you got back to

25  Brian's home.

1    A.    Well, we went there.  He was going to pick up his

2    pajamas and toothbrush.  And he spoke to Sara and said --

3    through the window, and he said he wanted to talk to see if

4    they could work things out.

14:56:27   5    Q.    And what happened when he spoke to Sara through the

6    window?

7    A.    She didn't want to talk to him.

8    Q.    And what did you see from Brian when -- during that

9    conversation?

14:56:36  10    A.    At that time, he became angry because she didn't want

11   to talk to him.

12   Q.    Okay.  And what did Brian do next?

13   A.    He went around to the back door to see if it was

14   unlocked.  And then it wasn't, so he kicked it in.

14:56:49  15    Q.    And what happened next?

16   A.    And as soon as we went in the back door, Sara was

17   standing there, and he pushed her back on the bad and was

18   holding her down because he wanted to talk to her.

19   Q.    And where were you at this time?

14:57:03  20    A.    I was in that room at that time.

21   Q.    And when you say he was "holding her," where were his

22   hands on Sara's body?

23   A.    More or less, like, around the collarbone, just

24   holding her down.

14:57:12  25    Q.    Okay.  And did you visualize Brian squeezing her neck

1    in any way?

2    A.    No.

3    Q.    Okay.  What happened next?

4    A.    Well, I saw that Holly was upset, so I started to go

14:57:23 5    to her.  And then I was just trying to get him to leave the

6    situation.

7    Q.    And when you say "him," you mean Brian?

8    A.    Yes, Brian.

9    Q.    Okay.  And when you say you tried to get him to leave

14:57:34 10    the situation, what do you mean?

11    A.    I wanted him to just leave from there and come home

12    and stay the night at our house.

13    Q.    And when you attempted to get Brian to leave, what did

14    you do?

14:57:44 15          How did he react?

16    A.    He was mad, and he went like this, and pushed me as

17    hard as he could right here.

18    Q.    And when you say "right here," where is that on your

19    body?

14:57:54 20    A.    Right through here.

21    Q.    Okay.  And you say he pushed you?

22    A.    Yes.

23    Q.    Okay.  And were you injured as a result of that push?

24    A.    No.

14:58:01 25    Q.    Did that push leave any marks on your body?

```
 1   A.    Yes.  A red mark.

 2   Q.    Okay.  Can you explain to the jury what that looked

 3   like.

 4   A.    It was just a round, red mark.  It was gone the next

 5   day.

 6   Q.    Okay.  And after he pushed you with his hand on your

 7   chest, describe for the jury what happened next.

 8   A.    He just left the scene.  He just walked out of the

 9   door.

10   Q.    And was 911 called at some point in time?

11   A.    Yes.

12   Q.    Okay.  When did that happen?

13   A.    That happened just before -- as soon he pushed me, 911

14   was called.

15   Q.    Okay.  So he pushed you, and then 911 was called.

16         Who called 911?

17   A.    I believe Sara dialed, but she handed the phone to me.

18   Q.    Okay.  And was Brian aware that you had called 911?

19   A.    Yes.

20   Q.    And was it at that point in time that he left the

21   home?

22   A.    After the call.

23   Q.    After the call.  Okay.

24   A.    Yes.

25   Q.    And when you called 911, what did you relay to the 911
```

1    operator?

2    A.    I said he was acting crazy.  They need to get there.

3    They need to bring someone there.

4    Q.    And what was your intention when you called 911?

14:59:09  5    A.    Well, I knew he wasn't himself.  I wanted him to get

6    help.  I thought he needed to maybe go to the hospital and

7    find out what was going on, because he just wasn't himself.

8    Q.    Okay.  And at the time you called 911, were you

9    scared?

14:59:23  10    A.    Yes.

11    Q.    After Brian left, what happened next?

12    A.    He left.

13          The deputies came in, and we were sitting at the

14    table.  They asked us what happened.  We told them.  They

14:59:39  15    wanted us to sign a domestic packet -- domestic violence

16    packet.

17    Q.    Did you request the officers -- or did you ask the

18    officers if you could sign domestic violence packets?

19    A.    No.

14:59:49  20    Q.    Did they bring that up to you?

21    A.    Yes.

22    Q.    Okay.  And when they brought that up to you, what was

23    your responses?

24    A.    Sara and I, neither one really wanting to do that.

14:59:58  25    And they kept telling us that if we wanted to get him help,

Couch-Page (Direct by Greene)

431

1    we needed to follow this procedure by signing this domestic

2    violence packet.

3    Q.    Okay.  And did you relay to the deputies that you did

4    not want to sign those?

5    A.    Yes.  Several times.

6    Q.    And did they continue to ask you to sign those?

7    A.    They said that was the only way they would help him.

8    Q.    Okay.  And at some point in time, did you sign those

9    papers?

