1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
2                          EASTERN DIVISION

3    ------------------------------X
     ELIZABETH GOODWIN, *As*           :   Case No. 1:15-cv-00210
4    *Administrator of the Estate*     :   Cleveland, Ohio
     *of* BRIAN GARBER,                :
5                                      :   Thursday, February 21, 2019
                  Plaintiff,           :   9:06 a.m.
6                                      :
         v.                            :   **VOLUME 3 – JURY TRIAL**
7                                      :   *(Pages 460 – 551)*
     RICHLAND COUNTY, OHIO, et         :
8    al.,                              :
                                       :
9                 Defendants.          :
     ------------------------------X

10

11

12              TRANSCRIPT OF JURY TRIAL PROCEEDINGS

13        BEFORE THE HONORABLE WILLIAM H. BAUGHMAN, JR.

14              UNITED STATES MAGISTRATE JUDGE

15

16

17
     Court Reporter:              Donnalee Cotone, RMR, CRR, CRC
18                                Realtime Systems Administrator
                                  United States District Court
19                                801 West Superior Avenue
                                  Court Reporters 7-189
20                                Cleveland, Ohio 44113
                                  216-357-7078
21                                donnalee_cotone@ohnd.uscourts.gov

22

23

24   Proceedings recorded by mechanical stenography, transcript

25   produced by computer-aided transcription.

1    APPEARANCES:

2

3         On behalf of Plaintiff Elizabeth Goodwin, *As*
          *Administrator of the Estate of Brian Garber*:

4

               **TERRY H. GILBERT, ESQ.**
5              **JACQUELINE C. GREENE, ESQ.**
               Friedman & Gilbert
6              55 Public Square,  Suite 1055
               Cleveland, Ohio 44113
7              216-241-1430
               tgilbert@f-glaw.com
8              greene@f-glaw.com

9

10        On behalf of Plaintiff Elizabeth Goodwin, *As*
          *Administrator of the Estate of Brian Garber*:

11

               **CHANCE G. DOUGLAS, ESQ.**
12             24100 Chagrin Boulevard
               Suite 280
13             Cleveland, Ohio 44122
               216-292-5200
14             cdouglas@hoffmanlegalgroup.com

15

          On behalf of Defendant Richland County, Ohio, et al.:
16

               **DANIEL T. DOWNEY, ESQ.**
17             **MELANIE J. WILLIAMSON, ESQ.**
               7775 Walton Parkway, Suite 200
18             New Albany, Ohio 43054
               614-221-1216
19             ddowney@fisheldowney.com
               mwilliamson@fisheldowney.com
20

21

22   ALSO PRESENT:              Deputy Raymond Jeffrey Frazier
                                Deputy Andrew Knee
23                              Deputy James Nicholson

24

25

1                        **I N D E X**

2                                                        **PAGE**

3      APPEARANCES....................................... 461

4      PRE-JURY COLLOQUY................................. 463

5      DIRECT EXAMINATION OF JAMES NICHOLSON............. 467
       BY MR. DOWNEY
6
       CROSS-EXAMINATION OF JAMES NICHOLSON.............. 480
7      BY MR. GILBERT

8      REDIRECT EXAMINATION OF JAMES NICHOLSON........... 482
       BY MR. DOWNEY
9
       CROSS-EXAMINATION OF MATTHEW D. GARBER............ 483
10     BY MR. DOWNEY

11     CROSS-EXAMINATION OF MATTHEW D. GARBER ........... 492
       BY MR. GILBERT
12
       RECROSS-EXAMINATION OF MATTHEW D. GARBER.......... 495
13     BY MR. DOWNEY

14     DIRECT EXAMINATION OF MICHAEL BEASLEY............. 498
       BY MS. WILLIAMSON
15
       CROSS-EXAMINATION OF MICHAEL BEASLEY.............. 502
16     BY MR. DOUGLAS

17     DIRECT EXAMINATION OF RAYMOND JEFFREY FRAZIER...... 504
       BY MS. WILLIAMSON
18
       CROSS-EXAMINATION OF RAYMOND JEFFREY FRAZIER....... 509
19     BY MR. GILBERT

20     REDIRECT EXAMINATION OF RAYMOND JEFFREY FRAZIER.... 520
       BY MS. WILLIAMSON
21
       DIRECT EXAMINATION OF ANDREW KNEE................. 522
22     BY MS. WILLIAMSON

23     CROSS-EXAMINATION OF ANDREW KNEE.................. 524
       BY MS. GREENE
24

25     REPORTER CERTIFICATE.............................. 551

1          MORNING SESSION, Thursday, February 21, 2019

2                    DEPUTY CLERK:  All rise.

3                            -  -  -

4              (Proceedings reconvened at 9:06 a.m.)

5              (In Open Court - Jurors Not Present)

6                      (Defendant Present)

7                            -  -  -

8                    DEPUTY CLERK:  Please be seated.

9                    THE COURT:  I understand there's some matters

09:06:21 10    that counsel would like to discuss before the jury comes in?

11                    MR. GILBERT:  Yes.  Just briefly, Judge.

12         We want to make sure that in the case of the

13    defendants that we're going to hear this morning, that

14    matters that had been ruled inadmissible in the pretrial

09:06:40 15    order pursuant to the motions in limine are adhered to.

16         And specifically, there is a Deputy Berry who would be

17    called today who was at the scene at the time of the

18    shooting.  But he also -- from our deposition, we learned

19    that there was some kind of incident the day before,

09:07:05 20    where --

21                    MR. DOWNEY:  We're not going to call

22    Deputy Berry.

23                    MR. GILBERT:  Okay.

24                    MR. DOWNEY:  We made that decision late last

09:07:12 25    night.

```
 1              MR. GILBERT:  All right.  Thank you.

 2         Also, are you calling Beasley?

 3              MS. WILLIAMSON:  Yes, we are.

 4              MR. GILBERT:  Okay.  Beasley, apparently, had

 5   contact with Brian sometime previously to the incident.  So

 6   we would like -- we don't think that that is relevant or

 7   admissible because that information was not conveyed to the

 8   three officers who engaged in the shooting at the time.

 9         And the Court had previously made it very clear

10   that -- and it doesn't go to damages either.

11         So the Court has made it very clear that anything that

12   the shooting officers knew would be allowed at the time that

13   they used deadly force, but anything that comes out

14   separately that they didn't know should not be allowed in

15   the testimony.

16         Plus, when that happened with Beasley, he was -- Brian

17   was a juvenile.  So it was many years earlier, from what I

18   understand.

19         So we would want to make sure that -- and I don't want

20   to just stand up and start objecting if that comes up.  I

21   want to know where we stand on that at this point.

22         Also --

23              THE COURT:  All right.  Well, we'll go through

24   his whole list.

25              MS. WILLIAMSON:  Okay.
```

1          MR. GILBERT:  Do you want me to finish the --

2          THE COURT:  Well, go ahead.

3          MR. GILBERT:  Okay.

4      And then we have a problem with what Sheldon and --

09:08:44 5   Sheriff Sheldon or Masi -- I forget if he's a captain.

6          MR. DOWNEY:  We decided not to call them last

7   night, too.

8          MR. GILBERT:  What's that?

9          MR. DOWNEY:  We're not calling them.

09:08:55 10         MR. GILBERT:  Okay.

11         MR. DOWNEY:  Yeah.  We went through the list

12   late last night.

13         THE COURT:  All right.  So we have the matter

14   of Deputy Berry.

09:09:01 15     Is that his title right now?

16         MS. WILLIAMSON:  It's Officer Beasley.

17         MR. DOWNEY:  He's not going to be called.

18         THE COURT:  He's not going to be called?

19         MS. WILLIAMSON:  No.  Officer Beasley.

09:09:10 20         THE COURT:  Officer --

21         MS. WILLIAMSON:  Officer Beasley.

22         THE COURT:  Beasley.  All right.

23   Officer Beasley and some contact that he had with the

24   decedent a number of years before.

09:09:20 25     Are you going to go into that?

1          MS. WILLIAMSON:  No, Your Honor.  We intend to

2    stick to the events of the day.

3          THE COURT:  The events of the day?

4      Very well.  Okay.

09:09:27 5          MR. GILBERT:  All right.

6          THE COURT:  No problems then.

7          MR. DOWNEY:  The first three issues of the

8    day, you won.

9      We were really working late on it last night and

09:09:38 10   calling people and -- yeah.

11         THE COURT:  All right.  Okay.

12         MR. GILBERT:  Sorry to waste the time with the

13   Court.

14         THE COURT:  Well, better to ask and to know

09:09:44 15   than --

16         MR. GILBERT:  Right.

17         THE COURT:  -- than to have to deal with it

18   later.

19     All right.  So are both sides ready for the jury to

09:09:53 20   come in?

21         MR. GILBERT:  We are, Your Honor.

22         THE COURT:  All right.

23     Mr. DeVan, please bring in the jury.

24         DEPUTY CLERK:  All rise for the jury.

09:11:29 25         (The jury entered the courtroom.)

Nicholson  (Direct by Downey)

1          DEPUTY CLERK:  Please be seated.

2          THE COURT:  Ladies and gentlemen of the jury,

3    yesterday plaintiff's concluded their case in chief, and

4    today we will hear the evidence that will be presented by

09:11:48 5    the defendant in this case.

6        Thank you for your attention in this trial so far.

7    And if you're -- hopefully we have this temperature problem

8    under control.  But if -- again, if there's anything that we

9    can do to make you more comfortable, if you have any

09:12:10 10    concerns, please let us know.

11          You may proceed.

12          MR. DOWNEY:  Thank you, Your Honor.

13        Defense would call Lieutenant James Nicholson.

14          DEPUTY CLERK:  Would you please raise your

09:12:41 15    right hand.

16        Do you solemnly swear that your testimony in this case

17    will be the truth, the whole truth, and nothing but the

18    truth, so help you God?

19            THE WITNESS:  I swear.

09:12:46 20            DEPUTY CLERK:  Please have a seat.

21            THE WITNESS:  Thank you.

22          DIRECT EXAMINATION OF JAMES NICHOLSON

23    BY MR. DOWNEY:

24    Q.    Thank you, sir.

09:12:55 25          Can you please state your current rank to the ladies

1    and gentlemen of the jury.

2    A.    Yes.

3          I'm a lieutenant in the Richland County Sheriff's

4    Office.

09:13:02  5    Q.    And how long have you worked at the Richland County

6    Sheriff's Office?

7    A.    This is going on my 25th year.

8    Q.    Lieutenant Nicholson, have you worked for other

9    agencies?

09:13:13  10    A.    Yes, I have.  The United States Army, as a military

11    policeman in the National Guard.

12    Q.    Lieutenant Nicholson, briefly, I'd like you to share

13    with the jury some of the commendations and awards you

14    received from the military.

09:13:27  15    A.    Yes, sir.

16          I received a Special Service Award from Mississippi

17    for Hurricane Katrina.

18          I also received an Ohio Basic Training Ribbon for

19    Ohio.

09:13:37  20          I also received the Ohio Award of Merit.  This is for

21    duties and things that we've done throughout the years of my

22    career with the Ohio Army National Guard.

23          I also received the Ohio Faithful Service Ribbon with

24    four oak leaf clusters.  And an oak leaf cluster means I've

09:13:55  25    received it more than once.  It's like a Good Conduct

Nicholson (Direct By Downey)

469

1    Ribbon.  Basically, a good conduct award.

2         I also received Ohio Special Service Award for

3    Lucasville prison riot and the Cincinnati floods.

4         I also received the Ohio Commendation Award, and I

5    also received the Ohio Distinguished Service Award for 20

6    years of service for the Ohio National Army Guard.

7         I also received the Overseas Reserve Component

8    Training Ribbon.  Overseas Service Ribbon for going

9    overseas.

10        I also received the Army Service Ribbon for joining

11   the service.

12        I also received the Noncommissioned Officer

13   Professional Development Ribbon.  What you do is, you get a

14   ribbon.  It's got a numerical 3 on it.  Every numerical

15   stands for a school that I've gone to to up my rank.

16        And then I've also received a Humanitarian Ribbon

17   with -- it's a medal, actually, with a Number 1 device.

18        I received Global War on Terrorism Medal.  Global war

19   on Terrorism Expeditionary Medal.  Iraq Campaign Medal with

20   two bronze stars for the two years I spent in Iraq.  That

21   would have been in 2003 to '04, 2008 to '09.

22        I also received a National Defense Service Ribbon with

23   two bronze stars.

24        I also received the Ohio Reserve Component Achievement

25   Medal with four oak leaf clusters.

Nicholson (Direct By Downey)

                    And I also received the Army Achievement Medal with

              two oak leaf clusters.

                    The Army Commendation Medal with two oak leaf clusters

              and a bronze star.

09:15:33   Q.    And how long were you in the military,

           Lieutenant Nicholson?

           A.    20 years.

           Q.    What was your rank when you retired?

           A.    I retired as a company first sergeant.

09:15:42   Q.    Can you tell the ladies and gentlemen of the jury

           about the positions you've held with the Richland County

           Sheriff's Office over the years?

           A.    Yes, I can.

                    I was a SWAT officer.  I was on SWAT for 15 years.

09:15:53          I also am a certified instructor thorough OPOTA that

           the department put me through.

                    I'm also -- on SWAT, I was a tool entry man, and then

           I became a point man.  Then I became a submachine gun

           operator, sniper, and then team leader.