10   A.    Yes.

11   Q.    Okay.  And what was your intent when you signed those

12   papers?

13   A.    We thought that he was going to be taken to the

14   hospital to see, you know, why he was so upset, what was

15   going on with him.

16   Q.    And during this encounter with the deputies, did your

17   husband Matthew arrive at 3425 Mill Run Road?

18   A.    Yes.  He came in, and we were sitting there writing

19   down some things on the paper.  And he asked us what we were

20   doing, and I told him.  And he said, I don't think you

21   should sign that because we can handle this ourselves.

22        And the sheriff looked at him and said, We are trying

23   to get help for your son.  And, Mr. Garber, you need to

24   leave.

25   Q.    And did he leave?

1    A.    Yes.

2    Q.    And at some point in time following you and Sara

3    signing those papers, did the deputies leave?

4    A.    Yes.

15:01:10  5    Q.    Okay.  And describe for me what happened after the

6    deputies left.

7    A.    I told Sara I would just take the kids to our house

8    and let them spend the night.

9    Q.    Okay.  So then you left 3425 Mill Run Road with Holly

15:01:23  10    and Nicholas?

11    A.    Yes.

12    Q.    And you were going to where?

13    A.    To our house at 3400.  Right across the street.

14    Q.    And did you make it up to the home?

15:01:31  15    A.    Yes.

16    Q.    And when you got to your home, describe for me what

17    you did next.

18    A.    My husband and I were in there.  As soon we came in

19    from the garage -- and I saw Brian's shoes.  And I said,

15:01:42  20    There's his shoes.

21          So he said, Well, he must be here somewhere.

22          So he went in the basement and looked.  And he came

23    back and said, He isn't there.

24          He went upstairs.  He came down, and said, He's

15:01:53  25    upstairs in his old bedroom.

Couch-Page (Direct by Greene)

433

| | |
|---|---|
| 1 | And so I went up there with him. |
| 2 | Q.   Okay.  And did you and Matthew both go upstairs at |
| 3 | that time? |
| 4 | A.   Yes.  Yes. |
| 15:02:00 5 | Q.   Okay.  And did you go both go into the room where |
| 6 | Brian was? |
| 7 | A.   Yes. |
| 8 | Q.   Okay.  And explain the scene for me as you saw it when |
| 9 | you walked into that room. |
| 15:02:07 10 | A.   He was sitting on the bed with his back to the |
| 11 | headboard.  And I was at the end of the bed, and my husband |
| 12 | was at the side closest to Brian. |
| 13 | Q.   Okay.  And did you have any conversations with Brian? |
| 14 | A.   Yes.  He was holding a beer, and I told him I didn't |
| 15:02:23 15 | like him drinking a beer. |
| 16 | Q.   And you said "He was holding a beer." |
| 17 | What hand was he holding that beer in? |
| 18 | A.   Right hand.  He was right-handed. |
| 19 | Q.   And when you told him you didn't think he should be |
| 15:02:29 20 | drinking a beer, how did he react? |
| 21 | A.   Somehow, which I don't remember, he didn't really |
| 22 | react any way.  He just, all of a sudden, had his hand under |
| 23 | his shirt. |
| 24 | Q.   Okay.  And did he say anything to you at that time? |
| 15:02:47 25 | A.   Yes.  He said, You need to leave.  Just leave me alone |

1    because you won't like what's under my shirt.

2    Q.    And how did you react to that?

3    A.    And I looked at him, and I said, Come on, Brian,

4    really?  You're trying to tell us that you have a gun now?

15:03:04  5    And he just looked at me, and he goes, Yeah.

6    Q.    Mrs. Garber, do you or Matthew have any guns or

7    firearms in your home at 3400 Mill Run Road?

8    A.    No.

9    Q.    Do you know if Brian owns a gun?

15:03:21 10    A.    No.

11    Q.    Do you know if Brian had a gun at his home at

12    3425 Mill Run Road?

13    A.    No, he did not.

14    Q.    Do you know if Brian has any experience with firearms?

15:03:30 15    A.    No, not at all.

16    Q.    Okay.  After he told you that -- he said yes to your

17    question of, Do you want me believe that's a gun, what

18    happened next?

19    A.    My husband and I went downstairs.  And I said, You

15:03:46 20    know, he just wants to be left alone.  I know he doesn't

21    have a gun.  But I'm going to take the kids home so that you

22    and I can talk to him and find out why he's behaving this

23    way.

24    Q.    Can you, for the jury, describe what it looked like

15:03:59 25    was under Brian's shirt when he said, You're not going to

1    like what's under my shirt.

2    A.    Like a fist.  Like a fist under his shirt.

3    Q.    And you said you did not believe it looked like a gun?

4    A.    No, not at all.

15:04:13  5    Q.    Okay.  Now, when you were leaving to go back -- to

6    take the children back to 3425 Mill Run Road, did Matthew

7    give you any instructions before you left?