09:16:12          And then I'm also -- with the sheriff's office I

           do -- I'm a meth tech.  I break down meth labs.  So I travel

           both throughout Richland County, Morrow, Knox, Huron,

           adjoining counties.  And I help them, and we break down

           labs.

09:16:26          I'm also a certified armer with the M&P Smith & Wesson

Nicholson (Direct By Downey)

1    .40 caliber pistol, and an armer for the AR rifle -- AR15

2    rifle, Smith & Wesson.

3    Q.    If you would, please tell, briefly, the ladies and

4    gentlemen of the jury about any commendations or awards you

09:16:42  5    received through your police officer career.

6    A.    Yes, sir.

7          The awards I've received are on my chest now.  The

8    yellow and white award, it has three stars in it.  The stars

9    means you've received it more than ones.  That is a

09:16:56 10   Commendation Award.  You receive those for individual acts

11   or as a unit.

12         The other award that I received is a Safe Driving

13   Award for 20 years safe driving.

14         And then the next one I received is a Deputy of the

09:17:08 15   Year Award.  That's given out to the deputy with very good

16   activity.  Does a lot of car stops.  Handles a lot of

17   reports.  And overall performance among his peers, stands

18   out.

19         The other award I received is a Certificate of Merit

09:17:24 20   through the sheriff's office.  A certificate of merit means

21   that's for items that I've recovered.  Large quantities of

22   money or property.

23         And then the next thing I received is -- would be my

24   Office Citation.  An Office Citation is a red and white, and

09:17:42 25   it also has three stars.  That's for on-view felony arrest,

1    meaning that you kind of put yourself in harm's way.  And

2    I've caught people during burglaries, during robberies, or

3    in a process of a felony of theft.

4        And the last thing I received is a blue ribbon from

09:18:00 5    Mansfield Police Department.  And that's for a Medal of

6    Honor.  That's for a 27-hour standoff with an individual

7    regarding a SWAT incident.

8    Q.    Thank you, Lieutenant Nicholson.

9    A.    You're welcome.

09:18:13 10   Q.    Have you had CIT training?

11   A.    Yes, I have.

12   Q.    Would you tell the ladies and gentlemen of the jury

13   what CIT training is.

14   A.    CIT training, it's Critical Incident Training.  It's

09:18:21 15   to help an officer be more familiar with people with mental

16   illnesses, or to deal with someone who is suffering some

17   type of mental illness.

18   Q.    And what are some of the skills that you developed

19   through CIT training?

09:18:40 20   A.    Basically, how to deescalate.  How to talk to

21   individuals.

22   Q.    Now -- and I don't want to repeat all of your

23   testimony from yesterday, but I would like to give the jury

24   an understanding of how many officers are on your shift.

09:18:53 25   A.    At that particular date and time, would be five.

Nicholson (Direct By Downey)

473

1    Q.    And how big is the area that you patrol?

2    A.    Slightly over 500 square miles.

3    Q.    And were you the shift supervisor?

4    A.    Correct, I was.

09:19:08 5    Q.    And can you tell the ladies and gentlemen of the jury

6    what that means.

7    A.    Shift supervisor, I'm responsible for the officers

8    when they come in.  I sign them in for roll call.  I read

9    them pass on.  I see to it whatever assignments that they

09:19:21 10   currently have going, that they continue on those

11   assignments.  I also assign them zones within the county

12   that they're to patrol in.

13        I make sure they take out civil papers for the court.

14   And I also see to it that anything we had previous from the

09:19:34 15   last shift, that we get that information.  I pass that on,

16   the same I would do for another oncoming shift when they

17   come in.

18   Q.    Now, generally, Lieutenant Nicholson, I would like you

19   to tell the jury how often are you dispatched or do you

09:19:51 20   receive domestic violence calls.

21   A.    Domestic violence calls are prevalent.  We get those

22   quite a bit.  Sometimes two, three a week.

23   Q.    How often are there firearms or reports of guns on the

24   domestic violence calls, generally?

09:20:06 25   A.    Generally?  Mostly -- mostly all the calls I go on.

1    Q.    And I'd like you to -- you heard about -- you've heard

2    a little bit about tactical plans when Mr. Gilbert, I think,

3    questioned you, correct?

4    A.    Yes, sir.

09:20:20  5    Q.    Can you tell the ladies and gentlemen of the jury

6    whether you typically do tactical plans on a domestic

7    violence call when there may be a gun present?

8    A.    Not necessarily.  We don't do tactical plans on --

9    Q.    Why is that?

09:20:33 10    A.    Just for the fact there's usually anywhere between

11    five to six of us, or less, handling a call.  We respond to

12    the call as quickly as possible.  We try to make the contact

13    with individuals as quickly as possible, and try to

14    deescalate as quickly as possible.

09:20:48 15    Q.    Now, in the times that you've been called out for

16    domestic violence calls, do you give commands to the

17    subjects, generally?

18    A.    Yes, I do.

19    Q.    Okay.  Have you ever had an incident where you've

09:21:01 20    given commands during a domestic violence call when there

21    may be a gun, where the subject did not comply?

22                    MR. GILBERT:  Objection.

23                    THE COURT:  Overruled.

24                    THE WITNESS:  Not to that incident that night.

09:21:18 25    BY MR. DOWNEY:

1    Q.    And would you tell the ladies and gentlemen of the

2    jury what typically happens on a domestic violence call.

3    A.    Domestic violence call, we try to get there as quickly

4    as possible.  We try to deescalate and find out who the

09:21:29 5    aggressor is.  We separate and we communicate with the

6    individuals that are there or any witnesses that are there

7    to get as much information from them as possible.

8    Q.    And what decisions do you make, typically, on a

9    domestic violence call?

09:21:43 10    A.    The decisions that are made are prevalent.  Has to do

11    with the primary aggressor, and possibly who is going to be

12    arrested, and taking statements and filling out information

13    and packets.

14    Q.    Now, changing up just a bit.

09:21:57 15          Can you tell the ladies and gentlemen of the jury how

16    long you've worked with Deputy Frazier?

17    A.    Going on almost 20 years.

18    Q.    And was he on your shift on March 16th, 2014?

19    A.    Correct, he was.

09:22:10 20    Q.    Do you trust Deputy Frazier?

21    A.    Yes, I do.  I trust him with my life.

22    Q.    Why do you trust him?

23    A.    The time that we've spent together, both with the

24    sheriff's deputy and on SWAT, he's been my point man on many

09:22:25 25    operations, and just working with him in general.  He has a

1    good work ethic.

2    Q.    Now, changing up to the point of the incident.

3          Can you tell the jury where Deputy Frazier stationed

4    himself in the bedroom that contained Brian Garber?

09:22:40  5    A.    Yes.  Deputy Frazier, he stepped in past Deputy Knee,

6    about 1 foot, and then took one step, about, approximately,

7    1 foot to the left, just inside the doorway.

8    Q.    Now, what were you thinking at that time?

9    A.    At that particular time, I'm trying to deescalate

09:22:56  10    Brian.  I'm trying to talk him down.  Trying to get him to

11    listen to my commands.

12    Q.    Did you perceive Brian Garber as a deadly threat?

13    A.    Absolutely.

14    Q.    Why?

09:23:08  15          Tell the jury.

16    A.    He perceived a deadly threat due to the fact that he

17    had this -- what looked to be a firearm under his shirt,

18    pointing it directly at us.

19    Q.    Why didn't you discharge your gun when you first came

09:23:23  20    into contact with Brian Garber?

21    A.    I wanted to deescalate.  I wanted to talk to him.  I

22    wanted to communicate with him, and do anything I could to

23    save his life.

24    Q.    Can you tell the ladies and gentlemen of the jury how

09:23:33  25    many times you've discharged your weapon in the line of duty

```
          1   as a police officer?

          2   A.    Once.

          3   Q.    Was it this incident?

          4   A.    It was that incident.

09:23:43  5   Q.    Now, I think Mr. Gilbert also asked you about sounds.

          6         You testified that the sound in a small room can be

          7   deceptive; is that correct?

          8   A.    Correct.

          9   Q.    Okay.  Can you explain to the ladies and gentlemen of

09:23:55 10   the jury, where the sound came from prior to the shooting

         11   with Brian Garber.

         12   A.    Yes, sir.

         13         When I heard the sound, it came towards me.  I'm

         14   standing right there at the door frame.  So it came towards

09:24:07 15   me from his position.

         16   Q.    Can you tell the ladies and gentlemen of the jury

         17   about other sounds that you heard as well?

         18   A.    Yes.  I heard -- as soon as I heard that sound, I

         19   heard Deputy Frazier and Deputy Knee fire almost

09:24:25 20   simultaneously.  Not, like, together, but almost

         21   simultaneously.  I was a little bit behind them, and that's

         22   when I fired.

         23   Q.    Did you say that was when you fired?

         24   A.    Excuse me?

09:24:37 25   Q.    I'm sorry.  I didn't hear you.
```

1    A.    What did you say?

2    Q.    Did you say that was when you fired?

3    A.    Correct.

4    Q.    Okay.

09:24:43  5          Can you tell the jury a little bit about what happened

6    with your magazine?

7    A.    Yeah.  I have pretty big hands.  So when I -- when

8    drew my weapon up and I fired, at some point in time, I hit

9    my magazine release, which protrudes out of the Smith &

09:24:59 10   Wesson a little bit, and it just fell right out of the

11   magazine well of the gun.

12   Q.    Now, Lieutenant Nicholson, are you familiar with guns

13   and what they look like?

14   A.    Yes, I am, sir.

09:25:10 15   Q.    Can you tell that to the jury.  Explain it to them.

16   A.    Yes.

17         Handguns, they come in different shapes and sizes

18   regarding revolvers and automatics.  You either load them

19   through the side, or underneath, with a magazine.  Mostly,

09:25:25 20   the handguns.  And they're approximately 6 to 8 inches in

21   length, depending on what type of system it is.

22   Q.    Now, Lieutenant Nicholson, have you ever attempted to

23   influence the statements of other officers regarding any

24   incident?

09:25:39 25   A.    No, I have not.

Nicholson (Direct By Downey)

1    Q.    Okay.  Can you tell the ladies and gentlemen of the

2    jury what happened in the kitchen of Matthew Garber's

3    residence following the shooting?

4    A.    Yes, sir.  We had just come down into the kitchen.  It

09:25:52 5    was after just a pretty stressful incident.  Deputy Knee had

6    just started working on a report to finish the previous

7    report from the first call, and had talked with

8    Deputy Frazier reference to him possibly being hit by an

9    object, and looking at him and his uniform.

09:26:09 10          And I had mentioned to him that I -- when I walked

11    over to Brian, I did not, at that time, see a gun, and I

12    believed it to be a Glock.

13    Q.    Lieutenant Nicholson, was any officer on your shift

14    disciplined for the events that occurred on

09:26:25 15    March 16th, 2014?

16                    MR. GILBERT:  Objection.

17                    THE COURT:  Sustained.

18                    MR. DOWNEY:  Your Honor, if I could just have

19    a moment.

09:27:08 20          No additional questions at this time, Your Honor.

21                    THE COURT:  Thank you, Mr. Downey.

22          Cross-examination?

23                    MR. GILBERT:  Thank you.

24

25

```
 1              CROSS-EXAMINATION OF JAMES NICHOLSON

 2    BY MR. GILBERT:

 3    Q.    Good morning, Lieutenant.

 4    A.    Good morning.

 5    Q.    Just a few questions.

 6          We've heard from you twice in this trial.  So I'll try

 7    to be limited in what I ask you.

 8          I want to make it very clear.

 9          You never saw Brian pull up his shirt; is that right?

10              MR. DOWNEY:  Objection, Your Honor.  Beyond

11    the scope.

12              THE COURT:  Overruled.

13              THE WITNESS:  Correct, I did not.

14    BY MR. GILBERT:

15    Q.    You never saw him lean forward and extend his right

16    hand?

17    A.    Correct, I did not.

18    Q.    You never saw him pull out from under his shirt an

19    object that appeared to be a firearm; is that true?

20    A.    That's true.

21    Q.    You never saw a dark object in his hand, did you?

22    A.    I did not.

23    Q.    You never saw him move his arm; is that right?

24    A.    Not his arms, just the transitioning --

25    Q.    I'm just asking the arms right now.
```

1   A.    Mm-hmm.  Not his arm.

2   Q.    You didn't see Brian Garber throw anything, did you?

3   A.    I did not.

4   Q.    You shot because you heard the bang, correct?

09:28:29  5   A.    Correct.

6   Q.    And it was a very loud bang?

7   A.    Correct.

8   Q.    And you were absolutely -- in your mind, you were sure

9   that that was a gunshot?

09:28:44 10   A.    Correct.

11   Q.    You've told the jury all the training you've had, all

12   the experiences you had.  That you're an instructor.  You

13   know what a gunshot sounds like, right?

14   A.    I do.

09:28:57 15   Q.    And you know in this case, there was no gun?

16   A.    I do now, yes.

17   Q.    Okay.  And you didn't feel the need to shoot until you

18   heard that bang?

19   A.    Correct.

09:29:08 20   Q.    All right.  So while there was a tense situation for

21   45 seconds to 50 seconds, you didn't feel the need to shoot

22   until you heard the bang, right?

23   A.    Correct.

24   Q.    And as you said, Knee and Frazier both were shooting

09:29:27 25   before you?