8    A.    Yes.  He said, You know, if the officers are still

9    down there, let them know that he's home.  They were wanting

15:04:25  10    to talk to him, so he's home.

11    Q.    Okay.  And did you at some point in time leave your

12    home and go back to 3425 Mill Run Road with the children?

13    A.    Yes, I left to take them home.

14    Q.    Okay.  And describe what happened when you got back to

15:04:40  15    that home.

16    A.    Well, I got there, and I didn't know for sure if Sara

17    was awake or not.  So I went up and knocked on the door.

18    And she answered the door and said, He has a gun.

19         And I said, I don't think he does.

15:04:53  20         And she asked me where the kids were, and I told her

21    they were in the car, and I was going to bring them in.

22         And had just got the door closed and just started to

23    turn to go off the porch and, all of a sudden, I see the

24    City of Belleville cops going up our driveway.  Right after

15:05:12  25    them, the Lexington cops.  Right after them, several

Couch-Page (Direct by Greene)

436

1    sheriff's cars.  And I'm standing on the porch thinking,

2    What's going on?

3         And so I went back to the car and sat there, and I'm

4    thinking, Should I take the kids in and go up there?  Or

15:05:29  5  should I just go up there and find out what's going on?

6         Because I did not know why they were at our house.

7    Q.    Ms. Garber, I want to go back.

8         When you got back to 3425 Mill Run Road, you said Sara

9    was on the phone?

15:05:42  10  A.    Yes.

11   Q.    Okay.  And you said that when she opened the door, she

12   said, He's got a gun?

13   A.    Yes.

14   Q.    Did you know who she was on the phone with at that

15:05:50  15  time?

16   A.    No, I did not.

17   Q.    All right.  Now, you said you went to sit in the car

18   with the children after you saw the police going up the

19   driveway?

15:05:56  20  A.    Yes.

21   Q.    Okay.  And how long were you sitting in that car?

22   A.    It didn't seem very long.  You know, I'm just sitting

23   there debating what to do next.  And then I'm ready to turn

24   the car back on, and I look and I see a sheriff's car coming

15:06:09  25  down the driveway and bring -- come and park right where I

1  was.  And they brought my husband down there.

2  Q.    Okay.  And what happened after you saw the deputy's

3  car come down with your husband?

4  A.    I asked him what happened.  He said, I don't know.  I

15:06:25  5  just heard shots.

6  Q.    Okay.  And were you instructed to do anything at that

7  time by the deputy?

8  A.    We were told just stay at that house.

9  Q.    Okay.  And did you do so?

15:06:35 10  A.    Yes.

11  Q.    Okay.  Now, at some point in time, did you find out

12  that Brian had been shot and killed?

13  A.    Later that -- maybe around midnight.

14  Q.    Okay.  And how did you find out?

15:06:49 15  A.    The chaplain came down and told us our son had passed

16  away and he wanted to pray with us.

17  Q.    Okay.  And if it's possible, can you put it into words

18  the emotions you felt when you found out Brian had been

19  killed.

15:07:04 20  A.    At that time, it's almost like disbelief.  You know,

21  you're in shock.  It's like, this couldn't have happened.

22  It was just such a disbelief.

23  Q.    And at the time you find out that Brian passed away,

24  did you have an understanding of what happened in that room?

15:07:19 25  A.    No.  They told us nothing.

1    Q.    Okay.  Now, when was Brian laid to rest?

2    A.    A week later.

3    Q.    Okay.

4                MR. DOUGLAS:  I'd like to show the witness

15:07:37  5    Plaintiff's Exhibit 37.

6    BY MR. DOUGLAS:

7    Q.    Mrs. Garber, can you describe what you see on the

8    screen there.

9    A.    The payment receipt of the funeral.

15:07:48  10   Q.    And can you, for the jury, state the amount of the

11   funeral?

12   A.    $8,481.45.

13               MR. DOUGLAS:  Permission to publish,

14   Your Honor.

15:08:01  15               MS. WILLIAMSON:  No objection, Your Honor.

16               THE COURT:  You may publish.

17   BY MR. DOUGLAS:

18   Q.    Okay.  Mrs. Garber, can you describe your emotions the

19   day of Brian's funeral.

15:08:14  20   A.    Almost like I wasn't there.  You know, just standing

21   and looking and -- not really remember anything but just

22   standing there.  I guess it was shock.  I don't know.  I was

23   just standing.  Disbelief.

24               MR. DOUGLAS:  38.

15:08:35  25        I'd like to show the witness Plaintiff's Exhibit 38.

Couch-Page (Direct by Greene)

439

1        Your Honor, may I approach the witness with the

2   computer and show it to her and then have her identify?