1    A.    Just a fraction before me, yes.

2    Q.    And you, after the scene -- after the shooting, went

3    up to Brian Garber to look at the -- and you looked at the

4    bed, you looked at his body, and you did not see a remote;

09:29:50  5    is that correct?

6    A.    Correct.  I don't recall it.

7              MR. GILBERT:  No further questions.

8              THE COURT:  Redirect?

9          REDIRECT EXAMINATION OF JAMES NICHOLSON

09:29:58 10   BY MR. DOWNEY:

11   Q.    Just to be clear for the jury, Lieutenant Nicholson.

12         Did you perceive Brian Garber as a deadly threat?

13   A.    Yes, I did.

14             MR. GILBERT:  Objection.  Asked and answered.

09:30:17 15            THE COURT:  Overruled.

16             MR. DOWNEY:  Thank you, Lieutenant.

17             THE WITNESS:  Thank you.

18             THE COURT:  Thank you.  You may step down.

19             THE WITNESS:  Thank you.

09:30:38 20            THE COURT:  You may call your next witness.

21             MR. DOWNEY:  Thank you, Your Honor.

22         Matthew Garber.

23             DEPUTY CLERK:  Will you please raise your

24   right hand, please.

09:30:56 25         Do you solemnly swear that your testimony in this case

```
           1    will be the truth, the whole truth, and nothing but the

           2    truth, so help you God?

           3                THE WITNESS:  I do.

           4                CROSS-EXAMINATION OF MATTHEW D. GARBER

09:31:02   5    BY MR. DOWNEY:

           6    Q.    Good morning, Mr. Garber.

           7          As you know, my name is Dan Downey.  I will be asking

           8    you questions today.

           9          I'm sorry for your loss, sir.

09:32:33  10          Can you please state your full name for the record.

          11    A.    Matthew David Garber.

          12    Q.    And, Mr. Garber, I have questions for you regarding

          13    the events of March 16th, 2014.

          14          You interacted with Brian Garber in the bedroom that

09:32:46  15    he grew up in that evening, correct?

          16                MR. GILBERT:  Objection.  Leading.

          17                THE WITNESS:  I did -- excuse me?

          18                MR. DOWNEY:  I think leading is appropriate,

          19    Your Honor.

09:32:58  20                THE COURT:  Overruled.

          21    BY MR. DOWNEY:

          22    Q.    Mr. Garber, you interacted with Brian Garber on

          23    March 16th, 2014, in his bedroom, correct?

          24    A.    Yes.

09:33:05  25    Q.    Okay.
```

1    A.    Interacted, yes.

2    Q.    And you saw what you believed to be a gun under his

3    shirt, correct?

4    A.    No.

09:33:12  5    Q.    Did you share with Cory Momchilov, agent for BCI, that

6    you thought Brian Garber had a gun under his shirt at the

7    time that you interacted with him in his bedroom?

8    A.    No.

9              MR. DOWNEY:  Your Honor, we'd like to queue up

09:33:35 10    the audio from Exhibit 1013, the interview with BCI.  It's

11    at 22:12:08, and we'd like to play it through 22:13:02.

12              (Video played in open court.)

13              MR. GILBERT:  Will you tell us what section

14    he's going to be --

09:35:02 15              MR. DOWNEY:  We were looking for 22:12:08.

16    BY MR. DOWNEY:

17    Q.    Mr. Garber, does that refresh your recollection as to

18    what occurred on March 14th, 2016?

19    A.    Yes.

09:36:13 20    Q.    And did you advise your wife, Connie Garber, to call

21    the police after you left that room?

22    A.    I told her to see if the police were still -- or

23    whoever it was across the street were still over there.

24    That's all I said to her.  I said, If they're still over

09:36:32 25    there, tell them -- they were looking for Brian -- to come

1    on up.

2    Q.    Do you recall Brian Garber telling you, You're not

3    going to like what I have under my shirt?

4    A.    Yes.

09:36:45  5    Q.    And you were aware that Brian had hit Connie that

6    night, correct?

7                    MR. GILBERT:  Objection.  Lack of foundation.

8                    THE COURT:  Mr. Garber [sic], lack of

9    foundation.  You are aware?

09:37:04 10                    MR. GILBERT:  Well, I mean, where did he hear

11   this from?  He wasn't in the room.  He wasn't at the house

12   where this incident occurred.

13                    THE WITNESS:  I don't --

14                    THE COURT:  Well, Mr. Garber [sic], could you

09:37:16 15   give us a bit more foundation.

16                    MR. DOWNEY:  Thank you, Your Honor.

17   BY MR. DOWNEY:

18   Q.    Mr. Garber, did you speak to Connie about what

19   happened across the street at 2435 Mill Run Road?

09:37:26 20   A.    No.

21   Q.    Did you ever visit 2435 Mill Run Road at the time that

22   Connie Garber and Sara Knowlton were filling out domestic

23   packets?

24   A.    Yes.  I don't know whether they were filling out the

09:37:38 25   packets, but I was over there at that time.

1    Q.    Did you tell them not to press charges?

2    A.    Yes.

3    Q.    And why did you do that?

4    A.    I thought we could handle it internally, within the

5    family.

6    Q.    Okay.  And did you learn when you went over to the

7    Mill Run address, prior to interacting with Brian Garber at

8    your own home, that he had hit Connie Garber?

9    A.    No, I don't think.

10    Q.    Did you observe a mark on Connie Garber?

11    A.    No.

12    Q.    Now, did you think that Brian Garber had a weapon in

13    the bedroom when you interacted with him at 3400 Mill Run

14    Road?

15    A.    No.

16             MR. DOWNEY:  Your Honor, I'd like to show the

17    witness Defense Exhibit 1012, page 5 of that document.

18             MR. GILBERT:  Objection.  Your Honor, that's

19    just -- that's a transcript.  He didn't sign that.  The

20    audio would be the better -- this is hearsay.

21             THE COURT:  Well, let's go to sidebar.

22             MR. DOWNEY:  Sure.

23             THE COURT:  Do you have a hard copy of the

24    exhibit?

25

1        (Discussion held at sidebar, as follows:)

2              THE COURT:  I mean, is this the transcript?

3              MR. DOWNEY:  Yes.

4              MR. GILBERT:  It's not a signed statement.

09:39:24  5   It's -- we don't know how it was prepared.

6              MR. DOWNEY:  We can play it.  We can play it,

7   if that's what you wants.

8              THE COURT:  You can play it?

9              MR. DOWNEY:  It's much more difficult to hear

09:39:32 10   it than it is to actually see it because the recording is

11   not a good quality.  But we can play it, if the Court is

12   inclined.

13              THE COURT:  You have some concern that this is

14   not properly --

09:39:42 15              MR. GILBERT:  I don't know.

16              THE COURT:  -- transcribed?

17              MR. GILBERT:  I don't know.

18              MS. GREENE:  I mean, I think that the accuracy

19   is not 100 percent, but, you know, they don't capture every

09:39:52 20   word.

21              MR. GILBERT:  The problem is, he's not hearing

22   what he -- you're reading something to him.  He's not

23   looking at himself talking.

24              MR. DOWNEY:  We could play the recording

09:40:06 25   and --

M. Garber (Cross by Downey)

488

```
                    1              THE COURT:  Why don't you play the recording.

                    2      That's the best thing.

                    3              MR. DOWNEY:  -- and then we can show him the

                    4      statements with respect to --

         09:40:11  5              THE COURT:  Right.

                    6              MR. GILBERT:  The statement is hearsay.  He'll

                    7      say what he says.

                    8              MR. DOWNEY:  We'll play the statement.

                    9              THE COURT:  All right.  Play the statement,

         09:40:21 10      and then we'll worry about the document later.  All right?

                   11              MS. WILLIAMSON:  Thank you, Your Honor.

                   12                   (End of sidebar discussion.)

                   13              (Proceedings resumed in open court.)

                   14      BY MR. DOWNEY:

         09:40:44 15      Q.   Mr. Garber, we're going to go ahead and play your

                   16      statement back to you.  Just listen very carefully.

                   17              MR. DOWNEY:  Go ahead.

                   18          Once again, technical difficulties.  We'll be with you

                   19      in one minute.

         09:41:07 20              (Recording played in open court.)

                   21                   (Pause in proceedings.)

                   22      BY MR. DOWNEY:

                   23      Q.   Mr. Garber?

                   24      A.   Yes.

         09:44:36 25      Q.   Did that refresh your recollection as to what you saw
```

M. Garber (Cross by Downey)

489

```
          1    in the room with Brian Garber?

          2    A.    Excuse me?

          3    Q.    Did that refresh your recollection as to what you saw

          4    in the room with Brian Garber?

09:44:46  5    A.    How do you mean?

          6    Q.    Well, you told Cory Momchilov that you saw the outline

          7    of a gun under his shirt in the statement that you just

          8    heard, correct?

          9    A.    It -- it -- it was his fist.  He had his hand

09:45:06 10    underneath his shirt.  Whether in the twilight, that's -- I

         11    didn't think it was a gun, no, at that time.

         12    Q.    Okay.  And what you told -- you were honest in your

         13    interaction with Special Agent Momchilov, correct?

         14    A.    That was BCI?

09:45:22 15    Q.    Yeah.

         16    A.    I think so.  I -- that was after the shooting.  He

         17    asked me whether I thought Brian had a gun.  And at that

         18    time, I said yes, because I didn't think trained --

         19    Q.    And I'm going to ask you another question, sir.

09:45:36 20    A.    Okay.

         21              MR. GILBERT:  Ask the question.

         22              MR. DOWNEY:  I'm asking on cross-examination.

         23    BY MR. DOWNEY:

         24    Q.    You heard yourself say, "No.  It was definitely the

09:45:44 25    outline of a gun," correct?
```

M. Garber (Cross by Downey)

490

```
 1    A.    I don't remember that, no.  I really -- I can't
 2    remember that.
 3                MR. DOWNEY:  We're going to play it again.
 4                THE WITNESS:  At what point was this?  After
 5    the shooting?
 6    BY MR. DOWNEY:
 7    Q.    You met with Special Agent Momchilov after the
 8    shooting, sir.
 9                (Audio recording played.)
10    BY MR. DOWNEY:
11    Q.    That's you in the video, correct, sir?
12    A.    I'm not getting a feed.
13    Q.    Okay.  Is that your voice?
14    A.    Yes.
15          Okay.
16                MR. DOWNEY:  Play the video.
17                    (Video recording played.)
18                MR. GILBERT:  Playing the whole video, Judge?
19                THE COURT:  Well --
20                MR. GILBERT:  I mean . . .
21                THE COURT:  -- we have to find it.
22          You asked for it.
23                MR. GILBERT:  No, I mean . . .
24          I just want to know if he's playing the whole video.
25                THE COURT:  No.  He's trying to find the
```

1    portion of the video that relates to the questions he wants

2    to ask him.

3                    MR. GILBERT:  He should know that.

4                    THE COURT:  You'll let us know, Mr. Downey,

09:48:28  5    when we get there.

6                    MR. DOWNEY:  Thank you, Your Honor.

7                      (Video played in open court.)

8                    MR. DOWNEY:  Stop it.

9    BY MR. DOWNEY:

09:49:06  10    Q.    Mr. Garber, did you see the video that time?

11    A.    Excuse me?

12    Q.    Did you see the video that time?

13    A.    Yes.

14    Q.    Was that you on the video monitor?

09:49:12  15    A.    Yes.

16    Q.    And was that Special Agent Momchilov from BCI?

17    A.    I never knew his name.  I recognize him, yes.

18    Q.    And were you truthful and honest with him when you sat

19    there answering questions from a law enforcement officer?

09:49:28  20    A.    Yes.

21                    MR. DOWNEY:  I have no additional questions

22    for you, Mr. Garber.

23                    Thank you.

24

25

1                    CROSS-EXAMINATION OF MATTHEW D. GARBER

2    BY MR. GILBERT:

3    Q.    Good morning, Mr. Garber.

4          How are you doing today?

5    A.    Been better.

6    Q.    Okay.

7          I want to put this in the context.

8          You had just learned that your only son had been

9    killed by deputy sheriffs within an hour or two or so of

10   this statement being made, correct?

11                   MR. DOWNEY:  Objection.  Leading.

12                   MR. GILBERT:  I'm cross-examining him.

13                   THE COURT:  It's cross-examination.

14                   MR. DOWNEY:  Beneficiary --

15                   THE COURT:  Overruled.

16                   MR. GILBERT:  You called him as your witness.

17                   THE COURT:  Overruled.

18   BY MR. GILBERT:

19   Q.    Is that correct?

20   A.    Yes.

21   Q.    You were extremely emotionally distraught, were you

22   not?