3        It's not translating over to the . . .

4             THE COURT:  Well, the Court is not seeing it.

15:09:59 5   Opposing counsel is not seeing it either, so . . .

6   BY MR. DOUGLAS:

7   Q.    Mrs. Garber, can you identify what you see on the

8   screen.

9   A.    Picture of my son.

15:10:59 10  Q.    Can you identify what this is.

11  A.    It's his baby picture that he -- that's a baby

12  picture.

13             MR. DOUGLAS:  Can we have permission to

14  publish, Your Honor?

15:11:18 15             THE COURT:  Any objection?

16             MS. WILLIAMSON:  No objection.

17             THE COURT:  You may publish.

18  BY MR. DOUGLAS:

19  Q.    Now, Connie, where was this shown at?

15:11:26 20  A.    This was shown at the funeral home.  The video for the

21  funeral home.

22  Q.    Okay.  And what are we looking at here?

23  A.    Family -- our family pictures.

24  Q.    How does it make you feel when you see these photos?

15:11:41 25  A.    Terrible.  I'll never seen my son again.

1    Q.    Take your time.

2          Mrs. Garber, how has the loss of your only child

3    affected you?

4    A.    It's devastated me.  There were times I didn't think I

15:12:08  5    could make it.

6    Q.    What is this photo we're looking at here, Mrs. Garber?

7    A.    When we went to Disney World.

8    Q.    And where did all these photos come from that are in

9    this video?

15:12:34  10   A.    From my home.

11   Q.    Mrs. Garber, how did Brian's children find out that

12   their father had passed away?

13   A.    I think Sara may have told them.

14   Q.    Can you give us any examples of how they have been

15:12:57  15   affected by the loss of their father.

16   A.    Yeah.  Holly was up at our house, and she looked at my

17   husband and said, Papo, can you be my daddy now?

18         And she tells me how she misses him.  She wishes he

19   was here.

15:13:18  20         And Nick, I could tell he was looking for him when

21   this happened because he would crawl around and just moan,

22   like he was looking for him.

23   Q.    Mrs. Garber, have you heard Holly or Nicholas talk

24   about Brian since he passed a way?

15:13:36  25   A.    Yes.  Holly does quite a bit.  She just tells me she

C. Garber (Cross by Douglas)

441

1    misses him and she wishes he was here.

2        And Nick was -- there's a picture of my son in the

3    living room on the wall.  Nick looked, and he goes, Grandma,

4    is that my daddy?

15:13:56  5        And I said, Yes.

6    Q.   All right.

7            MR. DOUGLAS:  Mrs. Garber, no further

8    questions.

9            THE WITNESS:  Okay.

15:14:17 10            THE COURT:  Cross-examination?

11            MS. WILLIAMSON:  Thank you, Your Honor.

12         CROSS-EXAMINATION OF CONNIE S. GARBER

13   BY MS. WILLIAMSON:

14   Q.   Good afternoon, Mrs. Garber.

15:14:48 15   A.   Good afternoon.

16   Q.   Do you need a moment?

17   A.   No.  I'm all right.

18   Q.   Okay.  My name is Melanie Williamson.  I think we've

19   met before -- it's been a couple of years -- at a

15:14:59 20   deposition.

21   A.   Yes.

22   Q.   I'm very sorry for your loss.

23        I do have some questions that I would like to ask you

24   today about March 16th, 2014.

15:15:09 25   A.   Okay.

```
        1    Q.    You testified earlier that you picked up your son from

        2    work that night.

        3    A.    Yes.

        4    Q.    And Brian was very upset at the time, wasn't he?

15:15:20 5    A.    He seemed to be upset.  He just -- I knew he just

        6    wasn't himself.  Something was bothering him.

        7    Q.    Brian was angry at Sara, right?

        8    A.    I believe so, yes.  He said they had an argument.

        9    Q.    And when you brought Brian to the home he shared with

15:15:35 10   Sara -- that's that 3424 -- 3425 Mill Run Road --

       11    A.    Yes.

       12    Q.    -- Brian couldn't get into the house, correct?

       13    A.    Correct.

       14    Q.    So Brian kicked in the door, didn't he?

15:15:47 15   A.    He went around back to see if it was unlocked.

       16    Q.    He kicked in the door, didn't he?

       17    A.    Yes, he did.

       18    Q.    And you observed him do that?

       19    A.    Yes.  I was right behind him.

15:15:57 20   Q.    And you also observed Brian push Sara down?

       21    A.    Yes.

       22    Q.    Holding her down on the bed?

       23    A.    Yes.

       24    Q.    And you tried to intervene to help Sara?

15:16:07 25   A.    Yes.
```

```
         1    Q.    And Brian hit you in response?

         2    A.    No.  He -- I was trying to just get him to leave, and

         3    I think he was just so upset.  That's when he smacked me

         4    right here and pushed me backwards.

15:16:25 5    Q.    So Brian did hit you?

         6    A.    Yes.

         7    Q.    And RCSO deputies who responded to the scene after

         8    your 911 call, they took pictures, didn't they, of your

         9    chest?

15:16:38 10   A.    Yes.

        11              MS. WILLIAMSON:  I would like to show you

        12    what's been marked as Defendants' Exhibit 1001.

        13              THE WITNESS:  Okay.  That's where he hit me.

        14              MS. WILLIAMSON:  And if you could, scroll so

15:16:59 15   she can see the second photo as well.

        16    BY MS. WILLIAMSON:

        17    Q.    And, Ms. Garber, I just would like you to identify

        18    these photos.

        19         Is this you in this exhibit?

15:17:10 20   A.    Yes.

        21    Q.    And that first photo in this exhibit, I think you

        22    already identified that as the area of where you were hit?

        23              MS. WILLIAMSON:  Can you go back.

        24              THE WITNESS:  Yes.

15:17:20 25              MS. WILLIAMSON:  Your Honor, I'd like
```