23   A.    Yes.  Absolutely.

24   Q.    You were at the house when you heard the gunshots in

25   the room where your son was in a bed, correct?

```
           1            MR. DOWNEY:  Objection.  Beyond the scope,

           2     Your Honor.

           3            THE COURT:  Overruled.

           4     BY MR. GILBERT:

09:51:13   5     Q.   When you were called in to give a statement --

           6            THE REPORTER:  I didn't hear an answer to the

           7     last question.

           8            THE WITNESS:  Correct.  I agree.

           9            THE COURT:  Mr. Garber, could you pull your

09:51:25  10     chair up a little closer to the microphone.

          11         Thank you.

          12     BY MR. GILBERT:

          13     Q.   Did you know what happened inside -- you were not

          14     inside the room when your son was shot, were you?

09:51:43  15     A.   No, I was not.

          16     Q.   You don't know what went on in that room, did you?

          17     A.   No, I did not.

          18     Q.   When you were being asked questions, you believed that

          19     your son had a gun, right?

09:51:59  20     A.   At what point?

          21     Q.   Is that because --

          22     A.   Oh, I see.

          23     Q.   When you were at the interview, did you believe your

          24     son had a gun because you couldn't believe that your son

09:52:10  25     would be shot unless he had a gun?
```

```
  1    A.    Absolutely.

  2                MR. DOWNEY:  Objection.  Form.  Leading.

  3                THE WITNESS:  That was my main rationale.

  4                MR. GILBERT:  I would ask that defense counsel

09:52:23  5    do not interrupt the answer of the defendant -- of the

  6    witness.

  7                THE COURT:  Well, he has a right to object,

  8    so . . .

  9                MR. GILBERT:  Okay.  I'm going to ask it

09:52:33 10    again.

 11                THE COURT:  All right.

 12    BY MR. GILBERT:

 13    Q.    Did you think -- did you think that your son would not

 14    have been shot -- that an unarmed person would not be shot

09:52:43 15    unless they had a gun?

 16    A.    That was my thinking, yes.

 17    Q.    So then, at that point, you were thinking that he

 18    probably had a gun, right?

 19    A.    Absolutely.  I mean, why -- if he was unarmed, I

09:52:56 20    figured what they were going to do is go up and get him,

 21    bring him down, and maybe jail him overnight, and try to get

 22    him some counseling.  That was my understanding going in.

 23    Q.    You now know that he did not have a gun, right?

 24    A.    Correct.

09:53:11 25    Q.    Okay.  And you never knew him to have a gun, did you?
```

```
           1    A.     Never.

           2                 MR. GILBERT:  No further questions.

           3                 THE WITNESS:  That's why I said no before.

           4    When I was standing at the bottom of the stairs, at that

09:53:26   5    point, I did think that he had a gun.  That BCI -- I thought

           6    he must have.  I mean, why would they go up there shoot him?

           7    So . . .

           8                 MR. GILBERT:  Thank you very much.

           9         No further questions.

09:53:55  10                 THE COURT:  Redirect?

          11              RECROSS-EXAMINATION OF MATTHEW D. GARBER

          12    BY MR. DOWNEY:

          13    Q.    Mr. Garber, did you share with Special Agent Momchilov

          14    that you thought Brian Garber had committed suicide by cop?

09:54:20  15    A.     No.  I never -- no.

          16                 MR. DOWNEY:  Your Honor, I would like to use

          17    the statement.

          18         If not, we'd have to locate it on the video.

          19                 THE COURT:  Any objection to using the

09:54:38  20    statement, or do we have to go to the video, Mr. Gilbert?

          21                 MR. GILBERT:  We'll just use the statement to

          22    make it easier.

          23                 THE COURT:  Use the statement?  All right.

          24                 MR. DOWNEY:  If we could, Your Honor, I'd like

09:54:58  25    to go to page 9 of Defense Exhibit 1012.
```

1                    MR. GILBERT:  Can we approach the bench here?

2              (Discussion held at sidebar, as follows:)

3                    MR. GILBERT:  What he believes or doesn't

4        believe about what happened in that room is completely

09:55:30  5   irrelevant.  You had made a decision to allow prior suicide

6        attempts in.  But he -- his belief or opinion whether or

7        not --

8                    THE COURT:  After the fact?

9                    MR. GILBERT:  After the fact.

09:55:41 10       -- has no bearing on this case.  They never argued

11       that this was a suicide by cop case.  They said they were

12       justified in shooting him.  Okay?

13            And to bring this into this case at this point in the

14       proceedings, I think, is almost prejudicial that he would

09:56:00 15  even bring that up.  It's beyond the scope of

16       cross-examination.  It's beyond the scope of direct

17       examination.

18                    MR. DOWNEY:  It's not.  My recollection is

19       that Mr. Gilbert asked Mr. Garber about what his thought

09:56:14 20  process was, what was happening, and what he thought

21       happened, and that he was surprised the officers would shoot

22       someone who wasn't armed.  And that that informed his

23       decision on how he talked to Cory Momchilov after the act.

24            So, of course, we get to get in what he thought and

09:56:29 25  what he said to Mr. Momchilov, because right now, it's

1    hanging out there what his opinion and what his belief is,

2    which was over objection.

3         So from my perspective, this is what he thought.  He

4    shared it.  We've already performed, you know, the

09:56:44  5    foundation.  It was his voice on the video.  The statement

6    is appropriate.  I'm going to ask him, Did you say that to

7    Mr. Momchilov?

8         If he says yes, we're done.

9         But, of course -- frankly, Mr. Gilbert and Ms. Greene

09:56:56 10  submitted voir dire questions about suicide by cop in this

11   case.

12              MR. GILBERT:  Oh, come on.

13              MR. DOWNEY:  I mean, the fact that we're not

14   arguing a suicide by cop, that's what he said.

09:57:05 15             MR. GILBERT:  Did we?

16              MR. DOWNEY:  You did.  You did.

17              MR. GILBERT:  But it was ob- --

18              MS. GREENE:  And they were not used --

19              THE REPORTER:  I can't hear you.

09:57:13 20             MS. GREENE:  Those questions were not used

21   when we got to present the actual case.  They were not in

22   the final set submitted to the Court to use in this case

23   with Judge Baughman.

24              THE COURT:  What is really at issue here is

09:57:24 25  what these policemen knew, and they had none of this -- they

```
          1    had none of this information.  This is after the fact.  What

          2    his opinion is is after the fact.

          3         I'm going to sustain the objection.

          4              MR. DOWNEY:  Thank you.

09:57:48  5                (End of sidebar discussion.)

          6              (Proceedings resumed in open court.)

          7              MR. DOWNEY:  No additional questions,

          8    Your Honor.

          9              THE COURT:  Mr. Garber, thank you for your

09:58:01 10    testimony.  You may step down.

         11         Call your next witness, please.

         12              MS. WILLIAMSON:  Thank you, Your Honor.

         13         Defense would like to call Officer Michael Beasley

         14    next.

09:59:39 15              DEPUTY CLERK:  Please raise your right hand.

         16         Do you solemnly swear that your testimony in this case

         17    will be the truth, the whole truth, and nothing but the

         18    truth, so help you God?

         19              THE WITNESS:  I do.

09:59:46 20              DEPUTY CLERK:  Please have a seat.

         21              THE WITNESS:  Thank you.

         22           DIRECT EXAMINATION OF MICHAEL BEASLEY

         23    BY MS. WILLIAMSON:

         24    Q.   Good morning, Officer Beasley.

09:59:55 25    A.   Good morning.
```

1    Q.    Can you please state your name, and spell your last

2    name for the Court.

3    A.    Michael Beasley, B-E-A-S-L-E-Y.

4    Q.    And where do you currently work?

10:00:06  5    A.    I work for the Lexington Police Department in

6    Lexington, Ohio.

7    Q.    And how long have you worked there?

8    A.    This year, it will be 16 years full time.  Altogether,

9    19 years.

10:00:17 10    Q.    And were you working for Lexington PD on

11    March 16, 2014?

12    A.    Yes, I was.

13    Q.    Did you receive a call to respond to the Garber

14    residence on that day?

10:00:31 15    A.    Yes.

16    Q.    And can you tell us about that?

17    A.    We received a call from Mutual Aid to assist the

18    Richland County Sheriff's Office with a domestic violence

19    complaint at the Garber residence.

10:00:46 20         Basically, when I got there, Brian Garber had already

21    left the scene, and we spent just several minutes searching

22    the area, trying to locate them.

23    Q.    When you say we spent several minutes, who else was

24    searching for Brian Garber?

10:01:02 25    A.    Deputies as well.

**Beasley (Direct by Williamson)**

500

1    Q.    Deputies from where?

2    A.    Richland County.

3    Q.    And did you go into the house at all?

4    A.    No.  Not the initial call.

10:01:14  5    Q.    And what happened -- you mentioned you looked for

6    Brian Garber.

7          What happened next?

8    A.    We were unable to locate him.  So I secured from

9    there, and went back on patrol within the Village of

10:01:29 10    Lexington.

11    Q.    At some point later that evening, did you receive an

12    additional call to go out to the Garber residence?

13    A.    Yes.  My dispatch had advised that Richland County was

14    back in route to his parents' house, and he was located at

10:01:43 15    the parents' house, and he had a firearm.

16    Q.    And what did you do upon receiving that information?

17    A.    We stood by at the Village limits, which basically

18    borders the Garbers' property, and waited for

19    Richland County to arrive.  And once they arrived, we

10:02:03 20    proceeded up the driveway with them.

21    Q.    And when you say "We stood by," who were you with at

22    that time?

23    A.    I was with my supervisor, Captain Troy Weaver.

24    Q.    Okay.  And you said Richland County Sheriff's officers

10:02:21 25    arrived.

1    And then what you did do?

2    A.    Well, Captain Weaver and I were, I think, the last two

3    there.  Like I said, we followed them up the driveway.  So

4    they had already gone inside.  We were the last two to get

10:02:35 5    into the house, as far as I can recall.

6    And at that point -- actually, Captain Weaver beat me

7    in the house.  I was getting a rifle out of my cruiser, and

8    when I came inside, he was already at the base of the

9    stairs.

10:02:50 10    I had seen, I believe, Matt Garber, Brian's father, in

11    one of the rooms on the first floor of the house.  I told

12    him he needed to get out of the house.

13    At that point, I heard somebody from upstairs say that

14    Brian had a gun, and I heard a bunch of -- I don't know

10:03:11 15    which deputies, but a bunch of deputies speaking, trying to,

16    basically, talk him down and get him to surrender the

17    firearm.  And then I heard a bunch of shots being fired.

18    Q.    Do you remember anything specific that you heard?

19    A.    The only specific thing I heard, and I don't know

10:03:32 20    which deputy said it, was, We all have families.  You don't

21    need to do this.

22    Something along those lines.

23    Q.    And where were you when you heard this?

24    A.    I was at the base of the stairs leading to the second

10:03:47 25    floor.

1    Q.    And you mentioned that you heard shots fired?

2    A.    Yes.

3    Q.    What did you do after that?

4    A.    After that, I escorted Matt Garber out of the

10:03:57 5    residence and into -- there was a Belleville officer

6    outside.  I handed him over to the Belleville officer, and

7    told him to take him across the street to Brian's residence.

8    Q.    Okay.

9              MS. WILLIAMSON:  Just one moment, Your Honor.

10:04:29 10    Thank you, Officer Beasley.

11    I don't have anything further at this time.

12              THE WITNESS:  Thank you.

13              THE COURT:  Any cross-examination?

14              CROSS-EXAMINATION OF MICHAEL BEASLEY

10:04:38 15  BY MR. DOUGLAS:

16    Q.    Hello, Officer Beasley.

17    Your testimony was that at the time of the shooting,

18  you were at the bottom of the stairs?

19    A.    Yes, sir.

10:04:45 20    Q.    Okay.  So you weren't in the room at the time shots

21  were fired, were you?

22    A.    No, I was not.

23    Q.    Okay.  So you don't know what happened, or what

24  transpired, in that room in the moments just prior to the

10:04:55 25  shooting, do you?

```
          1    A.    No, I do not.

          2              MR. DOUGLAS:  Nothing further.

          3              THE COURT:  Any redirect?

          4              MS. WILLIAMSON:  No, Your Honor.

10:05:01  5              THE COURT:  Officer, thank you for your

          6    testimony.  You may step down.

          7              THE WITNESS:  Thank you, sir.

          8              THE COURT:  Call your next witness.

          9              MS. WILLIAMSON:  Thank you, Your Honor.

10:05:35 10         We would like to call the defendant,

         11    Deputy Jeff Frazier, next.

         12              DEPUTY CLERK:  Raise your right hand, please.

         13         Do you solemnly swear that your testimony in this case

         14    will be the truth, the whole truth, and nothing but the

10:05:44 15    truth, so help you God?

         16              THE WITNESS:  I do.

         17              MS. WILLIAMSON:  Your Honor, we've had a

         18    request for a brief break here before Frazier.

         19              THE COURT:  We have?

10:06:09 20              MS. WILLIAMSON:  Yes.

         21              THE COURT:  All right.  As I said, thank you

         22    for the reminder.

         23         We will take a 15-minute break.

         24              MS. WILLIAMSON:  Thank you.

10:06:17 25              THE COURT:  We're in recess until --
```

1                    DEPUTY CLERK:  All rise.

2                    THE COURT:  -- 10:20.

3                              - - -

4              (The jury exited the courtroom.)

10:24:10   5          (Proceedings in recess at 10:06 a.m. )

6                              - - -

7                    DEPUTY CLERK:  All rise.

8              THE COURT:  Mr. DeVan, bring back the jury.

9                    DEPUTY CLERK:  All rise for the jury.

10:24:37  10                             - - -

11           (Proceedings reconvened at 10:24 a.m. )

12          (In Open Court - Defendant and Jury Present)

13                             - - -

14              DEPUTY CLERK:  Please be seated.

10:26:07  15              THE COURT:  Officer Frazier, you may retake

16     the stand.

17           DIRECT EXAMINATION OF RAYMOND JEFFREY FRAZIER

18     BY MS. WILLIAMSON:

19     Q.    Good morning, Deputy Frazier.

10:26:28  20     A.    Good morning.