C. Garber (Cross by Douglas)

444

1    permission to publish.

2                    THE COURT:  Objection?

3                    MR. GILBERT:  No objection.

4                    THE COURT:  No objection.

15:17:26 5        You may publish.

6                    MS. WILLIAMSON:  Thank you, Your Honor.

7    BY MS. WILLIAMSON:

8    Q.    So Brian hit you hard enough to have that red mark on

9    your chest, correct?

15:17:41 10   A.    Yes.  I fell backwards.  Yes.

11   Q.    You and Sara both called 911 that night?

12   A.    I know she dialed, but I believe I was -- I'm not

13   sure.  I don't remember if she talked to them or not.

14   Q.    You talked to 911, correct?

15:18:01 15   A.    Yes.  The first time, yes.

16   Q.    And you informed 911 that your son was, Going nuts on

17   us, beating on me and everything and breaking stuff?

18   A.    I don't remember saying that.

19   Q.    You don't remember saying that?

15:18:15 20   A.    Huh-uh.  I remember saying that he wasn't himself.

21                   MS. WILLIAMSON:  Your Honor, I'd like to play

22   Defendants' Exhibit 1003.

23        I'd just like to play a portion of it that is what I

24   had --

15:18:42 25                   THE COURT:  Could you identify it for the

1    record, please.

2                    MS. WILLIAMSON:  Sure.

3          It is Defendants' Exhibit 1003.  It is the 911 call

4    for Ms. Garber.

15:18:54  5                    THE COURT:  You may play it.

6                    (Audio recording played in open court.)

7    BY MS. WILLIAMSON:

8    Q.    Ms. Garber, was that your voice in that recording?

9    A.    Yes.

15:19:43 10   Q.    So you did say, "My son is going nuts on us, beating

11   on me and everything and breaking stuff"?

12   A.    Yes.  I was scared.

13   Q.    And your grandkids were present during that incident,

14   weren't they?

15:19:58 15   A.    Yes.

16   Q.    And they were upset and crying?

17   A.    Nick was too little, but Holly was upset.

18   Q.    Brian left that home, he left 3425 Mill Run Road

19   before the RCSO deputies arrived, correct?

15:20:14 20   A.    Correct.

21   Q.    And he later turned up at your home at 3400?

22   A.    Yes.

23   Q.    When you saw Brian that night at your home, he was in

24   the upstairs bedroom?

15:20:23 25   A.    Yes.

```
 1    Q.    And he was seated on a bed, correct?

 2    A.    Correct.

 3    Q.    And Brian had something under his shirt?

 4    A.    Not at that time, no.  He was holding a beer.  He was

 5    holding a can of beer.

 6    Q.    He had something under his shirt while he was in that

 7    room, correct?

 8    A.    Later he said --

 9    Q.    My question was just, while he was in that room, when

10    you saw him, he had something under his shirt?

11    A.    Yes.

12    Q.    And he implied to you that that something under his

13    shirt was a gun, correct?

14    A.    He did not.

15    Q.    He did not imply that to you?

16    A.    He just said that there -- I wouldn't like what was

17    under his shirt.

18    Q.    And you said to him in your testimony earlier, that,

19    You're trying to tell me you have a gun?

20    A.    Right.

21    Q.    And he said, Yes?

22    A.    Yes.

23    Q.    So my question was, he implied to you that he had a

24    gun, correct?

25    A.    Yes.
```

C. Garber (Redirect by Douglas)

447

1    Q.    You went to Sara's house with the kids after that?

2    A.    Yes.

3    Q.    Did you know that Brian had sent threatening text

4    messages to Sara that he was going to kill her?

15:21:31  5    A.    No, I did not.

6    Q.    You didn't return to your home that night, correct?

7    A.    Pardon me?

8    Q.    You didn't return back to 3400 Mill Run Road that

9    night?