21     Q.    How long did you work for the Richland County

22     Sheriff's Office?

23     A.    17 years.

24     Q.    And when did you retire?

10:26:36  25     A.    Last year, September 30th of 2018.

```
        1    Q.    Why did you retire?

        2    A.    Last year tomorrow, I had a heart attack, and followed

        3    by quadruple bypass the next day.

        4    Q.    Are you currently working now?

10:26:54 5    A.    I am not, no.

        6    Q.    Do you have plans to return to law enforcement work?

        7    A.    I -- the last week of May -- or I'm sorry.

        8          The last week of April, first week of May, I'm going

        9    to start at NC State in Mansfield, teaching at the academy.

10:27:11 10   Q.    And what academy is that?

       11    A.    North Central State Academy.

       12    Q.    What will you be teaching?

       13    A.    I'm certified in about 25 different topics, ranging

       14    from patrol tactics, report writing, evidence collection,

10:27:23 15   suspect approaches, booking.  Matters of that.  Basic police

       16    duties.

       17    Q.    During your employment with the Richland County

       18    Sheriff's Office, did you receive any commendations or

       19    awards?

10:27:35 20   A.    Several, yes.

       21    Q.    Would you explain for the jury what some of those

       22    awards and commendations were?

       23    A.    I was deputy of the year 2003, 2005, and 2007.

       24          I have ten-plus office citations awards for above and

10:27:54 25   beyond the call of duty.  It's the highest achievement level
```

1    you can get on a local level.

2        Numerous office merit awards for -- it's basically for

3    investigative cases, resolving and concluding investigative

4    cases.

5        I have -- I'm a Medal of Honor winner.

6        I have three Lifesaving Awards, two from the

7    Richland County Sheriff's Office and one from the State of

8    Ohio.

9    Q.   Can you tell us a little bit about those Lifesaving

10   Awards?

11   A.   The two from Richland County -- all three of the

12   Lifesaving Awards were for doing CPR and resuscitating

13   persons that had cardiac arrests.

14   Q.   At your time at the Richland County Sheriff's Office,

15   did you hold any special assignments?

16   A.   Yes.

17   Q.   And what were those?

18   A.   I was a member of the ASORT, Allied Special Operations

19   Response Team, for 7 years.  On that team, I was an entry

20   man, and then I went up to a level of rifleman, which is a

21   precision rifle operator.

22       After that, I was with the United States Marshals

23   Fugitive Task Force.  I was on the Richland County Drug Task

24   Force.  And I was a K9 officer for five years.

25   Q.   Did you have to receive any special training for any

1    of those assignments?

2    A.    Yes.

3    Q.    And what training did you receive?

4    A.    For the -- to be on the SWAT team back in 2003, we had

10:29:27 5    to go down to the Ohio Peace Officer Training Academy in

6    London, Ohio, and we spent ten days down there, 16-hour

7    days.

8         Miami-Dade Police Department from Florida came up.

9    Their SWAT team came up and put on a tactical course of your

10:29:44 10    basic SWAT duties.  Building entries, repelling, munitions,

11    and then all weapons certifications.

12    Q.    And going back to when you first became a law

13    enforcement officer.

14         What training did you receive to become a law

10:29:58 15    enforcement officer?

16    A.    I graduated the academy in 1996, and it's a basic

17    police academy.  I believe back at that time, it was

18    somewhere around 570 hours, course hours, you had to take to

19    become an officer.  And, again, that's all basic police

10:30:17 20    duties, from how to handle calls to writing reports to

21    submitting evidence to driving, defense tactics, firearms.

22    Q.    And beyond the academy, did you receive additional

23    training during your years at the Richland County Sheriff's

24    Office?

10:30:34 25    A.    Yes.  Yearly, we have what we call Continued

1    Professional Training that's required through the State of

2    Ohio through the Ohio Peace Officer Training Academy.  That

3    training can be anywhere from legal updates for the year,

4    all the way up to firearms qualifications, defense tactics,

10:30:51  5    driving, certifications, TASER, OC, baton.

6    Q.    Deputy Frazier, during your 17 years with the

7    Richland County Sheriff's Office, how many times have you

8    had to use deadly force?

9    A.    Twice.

10:31:10 10    Q.    And how did that affect you?

11    A.    Well, it's -- it's the -- it's the absolute hardest

12    thing you'll have to do in your lifetime as a police

13    officer.

14         Their faces are seared in your memory forever.  I see

10:31:42 15    these people every day, and it's not something that

16    just -- you just move on from.  You live with it for the

17    rest of your life.

18    Q.    Deputy Frazier, did you believe Brian Garber was a

19    threat to your life on March 16, 2014?

10:31:58 20    A.    Absolutely, I did.  100 percent.

21              MS. WILLIAMSON:  Just one moment, Your Honor.

22         I have nothing further, Your Honor.

23              THE COURT:  Cross-examination?

24              MR. GILBERT:  Yes.

10:32:25 25         We just need one second -- two seconds.

Frazier (Cross by Gilbert)
509

```
                  CROSS-EXAMINATION OF RAYMOND JEFFREY FRAZIER

   1

   2       BY MR. GILBERT:

   3       Q.    You indicated just now that you believe Brian Garber

   4       was a threat to your life; is that correct?

10:33:14  5   A.    Yes, sir.

   6       Q.    You have said, though, in your testimony in this

   7       trial, that you did not feel the need to use deadly force

   8       until after 45 to 50 seconds in that room, correct?

   9       A.    That's correct, yes, sir.

10:33:42 10   Q.    Okay.  And your testimony on Tuesday was that Brian

   11      lifted his shirt with his left hand.

   12                  MS. WILLIAMSON:  Objection, Your Honor.

   13      Beyond the scope.

   14                  THE COURT:  I'm going to overrule that.  Your

10:33:55 15   last question opened up some reasonable inquiry concerning

   16      the events of -- the evening of the death.

   17                  MS. WILLIAMSON:  Your Honor, may I have a

   18      sidebar?

   19                  THE COURT:  Brief.

10:34:11 20            (Discussion held at sidebar, as follows:)

   21                  THE COURT:  Your witness.

   22                  MS. WILLIAMSON:  Yes.

   23            Your Honor, I would like to put our position on the

   24      record, and have a continuing objection here.  I'd also like

10:34:29 25   to --
```

Frazier (Cross by Gilbert)

510

1          THE COURT:  You may.  You may.

2          MS. WILLIAMSON:  -- to further have this

3    argument:  I believe this is clearly outside of the scope in

4    Rule 611(b).

10:34:36 5    He was asked if he -- what he felt in the room.  That

6    was it.  There was nothing about what he saw, what he did.

7          Mr. Garber -- or sorry.

8          Mr. Gilbert has had ample opportunity to put on his

9    case in direct.  This -- it's beyond the scope.  This is --

10:34:55 10          THE COURT:  Mr. Gilbert?

11          MR. GILBERT:  Yeah.

12          Your Honor, we anticipated this was going to happen

13    because they asked the same question to

14    Lieutenant Nicholson.

10:35:07 15    They didn't confine just the commendations, training,

16    experience, and all that.  They brought up the actual

17    shooting incident, and asked him if he was in fear of his

18    life.

19          This is the central theme in this case.  I think I

10:35:23 20    have a right to cross-examine and clarify some issues.  I'm

21    not going to be that long.  But they opened the door, I

22    think.

23          MS. WILLIAMSON:  I don't --

24          THE COURT:  Here's my ruling:  I'm overruling

10:35:37 25    your objection.  I'll give you a continuing objection.

```
              1          But I want to make it clear.

              2          The question was, Did you fear for your life?

              3          Why he feared for his life is dilatory.

              4                 MR. GILBERT:  Okay.

10:35:49      5                 THE COURT:  But going beyond that is not.

              6          So confine your questioning to what facts made him

              7    fear for his life.

              8                 MR. GILBERT:  Okay.

              9                 THE COURT:  That was the question, and you are

10:36:01     10    entitled to inquire.

             11          That's my ruling.

             12                 MR. DOWNEY:  Thank you, Your Honor.

             13                    (End of sidebar discussion.)

             14                 (Proceedings resumed in open court.)

10:36:15     15    BY MR. GILBERT:

             16    Q.   Mr. Frazier, you indicated on Tuesday, as part of your

             17    belief that you feared for your life, that Brian lifted his

             18    shirt with his left hand, correct?

             19    A.   That's correct, sir.

10:36:41     20    Q.   And you also said that you saw a dark object in his

             21    hand; is that correct?

             22    A.   That's correct, sir.

             23    Q.   And then you heard a pop, and you responded with fire;

             24    is that correct?

10:36:53     25    A.   That's also correct, yes.
```

1    Q.    Now, on November 6th, 2014, you prepared a written

2    statement regarding the shooting incident, along with your

3    lawyer, correct?

4    A.    That's correct, yes, sir.

10:37:09  5    Q.    And in that statement, you said that you observed

6    Brian as he sat back on the bed, and started to lean forward

7    in a hurried manner; is that right?

8    A.    That's right, yes.

9    Q.    That was part of your fear of -- that your life was in

10:37:28 10   danger?

11   A.    No, not necessarily.

12   Q.    It wasn't?

13   A.    No.

14   Q.    Then why did you put it in your statement?

10:37:32 15   A.    Because it was part of the action.

16   Q.    You also said that he lifted his shirt slightly with

17   his fingers of his left hand, correct?

18   A.    That's correct, yes.

19   Q.    And you said that with his right hand, he pulled out

10:37:45 20   what appeared to be a firearm from under his shirt, correct?

21   A.    I believe I said that, yes.

22   Q.    And you said that he extended his right hand toward

23   you, correct?

24   A.    I believe that I said that as well.

10:37:57 25   Q.    And it was at that point that you heard a pop, right?

```
 1   A.    I don't recall it in that order, no.

 2   Q.    I'm not asking you in order.

 3         Did you say, and it was at that point that you heard a

 4   pop, after he extended his right hand towards you?

 5   A.    I don't recall that, no.

 6   Q.    Would you like to read your statement?

 7   A.    I believe what you're seeing.

 8   Q.    And that you only fired your weapon after -- after you

 9   observed Garber start to lift his shirt and present what

10   appeared to you to be a weapon, correct?

11   A.    I believe my testimony was that I returned fire after

12   I heard a pop.

13   Q.    Did you say in the written statement you prepared with

14   your lawyer that you only fired your weapon after you

15   observed Garber start to lift his shirt and present what

16   appeared to you to be a weapon?

17   A.    If that's what you have in front of you, I'm not going

18   to deny it.

19   Q.    Okay.  And you sat through this trial, and you heard

20   your colleagues, Knee and Nicholson, say they never saw

21   anything come out of his shirt, right?

22   A.    Yes, I did.

23   Q.    Okay.  So what they're saying and what you're saying

24   are two things different, right?

25   A.    Different officer perception.
```

```
 1    Q.    You were all in the same room, correct?

 2    A.    Different perceptions from different angles.

 3    Q.    Okay.  So on November 6th, the same day you wrote this

 4    statement with your lawyer and presented it to the

 5    authorities, you provided a video-recorded interview

 6    concerning the shooting, correct?

 7    A.    That's correct as well, yes.

 8    Q.    And in that video-recorded interview, you said that

 9    Brian brought his entire hand out of his shirt eventually?

10    A.    Eventually --

11    Q.    Do you remember that?

12    A.    Eventually, yes.

13    Q.    And you said that as he was pulling it out, you heard

14    the pop?

15    A.    My explanation of that is, is when --

16    Q.    Did you say that?

17    A.    I believe so.  If it's on the tape, yes.

18    Q.    Okay.  That's all I asked you.

19    A.    Okay.

20    Q.    Did you say that?

21    A.    Yes.

22    Q.    Okay.  Did you say that as you were firing at him, he

23    was not dying?

24    A.    Yes, I did say that.

25    Q.    And you said that the whole hand comes out, and you
```

**Frazier (Cross by Gilbert)**

1    continue to fire; is that right?

2    A.    That is correct, yes.

3    Q.    And you said that you saw something dark in his hand,

4    right?

10:40:21 5    A.    That's also correct, yes.

6    Q.    And you said you saw an object in his hand, correct?

7    A.    That is also correct.

8    Q.    And you heard your colleagues, who testified in the

9    trial that they didn't see anything like that, correct?

10:40:33 10   A.    Yes.

11   Q.    Okay.  So that was November 6th, 2014.

12         Then, on December 17th, 2015, you gave testimony under

13   oath in a deposition in this case, correct?

14   A.    That's correct, yes.

10:40:54 15   Q.    We've gone over some of that with you.

16   A.    Yes.

17   Q.    Okay.  And in that deposition, you testified that you

18   did not see an arm or hand come out of Brian's shirt,

19   correct?

10:41:07 20   A.    If that's what's in the testimony, then, yes, that's

21   what I said.

22   Q.    That contradicts what you said November 6th, 2014,

23   rite?

24   A.    My perception at the time I was giving a statement,

10:41:20 25   yes.

                1    Q.    Okay.  And you testified you never saw Brian point a

                2    firearm towards you other than from under his shirt,

                3    correct?

                4    A.    If that's what that says, yes.

10:41:30        5    Q.    Okay.  You don't deny you said that, right --

                6    A.    No, I'm not --

                7    Q.    -- on December 17th, 2015?

                8    A.    I'm not going to deny that, no.

                9    Q.    Okay.  And you also said on December 17th, in the

10:41:41       10    course of this litigation where you are a defendant, that

               11    you never saw Brian extend his arm.