15:21:41  10    A.    No.

11    Q.    So you did not hear anything that the officers may

12    have said to Brian?

13    A.    No.

14    Q.    You didn't see any interaction between Brian and any

15:21:51  15    of the officers?

16    A.    No.

17              MS. WILLIAMSON:  Just one moment, Your Honor.

18                   (Pause in proceedings.)

19              MS. WILLIAMSON:  Thank you for your time.

15:22:14  20         I have no further questions.

21              THE COURT:  Mr. Douglas, any redirect?

22              MR. DOUGLAS:  Yes, Your Honor.

23           REDIRECT EXAMINATION OF CONNIE S. GARBER

24    BY MR. DOUGLAS:

15:22:29  25    Q.    Mrs. Garber, when the deputies arrived in response to

| | |
|---|---|
| 1 | the first 911 call, did you ask the deputies to call for |
| 2 | medical attention? |
| 3 | A.    No, I did not. |
| 4 | Q.    Did you ask them to call for an ambulance? |
| 15:22:40  5 | A.    No, I did not. |
| 6 | Q.    Did you feel you needed medical attention? |
| 7 | A.    No. |
| 8 | Q.    How long did the red spot on your chest last? |
| 9 | A.    It was gone the next day. |
| 15:22:47 10 | Q.    Okay.  And when you called 911 that day, what did you |
| 11 | want for Brian? |
| 12 | A.    That day I wanted him to be taken to the hospital |
| 13 | because he was not himself.  And we thought that's what they |
| 14 | were going to do. |
| 15:23:04 15 | MR. DOUGLAS:  Nothing further. |
| 16 | THE COURT:  Mrs. Garber, thank you for your |
| 17 | testimony.  You may step down. |
| 18 | Any further witnesses for the -- |
| 19 | MR. GILBERT:  No, we have no further |
| 15:23:44 20 | witnesses. |
| 21 | And we will rest our case pending the introduction of |
| 22 | exhibits. |
| 23 | THE COURT:  Okay. |
| 24 | Well, ladies and gentlemen of the jury, that concludes |
| 15:23:59 25 | our testimony for today. |

1      I'm going to excuse you for the day.  I have certain

2  matters to take up with counsel, and we will reconvene

3  tomorrow at 9:00 a.m.  Again, I ask you to be down in the

4  jury assembly area by 8:30.

15:24:22  5            DEPUTY CLERK:  All rise for the jury.

6            (The jury exited the courtroom.)

7            THE COURT:  I have been trying to take

8  meticulous notes as to what exhibits have been used during

9  the plaintiff's case, and I'm going to suggest at this time

15:25:13 10  that the plaintiffs take a few minutes to get together their

11  list.

12            MR. GILBERT:  Yes.

13            THE COURT:  And I will try to go over my notes

14  and also make my list, and then we'll compare them.  And if

15:25:27 15  there's any objections, we'll hear those.

16      So although I'm going to sit up on the bench, we will

17  be in recess until further notice.

18            MR. DOWNEY:  Thank you, Your Honor.

19      If I may, we will be moving for judgment as a matter

15:25:44 20  of law procedurally.

21            THE COURT:  All right.  After the exhibits are

22  moved, then we'll hear you on your motions.

23            MR. DOWNEY:  Thank you, Your Honor.

24            THE COURT:  I would remind counsel as to what

15:26:31 25  I said at the beginning of the trial, and that is, I'm not

1    going to send back -- I'm not going to admit any exhibits

2    and send them back to the jury unless they've been used as

3    part of this trial.  In other words, I'm not going to send

4    back an exhibit that they've never seen before.

15:26:47 5         So keep that in mind.

6         And there may be exhibits on your list that you

7    haven't used, but, nevertheless, we are going consider only

8    those exhibits that have been used as part of the case

9    that's been presented here in Court.

15:27:00 10                          - - -

11            (Proceedings in recess at 3:25 p.m. )

12              THE COURT:  I will now hear from the

13    plaintiffs regarding the exhibits that they ask the Court to

14    admit into evidence, and I'll hear any objections that the

15:45:58 15    defendants have.

16         So why don't we just go down the list.

17         I have your exhibit list here.

18              MR. GILBERT:  Okay.

19              THE COURT:  And I've tried to keep track.  And

15:46:08 20    our court reporter tells me that if there's any confusion,

21    she can search to see if, in fact, it was used, so . . .