               12    A.    Say that one more time.

               13    Q.    You testified that you never saw Brian extend his arm,

               14    correct?

10:41:55       15    A.    I don't recall that.

               16    Q.    And you testified that you did not ever see him lift

               17    his shirt and present a firearm to you, in that deposition?

               18    A.    I don't recall that either.

               19    Q.    Okay.  And you testified that you did not ever see

10:42:14       20    Brian brandish what you thought looked like a firearm,

               21    correct?

               22    A.    I believe you're twisting my words.

               23    Q.    I'm reading it right from the deposition.

               24          And I'll show it to you.

10:42:24       25    A.    I don't --

```
  1    Q.    No problem.

  2    A.    I don't recall saying that.

  3    Q.    Okay.  And you testified that you never actually saw

  4    an object in Brian's hand, correct?

  5    A.    I don't recall that either.

  6    Q.    And you testified that you did not see Brian with a

  7    gun, right?

  8    A.    Yes, I did testify to that.  Yes.

  9    Q.    And you testified that whatever was in Brian's hand,

 10    it was only -- it was only under his shirt?

 11    A.    I believe so, yes.

 12    Q.    Okay.  And you don't think that contradicts what you

 13    said earlier on November 6, 2014; is that right?

 14    A.    Answering questions as they're being asked.

 15    Q.    Is that right?

 16    A.    Yes.

 17    Q.    Okay.

 18               MR. GILBERT:  Let's bring up the deposition.

 19          Exhibit 2, Your Honor.

 20    BY MR. GILBERT:

 21    Q.    I want you to read this -- I want you to read this to

 22    the jury, which is, line -- page 55, line 11.

 23    A.    Do you want me to start at 11?

 24    Q.    Yes.

 25    A.    Or you just want me to read 11?
```

```
       1    Q.    Read it out loud so the jury can hear it.

       2    A.    Number 11:  "Question:  Before the pop, did you see

       3    his arm or hand come out the area of the shirt?"

       4    Q.    What's your answer?

10:43:56  5    A.    "I did not."

       6    Q.    Go to the next question.

       7    A.    "Question:  Did you ever see his hand come out of that

       8    shirt?"

       9    Q.    Answer?

10:44:09 10    A.    "No."

      11    Q.    Next question.

      12    A.    "Did you ever see him point a gun at you?"

      13    Q.    Answer?

      14    A.    "Just what I perceived to be a gun underneath his

10:44:19 15    shirt."

      16    Q.    "Question:  Did you ever see him extend his arm?"

      17    A.    Do you want me to read the next one?

      18    Q.    Read the answer.

      19    A.    "No, sir."

10:44:30 20    Q.    "Question:  Did you ever see him lift his shirt and

      21    present a firearm to you?"

      22    A.    "No, sir."

      23    Q.    Did you -- the next question, go ahead, read it.

      24    A.    It says, "Did you ever see Brian brandish what you saw

10:44:46 25    was -- looked like a gun?"
```

1    Q.    Answer?

2    A.    "No, sir."

3    Q.    Next page.

4         And it reads what, that first question?

10:44:56  5    A.    "So you never saw him with an object in his hand?"

6    Q.    And I then asked, "Visibly?"

7    A.    "I did not see him with a gun, no."

8    Q.    And then I asked you, "Or an object?"

9         And what was your answer?

10:45:14 10    A.    "I did not see any objects in his hand.  Whatever he

11  had was underneath his shirt."

12    Q.    Okay.  Mr. Frazier, you were under oath on

13  December 17th, 2015, where you testified under penalties of

14  perjury?

10:45:46 15    A.    That's correct, yes.

16    Q.    Okay.  Right?

17    A.    Yes.

18    Q.    And you're under oath at this time?

19    A.    That's correct, yes.

10:45:53 20    Q.    And you're sworn to tell the truth when you're under

21  oath; is that correct?

22    A.    That's true, yes.

23    Q.    So which version is the truth in this case?

24    A.    I've told you the truth.

10:46:07 25    Q.    We'll let the jury decide that.

1          MR. GILBERT:  Thank you very much.

2          THE WITNESS:  You're welcome.

3          THE COURT:  Redirect?

4          MS. WILLIAMSON:  Yes, Your Honor.

10:46:15  5     REDIRECT EXAMINATION OF RAYMOND JEFFREY FRAZIER

6    BY MS. WILLIAMSON:

7    Q.    Deputy Frazier, you've given a lot of statements over

8    the course of the past five years in this case.

9    A.    Four or five, yes.

10:46:37 10   Q.    And I'd like to make sure you have the opportunity to

11   tell the story about what happened.

12          MS. WILLIAMSON:  Can you quickly pull up the

13   deposition transcript that was just pulled up, page 55.

14   BY MS. WILLIAMSON:

10:46:50 15   Q.    Looking at the answers that you read here.

16          "Did you ever see" --

17          I'm looking at line 20.

18          "Did you ever see him lift his shirt and present a

19   firearm to you?"

10:47:25 20          Your answer was, "No, sir."

21          Can you explain that answer?

22   A.    I've never seen a gun, ever.  I've never testified

23   that I've ever saw a gun.

24   Q.    And did you ever see the whole object come out of his

10:47:38 25   shirt?

A.    No.

Q.    What did you see when you looked at Brian Garber as he was seated on that bed?

A.    An object under his shirt that appeared to be a firearm.

Q.    And did you see Brian Garber move?

A.    Yes.

Q.    Explain what you saw.

A.    He leaned back, leaned forward, lifted his shirt with his left hand.  I seen what perceived to be a firearm.  I heard a pop.  I returned fire.

Q.    And when you say you saw what you perceived to be a firearm, what do you mean?

A.    I seen a black object.  I didn't see the whole object.  It looked to be a firearm underneath his shirt.  I perceived it to be a firearm.

Q.    Can you describe the shape of that object?

A.    About this long.  About that wide.  And it looked like the barrel of a firearm sticking out of his shirt -- or sticking in his shirt.

Q.    And why did you fire your weapon?

A.    Because I was scared to death.  I thought I was going to be shot.

        MS. WILLIAMSON:  One moment, Your Honor.

        Nothing further.

                          THE COURT:  Officer, thank you for your

testimony.

                          MR. GILBERT:  Can we have a redirect?

                          THE COURT:  I'm not going to permit it.

10:48:57                   MR. GILBERT:  You're not?

                          THE COURT:  Denied.

          Officer, you may step down.

          You meant recross.

                          MR. GILBERT:  I'm not going to argue with the

10:49:08  Court.

                          THE COURT:  All right.  Thank you for that,

Mr. Gilbert.

          Call your next witness.

                          MS. WILLIAMSON:  Yes, Your Honor.

10:49:16  We'd like to call Deputy Andrew Knee.

                          DEPUTY CLERK:  Raise your right hand, please.

          Do you solemnly swear that your testimony in this case

will be the truth, the whole truth, and nothing but the

truth, so help you God?

10:49:24                   THE WITNESS:  Yes, sir.  I do.

                          DIRECT EXAMINATION OF ANDREW KNEE

BY MS. WILLIAMSON:

Q.    Good morning, Deputy Knee.

A.    Good morning.

10:50:20  Q.    I know you've already been here and already testified

1    before this jury.  I don't intend to revisit all of your

2    testimony, but I do have some areas of inquiry this morning.

3    A.    Yes, ma'am.

4    Q.    In your prior testimony, you described the shape of

10:50:34   5    the object under Brian Garber's shirt as a distinct

6    rectangular shape.  And I believe you demonstrated for the

7    jury the approximate inches in length of that.

8         Was that description of the object based on your own

9    personal observations of the object that night?

10:50:53  10    A.    Yes, that was based on my own personal observations

11    that night.

12    Q.    Did any other officer tell you how to describe that

13    object?

14    A.    No, they did not.

10:51:01  15    Q.    Did you believe that that object was a firearm?

16    A.    Yes, I did.

17    Q.    Going back to the room that night.

18         I'd like for you to describe for the jury what was

19    going through your mind during the interaction with

10:51:21  20    Brian Garber.

21    A.    At the time our interaction was going on, ladies and

22    gentlemen, I honestly believed at any moment in time, I was

23    going to take a round in the head.  That was the main

24    thought that was going through my head the whole time that

10:51:35  25    we were doing this.

```
         1        Now, was deadly force justified at that point in time,

         2   before we heard the bang?  Yes, it was.

         3        Did I choose to do that immediately?  No.

         4        My fellow officers were doing the best they possibly

10:51:49 5   could to try and deescalate the situation and talk him down,

         6   and I attempted to let them do so, to the best of their

         7   ability.

         8   Q.   Deputy Knee, how many times have you had to use deadly

         9   force in your career?

10:52:00 10  A.   This is the only incident in my career where I've had

         11  to.

         12  Q.   And how has this impacted you?

         13  A.   It's a great tragedy that it had to work out this way.

         14  It really is.  But at the end of the day, I did my job, and

10:52:15 15  I did what I had to do at the given time.

         16            MS. WILLIAMSON:  Thank you, Deputy Knee.

         17            THE COURT:  Any cross-examination?

         18            MS. GREENE:  Yes, Your Honor.

         19            CROSS-EXAMINATION OF ANDREW KNEE

10:52:34 20  BY MS. GREENE:

         21  Q.   Deputy Knee, you are not on trial today, are you?

         22        You're not a defendant in this case today?

         23  A.   No, ma'am.

         24  Q.   And on March 16th, 2014, you never saw Brian pull up

10:52:53 25  his shirt, did you?
```

1    A.    No, ma'am.

2              MS. WILLIAMSON:  Objection.  Scope.

3              THE COURT:  Overruled.

4    BY MS. GREENE:

10:52:58  5    Q.    And on that date, you never saw Brian lean forward and

6    extend his right hand, correct?

7    A.    No, ma'am.

8    Q.    And on that date, you never saw him pull out from

9    under his shirt an object, did you?

10:53:10 10    A.    No, ma'am.

11    Q.    You never saw a dark object in his hand, correct?

12    A.    That's correct.

13    Q.    And you never saw him move his arms at the time of the

14    shooting, right?

10:53:18 15    A.    That's correct.

16    Q.    You did not see him throw anything?

17    A.    That's correct.

18    Q.    You shot because you heard a bang, correct?

19    A.    That's correct.

10:53:26 20    Q.    And you were sure that bang was a gunshot?

21    A.    At the time, that's what I believed it was.

22    Q.    And you did not feel the need to shoot until you heard

23    that bang, correct?

24    A.    That's correct.

10:53:37 25    Q.    And Frazier shot before you, right?

```
 1   A.    Yes.

 2   Q.    Sometime after the shooting, you heard that it was not

 3   a gun under Brian's shirt, but instead, it was a remote,

 4   correct?

 5   A.    That's correct.

 6   Q.    But when you were in that bedroom, you did not see the

 7   remote on the bed, did you?

 8   A.    That's correct.

 9              MS. WILLIAMSON:  No further questions.

10              THE COURT:  Any redirect?

11              MS. WILLIAMSON:  No, Your Honor.

12              THE COURT:  Officer Knee, thank you for your

13   testimony.  You may step down.

14              THE WITNESS:  Thank you, Your Honor.

15              MR. DOWNEY:  Your Honor, that's defense's last

16   witness.

17              THE COURT:  Defense rests?

18              MR. DOWNEY:  Yes, Your Honor.

19              THE COURT:  All right.

20        Ladies and gentlemen of the jury, the defendant has

21   now concluded its case in chief.  There are some matters

22   that I need to discuss with counsel.

23        It's 10:54, and I will want to speak to you briefly

24   about how we're going to proceed from here.  So I'm going to

25   have Mr. DeVan take you back to the jury room.  And after
```

```
          1    I've had discussions with counsel, we'll bring you back, and

          2    talk about what's going to happen going forward.

          3         Again, I want to thank you for your attention and for

          4    your service.

10:54:59  5              DEPUTY CLERK:  All rise.

          6              (The jury exited the courtroom.)

          7              THE COURT:  We'll wait until Mr. DeVan gets

          8    back, and then discuss going forward.

          9         The first order of business will be defendants'

10:56:19 10    exhibits.

         11         Do you need some time to consult before you present

         12    your exhibits?

         13              MR. DOWNEY:  Thank you, Your Honor.

         14         Just a minute or two.

10:56:27 15              (Pause in proceedings.)

         16              THE COURT:  All right.

         17              MR. DOWNEY:  Defendants are ready, Your Honor.

         18              THE COURT:  You may proceed.

         19              MS. WILLIAMSON:  Thank you, Your Honor.

11:00:44 20         We don't have much.

         21         Can you hear?

         22              THE COURT:  There we go.

         23              MS. WILLIAMSON:  Okay.

         24              THE COURT:  All right.

11:00:54 25              MS. WILLIAMSON:  Defendants' Exhibit 1001.
```

1       And then we have just the limited portion that was

2   identified of Defendants' Exhibit -- Defendants'

3   Exhibit 1006.  Just the portion that was played in Court.

4       And for Defendants' Exhibit 1013, again, just the

11:01:32  5   limited portion that was played in Court.

6       Oh, I'm sorry.  I think I misspoke.

7       It wasn't Defendants' Exhibit 1006.  I believe it was

8   Defendants' Exhibit 1003, the 911 recording.

9               THE COURT:  1001, 1003 --

11:02:00  10              MS. WILLIAMSON:  Yes.