22              MR. GILBERT:  Would you like to pause after

23    each one to see --

24              THE COURT:  Well, would it make sense for me

15:46:26 25    to give you my list?

```
          1              MR. GILBERT:  We'll just run down our list.

          2              THE COURT:  All right.  Run down your list.

          3              MR. GILBERT:  It's possible we might have

          4    missed something.

15:46:47  5              THE COURT:  All right.

          6              MR. GILBERT:  So plaintiff would offer the

          7    following exhibits:  Plaintiff's Exhibit 27-1.

          8              THE COURT:  All right.  Hang on a second.

          9      I have it.

15:47:09 10              MR. GILBERT:  27-4.

         11              THE COURT:  I have that one.

         12              MR. GILBERT:  27-6.

         13              THE COURT:  I do not have that one.

         14              MS. WILLIAMSON:  I do not either.

15:47:25 15              THE COURT:  All right.  Well, just give me the

         16    list, and then we'll go back and take a look at the ones

         17    that I have questions on.

         18              MR. GILBERT:  We'll withdraw that because it's

         19    pretty much a duplicate.

15:47:45 20              THE COURT:  All right.

         21              MR. GILBERT:  27-9.

         22              THE COURT:  I have it.

         23              MR. GILBERT:  27-10.

         24              THE COURT:  I have it.

15:47:54 25              MR. GILBERT:  27-11.
```

1              THE COURT:  I have it.

2              MR. GILBERT:  27-12.

3              THE COURT:  I have it.

4              MR. GILBERT:  28-1.

15:48:02  5    THE COURT:  I have it.

6              MR. GILBERT:  28-2.

7              THE COURT:  I have that one.

8              MR. GILBERT:  28-11.

9              THE COURT:  I have it.

15:48:17 10    MR. GILBERT:  29-2.

11             THE COURT:  I have it.

12             MR. GILBERT:  29-3.

13             THE COURT:  I don't have that one.

14        Okay.

15:48:29 15    MR. GILBERT:  29-4.

16             THE COURT:  I have it.

17             MR. GILBERT:  29-5.

18             THE COURT:  I have it.

19             MR. GILBERT:  29-6.

15:48:37 20    THE COURT:  I have that.

21             MR. GILBERT:  We'll withdraw 29-3.

22             THE COURT:  Okay.

23             MR. GILBERT:  Exhibit 34, the autopsy report.

24             THE COURT:  I have it.

15:48:54 25    MR. GILBERT:  And Plaintiff's Exhibit 35.

1    35-1 through 13.

2              THE COURT:  I don't have 5.

3              MR. GILBERT:  Yeah.  I don't know what

4    happened there, but . . .

15:49:10  5              MS. WILLIAMSON:  Defendants don't have 5

6    either.

7              MR. GILBERT:  All right.  So then every one

8    except the Exhibit 5.

9              THE COURT:  All right.

15:49:25 10              MR. GILBERT:  Plaintiff's Exhibit 37.

11              THE COURT:  I have it.

12              MR. GILBERT:  38.

13              THE COURT:  I have it.

14              MR. GILBERT:  39.

15:49:31 15              THE COURT:  I have it.

16              MR. GILBERT:  40.

17              THE COURT:  I have it.

18              MR. GILBERT:  And 41.

19              THE COURT:  I have it.

15:49:38 20              MR. GILBERT:  And Plaintiff's Exhibit 51.

21              THE COURT:  51, the --

22              MR. GILBERT:  The remote.

23              THE COURT:  The remote.

24              MR. GILBERT:  And Joint Exhibit 5.

15:49:50 25              THE COURT:  Joint Exhibit 5.

1          MR. GILBERT:  It's the deadly force policy.

2          THE COURT:  Yeah.  Let me just --

3     Okay.  I have that one as well.

4     For the defendant, any objection to any of those

15:50:25 5  exhibits?

6          MS. WILLIAMSON:  Yes, Your Honor, we do.

7          THE COURT:  Okay.

8          MS. WILLIAMSON:  We have an exhibit to -- I'm

9     sorry.

15:50:35 10    We have an objection to the admission of Joint

11     Exhibit 5, the policy.  The Monell claims are out of this

12     case.  There are no policies that are at issue.

13          THE COURT:  Well, I looked at my order in

14     limine, and it referred to the barricade policy.

15:50:55 15    And this is not part of the barricade policy, is it?

16          MS. WILLIAMSON:  It's not part of the

17     barricade policy, but there still is no Monell claim

18     involving any of the policies from the RCSO.

19          THE COURT:  Well, this doesn't go to Monell.

15:51:13 20 It goes to the question of what Officer Frazier had

21     knowledge of in terms of alternatives, and how he was to

22     proceed at the time he entered the room.