11              THE COURT:  -- 1006?

12              MS. WILLIAMSON:  Not 1006.  I apologize.  I

13   misspoke.

14              THE COURT:  All right.  So it's 1001 and 1003?

11:02:12  15              MS. WILLIAMSON:  And 1013.

16              THE COURT:  1013?

17              MS. WILLIAMSON:  Yes.  And those will be just

18   the -- those last two, just the limited portions that were

19   identified by the witnesses and played for the jury.

11:02:28  20              THE COURT:  All right.

21          Let's start with 1013.

22          This was the one where there was the transcript?

23              MS. WILLIAMSON:  Yes.

24              THE COURT:  It would seem to me that for

11:02:39  25   purposes of the jury, if it can be verified that the

1   transcript -- because it's very limited portions -- if it

2   can be verified that the transcript is an accurate

3   transcription, then merely those two portions, which would

4   be a redaction, would be easier for the jury to handle back

11:03:00  5   in the jury room.

6              MS. GREENE:  Judge, plaintiff does object to

7   the admission of that exhibit because it's hearsay.  It was

8   used for impeachment, and the witness was here to testify.

9              THE COURT:  Well, I'm going to admit it.  It's

11:03:20 10   very short.  But I'd prefer to do it by transcript, unless

11   the transcription is defective.  So there's going to have to

12   be a review to make sure that it is.

13         And this 1003, again, technically, how is the jury

14   going to handle that, if they want to hear it?

11:03:45 15              MS. WILLIAMSON:  That one, we have just the

16   clips.  We could --

17              THE COURT:  You just have the clip.

18              MS. WILLIAMSON:  We just have the clip of what

19   was played.

11:03:52 20              THE COURT:  All right.  So what kind of

21   technology would the jury need to hear it?

22              MS. WILLIAMSON:  Do you -- oh, I mean, we

23   could -- if they ask for it, we could, you know, provide a

24   laptop that would allow them to hear the recording, the clip

11:04:11 25   of it.

1          MR. GILBERT:  Judge, I hate to go back to

2     Evidence 101, but you cannot introduce prior inconsistent

3     statements where the -- where the witness said, That's him

4     there.  It's his voice.

11:04:38  5          I mean, he admitted it.  And then he comes up with an

6     explanation.

7          You can't actually bring in the impeachment document,

8     or statement, as an independent exhibit.

9          THE COURT:  Which one are you -- which one are

11:04:59 10    you talking about now?  Which exhibit?

11          MR. GILBERT:  Any of them.  Any of those

12     recordings.

13          THE COURT:  Well, 1003 is the audio call of

14     the 911, right?

11:05:12 15          MR. GILBERT:  Well, they only played a certain

16     portion of it.

17          THE COURT:  Well, and that's all they want to

18     introduce.

19          MR. GILBERT:  I'm talking about the interview

11:05:20 20    of Mr. Garber, and the 911 call, too.

21          MS. WILLIAMSON:  It's already been admitted.

22          MR. DOWNEY:  It's already been admitted.

23          THE COURT:  Well --

24          MR. GILBERT:  Nothing has been admitted.

11:05:30 25          MR. DOWNEY:  The Judge --

 1                    MS. WILLIAMSON:  The Judge --

 2                    MR. DOWNEY:  -- he already made a ruling.

 3                    THE COURT:  Well, the 911 call was

 4    information --

11:05:36  5                    MR. GILBERT:  Right.

 6                    THE COURT:  -- that was available prior to the

 7    incident.  So I don't see a problem with that.

 8           And then --

 9                    MS. GREENE:  Judge, if we could just put on

11:05:46 10    the record that we object to the admission of these two

11    particular exhibits, 1003 and -- or 1013, or any portions

12    thereof, as hearsay, completely excluded under the Hearsay

13    Rules 801 and 802.

14           Thank you.

11:06:02 15                    THE COURT:  All right.  So you're talking

16    about, again, your objection goes to 1003 and 1013, correct,

17    the portions?

18                    MS. GREENE:  Yes, Judge.

19                    THE COURT:  All right.  I'm going to overrule

11:06:21 20    that.

21           But I do have some concerns about the form in which

22    they're going to be presented to the jury, if they choose to

23    want to review those two exhibits.

24                    MS. WILLIAMSON:  We do have --

11:06:37 25                    MR. DOWNEY:  We have a transcript of the 911

1    call as well.

2                    THE COURT:  You do?

3                    MR. DOWNEY:  Yeah.  That could be redacted to

4    just that portion that was played.

11:06:51  5                    MS. WILLIAMSON:  Or we can make a computer

6    available --

7                    THE COURT:  All right.  Well, again --

8                    MS. WILLIAMSON:  -- if it's asked for.

9                    THE COURT:  -- the question -- I've overruled

11:06:56  10   the objection.

11        The question is the accuracy of the transcription.

12        I'd prefer they have the text.  And if, in fact, it's

13   a fair and accurate transcription, then that's how it should

14   go in.

11:07:13  15       If not, then we have a different problem.

16                   MR. GILBERT:  Well, in light of that, we could

17   go over it.

18                   MR. DOWNEY:  We think it's accurate,

19   Your Honor.

11:07:21  20                   MR. GILBERT:  We can go over it and make sure.

21                   THE COURT:  All right.  And I'm not asking you

22   to waive your objection, just --

23                   MR. GILBERT:  No.  No.

24        Thank you.

11:07:28  25                   THE COURT:  All right.  So -- all right.

1          Well, that leaves us with where we're going forward.

2          And I believe this is in my trial order, but I

3     instruct the jury before closing argument.

4          So we're going to need a charge.  And I told you that

11:07:47  5     I would have you meet to see if you could agree on a charge.

6     We've also been working on a charge to take a look at what

7     you gave us in light of where we are in the trial.

8          And why don't we do that over the lunch hour.  And

9     hopefully -- hopefully -- we can have a charge ready this

11:08:10 10     afternoon, and go ahead and charge of jury.

11          I'm inclined to give you a half an hour -- each side a

12     half an hour for their clothing arguments, so -- yes.

13          Oh, and I'm going to give them the stipulations, too,

14     when they -- before I give them the charge.

11:08:32 15          Thank you, Mr. DeVan.

16                    MR. DOWNEY:  Your Honor, if I may.

17          Are we going to close today or tomorrow?

18                    THE COURT:  Well, that's the question.  It

19     depends on how long it takes to get a charge.

11:08:43 20          And, obviously, here's the problem:  If I'm going to

21     give them the charge, and then you're going to argue, so

22     that there's some contemporaneous context for that, it may

23     very well be it's just better to come back tomorrow and do

24     the whole thing.  And I think we can have it all done in the

11:08:59 25     morning.

 1              MR. DOWNEY:  I think that's right, Your Honor.

 2     That would be the defense perspective.

 3              THE COURT:  How do you feel about that from

 4     the plaintiff's side?

11:09:05  5              MR. GILBERT:  I think we agree for that.

 6              THE COURT:  All right.  So we can let the jury

 7     go for the day?  We can let the jury go for the day, and

 8     have them come back tomorrow?

 9              MR. GILBERT:  Well, we can stay around here.

11:09:19 10              MR. DOWNEY:  Right.  We can --

11              THE COURT:  Well, you have to stay around

12     here.  You have to come up with a charge.

13              MR. DOWNEY:  That's what we agree on.

14              THE COURT:  We all have some work to do here

11:09:24 15     before we move on.

16              MR. DOWNEY:  Right.

17              THE COURT:  But that way we have the rest of

18     the day to give it our best efforts.  And if I have to come

19     up with my own decision with respect to some of this stuff,

11:09:37 20     I will.

21              MR. DOWNEY:  Thank you, Your Honor.

22              THE COURT:  It goes without saying.

23         All right.

24              MR. DOWNEY:  We'd also like to renew our

11:09:44 25     motion to dismiss under Rule 50 at the close of the defense

1    case.

2              THE COURT:  Okay.  And we can do that.  We'll

3    put that -- we'll put that on the record before -- after I

4    send the jury --

11:09:57  5              MR. DOWNEY:  Great.

6         Thank you, Your Honor.

7              THE COURT:  -- after I send -- dismiss the

8    jury for the day.

9         All right.  So just so that we're clear, number one,

11:10:06  10   we're going to dismiss the jury for the day.  We're going to

11   tell them that they'll be back first thing in the morning.

12        At that time, they will receive the stipulations, the

13   instructions from the Court, and they will hear closing

14   argument, and they will deliberate.

11:10:21  15        And then we'll have your motion on the record, and

16   then we'll recess and work on the charge.

17              MS. WILLIAMSON:  Thank you.

18              MR. DOWNEY:  Thank you, Your Honor.

19              THE COURT:  Bring back the jury, Mr. DeVan.

11:11:41  20              DEPUTY CLERK:  All rise for the jury.

21              (The jury entered the courtroom.)

22              DEPUTY CLERK:  Please be seated.

23              THE COURT:  Members of the jury, you have now

24   heard all the testimony that's going to be presented in this

11:12:22  25   case, and the attorneys in the Court now need to meet and

1    work on final instructions for the jury before you

2    deliberate.

3         I've consulted with counsel, and we believe that it's

4    in the best interest of making sure that we have complete

11:12:41  5    and proper instructions, that we take the rest of the day

6    working on that task.  And so, therefore, I am going to

7    release you for the day and have you come back tomorrow,

8    reporting at 8:30 to begin at 9:30.

9         Now, at that time, you will hear stipulations of fact,

11:13:04 10    facts that the parties have agreed to.  I will give you my

11    instructions, and then you will hear closing arguments from

12    counsel for both sides.

13         Following closing argument, then, you will deliberate

14    for purposes of reaching your verdict in this case.

11:13:28 15         So it appears that you will start deliberating in the

16    morning.  I'll let you know, just for purposes of your

17    planning, that while you're deliberating, you do receive

18    lunch.  So we'll bring it in, and you won't have to go out.

19         And hopefully by the end of the day -- although, you

11:13:51 20    don't have to, if you're not at that point -- you'll have a

21    verdict.  But you take as long as you need in order to come

22    back with a verdict in this case.

23         I do want to admonition you, again, that you are not

24    to communicate with anyone about the case, even your fellow

11:14:14 25    jurors.

1    I assure you you'll have a full opportunity to discuss

2    this case with your fellow jurors after the case has been

3    submitted for your deliberations.

4    And, once again, remind you about restrictions on

11:14:33  5    using the Internet, social media, for purposes of

6    communicating about the case with anyone or doing any

7    independent research or inquiry.  That's strictly

8    prohibited.  So as curious as you may be, given all that

9    you've heard, please stay away from the Internet as it

11:14:57 10    relates to this case.

11    Does anybody on the jury have any questions before I

12    let you go for the day?

13                    (No response.)

14                    THE COURT:  All right.  Again, thank you for

11:15:05 15    your attention.  Thank you for your service.  We'll see you

16    tomorrow morning, and we'll proceed with the case at that

17    time.

18                    DEPUTY CLERK:  All rise.

19                         - - -

11:15:10 20            (Jury excused for the day at 11:15 a.m.)

21                         - - -

22                    MR. DOWNEY:  If we may, defense moves, once

23    again, for judgment as a matter of law under Rule 50, and

24    renew the qualified immunity motion filed on behalf of

11:16:21 25    Deputy Frazier as the plaintiff's claims.

1            And note specifically to the Court that there's no

2       evidence presented at trial of conscious pain and suffering

3       or emotional damages for Brian Garber, and we would move to

4       dismiss that claim as well.

11:16:34  5                 THE COURT:  Again, your motion is denied.

6            However, you reserve the right to make it again after

7       the jury returns its verdict.  And so if you're so disposed

8       to do so, we'll hear it again at that time.

9                 MR. DOWNEY:  Thank you, Your Honor.

11:16:49 10                 THE COURT:  Did you want to say something,

11      Mr. Gilbert?

12                 MR. GILBERT:  I'll leave it.

13                 THE COURT:  All right.

14                 MR. GILBERT:  I'll put my foot in my mouth,

11:17:03 15      maybe.

16                 MR. DOWNEY:  Please talk, Terry.

17                 MS. WILLIAMSON:  Yeah.  Yeah.

18                 THE COURT:  All right.  The Court is in recess

19      until 1:00.

11:17:11 20                 MR. DOWNEY:  Thank you, Your Honor.

21                 MS. WILLIAMSON:  Thank you.

22                 THE COURT:  Oh, the other thing I'll mention

23      to you is, of course, you'll need to assemble all of those

24      exhibits because they will go back to the jury room.

11:17:23 25           So get your exhibits together.  And you're going to

1    talk about these audio exhibits, and whether they can be put

2    in some kind of a written form.

3         And then I want you to inspect the entire package,

4    consisting of plaintiff's exhibits and defendants' exhibits,

11:17:43 5    and then I will have you certify on the record that these

6    are the exhibits that have been admitted.  So . . .

7                   MR. DOWNEY:  Thank you, Your Honor.

8                   MR. GILBERT:  Thank you.

9                   MR. DOWNEY:  And should we be working on the

11:17:54 10    jury instructions now as well?

11                   THE COURT:  Right.

12                   MR. DOWNEY:  Okay.  We'll do that.

13                   THE COURT:  And as I say, you may not be

14    finished by 1:00, but we got the rest of the afternoon.

11:18:07 15                   MR. DOWNEY:  Thank you, Your Honor.