23          MS. WILLIAMSON:  Your Honor, we believe it

24     goes to what the shooting review board did, which was

15:51:33 25 something that was kept out of this.

```
 1              THE COURT:  Well, that's the policy.  It's not

 2     the review board's findings.

 3              MS. WILLIAMSON:  The review board was all

 4     about whether or not he was within policy.  That's where

15:51:43  5     those policies --

 6              THE COURT:  Well, the jury hasn't heard

 7     anything about that.

 8              MS. WILLIAMSON:  And we feel like this opens

 9     the door to that, then.

15:51:51 10              THE COURT:  Plaintiffs?

11              MR. GILBERT:  I mean, we have a burden of

12     proof of showing whether the shooting was reasonable or not.

13     And based on his training --

14              THE COURT:  Objectively unreasonable.

15:52:03 15              MR. GILBERT:  Objectively, whether it's

16     objectively unreasonable.

17              THE COURT:  Unreasonable, right.

18              MR. GILBERT:  Thanks for correcting me.

19         And so having him understand what the policies are

15:52:19 20     regarding the specific issue of deadly force is part of our

21     proof in the case.

22         We're not bringing up any review board.  It's just his

23     understanding of what the appropriate use of force is, and I

24     think that's perfectly fine.

15:52:34 25              THE COURT:  And that's one page, right?
```

1          MR. GILBERT:  Yeah.

2          THE COURT:  It's only one page out of that.

3          MS. WILLIAMSON:  Your Honor, this is about the

4  Fourth Amendment.  It's not about the violation of policy.

15:52:44  5     I mean, this is whether -- just as Mr. Gilbert just

6  explained, this is whether it was objectively unreasonable

7  under the Fourth Amendment.  This is excessive force.  It

8  has nothing to do with the violation of policy.

9          The reason why the results and findings of the

15:53:01 10  shooting review board and BCI have been excluded is because

11  that's not the province of the jury to decide.  They're

12  going to look at this and see a policy and make a

13  determination that there -- I think there's a potential to

14  confuse them in that same way.

15:53:18 15          THE COURT:  Well, I believe it's part of the

16  totality of the circumstances of what the officer knew and

17  was aware of when he was confronting the situation, and,

18  therefore, I'll admit it.

19          MS. WILLIAMSON:  Thank you, Your Honor.

15:53:36 20          THE COURT:  So the exhibits as identified for

21  the record as being proffered are admitted.

22     Now, Mr. Downey, you have a motion?

23          MR. DOWNEY:  I do, Your Honor.

24     Briefly, Your Honor, under Civil Rule 50, defendants

15:54:00 25  maintain a motion for a qualified immunity judgment as a

1    matter of law on behalf of Deputy Frazier with respect to

2    the excessive use claim, the wrongful death claim.

3         And we'd also note for the Court's attention that

4    there's no evidence that's been presented of conscious pain

15:54:16  5    and suffering on the part of Brian Garber.  So we'd move to

6    dismiss those claims as well.

7              THE COURT:  All right.  I'm going to deny the

8    motion without prejudice to being reasserted at the end of

9    the case.

15:54:30  10              MR. DOWNEY:  Thank you, Your Honor.

11              THE COURT:  So tomorrow at 9:00 we will begin

12    the defendants' case.

13         And what witnesses will be available tomorrow?

14              MR. DOWNEY:  We've got our full roster already

15:54:40  15    handed off to plaintiffs.

16         We're going to start with Officer Nicholson.  And we

17    think we're going to have a full day tomorrow, but --

18              THE COURT:  All right.

19              MR. DOWNEY:  But the likelihood is that

15:54:51  20    depending on crosses and things like that, that we get

21    through defendants' case tomorrow.

22              THE COURT:  All right.  Very well.  And then

23    we will -- after that, we will meet to discuss the

24    instructions.

15:55:02  25         I believe, just by way of preview, that the

1    instructions that you have agreed to are by and large

2    appropriate, and the ones that you have disagreed about are

3    no longer in the case.

4        So subject to further examination by you and

15:55:23  5    examination by me and discussion, that can be a lodestar for

6    you in taking a look at what you've submitted already.

7        And I believe I also gave counsel at an earlier point

8    in time, the instructions given in Smith versus Jones by

9    Judge Oliver, and those instructions appear to be very

15:55:48  10    appropriate in this situation.  So that may be some guidance

11    also.

12        And I would encourage counsel -- in fact, I'll provide

13    you time before we meet to see if you can totally agree upon

14    a charge.  Give you time to meet and confer, see if you can

15:56:08  15    totally agree upon a charge so that we don't need to split

16    any hairs over that.

17        All right?

18            MR. DOWNEY:  Thank you Your Honor.

19            THE COURT:  All right.  There being no further

15:56:18  20    business before the Court this afternoon, we are in recess

21    until tomorrow morning at 9:00.

22            DEPUTY CLERK:  All rise.

23                - - -

24        (Proceedings in recess for the day at 3:57 p.m.)

25

459

1                     **C E R T I F I C A T E**

2

3          I certify that the foregoing is a correct transcript

4     from the record of proceedings in the above-entitled matter.

5

6     _/s/ Donnalee Cotone _____21st of April, 2019_
      DONNALEE COTONE, RMR, CRR, CRC                    DATE
7     Realtime Systems Administrator

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25