16                   MS. WILLIAMSON:  Thank you.

17                   MR. DOWNEY:  Your Honor, can we have

18    Deputy Frazier excused for the day?

19                   THE COURT:  He may be excused.

11:18:52 20                   MR. DOWNEY:  Thank you, Your Honor.

21                        - - -

22            (Proceedings in recess at 11:18 a.m. )

23                   DEPUTY CLERK:  All rise.

24

25

1                              - - -

2                   (Proceedings reconvened at 1:24 p.m.)

3                    (In Open Court - Jury Not Present)

4                         (Defendant Present)

13:24:03   5                              - - -

6               DEPUTY CLERK:  Please be seated.

7               THE COURT:  At my request, counsel have been

8       meeting in an effort to come up with an agreed set of

9       instructions for the jury, and I understand that except with

13:24:23  10    one matter, they have agreed.

11          So I'll hear first from the plaintiff.

12               MS. GREENE:  Yes, Judge.

13          One matter in regard to the credibility instruction we

14      have a disagreement about, and then I know defendants plan

13:24:41  15    to raise one other issue in relation to survivorship

16      damages.

17          With regard to the credibility instruction, the

18      instructions we have provided are identical, other than one

19      paragraph at the end of plaintiff's version, which makes

13:24:56  20    clear that testimony of a police officer is entitled to no

21      special or exclusive sanctity over that of another witness

22      with regard to credibility.

23          So we ask that that paragraph be included.

24               MS. WILLIAMSON:  Your Honor, our instruction

13:25:09  25    is the instruction that was provided to us on credibility

                1    from Judge Polster.

                2         We -- the inclusion of the last paragraph is

                3    prejudicial to the defendants, and further, the sentiment of

                4    that instruction is already covered.  We have an

    13:25:27   5    instruction -- I think it's the third instruction -- which

                6    includes that all persons are equal under the law.  And it's

                7    also covered in the credibility instruction itself.  I don't

                8    feel like we need this other last paragraph here.

                9         In terms of -- should I go on to the other?

    13:25:47   10                THE COURT:  No.  Let's just deal with that

               11    one.

               12                MS. WILLIAMSON:  Sure.

               13                THE COURT:  As I told counsel off the record,

               14    I have been reviewing the instructions given in a similar,

    13:25:59   15    although, not identical case, *Smith versus Jones*,

               16    1:13-cv-744, which was tried to a verdict before

               17    Judge Oliver, and I want to see what kind of credibility

               18    instruction he gave.

               19         As I read his instruction, he doesn't say anything

    13:26:30   20    about classes of persons, singling out anyone for caution

               21    regarding weight to be assigned.

               22         Is it really necessary to do that?

               23                MS. GREENE:  Judge, we believe that the other

               24    instruction that Ms. Williamson referenced does generally

    13:27:10   25    state that witnesses -- or all people are all equal under

1    the law.

2        But we do believe that it's important to note,

3    specifically with regard to police officers, that their

4    testimony is not afforded at a greater weight than other

13:27:23  5    witness, because that does manifest itself often in the way

6    people hear accounts given by law enforcement.  And we would

7    just like to ensure that the jury is instructed that that

8    testimony is equal.

9            THE COURT:  Well, I did question the jurors on

13:27:39 10    voir dire about whether they could be fair, impartial, and

11    not give weight to a police officer just because he was a

12    police officer.  And all of the jurors who were selected

13    indicated that they could.

14        I'm going to omit that.  It wasn't given in -- it

13:28:12 15    wasn't given in *Smith*, and you indicate that Judge Polster's

16    standard instructions don't include that with the Court.

17    That's his standard civil instruction.  That doesn't

18    necessarily mean that they're --

19        Or did he give them to you in the context of -- did he

13:28:26 20    say these are the ones that he would give in this case?

21            MS. WILLIAMSON:  He gave them to us in the

22    context of this case.

23            THE COURT:  Well, is this just his general

24    set.

13:28:33 25        I know he has a general set of jury instructions.

1          MS. WILLIAMSON:  It may have been his general

2     set.

3          THE COURT:  All right.  I'm going to not

4     include that.

13:28:45 5          MS. WILLIAMSON:  Thank you, Your Honor.

6          MS. GREENE:  Thank you.

7          THE COURT:  All right.  So let's go on to the

8     issue of wrongful death damages.

9          MS. GREENE:  Survivorship damages.

13:28:53 10          THE COURT:  Survivorship damages, yes.

11          MS. WILLIAMSON:  Yes, Your Honor.

12        As we have argued twice on our Rule 50 motion

13     regarding the no -- essentially, no evidence of conscious

14     pain and suffering, we believe that that should be removed

13:29:04 15     from the instructions.  That would be in the instruction

16     for -- I believe, it's the damages one, generally.  It's in

17     there, and then it's also in the survivorship.

18          THE COURT:  There was a survivorship

19     instruction given in *Smith versus Jones*.

13:29:26 20          MS. GREENE:  Judge, yes, there was.  I

21     think it's--

22          THE COURT:  And I believe that -- I believe

23     that under Ohio law, it is appropriate to -- there doesn't

24     need to be any specific evidence in order for them to

13:29:46 25     consider that.

1        MS. GREENE:  Judge, if I can just briefly

2   respond.

3        Defendant Frazier did testify today that he had

4   previously stated that as he was shooting at Brian Garber,

13:29:59 5   he was not dying, and so he kept shooting.

6        So we do believe that that is in the record and would

7   ask that that provision remain in the instructions.

8        THE COURT:  Can I see the instruction that

9   you've been working off of.

13:30:23 10        MS. GREENE:  I have it in electronic form.

11        DEPUTY CLERK:  Can you put it on the monitor

12   or --

13        MS. GREENE:  Oh, actually, yeah, we probably

14   could.

13:30:32 15        THE COURT:  You can do that.

16        And while you're doing that, I'm going to show you

17   what I had marked up from *Smith*, which is an instruction

18   that I'm comfortable giving, if it makes any sense.

19        Mr. DeVan, you want to give a copy of this to each

13:31:11 20   side.

21        It's -- what was numbered in that case is Number 20 on

22   page 28.  And the markup is mine.

23        MS. GREENE:  So the parties --

24        THE COURT:  This is *Smith versus Jones*, yes.

13:32:05 25        MS. GREENE:  Judge, no.  This is the very

1    instruction --

2                    THE COURT:  This is basically what I came up

3    with.

4                    MS. GREENE:  -- that we've been working on.

13:32:10  5        Okay.

6                    THE COURT:  What you have on the screen.

7        All right.  So I am comfortable with giving that

8    instruction, and I will give that instruction.

9        All right.  So with respect to the credibility,

13:32:33 10  there's going to be no particular reference to law

11   enforcement officers.  And I'm going to give the instruction

12   as it appears on the screen, which is essentially the

13   instruction that I came up with after reviewing *Smith versus*

14   *Jones*.

13:32:53 15                  MR. DOWNEY:  Thank you, Your Honor.

16       And, again, we agree as to form.  Our only objection

17   was with respect to --

18                    THE COURT:  It's an objection to content.

19                    MR. DOWNEY:  Right.

13:33:04 20                  THE COURT:  All right.

21       So do you have a unified document?

22                    MS. GREENE:  Yes, we do, Judge.

23                    THE COURT:  Is it in PDF form.

24                    MS. GREENE:  It's in Word document form.  I

13:33:14 25  can --

1          THE COURT:  Word document form.

2          All right.  You can arrange with Ms. Kassel to get it

3     down to her, and then we'll have that prepared and have a

4     copy for each of you to review before it's given tomorrow at

13:33:27  5     the beginning of court.

6               MS. GREENE:  The one remaining issue, then, is

7     also the verdict form we reviewed while we were working on

8     these, the version from the *Smith v Jones* case.  And I

9     believe -- correct me if I'm wrong, Ms. Williamson -- but

13:33:40  10    that in form and substance we agree.

11         And I think that you probably reserve your exception

12    with the survivorship issue.  But otherwise --

13              THE COURT:  All right.  So there is a verdict

14    form attach to this document.

13:33:52  15              MS. GREENE:  There isn't currently, but we can

16    very quickly type it up.

17              MS. WILLIAMSON:  Yeah.

18              THE COURT:  Okay.  All right.

19              MS. WILLIAMSON:  And we have just -- as

13:33:59  20    Ms. Greene noted, like, the same objection to the inclusion

21    of the language of conscious pain and suffering.

22              THE COURT:  All right.  So once we get it

23    finalized, then you can put that objection --

24              MS. WILLIAMSON:  Sure.

13:34:10  25              THE COURT:  -- on the record, just to make

1      sure that we're on the same page.

2                     MS. WILLIAMSON:  Thank you.

3                     THE COURT:  And I would appreciate it if for

4      tomorrow you would have the exhibits ready to go as have

13:34:21  5      been admitted.

6          And if you want to merely take your list and highlight

7      the ones that are being admitted, your individual lists.

8                     MS. GREENE:  Judge, I believe both parties

9      have already prepared the exhibits for the jury, and

13:34:37 10      inspected each other's --

11                     THE COURT:  Right.  Okay.  So that's good.

12      You've inspected it.  But I'm looking for just -- for

13      purposes of the record, to just have a -- just have a list

14      of exhibits as admitted.

13:34:51 15          And if you merely want to highlight which ones are

16      being admitted on the -- on your exhibit list, that's fine,

17      or you can do a separate one.  It's up to you.  I just want

18      to have that for the record, though.

19                     MS. WILLIAMSON:  Your Honor, just one thing I

13:35:11 20      wanted to note for the exhibits.

21          We did do the transcript for the 911 call.  We were

22      not able to do the transcript for the BCI one.  We watched

23      it, and it was determined that it wasn't identical to the

24      language.  So we have put that on a PDF -- not on a PDF.

13:35:28 25      I'm sorry -- on a flash drive.  We have indicated the start

1    and stop time.

2        And the parties have asked if, in fact, the jury asks

3    for that to played, obviously, they're going to need a

4    laptop to do that.

13:35:41  5            THE COURT:  We'll provide it.

6            MS. WILLIAMSON:  But would the parties be able

7    to be back there so that there could be assurance that they

8    only watch the portion --

9            THE COURT:  That's fine.  We can bring them in

13:35:51 10   the courtroom, and they can watch it here.

11           MS. WILLIAMSON:  Okay.

12           THE COURT:  You know, no comment.  Just they

13   watch it, and that's it.  But only if they request it.

14           MS. WILLIAMSON:  Thank you, Your Honor.

13:35:56 15           THE COURT:  All right.

16       Is that good?

17           MS. GREENE:  Thank you, Your Honor.

18           THE COURT:  All right.  Do we have any other

19   issues to resolve before going in tomorrow?

13:36:02 20       The one thing I did want to ask, and I forgot to bring

21   out my copy, proximate cause has been stipulated, and I

22   don't recall whether that's been included in your

23   stipulation of facts.

24           MS. GREENE:  Judge, I don't believe it was in

13:36:17 25   the version that was submitted prior to the start of the

1      trial.

2                  THE COURT:  All right.  Could we put that in

3      there so that when I read it, I'll have it.  Again, you'll

4      have to agree on it, how you want to word that, but . . .

13:36:32  5          And so I take it there's no -- there's no instruction

6      on proximate cause.

7              If there is, we don't need one, do we?

8                  MS. GREENE:  There is one currently, I guess,

9      with the stipulation.  We actually got to take that out.

13:36:52 10                 THE COURT:  Okay.  Well, you can take a look

11      at what I gave you there.  I incorporated a reference to

12      probable cause in the elements for the Section 1983.

13              Let me find out.  Let me identify the page for you.

14              Yes.  That's on page 20.

13:38:01 15          All right.  So if you could make those changes as

16      appropriate, we'll go over those tomorrow to make sure we're

17      all on the same page.

18              And I'm grateful for your work and for the agreement

19      that you reached.

13:38:16 20                 MR. DOWNEY:  Thank you, Your Honor.

21                  THE COURT:  That moves it along.

22                  MS. GREENE:  Thank you.

23                  THE COURT:  And perhaps will give you a chance

24      tonight -- well, you have closing arguments.  30 minutes.

13:38:27 25      30 minutes a side.

1          MR. GILBERT:  And that's for both.

2          THE COURT:  Yes.  If you reserve time for

3    rebuttal out of the 30.

4          MR. GILBERT:  Thank you.

13:38:35 5          THE COURT:  Okay.  So we should be able to get

6    this case to the jury before noon.  They will be provided

7    lunch, so they'll be able to work through lunch, should they

8    choose to do so.  They won't have to leave the jury room.

9          And hopefully by the end of the day we'll have a

13:38:53 10   verdict, and if not, we'll be back on Monday.

11         Anything for the plaintiff?

12         MR. GILBERT:  Nothing further.

13         THE COURT:  Anything further on behalf of

14   defendant.

13:39:03 15         MR. DOWNEY:  Nothing, Your Honor.

16         Thank you.

17         THE COURT:  There being no further before the

18   Court this afternoon, we are now in recess.

19         DEPUTY CLERK:  All rise.

13:39:57 20                - - -

21         (Proceedings adjourned at 1:39 p.m.)

22

23

24

25

1                              **C E R T I F I C A T E**

2

3          I certify that the foregoing is a correct transcript

4     from the record of proceedings in the above-entitled matter.

5

6     */s/ Donnalee Cotone _____21st of April, 2019*
      DONNALEE COTONE, RMR, CRR, CRC                     DATE
7     Realtime Systems Administrator

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25